1 | Michael Gerard Fletcher (State Bar No. 070849)
    mfletcher@frandzel.com
2 | Reed S. Waddell (State Bar No. 106644)
    rwaddell@frandzel.com
3 | FRANDZEL ROBINS BLOOM & CSATO, L.C.
  | 1000 Wilshire Boulevard, Nineteenth Floor
4 | Los Angeles, California 90017-2427
  | Telephone: (323) 852-1000
5 | Facsimile: (323) 651-2577

6 | Attorneys for creditor ZIONS
  | BANCORPORATION, N.A., dba
7 | California Bank & Trust

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| In re | Case No. 21-50028-SLJ |
| EVANDER FRANK KANE, | Chapter 7 |
| Debtor. | **MOTION BY CREDITOR ZIONS BANCORPORATION, N.A., TO CONVERT CASE TO CHAPTER 11 AND APPOINT CHAPTER 11 TRUSTEE; MEMORANDUM OF POINTS AND AUTHORITIES** |
| | Date: [To be set]<br>Time: [To be set]<br>Place: Courtroom 9<br>San Jose, California<br>(video or phone hearing) |

**TABLE OF CONTENTS**

Page

I. JURISDICTION OVER THIS CORE PROCEEDING ..................................................... 5

II. UNDERLYING FACTS ............................................................................................... 5

    A. Kane is a San Jose Sharks Professional Hockey Player. ............................... 5

    B. Kane Admits Owing Unsecured Creditors Over $18 Million. ....................... 6

    C. Kane Pretends to Have Only $2,038 in Monthly Income. ............................. 6

    D. Kane Intends to Pay Nothing to Unsecured Creditors. .................................. 6

    E. Kane Actually Has Substantial Assets and Financial Prospects. ................... 6

    F. Kane Stands to Earn $29 Million In Salary and Bonuses Through 2025. .... 7

    G. Kane's Inflated Monthly Expenses and Dependents. .................................... 9

    H. Kane is a Chronic Gambler and Spends Profligately. ................................... 9

    I. Timing the Chapter 7 Filing to Inflict Maximum Harm on His Creditors. ... 11

    J. Irregularities in the Kane Loan Pre-Petition. ............................................... 12

III. ARGUMENT ............................................................................................................. 13

    A. Kane's Case Should Be Converted Because He Has the Ability to Pay His Creditors. ....................................................................................................... 13

    B. Once the Case Is Converted, A Trustee Should Be Appointed to Take Control of the Property of the Estate. ............................................................ 15

    C. Cause Exists Under § 1104(a)(1) to Appoint a Trustee. .............................. 16

    D. Appointment of a Trustee is in the Best Interest of the Creditors. .............. 17

    E. The Order Approving This Motion Should Be Immediately Effective. ..... 18

IV. CONCLUSION ......................................................................................................... 19

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*In re Baker*,
    503 B.R. 751 (Bankr. M.D. Fla. 2013) ................................................................................. 15

*In re Corona Care Convalescent Corp.*,
    527 B.R. 379 (Bankr. C.D. Cal. 2015) ................................................................................. 16

*In re Decker*,
    535 B.R. 828 (Bankr. D. Alaska 2015) ................................................................................ 14

*Fukutomi v. U.S. Trustee (In re Bibo, Inc.)*,
    76 F.3d 256 (9th Cir. 1996) ................................................................................................. 16

*In re Gordon*,
    465 B.R. 683 (Bankr. N.D. Ga. 2012) .................................................................................. 14

*Harris v. Viegelahn*,
    575 U.S. 510, 135 S. Ct. 1829 (2015) .................................................................................. 13

*In re LHC, LLC*,
    497 B.R. 281 (Bankr. N.D. Ill. 2013) ................................................................................... 17

*Lowenschuss v. Selnick (In re Lowenschuss)*,
    171 F.3d 673 (9th Cir. 1999) ............................................................................................... 17

*In re NOA, LLC*,
    578 B.R. 534 (Bankr. E.D.N.C. 2017) ................................................................................. 16

*In re Parvin*,
    538 B.R. 96 (Bankr. W.D. Wash. 2015), *aff'd*, 549 B.R. 268 (W.D. Wash.
    2016) .................................................................................................................................... 13

*In re Peterson*,
    524 B.R. 808 (Bankr. S.D. Ind. 2015) .................................................................................. 14

*In re Schlehuber*,
    489 B.R. 570 (B.A.P. 8th Cir. 2013) *aff'd* 558 Fed. Appx. 715 (8th Cir. 2014) ................... 14

*In re Thomas*,
    596 B.R. 350 (Bankr. W.D. Tenn. 2019) ............................................................................. 17

**Federal Statutes**

11 U.S.C. 1104(a)(1) ................................................................................................................. 16

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

11 U.S.C. § 706(b) .................................................................................................. 5, 13, 14, 15

11 U.S.C. § 1104 .................................................................................................................. 5, 15

11 U.S.C. § 1104(a)(1) ........................................................................................................... 16, 17

11 U.S.C. § 1104(a)(2) ........................................................................................................... 16, 17

11 U.S.C. § 1115(a)(2) ................................................................................................................ 13

11 U.S.C. § 1334 ........................................................................................................................... 5

28 U.S.C. § 157(b) ....................................................................................................................... 5

**State Statutes**

California Stats. 2020, § 94 (AB 1885) .................................................................................... 12

**Rules**

Fed. R. Bankr. P. 7062 ............................................................................................................. 18

Fed. R. Civ. P. 62(a) ................................................................................................................. 18

**Constitutional Provisions**

13th Amendment ....................................................................................................................... 14

**Other Authorities**

4 *Norton Bankr. L. & Prac*. 3d § 79:1 .................................................................................... 14

TO: THE HONORABLE STEPHEN L. JOHNSON, UNITED STATES BANKRUPTCY JUDGE.

Zions Bancorporation, N.A., dba California Bank & Trust ("Zions"), is a creditor of debtor Evander Frank Kane ("Kane" or "Debtor"), to whom Kane admits he owes at least $4.25 million (*see Schedules E/F*; Doc. # 1; p. 33 of 73; creditor para. 4.24). Zions hereby seeks to convert this case to one under chapter 11 pursuant to 11 U.S.C. § 706(b) and to appoint a chapter 11 trustee pursuant to 11 U.S.C. § 1104. In support of this motion, Zions states as follows:

## I.  JURISDICTION OVER THIS CORE PROCEEDING

Evander Kane filed his petition under chapter 7 of the Bankruptcy Code commencing this case on January 9, 2021, and an order for relief was entered that day. This Court has jurisdiction to hear and determine this motion proceeding pursuant to 11 U.S.C. § 1334. This motion is a core proceeding pursuant to 28 U.S.C. § 157(b), which this Court may hear and determine and for which this Court has the authority to enter a final order granting the requested relief.

## II.  UNDERLYING FACTS

### A.  Kane is a San Jose Sharks Professional Hockey Player.

Kane is a professional hockey player, who is currently actively playing for the San Jose Sharks professional hockey team of the National Hockey League ("NHL"). The San Jose Sharks started their 2021 season on January 14, 2021, *a mere 5 days* after Kane filed his chapter 7 petition, with a road game win against the Arizona Coyotes in Glendale, Arizona. Kane played and scored for the Sharks.[1]

---

[1] https://www.nhl.com/gamecenter/sjs-vs-ari/2021/01/14/2020020014#,game=2020020014,game_state=final

### B. Kane Admits Owing Unsecured Creditors Over $18 Million.

When Kane filed his chapter 7 petition 5 days earlier, he admitted to having $18,081,019.87 in non-priority, unsecured creditor claims against him (*See* Schedules; Doc. # 1; *Schedules E/F: Creditors Who Have Unsecured Claims*; p. 35 of 73; para. 6i). This $18+ million in unsecured debt is claimed to be primarily business related debt. (*Id.; Voluntary Petition for Individuals Filing for Bankruptcy*; p. 6; paras. 16a and 16b).

### C. Kane Pretends to Have Only $2,038 in Monthly Income.

Kane claims that he has only $2,083 in monthly income from a podcast (*Id.*; *Schedule I: Your Income*; p. 40; para. 10) and otherwise minimal assets not encumbered with primarily real property liens.

### D. Kane Intends to Pay Nothing to Unsecured Creditors.

And, despite having prepared for the new NHL season with the Sharks that he would start in just 5 days' time, Kane stated in his Schedules on January 9 that --- in his estimation under penalty of perjury --- he would pay precisely *nothing* to his unsecured creditors (*Id*. at p. 6; para. 17).[2]

### E. Kane Actually Has Substantial Assets and Financial Prospects.

However, notwithstanding Kane's less-than-candid claims and disclosures, it actually appears that Kane filed the chapter 7 petition specifically to avoid using any of his substantial wealth to pay any of his unsecured creditors. Post-petition, Kane apparently wants to continue his profligate pre-petition spending. He wants to shield from his creditors his considerable, multi-million dollar annual professional sports salary in chapter 7, and to continue living his luxurious life style, with multiple properties here and in Canada, supposedly supporting numerous relatives, all the while gambling huge sums of money, investing in speculative tax shelters, and generally stiffing his creditors.

---

[2] The chapter 7 trustee, however, on January 15, 2021, caused a notice of possible dividend to be filed and served (*See* Doc. # 13), notwithstanding Kane's estimate that his $18+ million in unsecured creditors will get nothing.

In reality, Kane's bankruptcy schedules, statement of financial affairs, and other required filings evidence that Kane holds assets and expenses commensurate with his past NHL salary: *$7 million* in just 2020 alone (*see Statement of Financial Affairs*; Doc. # 1; p. 47 of 73; para. 4), which mirrored his *$7 million* in 2019, a $1 million increase from *$6 million* in 2018 (*Ibid*.).[3]

### F. Kane Stands to Earn $29 Million In Salary and Bonuses Through 2025.

Kane admits to having an executory employment contract with the San Jose Sharks (*see Schedule G: Executory Contracts and Unexpired Leases*; Doc. # 1; p. 36 of 73; para. 2.3). But, he wants to use none of that salary to pay creditors. While he tries to avoid paying his creditors, though, he also wants pretend that his future salary is nothing special. He limits his disclosures to his 2021 salary, which he says will *only* be $3 million and will be subject to further reductions due to a limited league schedule and other adjustments. (*Id*.; *Attachment to Schedule I*; p. 41 of 76).

Yet, contrary to the false picture presented by Kane, the actual Kane-NHL employment agreement, his *Standard Players Contract* ("NHL Contract"), dated as of May 25, 2018, paints a far different scene (Toal Declaration; para. 2; Exhibit 1). Under the NHL Contract, Kane stands to earn substantial amounts in the future, which earning power commenced within days of the petition date.[4] First, Kane is paid during the season twice monthly. The season started on January 14, 2021, 5 days after the filing of the chapter 7 petition. Kane obviously timed it so that his chapter 7 petition was filed just before payments to him recommenced under the NHL Contract. This enabled Kane to attempt to claim that his substantial salary for the 2021 season, and beyond, is not property of this chapter 7 estate.

---

[3] These salary amounts *do not include* his additional, substantial, unaccounted for signing bonuses in each such year, as discussed below.

[4] This is not a motion to dismiss based on section 707(b) alleging "abuse" by Kane, within the meaning of that section, although his attempts to hide his substantial earnings from creditors are clearly wrongful and abusive to creditors. *Kane needs to stay in bankruptcy*. This is a motion to convert this case under section 706(b) to chapter 11, without Kane's consent. His abuses are clear evidence to support granting this motion to convert. The issue here is not whether Kane's debts are or are not consumer debts. This motion accepts at face value, for argument's sake at the moment, Kane's claim that they are business debts.

But, Kane's 2021 $3 million salary for 2021 is not the entire story. Under the NHL Contract, Kane actually is slated to earn a total of *$25 million* in salary from and after the filing of his chapter 7 petition through 2025, not just the "less-than-$3 million" for 2021 that Kane has disclosed in the Schedules. And, there is still more. In addition to the $25 million in salary under the NHL Contract, Kane is also entitled to receive substantial additional signing bonus compensation. According to the San Jose Sharks Addendum "A", Addendum to National Hockey League Standard Player Contract that is attached to the NHL Contract (Toal Decl., Exhibit 1), Kane also is slated to receive 2 additional deferred signing bonus payments post-petition, of $2 million each. Kane gets one such *$2 million* bonus payment on July 1, 2022, and another such *$2 million* bonus payment on July 1, 2024 (*Id*., at p. 13 of PDF, Addendum A).

In summary, Kane gets the following under his NHL Contract (Toal Decl., Exhibit 1, pp. 1 and 13 of PDF):

| Salary Year | Amount |
|---|---|
| 2020/2021 | $3 Million |
| 2021/2022 | $7 Million |
| July 1, 2022 Bonus | $2 Million |
| 2022/2023 | $5 Million |
| 2023/2024 | $6 Million |
| July 1, 2024 Bonus | $2 Million |
| 2024/2025 | $4 Million |
| **Total 2021-2025** | **$29 million** |

Kane also has not accounted for substantial pre-petition assets. Included in what is undisclosed is just what Kane did with his *$7 million* in 2020 salary, or his *$6 million* in 2019 salary, or his *$6 million* in 2018 salary (*Id*., at p. 1 of PDF). Also undisclosed is what Kane did with his separate *$3 million* signing bonus he was scheduled to receive last year, on July 1, 2020; or his *$2 million* signing bonus on July 1, 2019; or his *$3 million* signing bonus on July 1, 2018 (*Id.* at p. 13 of PDF).

Kane is entitled to get $29 million in salary and bonuses under his NHL Contract post-petition. Not, $2,038 per month from a podcast. His anticipated earnings under his NHL Contract are what one would expect concerning a person like Kane who reports expenses in excess of $93,000 for each and every month (*See Schedule J: Your Expenses*; Doc. # 1; p. 43 of 73; para. 22c, "Calculate your monthly expenses"), assuming only for argument's sake that such expenses are appropriate without adjustment.

### G. Kane's Inflated Monthly Expenses and Dependents.

Kane is also being less than candid about his monthly expenses and his dependents. Kane answered "No" when asked in his Amended Schedules "Do your expenses include expenses of people other than yourself and your dependents," who he identified in those Amended Schedules as his non-debtor wife and infant daughter. (*See, Amended Schedule J: Your Expenses*; Doc. # 30; p. 10 of 11; para. 2). But, he nonetheless claims $15,000 of the $93,000+ in monthly expenses for his "father, mother, grandmother, and uncles" (*Id.* at p. 11, para. 19), who he initially tried to claim as his dependents too (*Compare Amended Schedule J; Your Expenses*; Doc. # 30; p. 10 of 11, para. 2, *with Schedule J: Your Expenses*; Doc. # 1; p. 42 of 73, para. 2, adding in a sister for good measure).

And, Kane claims to need $12,000 per month in "Childcare and children's educational expenses" to pay for a 24/7 rotation of day and night nurses for a 6-month old infant, even though his wife does not work outside the home (Warrington Decl., para. 8). Those expenses are on top of an additional $8,000 per month for "Food and housekeeping supplies," plus $8,910.83" per month for luxury vehicle payments, together with $600 for "Vehicle insurance" per month. (*See Amended Schedule J: Your Expenses*; Doc. # 30; p. 11 of 11; paras. 8, 9, 15c, 17a, and 17b).

Apparently, his creditors are expected to support Kane, his wife, his daughter, and all of his relatives for Kane's lavish life style, and theirs as well.

### H. Kane is a Chronic Gambler and Spends Profligately.

Separate and apart from the issues associated with Kane attempting to hide $29 million in assets that could be used to pay his admitted business debts --- and likely pay them in full --- are the open and unanswered questions about his behavior in general.

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

Kane has a serious gambling problem. And he not only misrepresents the facts and shades the truth, he makes other seriously questionable financial decisions. Kane is not someone to be trusted to handle substantial sums of money for any period of time, or to tell the truth about his assets. From the Schedules and Statement of Affairs, it appears that:

- Kane originally claimed under oath that he had transferred no property within the 2 years pre-petition to anyone out of the ordinary course. (*See Statement of Affairs*; Doc. # 1; p. 51 of 73; para. 18).
- Yet, Kane now admits that actually he handed over 2 Rolex watches valued at $75,000 in the aggregate less than 60 days before the petition date as a payment against a gambling debt (*See* Amended Schedules and Statements; Doc. # 29; p. 7 of 10; para. 18). Does someone who is being truthful really not remember forking over his expensive Rolex watches to pay a gambling debt, just before filing a bankruptcy petition? What strong arming led Kane to do this remains unclear.
- And, Kane admits that separately he lost an additional $1.5 million gambling in the Cosmopolitan and MGM casinos and dealing with bookies for sports gambling *during just the last year*, pre-petition, while he was stiffing numerous creditors. (*See Statement of Affairs;* Doc. # 1;., at p. 50-51 of 73; para. 15; Warrington Declaration, para. 4).
- Additionally, Kane testified at his initial 341(a) examination that he borrowed $600,000 to $700,000 from South River Capital, LLC, to pay other gambling debts. (Warrington Decl., *id*. at para. 3).
- Kane dealt with a company literally named Lone Shark Holdings, LLC, supposedly borrowed $2.55 million to speculate on tax attributes (another form of gambling), and purported to grant to it security interests of questionable validity in certain tax refunds (*See* Schedules; Doc. # 1; Schedule D; pp. 20-21; para. 2.3 and 2.4).
- One of Kane's tax gambles happened immediately pre-petition. Kane's $750,000 debt to Lone Shark holdings was incurred in December 2020. (*Id*.) He used that to fund the "tax conservation investment" which appears to be related to his scheduled

membership interests in Ascher Capital II and III his purchased interests in these LLCs "in connection with conservation tax easement acquisition." (*See Schedule A/B: Property*, Doc. # 1; p. 14 of 73; para. 19).

**I.      Timing the Chapter 7 Filing to Inflict Maximum Harm on His Creditors.**

Kane is attempting to use the bankruptcy system to inflict the maximum in harm to his unsecured creditors and hide further assets. Kane admitted in his 341(a) exam that he only purchased his Richland Avenue, San Jose, residence last August 2020, before which time he rented (Warrington Decl., para. 6). Kane purchased the Richland residence through Lions Property, wholly owned by him and his non-debtor spouse (*see Schedule A/B: Property*, Doc. # 1; p. 14 of 73; para. 19), only about 4+ months before filing his petition under chapter 7 on January 9, 2021. The Richland grant deed (Warrington Decl., Exhibit 2) shows that Kane closed the sale on August 21, 2020, and the seller paid $3,333 in documentary transfer tax. In Santa Clara County, for property in San Jose, that equates to a purchase price of $1,010,000.[5] But, Kane put the vested title in the name of an entity, Lions Property, LLC, a Florida LLC that he controls, and not in his personal name. He obviously pulled this stunt to shield the purchase from the numerous creditors going after him just during August 2020 when he bought the house. (*See Statement of Financial Affairs*; Doc. # 1; p. 48; para. 9 "Identify Legal Actions, Repossessions, and Foreclosures"). Note that the seller signed the deed as of March 8, 2020, with the seller's signature notarized on March 10, 2020. The deed was held for nearly 5 months before being recorded.

Then, on the afternoon of January 8, 2021, *just before filing his chapter 7 petition the next day*, Kane as the manager of Lions Property transferred title to the Richland property to himself, personally, such that Lions Property now has no assets (*See Schedule A/B: Property*, Doc. # 1; p. 14 of 73; para. 19). Kane signed a quitclaim deed to himself and his wife before a notary on January 8, 2021. (Warrington Decl., Exhibit 3). This quitclaim stunt also appears from the face of

---

[5] The documentary transfer tax in Santa Clara County for properties in San Jose is $1.65 per $500 of value of the transferred property, which equates to a sale price of $1.01 million. *See* clerkrecorder.sccgov.org/real-estate-recording.

the quitclaim deed to have cost Kane's creditor's $37,169.19 in wasted payments for transfer taxes and fees. *Ibid*.

These residential purchase and vesting machinations were obviously planned to adversely impact Kane's unsecured creditors to the maximum extent possible, while wasting cash on these transfer games. Kane first hid the Richland property from creditors in a shell company. Then, just before filing the chapter 7 petition, Kane grabbed for the equity in the Richland property for himself, claiming in this bankruptcy proceeding a recently significantly enhanced California personal exemption, one that would not have been available to a LLC owning the Richland property on the petition date. These acts may constitute fraudulent transfers made by Lions Property and received by Kane not in good faith, and wrongful transformations of non-exempt assets into exempt assets.

Kane filed the petition just after California's increased homestead exemption took effect. That enhanced personal exemption was signed into law on September 18, 2020 (California Stats. 2020, section 94 (AB 1885)). Kane now claims that newly enhanced homestead for his newly purchased residence based on his transfer of the residence into his personal name just prior to filing the chapter 7 petition. (*See Schedule C: The Property You Claim As Exempt*; Doc. # 1; p. 17 of 73; para. 2; "$600,000.00 C.C.P. § 704.730.").

### J. Irregularities in the Kane Loan Pre-Petition.

Zions believes that there may have been significant irregularities in what Kane provided and what he promised Zions in the making of the original loan. Zions is evaluating whether to file its adversary complaint to have the debt owed to it deemed to be non-dischargeable (Toal Decl., para. 3). Zions is informed that other creditors similarly believe that they are holding materially false pre-petition financial statements. Investigation into Kane's pre-petition behavior is just now beginning, and it is currently unknown what other irregularities might be discovered, triggering other issues for Kane under sections 523 and/or 727.

## III. ARGUMENT

Kane's chapter 7 petition and case should be converted to one under chapter 11 and a trustee should be appointed, without his consent and over any objections that he might raise. In a chapter 11 case, all of Kane's assets should be administered by a chapter 11 trustee who can be trusted; unlike what creditors could expect from Kane. Using his salary and bonuses, Kane ought to be able to pay most, if not all, of his obligations. Kane has shown an inability or unwillingness to maintain his own finances; he misstates and shades the truth; he gambles heavily; and he lacks the confidence of his creditors to handle any of his assets or his substantial NHL salary and bonuses.

### A. Kane's Case Should Be Converted Because He Has the Ability to Pay His Creditors.

In an individual's chapter 7 case, "a Chapter 7 estate does not include the wages a debtor earns or the assets he acquires after the bankruptcy filing. § 541(a)(1)." *Harris v. Viegelahn*, 575 U.S. 510, 135 S. Ct. 1829, 1835 (2015). By contrast, in an individual's chapter 11 case, post-petition earnings from services performed by the debtor post-petition (and before the case is closed, dismissed, or converted) *are* included within property of the estate. 11 U.S.C. § 1115(a)(2). That is the key reason for this motion to convert Kane's pending chapter 7 proceeding to chapter 11.

The Bankruptcy Code allows the court to convert a case under chapter 7 to a case under chapter 11. Section 706(b) states that, "[o]n request of a party in interest and after notice and a hearing, the court may convert a case under this chapter to a case under chapter 11 of this title at any time." 11 U.S.C. § 706(b). The burden is on the movant to show that the case should be converted. *In re Parvin*, 538 B.R. 96, 101 (Bankr. W.D. Wash. 2015), *aff'd*, 549 B.R. 268 (W.D. Wash. 2016) (citing *In re Hardigan*, 490 B.R. 437, 445 (Bankr. S.D. Ga. 2013), *aff'd*, 517 B.R. 379 (S.D. Ga. 2014)).[6]

---

[6] In addition to the right of a party in interest to convert a chapter 7 case to chapter 11 under § 706(b), Bankruptcy Code § 707(b) authorizes conversion as an alternative to dismissal, provided the debtor consents and the Court finds that filing of the original case was an abuse of

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

An individual's pending chapter 7 case may be the subject of an "involuntary" conversion to chapter 11, at least where, as with Kane in this case, the individual's debts are primarily non-consumer debts. *See In re Gordon*, 465 B.R. 683, 692 (Bankr. N.D. Ga. 2012) (holding that Section 706(b) applies to a chapter 7 case of an individual debtor with primarily non-consumer debts). Note that in *Gordon*, the Court overruled a claim that conversion would constitute involuntary servitude or violate the 13th Amendment — a sometimes ruse raised by unhappy and non-consenting debtors in contested conversions of individual cases from chapter 7 to 11. *Id*. at 697-98. There is no such issue here.

On its face, to have a chapter 7 case converted, Section 706(b) only requires that: (i) a party in interest request conversion; and (ii) the Court make a determination after notice and a hearing. *Id*. Section 706(b) contains no standard or burden that the moving party must meet. "The only caveat to conversion from a chapter 7 to a chapter 11 debtor is that the debtor be eligible to be a debtor under chapter 11." *In re Peterson*, 524 B.R. 808, 815 (Bankr. S.D. Ind. 2015).

Because Section 706(b) contains no standards for determining such a request on its face, courts should "consider anything relevant that would further the goals of the Bankruptcy Code." *In re Schlehuber*, 489 B.R. 570, 573 (B.A.P. 8th Cir. 2013) *aff'd* 558 Fed. Appx. 715 (8th Cir. 2014). "The decision of whether to convert a case 'is left to the sound discretion of the court, based on what will most inure to the benefit of all parties in interest.'" *Schlehuber*, 489 B.R. at 573 quoting *In re Willis*, 345 B.R. 647, 654 (B.A.P. 8th Cir. 2006). However, "§ 706(b) does not require a balancing of interest to convert the case." *In re Decker*, 535 B.R. 828, 838 (Bankr. D. Alaska 2015).

"A debtor's ability to pay typically is the starting point in the analysis, however, since the whole reason for asking a case to be converted is the assumption that creditors would receive more in a chapter 11 than a chapter 7." *Peterson*, 524 B.R. at 815.

Kane can pay his creditors from his substantial, multi-million salary and bonus expectations based on his continuing pro-hockey career. Clearly. Not just from chapter 7 trustee

---

chapter 7. *See* 4 *Norton Bankr. L. & Prac*. 3d § 79:1. This is not that motion nor is this that case.

4136239.1 | 031205-0132    14

FRANDZEL ROBINS BLOOM & CSATO, L.C.
1000 WILSHIRE BOULEVARD, NINETEENTH FLOOR
LOS ANGELES, CALIFORNIA 90017-2427
(323) 852-1000

avoiding power actions, that might generate a dividend to the estate. From his substantial earning power post-petition.

The chapter 7 trustee in this matter has already concluded that his administering the chapter 7 estate likely would result in a dividend to creditors. From the Schedules, that would seemingly be based on avoiding power actions. But, because the facts surrounding Kane's actions are still being developed, any of these potential causes of action can be valuable to facilitate a plan of reorganization, including a potential increased recovery for creditors. But, the real driving force for creditor recoveries would be from a chapter 11 plan that brings into its ambit Kane's $29 million in salary and bonus expectations.

If the case converts to chapter 11, Kane may be able to cut deals with his creditors to streamline the administration of the estate, and avoid those issues becoming adversary proceedings, such as the non-dischargeability action Zions is preparing to file. Lastly, there is another potential benefit to Kane if the case is converted to one under chapter 11. Kane and a chapter 11 trustee (if one is appointed) may be able to facilitate a resolution of this case which allows Kane to receive a discharge. The chapter 7 trustee presumably is investigating Kane's losses. If Kane cannot satisfactorily explain his losses, there could be further litigation over Kane's ability to obtain a chapter 7 discharge. Proceeding under chapter 11 could potentially obviate any such creditor or trustee litigation, as creditor damages could be minimized or avoided entirely in chapter 11 as Kane could repay his debts over time under a plan of reorganization. *See In re Baker*, 503 B.R. 751, 758-59 (Bankr. M.D. Fla. 2013).

Conversion of this case to chapter 11 benefits all parties in interest. Together with the fact that Kane has the ability to repay his debts, conversion under Section 706(b) is warranted.

**B. Once the Case Is Converted, A Trustee Should Be Appointed to Take Control of the Property of the Estate.**

If the Court converts this case to one under chapter 11, it should appoint a trustee to oversee the estate.[7]

---

[7] Section 1104 requires the U.S. Trustee to consult with creditors over any such appointment. Zions sees no reasons not to retain the current chapter 7 trustee to administer any

The Bankruptcy Code provides two bases for the appointment of a Chapter 11 trustee. Under 11 U.S.C. § 1104(a)(1), the bankruptcy court must appoint a trustee if a movant, after notice and a hearing, demonstrates "cause." 11 U.S.C. 1104(a)(1) ("[T]he court shall order the appointment of a trustee . . .") (emphasis added).

Section 1104(a)(2) authorizes a bankruptcy court to appoint a chapter 11 trustee, without a showing of cause, "if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor." 11 U.S.C. § 1104(a)(2).

### C. Cause Exists Under § 1104(a)(1) to Appoint a Trustee.

Section 1104(a)(1) provides that the bankruptcy court must appoint a trustee if a movant, after notice and a hearing, demonstrates "cause." 11 U.S.C. § 1104(a)(1) ("[T]he court *shall* order the appointment of a trustee . . .") (emphasis added). Section 1104(a)(1) provides four non-exclusive circumstances constituting "cause" for the appointment of a trustee "including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause . . . ." *Id*.; *see also In re NOA, LLC*, 578 B.R. 534, 540 (Bankr. E.D.N.C. 2017) (providing that section 1104(a)(1)'s list is non-exclusive).

Determinations to appoint a trustee for cause are fact intensive and only require proof by a preponderance of the evidence. *In re Corona Care Convalescent Corp.*, 527 B.R. 379, 382 (Bankr. C.D. Cal. 2015) (citing 7 Resnick and Sommer, Collier on Bankruptcy, ¶ 1112.04[4] at 1112–22 (16th ed. 2014); *In re Woodbrook Assocs.*, 19 F.3d 312, 317 (7th Cir. 1994); *In re Citi–Toledo Partners*, 170 B.R. 602, 606 (Bankr. N.D. Ohio 1994); *Grogan v. Garner*, 498 U.S. 279, 286 (1991)). And, this Court also has the power to order appointment of a chapter 11 trustee *sua sponte*. *Fukutomi v. U.S. Trustee (In re Bibo, Inc.)*, 76 F.3d 256 (9th Cir. 1996).

---

converted chapter 11 estate.

In this case, cause exists to appoint a trustee. Kane simply cannot be trusted to handle large sums of money, or to make good decisions, or to put the interests of the estate and his creditors first. He is just not that guy.

Further, courts have found that "intense, irreconcilable conflicts and acrimony between the debtor and creditors can rise to the level of 'cause.'" *See In re Thomas*, 596 B.R. 350, 361 (Bankr. W.D. Tenn. 2019) (citations omitted). Kane continued to spend lavishly and gamble heavily pre-petition while hiding assets from the creditors going after him. Creditors are not going to suddenly find Kane a wonderful steward of millions of dollars just because the case converts to chapter 11.

For those reasons, cause exists to appoint a trustee if this case is converted to Chapter 11.

### D. Appointment of a Trustee is in the Best Interest of the Creditors.

Section 1104(a)(2) authorizes a bankruptcy court to appoint a chapter 11 trustee, without a showing of cause, "if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor." 11 U.S.C. § 1104(a)(2).

Courts have substantial discretion whether to appoint a trustee under Section 1104(a)(2). *Lowenschuss v. Selnick (In re Lowenschuss)*, 171 F.3d 673, 685 (9th Cir. 1999). The standards under Section 1104(a)(2) are more flexible than those under Section 1104(a)(1). *In re LHC, LLC*, 497 B.R. 281, 293 (Bankr. N.D. Ill. 2013) (citations omitted). "The flexible standards embodied in § 1104(a) are intended to accommodate two goals: (1) facilitation of the debtor's reorganization; and (2) protection of the public interest and of creditors." *Thomas*, 596 B.R. at 362-63.

In determining whether a trustee should be appointed under Section 1104(a)(2), "the factors that have been considered include: (1) the trustworthiness of the debtor; (2) the debtor's past and present performance and prospects for rehabilitation; (3) whether the business community and creditors of the estate have confidence in the debtor; and (4) whether the benefits outweigh the costs." *LHC*, 497 B.R. at 293 (citing *In re Madison Mgmt. Grp., Inc.*, 137 B.R. 275, 282 (Bankr. N.D. Ill. 1992)).

In this case, the appointment of a trustee is in the best interest of creditors because it will facilitate a reorganization; it will protect creditors; and there is no reason to trust Kane to do anything other than to continue to act venally, for his self-aggrandizement.

Kane gambles heavily and makes poor, self-centered financial decisions. He ought not be allowed to continue handling his substantial salary and bonuses, or be allowed to continue gambling and speculating with his income instead of committing it to his creditors.

Creditors likely have no confidence in Kane's ability to administer his estate for their benefit. Zions certainly does not. The story painted in the Schedules and Statement of Affairs is not a pretty one. Kane has frittered away significant amounts of money, in actual gambling at many different venues and in many different ways.

The benefit of appointing a trustee outweighs the cost of appointing one, in part because Kane's creditors lack confidence in him. Although there are costs associated with the appointment of a trustee, those costs are far outweighed by the creditors having confidence in the trustee and that the process will be equitable. Moreover, without the appointment of a trustee, there likely will be significant litigation between the debtor and the creditors, possibly consuming more assets than would otherwise be paid to a trustee.

It is in the best interest of the estate and its creditors that a trustee be appointed if this case is converted to chapter 11.

**E.     The Order Approving This Motion Should Be Immediately Effective.**

Any order granting this motion should become effective immediately. Kane is paid twice a month under his NHL Contract, and all such money should become property of the estate immediately. Also, Kane has proven to be untrustworthy, and this Court has the power to stop him from playing with that salary to the detriment of his creditors. Fed. R. Bankr. P. 7062 (making effective Fed. R. Civ. P. 62(a) providing for a stay "unless the court orders otherwise.").

## IV. CONCLUSION

For the reasons set forth above, the Court should convert this case to one under chapter 11 and appoint a chapter 11 trustee.

DATED: February 25, 2021

Respectfully submitted.

FRANDZEL ROBINS BLOOM & CSATO, L.C.
MICHAEL GERARD FLETCHER
REED S. WADDELL

By: /s/ Michael Gerard Fletcher
MICHAEL GERARD FLETCHER
Attorneys for creditor Zions Bancorporation, N.A.