Stephen D. Finestone (125675)
Jennifer C. Hayes (197252)
Ryan A. Witthans (301432)
FINESTONE HAYES LLP
456 Montgomery Street, Floor 20
San Francisco, CA 94104
Tel.:    (415) 616-0466
Fax:    (415) 398-2820
Email: sfinestone@fhlawllp.com
Email: jhayes@fhlawllp.com
Email: rwitthans@fhlawllp.com

Attorneys for Debtor,
Evander Frank Kane

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| In re<br><br>EVANDER FRANK KANE,<br><br>Debtor. | Case No. 21-50028-SLJ<br>Chapter 7<br><br>**DEBTOR'S OPPOSITION TO MOTION TO CONVERT AND FOR APPOINTMENT OF CHAPTER 11 TRUSTEE[1]**<br><br><u>Hearing:</u><br>Date:   March 30, 2021<br>Time:  11:00 a.m. Pacific Time<br>Place:  Via Zoom videoconference<br><br>*Please check www.canb.uscourts.gov for information regarding the Court's operations due to the COVID-19 pandemic.* |

---

[1] Unless specified otherwise, all chapter and code references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532. "Bankruptcy Rule" references are to the Federal Rules of Bankruptcy Procedure and "B.L.R." references are to the Bankruptcy Local Rules for the Northern District of California. "ECF" references are to the docket in this proceeding.

OPPOSITION TO MOTION TO CONVERT                                                                    i

# **TABLE OF CONTENTS**

I.   INTRODUCTION ...................................................................................................... 1

II.   SUMMARY ........................................................................................................... 1

III.   STATEMENT OF FACTS ..................................................................................... 2

   A.   Background and Events Prior to the Bankruptcy Filing .................................. 2

   B.   Post-Filing Events ........................................................................................... 3

   C.   Kane's Responses to Misstatements or Misunderstandings in the Motion ........... 4

     1.   Kane's Salary ............................................................................................ 4

     2.   Kane's Gambling ...................................................................................... 5

     3.   Tax Investment ......................................................................................... 5

     4.   Prepetition Transfer of Two Watches ...................................................... 6

     5.   The Timing of Kane's Bankruptcy Filing ................................................ 6

     6.   Kane's Prepetition Conduct Related to the Lenders ................................ 7

IV.   THE COURT SHOULD NOT CONVERT THE CASE TO CHAPTER 11 ........... 7

   A.   Legal Standard and Burden of Proof ............................................................... 7

   B.   The Factors Militate Against Conversion to Chapter 11 ................................. 8

     1.   Ability to Pay .......................................................................................... 8

     2.   Period of Time Debts over Which Debts Were Incurred, Efforts to Repay or Negotiate, and Unforeseen Circumstances Precipitating Bankruptcy ................................. 10

     3.   Accuracy of Schedules and Statements and Possibility to Reduce Expenses . 10

     4.   Likelihood of Plan Confirmation and Ground for Dismissal or Reconversion 12

     5.   Whether the Parties in Interest Would Benefit from Conversion .................... 13

V.   IF KANE'S CASE IS CONVERTED, APPOINTMENT OF A CHAPTER 11 TRUSTEE IS INAPPROPRIATE ................................................................................... 14

   A.   Legal Standard and Burden of Proof ............................................................. 14

   B.   No Cause Exists to Appoint a Chapter 11 Trustee ........................................ 14

   C.   Appointment of a Trustee Is Not in the Best Interests of Creditors or the Estate 15

VI.   CONVERSION TO CHAPTER 11 AND APPOINTMENT OF A CHAPTER 11 TRUSTEE WOULD VIOLATE THE THIRTEENTH AMENDMENT'S PROHIBITION ON INVOLUNTARY SERVITUDE ................................................................................... 17

   A.   Conversion to Chapter 11 Would Violate the Thirteenth Amendment .............. 18

   B.   Appointment of a Chapter 11 Trustee Would Also Violate the Thirteenth Amendment ........................................................................................................... 19

VII.   CONCLUSION ................................................................................................... 21

Case: 21-50028   Doc# 65   Filed: 03/18/21   Entered: 03/18/21 20:44:20   Page 2 of 25

# **TABLE OF AUTHORITIES**

**Cases**

*Adams v. Marwil (In re Bayou Group, LLC)*, 564 F.3d 541 (2nd Cir. 2009) .............................. 14

*Bailey v. Alabama*, 219 U.S. 219 (1911)................................................................................... 17

*Breland v. United States (In re Breland)*, No. 19-14321, 2021 U.S. App. LEXIS 6970 (11th Cir. Mar. 10, 2021)........................................................................................................................ 17

*Clyatt v. United States*, 197 U.S. 207 (1905)............................................................................ 17

*Friends of the Earth, Inc. v. Laidlaw Environmental Servs., Inc.*, 528 U.S. 167 (2000)............. 17

*Gebhardt v. Hardigan (In re Hardigan)*, 517 B.R. 379 (S.D. Ga. 2014) ..................................... 8

*Gill v. Stern (In re Stern)*, 345 F.3d 1036 (9th Cir. 2003) ........................................................... 7

*In re Basil St. Partners, LLC*, 477 B.R. 856 (Bankr. M.D. Fla. 2012) ........................................ 16

*In re Brophy*, 49 B.R. 483 (Bankr. D. Haw. 1985) .................................................................... 18

*In re Clemente*, 409 B.R. 288 (Bankr. D.N.J. 2009).................................................................. 20

*In re Decker*, 535 B.R. 828 (Bankr. D. Alaska 2015).................................................................. 8

*In re Gordon*, 465 B.R. 683 (Bankr. N.D. Ga. 2012) ............................................................ 8, 13

*In re Graham*, 21 B.R. 235 (Bankr. N.D. Iowa 1982) .......................................................... 18, 19

*In re Hardigan*, 490 B.R. 437 (Bankr. S.D. Ga. 2013) ............................................................ 8, 9

*In re Klein*, 79 B.R. 769 (N.D. Ill. 1987) .................................................................................. 16

*In re Lobera*, 454 B.R. 824 (Bankr. D.N.M. 2011) ....................................................... 8, 18, 19

*In re Nautilus of N.M., Inc.*, 83 B.R. 784 (Bankr. D.N.M. 1988) ............................................... 14

*In re Sharon Steel Corp.*, 86 B.R. 455 (Bankr. W.D. Pa. 1988) ................................................ 16

*In re Snyder*, 509 B.R. 945 (Bankr. D.N.M. 2014) ....................................................... 8, 18, 19

*In re Thomas*, 596 B.R. 350 (Bankr. W.D. Tenn. 2019).......................................................... 15

*In re Tomlinson Interests, Inc.*, 128 B.R. 181 (Bankr. S.D. Tex. 1991) ..................................... 16

*In re Velde*, No. 18-11651-A-11, 2018 Bankr. LEXIS 2810 (Bankr. E.D. Cal. Sep. 12, 2018)... 14

*Official Comm. of Asbestos Claimants v. G-I Holdings, Inc. (In re G-I Holdings, Inc.)*, 385 F.3d 313 (3rd Cir. 2004)..................................................................................................................... 14

*Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548 (3d Cir. 2003)......................................................................................... 14

*Prologo v. Flagstar Bank, FSB (In re Prologo)*, 471 B.R. 115 (D. Md. 2012) ........................... 14

*Schuster v. Dragone*, 266 B.R. 268 (D. Conn. 2001) ............................................................. 16

*Toibb v. Radloff*, 501 U.S. 157 (1991) .............................................................................. 18, 19

**Statutes**

11 U.S.C. § 1104 ................................................................................................................ 14, 15

11 U.S.C. § 1112 ................................................................................................ 13, 17, 19, 20

11 U.S.C. § 1115 .................................................................................................... 12, 17, 20

11 U.S.C. § 1307 ...................................................................................................................... 19

11 U.S.C. § 327 ........................................................................................................................ 19

11 U.S.C. § 341 .......................................................................................................................... 4

11 U.S.C. § 363 ........................................................................................................................ 19

11 U.S.C. § 364 ........................................................................................................................ 19

11 U.S.C. § 365 ........................................................................................................................ 19

11 U.S.C. § 521 .......................................................................................................................... 4

11 U.S.C. § 523 ................................................................................................... 1, 7, 12, 16

11 U.S.C. § 706 .................................................................................................................. passim

11 U.S.C. § 707 ........................................................................................................................ 8, 9

11 U.S.C. § 727 ...................................................................................................................... 1, 7

Case: 21-50028   Doc# 65   Filed: 03/18/21   Entered: 03/18/21 20:44:20   Page 3 of 25

**Other Authorities**

6 Collier on Bankruptcy, ¶ 706.03 (Alan N. Resnick & Henry J. Sommer, eds., 16th ed.).......... 18

H.R. Rep. No. 595, 95th Cong., 1st Sess. 120 (1977)................................................................. 18

H.R. Rep. No. 595, 95th Cong., 1st Sess. 380 (1977).................................................................. 8

S. Rep. No. 989, 95th Cong., 2nd Sess. 94 (1978)...................................................................... 8

**Constitutional Provisions**

U.S. Constitution Amend. XIII ....................................................................... 1, 17, 20

Evander F. Kane ("Kane"), the debtor in this bankruptcy case, submits the following opposition to the *Motion by Creditor Zions Bancorporation, N.A., to Convert Case to Chapter 11 and Appoint Chapter 11 Trustee* (the "Motion"), ECF 33, as joined by other creditors, ECF 41, 48, 57, 63.

## I. INTRODUCTION

Having driven Kane into bankruptcy, his creditors, led by Zions Bancorporation ("Zions") now seek to convert his case into a Chapter 11 so that, under the control of a Chapter 11 trustee, Kane can be forced to work for them for the foreseeable future. The perception that creditors would do better in Chapter 11 is not a basis for conversion. Kane opposes the Motion and urges the Court to deny it.

## II. SUMMARY

The Motion is heavy on snark and innuendo but does not satisfy Zions' burden to demonstrate that conversion is called for in this case. After wading through the personal attacks on Kane, the entire argument boils down to the fact that Zions and the joining creditors will recover more if the case is converted. Even if true (and there are doubts about that proposition), conversion is not appropriate.

Kane is within his rights to seek a Chapter 7 discharge. He has cooperated extensively with the Chapter 7 trustee, Fred Hjelmeset (the "Trustee"), and the Office of the U.S. Trustee ("UST"). He has already reached an agreement with the Trustee which will result in the recovery of $255,000 by the bankruptcy estate and has made the initial payment of $55,000 toward that settlement. If individual creditors believe they have a basis to challenge his discharge under §§ 523 or 727, they are free to bring such challenges. In fact, Kane has stipulated to extensions of time for creditors and the UST to do so.

Forcing an individual debtor into a Chapter 11, particularly with the appointment of a Chapter 11 trustee, is a drastic remedy and is not warranted in this case. While the Motion makes reference to the Thirteenth Amendment issues as a "ruse," the constitutional issues are real and problematic, as discussed below. Kane now turns to the factual and legal arguments from the Motion.

OPPOSITION TO MOTION TO CONVERT      1

# III. STATEMENT OF FACTS[2]

## A. Background and Events Prior to the Bankruptcy Filing

Kane is 29 years old. He is a professional hockey player who started playing professional hockey at the age of 18. He is currently under contract with the San Jose Sharks (the "Sharks") and has played for the club since 2018. Kane lives in San Jose, California, with his wife and their nine-month-old daughter.

Through the "guidance" of an agent/broker, Sure Sports LLC ("Sure Sports") and its principal Leon McKenzie ("McKenzie"), Kane entered into numerous loans. The primary loans for purposes of this case and the Motion were with Zions for $4.25 million, Centennial Bank ("Centennial") for $8 million, Professional Bank ("Professional") for $1.5 million, South River Capital ("South River") for $600,000,[3] and Lone Shark Holdings, LLC ("Lone Shark") for $750,000. Zions, Centennial, Professional, South River, and Lone Shark are referred to collectively as the "Lenders."

Kane paid sizeable fees to Sure Sports to arrange the loans. For example, on the Zions loan, Kane paid Sure Sports fees of approximately $67,000. Unbeknownst to Kane at the time, the Lenders were also paying Sure Sports fees for directing Kane to them for loans. Kane also learned that after he went into default on the loans, Sure Sports was providing the Lenders with recommendations on attorneys to use in California and litigation strategy, including the garnishing of Kane's salary. Sure Sports' conduct forms the basis of Kane's crossclaim against them in litigation pending in Miami, Florida.

The loans are similar to one another and a portion of Zions' loan documents is attached to the Kane Declaration. The loans generally included a Business Loan Agreement, promissory notes, and additional documents seeking to securitize the loan against Kane's future wages. The

---

[2] The facts are based on the accompanying declarations of Evander Kane and John Fiero and the documents attached thereto.

[3] South River filed a claim for $1,101,429.87 based upon a "Confessed Judgment" which it obtained in Baltimore County, Maryland. The confessed judgment includes interest, attorneys' fees, and $381,404.70 for what is identified as "Other fee." Claim 4 Part 5 at 2 (overall, page 33 of 36). Even if the confessed judgment were otherwise enforceable here, the "Other fee" is an unenforceable penalty.

OPPOSITION TO MOTION TO CONVERT 2

loan documents did not include any of the customary consumer disclosures and protections. While Zions acknowledges, as it must, that for purposes of its Motion Kane's debts are business debts, given its own loan documents, Kane is at a loss as to how Zions could argue in good faith that Kane's debts are consumer. *Cf.* Motion at 7, n.4.

Kane eventually defaulted on his loans with the Lenders and in October 2019 he retained John Fiero of Pachulski Stang Ziehl & Jones to restructure his debt. As set forth in Mr. Fiero's declaration, Mr. Fiero brought in Ben Cary, a Certified Insolvency and Restructuring Advisor, to support the restructuring efforts. Mr. Fiero concluded that the Lenders' assertion of a security interest in Kane's future salary was ineffective and contrary to the Uniform Commercial Code and so advised the Lenders. Mr. Fiero spent many months and more than 100 hours of attorney time seeking to reach a resolution with the Lenders. The efforts were for naught and the Lenders filed suits against Kane in Santa Clara County and Maryland. Centennial eventually dismissed its Santa Clara lawsuit, but then immediately sued Kane and the Sharks in District Court in Miami, Florida. Faced with multi-front litigation and far more debt than he could conceivably manage, Kane filed the instant bankruptcy case on January 9, 2021.

B. <u>Post-Filing Events</u>

The Trustee was appointed as Chapter 7 trustee, and he retained legal counsel (Gregg Kleiner) and an accountant (Richard Pierotti). Kane has cooperated fully in responding to numerous requests for information from the Trustee as well as the UST. Among other things, he provided (1) statements for all bank accounts going back to January 2020, (2) credit card statements, (3) prior years' federal and state tax returns, (4) mortgage statements, (5) insurance information, (6) information regarding various business entities and business ventures, (7) a breakdown of the use of loan proceeds, (8) an explanation of transactions reflected in bank statements and credit card statements, (8) lease agreements, (9) loan agreements, and (10) various other miscellaneous documents reflecting his debts and financial history.

Kane also provided access to his home in San Jose and real property in Vancouver, British Columbia, to realtors selected by the Trustee to opine as to the current value of the real property assets. Kane accepted the valuations provided by the Trustee's realtors in reaching the

settlement with the Trustee regarding the real estate and funds on account. *See* ECF 42. The Trustee filed a motion seeking approval of that settlement and Kane made the first installment payment of $55,000 to the Trustee consistent with the terms of the settlement.

Kane appeared for his initial § 341 meeting of creditors, which lasted approximately 2.5 hours, and appeared for a continued meeting on February 25, 2021. The continued meeting lasted approximately 30 minutes, after which time the Trustee concluded the meeting. Kane continued providing documentation to the Trustee and UST as requested after the § 341 meetings. Kane also stipulated with the UST and various creditors to extend the deadlines for filing complaints to determine dischargeability or object to discharge.

In short, and contrary the erroneous depiction in the Motion, Kane has been a responsible Chapter 7 debtor and has fulfilled his duties under § 521 in what is, without question, a complicated and unusual case.

C. <u>Kane's Responses to Misstatements or Misunderstandings in the Motion</u>

The Motion contains many errors or mischaracterizations, and Kane responds to them below before addressing the legal arguments at issue.

*1. Kane's Salary*

It would be foolish for Kane to suggest his salary for playing hockey is not significant, and not to acknowledge that it is far higher than the typical Chapter 7 debtor. His current and future salary is far lower, however, than the gaudy figures in the Motion. First, contrary to the Motion's suggestion that Kane misrepresented his salary in Schedule I, he provided a detailed description of the anticipated changes to his monthly income and the potential variations to the income. Kane would hazard a guess that the creditors cannot point to a Schedule I in another case that includes as much detail as Kane's.

Second, The Motion ignores that under the current Collective Bargaining Agreement ("CBA") between the NHL owners and the Players' Association, significant sums are withdrawn from players' paychecks. To begin with, an amount is withheld as an "Escrow." This amount is related to revenue sharing between the owners and players. If the league does not hit certain revenue targets for a season, the escrowed funds go back to the owners. For the year 2020–2021,

the escrowed amount is 20% of payroll, which amount is withheld from paychecks. Due primarily to the COVID-19 pandemic, which limited the numbers of games played and has prevented fan attendance, the league did not hit its revenue targets in the 2019–2020 season and will not hit them for the 2020–2021 season. Thus, Kane will not ever see any of the escrowed funds. In addition to the Escrow amounts, pursuant to an amendment to the CBA signed shortly before the beginning of the current season, an additional amount of salary is withheld as deferred compensation (the "Deferral"). The Deferral withholding is 10% and is to be paid to the players in three equal installments (without interest) in October 2022, 2023, and 2024.

The Escrow and Deferral deductions have a significant effect on Kane's pay. By way of example, he received his first paycheck for the current season at the end of January 2021. His gross earnings for the pay period were $213,905. After Escrow, Deferral, typical payroll deductions such as state and federal income taxes, and other incidental deductions, Kane's net pay was $38,709. Finally, a player's salary is based upon games played, rather than a simple dividing up of an annual salary into semi-monthly paychecks. The Sharks have played 26 games this season but thus far have had three games postponed due to COVID-19 protocols. The players will not get paid for those games unless and until they are made up in the future. So, while Kane's salary is significant, it is not anything like that described in the Motion and is subject to significant uncertainty.

### 2. Kane's Gambling

The Motion states that Kane has a "serious gambling problem" and then launches from that into a conclusion that he cannot be trusted to handle substantial sums of money. Kane has not denied or hidden his past gambling, which is listed in his Statement of Financial Affairs ("SOFA"). Gambling has been an issue in Kane's past and has had a negative effect on his life, financially and otherwise. Kane has undergone, and continues to receive, personal therapy to deal with gambling and other matters, hoping to put the issue squarely in his past.

### 3. Tax Investment

The Motion criticizes Kane's purchase of a tax related investment. The issue is not relevant to the question of conversion but is more of Zions' personal attack on Kane. In any

OPPOSITION TO MOTION TO CONVERT 5

event, the Motion gets things wrong with respect to the investment. The Motion claims Kane borrowed $2.55 million for a "gamble." This is incorrect, and as pointed out in Lone Shark's joinder, "[a]n investment in tax credits can hardly be characterized as gambling." ECF 63. Kane borrowed $750,000 to invest in the structure pursuant to various private placement memoranda. He was only required to pay an initial fee of $35,000 in connection with the investment, which he was advised should result in a tax refund of approximately $1.8 million. Kane made this investment at the time as a way to raise funds to pay back creditors and has provided all the documents related to this investment to the Trustee and UST. If the investment pays off, the funds (beyond the loan amount) would go to the Trustee.

### 4. Prepetition Transfer of Two Watches

In another caustic attack on Kane's truthfulness, Zions brings up Kane's amendments to his SOFA to include his transfer of two watches. Kane diligently filed and has amended his Schedules and SOFA. Kane did not have a CPA or financial advisor assist in the preparation of his bankruptcy filings. With respect to the watches, at the Meeting of Creditors Kane was asked numerous questions about items in his bank statements, which he had provided to the Trustee and UST. Often the entry in question involved payments to various creditors. The questions triggered his memory about repaying debt with the transfer of the watches and that was something he added to the amended SOFA. No one asked about any Rolex watches or whether Kane had ever paid a creditor via transfer of property. Far from being evidence of nefarious conduct, the amendments demonstrate Kane's ongoing efforts to comply with his obligations under the Bankruptcy Code.

### 5. The Timing of Kane's Bankruptcy Filing

Zions is critical of the timing of Kane's bankruptcy filing. Apparently, Zions believes Kane should have filed (if at all) at a time more advantageous to Zions and Kane's other creditors. Zions is offended that Kane's filing came after the change to California's homestead exemption. Zions also complains that the LLC owned by Kane and his wife transferred title to their residence (the "San Jose Property") into their individual names. Zions goes so far to claim

that the LLC ("Lions Properties") may have made a fraudulent transfer to Kane, though it fails to explain how that could be as the LLC had no creditors.

Kane provided the Trustee and UST with all documents related to the purchase of the San Jose Property and the debt against it. Lions Properties was the initial purchaser of the San Jose Property. Kane provided the Trustee and UST with documents concerning the formation and ownership of Lions Properties. Kane also provided the Trustee's realtor physical access to the San Jose Property during the pandemic, despite the fact that he lives there with his wife and their young daughter. The Trustee has assessed the value of the San Jose Property, which was not that far off from the value Kane placed on the Bankruptcy Schedules, and that value forms the basis of Kane's settlement with the Trustee. To the extent Zions is complaining about Kane's exemption or bankruptcy planning, Ninth Circuit law is clear that bankruptcy planning, including the transfer of nonexempt property into exempt property is allowed. *See Gill v. Stern (In re Stern)*, 345 F.3d 1036, 1043–1044 (9th Cir. 2003)[4].

### 6. Kane's Prepetition Conduct Related to the Lenders

Zions intimates that there "may have been significant irregularities" regarding the financial information Kane submitted in connection with the Zions loan. Motion at 12. As the assertion is not specific, Kane cannot respond to it, but he denies having engaged in any misrepresentation. Zions also claims that the other Lenders may have similar claims, and some of them, such as South River in its Joinder to the Motion, ECF 48, have said as much. Kane stipulated with the Lenders (and the UST) to extend the time for them to bring various challenges to his Chapter 7 discharge. The likelihood of the Lenders bringing §§ 523 or 727 claims in a Chapter 11 is a matter the Court should consider as well and is discussed below.

## IV.   THE COURT SHOULD NOT CONVERT THE CASE TO CHAPTER 11

A. <u>Legal Standard and Burden of Proof</u>

Section 706(b) states, "On request of a party in interest and after notice and a hearing, the court may convert a case under this chapter to a case under chapter 11 of this title at any time."

---

[4] While making this point and citing *Stern*, Kane does not concede that the San Jose Property was not exempt prior to the transfer.

OPPOSITION TO MOTION TO CONVERT                                                      7

§ 706(b). The burden is on the moving party to show that the case should be converted from Chapter 7 to Chapter 11. *In re Decker*, 535 B.R. 828 (Bankr. D. Alaska 2015).

Unlike dismissal or conversion under § 707(a)–(b), conversion under § 706(b) is not conditioned on any specific factors or limited to any subset of debtors. *Decker*, 535 B.R. at 834–35. Rather, the decision whether to convert is left in the sound discretion of the court and should be based on what will most inure to the benefit of all parties in interest. *Id.* at 837; H.R. Rep. No. 595, 95th Cong., 1st Sess. 380 (1977); S. Rep. No. 989, 95th Cong., 2nd Sess. 94 (1978). Courts have applied a variety of factors in determining whether § 706(b) conversion would be appropriate, including (1) the debtor's ability to repay his debts (i.e., from a stable source of future income); (2) the period of time over which the debts were incurred; (3) whether the debtor has made any efforts to repay his debts or negotiate with creditors; (4) whether the bankruptcy filing was precipitated by an unforeseen or sudden calamity; (5) whether the debtor's schedules and statement of current and income reasonably and accurately reflect the debtor's true financial condition, and whether the debtor's expenses could be significantly reduced without depriving the debtor and his dependents of necessities; (6) the likelihood of confirmation of a Chapter 11 plan and whether there exist grounds for immediate dismissal or reconversion; and (7) whether the parties in interest would benefit from conversion. *See, e.g., Gebhardt v. Hardigan (In re Hardigan)*, 517 B.R. 379, 383–84 (S.D. Ga. 2014) (collecting cases); *In re Hardigan*, 490 B.R. 437, 447 (Bankr. S.D. Ga. 2013) (same); *In re Gordon*, 465 B.R. 683, 692–93 (Bankr. N.D. Ga. 2012).

B. The Factors Militate Against Conversion to Chapter 11

   1. *Ability to Pay*

While a debtor's ability to pay creditors is an important factor, it alone does not justify conversion under § 706(b). *See, e.g., Hardigan*, 490 B.R. at 448–451; *In re Snyder*, 509 B.R. 945 (Bankr. D.N.M. 2014) (denying motion to convert case of high-earning doctor who had legitimate reasons for declaring bankruptcy); *In re Lobera*, 454 B.R. 824 (Bankr. D.N.M. 2011)

OPPOSITION TO MOTION TO CONVERT                                        8

(denying conversion despite a debtor's clear ability to pay, absent other factors).[5] As noted in *Hardigan*, consideration of ability to pay is so subjective and value based as to risk lack of equal and uniform treatment of debtors. 490 B.R. at 450.

The Lenders' primary argument is that the Debtor's salary may be as high as $29 million spread out over the next several years. However, as pointed out above, the Lenders overlook various deductions from, and uncertainties about, this figure. Kane's salary is currently reduced 30% by Escrow and Deferral amounts that are outside of Kane's control. The salary is also based upon games played, which is also outside of Kane's control, and is further reduced by various state tax, federal tax, and other incidental deductions. With these deductions and adjustments, Kane's recent gross pay of over $213,905 was reduced by approximately 82% to $38,709. It follows that Kane can expect to actually receive far less than the $29 million figure touted by Zions in its Motion and the Lenders in their joinders.

As admitted by the Motion, the Trustee has concluded that this Chapter 7 case will likely result in a distribution to creditors. Motion at 15; ECF 13 (*Notice of Possible Dividend*). Kane has already entered into a settlement agreement with the Trustee to bring $255,000 into the bankruptcy estate and has already made the initial $55,000 payment. The Motion suggests that other amounts may come into the bankruptcy estate, through collection of tax refunds, avoidance actions, or otherwise. However, none of the Lenders have attempted to estimate, in any meaningful way, what the Chapter 7 dividend may be or what they would receive, if anything, in a hypothetical Chapter 11 case. While holding back from speculation as to those amounts, Kane notes that the Lenders have not carried their burden to show that a hypothetical Chapter 11 distribution would be significantly greater than the expected distribution under Chapter 7.

For these reasons, the Motion fails to establish that Kane has an ability to repay a meaningful amount of his debts in Chapter 11, as opposed to Chapter 7. Furthermore, even if the

---

[5] Note that, in these cases, the discussion regarding ability to pay appears in discussion of § 707 dismissal or conversion, and that discussion is incorporated into consideration of § 706(b) conversion because it was predicated on the same evidence.

Court were inclined to determine that Kane does have an ability to repay more than creditors will receive in a Chapter 7, that factor alone does not justify conversion.[6]

### 2. Period of Time Debts over Which Debts Were Incurred, Efforts to Repay or Negotiate, and Unforeseen Circumstances Precipitating Bankruptcy

The next factors are a consideration of the period of time over which the debts were incurred, whether the debtor has made any efforts to repay his debts or negotiate with creditors, and whether the bankruptcy filing was precipitated by an unforeseen or sudden calamity.

This is not the case where the debtor took out exorbitant loans only to declare bankruptcy shortly thereafter. Rather, Kane's debts increased steadily over the course of a few years, and he diligently attempted to repay them before defaulting in October 2019. After defaulting, Kane hired professionals in an attempt restructure the debts. At this point, Kane discovered that the Lenders had attempted to take invalid security interests in his future income and also that Sure Sports had benefited from both sides of the deal, receiving payments from lenders in exchange for their directing Kane to those lenders. Ultimately and unfortunately, the restructuring discussions unraveled, and certain creditors initiated multiple lawsuits. Furthermore, the COVID-19 pandemic caused the cancellation of several games, resulting in a sharp and unexpected decrease in Kane's income that has not yet resolved.

This bankruptcy is not an attempt to "game the system," or even worse, to "inflict the maximum in harm to his unsecured creditors and hide further assets." Motion at 11. Kane worked honestly to repay his debts, and his inability to do so resulted from a confluence of unfortunate factors, some of which were outside of his control. Facing overwhelming multi-front litigation and a severely diminished income, Kane was left with no choice but to declare bankruptcy. For these reasons, these factors favor denial of the Motion.

### 3. Accuracy of Schedules and Statements and Possibility to Reduce Expenses

The next factors are whether the debtor's schedules and statement of current and income reasonably and accurately reflect the debtor's true financial condition, and whether the debtor's

---

[6] If any of the Lenders were successful in their assertion of a security interest in Kane's salary, that would significantly curtail any creditor recovery in a Chapter 11.

expenses could be significantly reduced without depriving the debtor and his dependents of necessities.

The Motion paints Kane as a dishonest and deceitful individual who "misrepresents the facts and shades the truth." Motion at 10. This personal attack is unfounded. The Motion claims that Kane was not being truthful by omitting the transfer of two Rolex watches in payment of debt in his Schedules. Motion at 10. Kane's Schedules are detailed and complicated, and Kane has amended the documents several times to ensure their accuracy and completeness. Despite Zions' allegations of dishonesty, Kane's amendment to show the transfer of the watches demonstrates his honesty—only an honest debtor would voluntarily undertake to amend the Schedules to include such a transfer. The Motion also claims that Kane attempts to hide payments to dependents. Motion at 9. However, Kane disclosed all such payments in his amended Schedules. ECF 30 at 11. Despite Zions' allegations against Kane's character, which are baseless and untrue, Kane's Schedules, SOFA, filings, and statements accurately reflect his true financial condition.

The Motion also complains that Kane's monthly expenses are excessive, including (1) $15,000 to dependent family members; (2) $12,000 for childcare and medical-related expenses; (3) $8,000 for food and housekeeping supplies; (4) $8,910.83 for vehicle payments; and (5) $600 for vehicle insurance. Kane concedes that these expenses are higher than most other debtors. However, Kane works hard to support his family, and the expenses are reasonably necessary to do so. And even if a portion of these expenses were determined to be unnecessary, which itself would be an unreasonable outcome, the amount saved pales in comparison to the tens of millions of dollars in total claims in this case and would not meaningfully effect Kane's ability to pay or creditor recovery.

Despite the Lenders' personal attacks, Kane's disclosures have been honest, accurate, and complete, and his expenses are reasonable given the circumstances. These factors weigh in favor of denying the Motion.

*4. Likelihood of Plan Confirmation and Ground for Dismissal or Reconversion*

As to the likelihood of plan confirmation, the Lenders have created major impediments to Kane obtaining a timely fresh start if he is forced into a Chapter 11 case.[7] The Lenders assert security interests in Kane's future income and also suggest that they intend to bring various claims for nondischargeability or denial of discharge. Upon conversion will they fight over which creditor has priority to the alleged collateral (i.e., Kane's salary).

The threat of dischargeability litigation in the context of a Chapter 11 is particularly troubling and is no doubt a reason the Lenders are advancing this Motion. Kane could be facing multiple dischargeability cases with no ability to defend himself. His salary would be property of a Chapter 11 estate pursuant to § 1115 and unavailable to pay counsel to defend the adversary proceedings. Moreover, what would be the outcome if a Lender prevailed on a § 523 claim? How could Kane (or a trustee) confirm a plan that sought to use postpetition wages for a plan when a portion of the wages were subject to garnishment by a creditor with a nondischargeable claim. Moreover, as discussed below, a plan proposed by a Chapter 11 trustee would raise constitutional issues. These issues may take months or years to resolve.

In the meantime, creditors that wished to pursue nondischargeability or denial of discharge would have little incentive to support a Chapter 11 plan that would contemplate partial payments over five years. Furthermore, the other unsecured creditors would have no incentive to support a plan under which the Lenders are paid more than they are. This makes confirmation of a Chapter 11 plan dubious in the short run, and if the Lenders' claims are not dischargeable, then Kane is at the disadvantage of not being able to address the entirety of those claims until after the completion of a Chapter 11 plan.

By contrast, if this case continues in Chapter 7, unsecured creditors will receive a pro rata distribution in a much shorter time span. Kane may also immediately address the Lenders'

---

[7] The Motion argues that if the Court converts the case, Kane and the Lenders may "cut deals" to resolve all the problematic issues presented in a Chapter 11. Motion at 15. In other words, a conversion order is just a negotiating cudgel the Lenders would like the Court to hand them. This is not a basis for conversion. Nor, based on the Lenders prepetition conduct, is resolution likely to occur.

OPPOSITION TO MOTION TO CONVERT                                    12

claims regarding nondischargeability and validity of the security interests in future income. Kane could defend himself and would at least have some ability to deal with any claims should they be held to be nondischargeable. For these reasons, this factor weighs in favor of denying the Motion.

Courts often review the factors identified in § 1112(b) on a motion to convert, because if cause exists to reconvert from Chapter 11 under § 1112(b), then conversion from Chapter 7 under § 706(b) would be a futile and wasted act. *Gordon*, 465 B.R. at 692. While Kane vigorously disputes the factual allegations in the Motion, he notes that, if the allegations are taken as true and used to support conversion to Chapter 11, those same allegations could support immediate dismissal or reconversion to Chapter 7. For example, the Motion's factual allegations could be used to allege "cause" to reconvert to Chapter 7 under § 1112(b)(4)(A) (substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation), § 1112(b)(4)(B) (gross mismanagement of the estate), and § 1112(b)(4)(E)–(H) (various failures to comply with court orders and provide adequate information). This factor weighs in favor of denying the Motion.

### 5. Whether the Parties in Interest Would Benefit from Conversion

Obviously, the Lenders believe that conversion to Chapter 11 would increase their returns over that which they would receive in Chapter 7 by capturing Kane's postpetition personal service income, though Kane believes the Lenders have an overinflated idea of how much the income actually is. However, conversion to Chapter 11 would not further the interests of the Debtor or those that depend on him for support. If the Court were to convert the case to Chapter 11, Kane would be unable to reconvert to Chapter 7. § 1112(a)(3). He would be trapped in a Chapter 11 case that he does not need and does not want.[8] This is not the fresh start that Congress envisioned when it crafted the Bankruptcy Code.

---

[8] This is not the case where the debtor is a business to reorganize; this is the case of an individual that derives his income from providing personal services. Putting him in Chapter 11 would be to force him to work for his creditors against his will.

# V. IF KANE'S CASE IS CONVERTED, APPOINTMENT OF A CHAPTER 11 TRUSTEE IS INAPPROPRIATE

## A. Legal Standard and Burden of Proof

While Kane contends that this case should not be converted to Chapter 11, were the Court to disagree, it then must reach the issue of whether to appoint a Chapter 11 trustee. The appointment of a Chapter 11 Trustee is an "exceptional remedy that should not be made lightly." *In re Nautilus of N.M., Inc.*, 83 B.R. 784, 788 (Bankr. D.N.M. 1988). Because "appointing a Trustee is an 'extraordinary' remedy . . . there is a corresponding 'strong presumption' that the debtor should be permitted to remain in possession." *Prologo v. Flagstar Bank, FSB (In re Prologo)*, 471 B.R. 115, 124 (D. Md. 2012) (citing *Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 577 (3d Cir. 2003)). A Trustee shall be appointed upon a finding either of cause, or a finding that appointment is in the best interest of creditors. § 1104(a)(1)–(2). Cause may include, but is not limited to, "fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case." § 1104(a)(1).

Though some courts employ a preponderance of evidence standard when evaluating a motion to appoint a Chapter 11 Trustee pursuant to § 1104(a)(1), the standard of proof is unsettled in the Ninth Circuit, leading some bankruptcy courts to employ a clear and convincing standard of proof due to the gravity of a Trustee appointment. *In re Velde*, No. 18-11651-A-11, 2018 Bankr. LEXIS 2810, at *4 (Bankr. E.D. Cal. Sep. 12, 2018) (citing *Adams v. Marwil (In re Bayou Group, LLC)*, 564 F.3d 541, 546 (2nd Cir. 2009) and *Official Comm. of Asbestos Claimants v. G-I Holdings, Inc. (In re G-I Holdings, Inc.)*, 385 F.3d 313 (3rd Cir. 2004)).

## B. No Cause Exists to Appoint a Chapter 11 Trustee

If the Court were to decide to convert Kane's case to Chapter 11, the Motion does not establish that cause exists under any standard to appoint a Chapter 11 trustee. Zions points to no specific facts from its lengthy, biased allegations to support a request for appointment of a Chapter 11 trustee. Instead, Zions simply states that Kane "cannot be trusted to handle large sums of money, or make good decisions, or put the interests of the estate and his creditors first.

OPPOSITION TO MOTION TO CONVERT                                                          14

He is just not that guy." Motion at 17. While Zions attacks Kane's character and states Zions' lack of trust in Kane, Zions does not, and cannot, point to specific facts (i.e., fraud, dishonesty, incompetence, or gross mismanagement) to support its naked assertion that cause exists to appoint a Chapter 11 trustee.

Zions suggests that the relationship between Kane and his creditors is so hostile that a Chapter 11 trustee must be appointed, citing a Tennessee case for the proposition that "intense, irreconcilable conflicts and acrimony between the debtor and creditors can rise to the level of 'cause.'" *In re Thomas*, 596 B.R. 350, 361 (Bankr. W.D. Tenn. 2019). To support this argument, the Motion alleges, without evidence, that Kane hid assets from creditors while spending lavishly prepetition and suggests that creditors "are not going to suddenly find Kane a wonderful steward of millions of dollars just because the case converts to chapter 11." Motion at 17.

Besides being factually untrue, this argument misunderstands the impact of *Thomas*. The court in *Thomas* noted that "acrimony is cause to appoint a trustee when the inherent conflicts extend beyond the healthy conflicts that always exist between debtor and creditor." *Id.* (internal quotations omitted). Zions fails to mention that *Thomas* involved parties with a long adversarial history prior to arriving at the bankruptcy court's doorstep, that "no party disputes that there [was] a long history of severe acrimony among the interested parties," which spanned years prior to and during the bankruptcy. *Id.* at 362.

Zions fails to provide any evidence of irreconcilable conflict or acrimony between Kane and his lenders beyond that which always exists between debtor and creditor. Kane has dutifully fulfilled all his obligations as a Chapter 7 debtor and has cooperated with the UST, the Trustee, and his creditors in this case. Zions has not substantiated its accusations regarding Kane's character nor shown any special circumstances that would warrant the appointment of a Chapter 11 trustee.

C.  Appointment of a Trustee Is Not in the Best Interests of Creditors or the Estate

A Chapter 11 trustee may also be appointed if the Court finds "such appointment is in the interests of creditors . . . and other interests of the estate." § 1104(a)(2). "In determining whether the appointment of a Trustee is in the best interests of creditors, a bankruptcy court must

necessarily resort to its broad equity powers. In equity, courts eschew rigid absolutes and look to the practical realities and necessities inescapably involved in reconciling competing interests." *Schuster v. Dragone*, 266 B.R. 268, 273 (D. Conn. 2001) (internal quotations omitted). "Consequently, the analysis becomes one of whether the cost of appointing a [t]rustee is outweighed by the benefits derived by the appointment." *In re Sharon Steel Corp.*, 86 B.R. 455, 457 (Bankr. W.D. Pa. 1988) (internal quotations omitted). Moreover, immediate appointment of a Chapter 11 trustee upon conversion for the benefit of creditors is a measure generally taken only when a debtor has contributed to the floundering of the bankruptcy in its previous chapter. *See, e.g., In re Basil St. Partners, LLC*, 477 B.R. 856 (Bankr. M.D. Fla. 2012) (converting case from Chapter 7 to 11 and appointing a trustee as resolution to yearlong involuntary Chapter 7 dispute); *In re Tomlinson Interests, Inc.*, 128 B.R. 181 (Bankr. S.D. Tex. 1991) (converting case from Chapter 7 to 11 and appointing a trustee after the case languished for five and a half years); *In re Klein*, 79 B.R. 769 (N.D. Ill. 1987) (finding appointment of a trustee upon conversion to Chapter 11 was appropriate where a debtor had failed to act as a fiduciary and had engaged in fraud, dishonesty, and gross mismanagement as a bankruptcy debtor).

Zions has not shown that the immediate appointment of a trustee would be in the best interests of the creditors or the bankruptcy estate. Instead, it opts for representations of Kane's character which border on harassment and mischaracterization of past financial problems. As detailed above, Kane is dutifully fulfilling all responsibilities of a Chapter 7 debtor, and creditors will benefit from an efficient and orderly liquidation of Kane's nonexempt assets. In the short life of the bankruptcy, Kane has shown himself to be efficient and transparent with creditors, the UST, the Trustee, and the Court. Zions has not shown that Kane should not similarly be afforded the opportunity to prove his capability of running a transparent and efficient Chapter 11 process.

Rather than create efficiency, appointment of a Chapter 11 trustee on top of conversion will only serve to create an additional layer of expense and delay to the detriment of unsecured creditors, to accomplish a task that Kane is sufficiently capable of performing. It is a disingenuous assertion that the appointment of a Chapter 11 trustee in a converted case will serve to avoid litigation—if any creditor finds that a § 523 action (which Zions itself notes it may file)

or other litigation will net a higher payout, that will be a creditor's choice regardless of whether a Chapter 11 trustee or a debtor in possession is at the helm. That Zions and others extended credit to Kane and may claim some security interest in Kane's income is not enough to establish that the appointment of a Chapter 11 trustee to handle that income will most benefit creditors or the estate.

## VI. CONVERSION TO CHAPTER 11 AND APPOINTMENT OF A CHAPTER 11 TRUSTEE WOULD VIOLATE THE THIRTEENTH AMENDMENT'S PROHIBITION ON INVOLUNTARY SERVITUDE

As noted above, much of the debt extended by Kane's larger creditors was purportedly secured by Kane's future income. Zions makes it clear in its Motion that the sole reason it seeks conversion to Chapter 11 and appointment of a Chapter 11 trustee is to ensure that Kane's future income is property of the bankruptcy estate, for whatever period of years the Chapter 11 trustee and creditors deem appropriate for a bankruptcy plan. This violates the Thirteenth Amendment's prohibition against involuntary servitude and cannot be tolerated by the Court.[9]

The Thirteenth Amendment ended involuntary servitude unless convicted of a crime. U.S. Const. Amend. XIII, § 1. Included within this bar on involuntary servitude is the concept of peonage. Peonage is "the status or condition of compulsory service, based upon the indebtedness of the peon to the master." *Clyatt v. United States*, 197 U.S. 207, 215–16 (1905). "A peon is one who is compelled to work for his creditor until his debt is paid." *Bailey v. Alabama*, 219 U.S. 219, 242 (1911). While some may consider involuntary servitude to be an extreme description of the Debtor's potential fate, recent bankruptcy courts have recognized that involuntary servitude is the exact unfortunate outcome when §§ 1112(a)–(b), 1104(a), and 1115 collide.

---

[9] This argument is sometimes challenged on ripeness grounds. However, given that conversion to Chapter 11 and appointment of a trustee would cause an imminent, concrete, and particularized injury, that is fairly traceable to the conversion and appointment, and that is redressable by a favorable decision, the Court may properly consider the issue now. *Breland v. United States (In re Breland)*, No. 19-14321, 2021 U.S. App. LEXIS 6970, at *5 (11th Cir. Mar. 10, 2021). *See Friends of the Earth, Inc. v. Laidlaw Environmental Servs., Inc.*, 528 U.S. 167, 180–81 (2000).

A.  Conversion to Chapter 11 Would Violate the Thirteenth Amendment

Although there is no absolute prohibition on the involuntary conversion of an individual's case, courts are sensitive to the issue of involuntary servitude under Chapter 11 (and Chapter 13). 6 Collier on Bankruptcy, ¶ 706.03 (Alan N. Resnick & Henry J. Sommer, eds., 16th ed.). Even though individuals are eligible to be debtors under Chapter 11, courts have refused to grant motions to convert when the movant's intent was to compel the debtor to submit to an involuntary payment plan. *Snyder*, 509 B.R. 945; *In re Graham*, 21 B.R. 235 (Bankr. N.D. Iowa 1982) ("individual debtors should not be forced into a repayment plan against their will"); *In re Brophy*, 49 B.R. 483 (Bankr. D. Haw. 1985) (following *Graham* and finding "that Section 706(b) was not intended to be a vehicle by which individual debtors would be forced to submit to a plan of repayment against their wills.").

On the subject of mandatory Chapter 13 proceedings, Congress has stated

> . . . Chapter 13 is completely voluntary. The Committee [on the Judiciary] firmly rejected the idea of a mandatory or involuntary Chapter XIII in the 90th Congress. The thirteenth amendment prohibits involuntary servitude. Though it has never been tested in the wage earner context, it has been suggested that a mandatory chapter 13, by forcing an individual to work for creditors, would violate this prohibition. On policy grounds, it would be unwise to allow creditors to force a debtor into a repayment plan. An unwilling debtor is less likely to retain his job or to cooperate in the repayment plan, and more often than not, the plan would be preordained to fail.

H.R. Rep. No. 595, 95th Cong., 1st Sess. 120 (1977) (footnotes omitted). Prior to the BAPCPA, there were no similar issues with Chapter 11. *See Toibb v. Radloff*, 501 U.S. 157, 165–66 (1991) (finding no concerns about involuntary servitude because Chapter 11 did not require a debtor to pay future wages). However, BAPCPA changed this by expanding the Chapter 11 estate to include postpetition personal service income. *Lobera*, 454 B.R. at 854 n.33. By allowing creditors to force conversion of a Chapter 7 debtor's case to Chapter 11, coupled with an inability of the debtor to voluntarily reconvert or dismiss and the inclusion of the debtor's postpetition income, Congress created the setting for a constitutional challenge. *Id.*

It is doubtful that Congress intended to subject individual debtors to the possibility of involuntary servitude in light of its misgivings concerning the constitutionality and wisdom of

OPPOSITION TO MOTION TO CONVERT                                                          18

forced repayment plans. *See In re Graham*, 21 B.R. at 239 n.6. Courts have observed, however, that the "legislative history indicates that Congress was thinking primarily, if not exclusively, of corporate, and not individual, debtors in the context of involuntary Chapter 11 proceedings." *Id.* (internal citations removed). No one can force an individual to be a Chapter 13 debtor against his will, because doing so might violate the Thirteenth Amendment's involuntary servitude prohibition. *Toibb*, 501 U.S. at 165–66; *Lobera*, 454 B.R. 855. *See* §§ 706(c) and 1307(a). There are no similar statutory protections for potential individual Chapter 11 debtors, but the constitutional right against involuntary servitude remains. *Snyder*, 509 B.R. at 955. The policy reasons, as stated by Congress, also remain. It is better to encourage a debtor to retain his employment, instead of risking that a debtor will walk away from his job to avoid working to fund a repayment plan that primarily benefits someone else. *Graham*, 21 B.R. 235 at 238–39. It is also better to avoid the administrative difficulties in attempting to force a debtor to comply with a repayment plan that is preordained to fail, instead of enforcing compliance with Chapter 7. *Id.*

Because conversion to Chapter 11 would make Kane's future wages property of the bankruptcy estate, and because he would be forced to work involuntarily for the creditors' benefit without the option to reconvert or dismiss his case, conversion would violate the Thirteenth Amendment. As such, the Motion cannot be granted.

B. Appointment of a Chapter 11 Trustee Would Also Violate the Thirteenth Amendment

If Kane's case was converted to Chapter 11 and a Chapter 11 trustee appointed, Kane would lose additional rights and freedoms in addition to those described above. He would be stripped of his ability to (or even to seek permission to) (1) manage his income from his providing personal services; (2) convert or dismiss his case under § 1112(a) and (b)(2); (3) hire professionals under § 327; (4) use, sell, or lease property of the estate under § 363; (5) obtain credit under § 364; and (6) accept and reject executory contracts and unexpired leases to which he is a party under § 365. Converting Kane's case to Chapter 11 and appointing a Chapter 11 trustee would depose him of his ability to act as a debtor in possession and subjugate him to the whims of his creditors and the Chapter 11 trustee.

OPPOSITION TO MOTION TO CONVERT

19

This has caused significant issues when it has arisen. In one case, a trustee was appointed in the case of a voluntary Chapter 11 debtor without consideration of the constitutional issues. *In re Clemente*, 409 B.R. 288 (Bankr. D.N.J. 2009). The case quickly hit a statutory roadblock because the debtor, no longer serving as debtor in possession, lost power to convert his case, lost access to his income, and was caught "between the Charybdis of § 1115 and the Scylla of § 1112." He was required to commit his future earnings to pay back creditors but was unable to retreat from such commitment. *Id.* at 290–91. The Court noted that the debtor was disqualified from Chapter 13 due to his substantial debts and that he was detained in Chapter 11 until the Chapter 11 trustee decided to move for conversion (which was unlikely) or a plan of reorganization was confirmed (which was also unlikely due to various points of contention). *Id.* at 293. As such, Chapter 11 was his only option and "he would be forced to work for his creditors in breach of his freedoms guaranteed by the Thirteenth Amendment." *Id.* The Court ultimately used its equitable powers to *sua sponte* terminate the Chapter 11 trustee, restoring the debtor to possession and management of the estate, and then immediately converted the case to Chapter 7, thus avoiding the constitutional issues and harmonizing the sections of the Bankruptcy Code. *Id.* at 295. While the *Clemente* court demonstrated great creativity in untying a constitutional knot, the Motion should be denied as to avoid any tangles whatsoever.

Finally, the Motion presents a disturbing hypothetical. The Motion is premised on the assumption that Kane will earn large amounts of income that will become part of the Chapter 11 estate and an eventual plan of reorganization to be administered by a Chapter 11 trustee. This is further predicated on the supposition that the Chapter 11 trustee will assume a pending executory contract between Kane and the Sharks. While Kane currently intends to continue playing with the Sharks, the Lenders request that his personal choice be removed from the equation. Granting the Motion would place a Chapter 11 trustee in charge of Kane's life. It creates a risk that the Chapter 11 trustee would seek to assume a personal services contract that Kane may wish to reject. It would also result in the Chapter 11 trustee making important decisions about Kane's future employment, residence, and all of his living expenses. Subjugating Kane, as well as his

family, to the whims of a Chapter 11 trustee not only violates the Thirteenth Amendment, but it is also an affront to Kane's dignity.

Rather than trap Kane in an inescapable situation, from which it may later have to free him after having added layers of administrative expenses, the Court should simply avoid the constitutional problems and deny the Motion outright.

## VII.  CONCLUSION

For the reasons stated above, Kane respectfully requests that the Court deny Zions' Motion, as joined by the Lenders, in its entirety.

Dated March 18, 2021                    FINESTONE HAYES LLP


                                        */s/ Stephen D. Finestone*
                                        Stephen D. Finestone
                                        Attorneys for Debtor,
                                        Evander Frank Kane