ANTHONY & PARTNERS, LLC
JOHN A. ANTHONY (SBN0731013)
  janthony@anthonyandpartners.com
ANDREW J. GHEKAS (SBN 0119169)
aghekas@anthonyandpartners.com
100 S. Ashley Drive, Suite 1600
Tampa, Florida 33602
Telephone: 813.273.5616
Facsimile: 813.221.4113

COOPER, WHITE & COOPER LLP
PETER C. CALIFANO (SBN 129043)
  pcalifano@cwclaw.com
201 California Street, 17th Floor
San Francisco, California 94111
Telephone: 415.433.1900
Facsimile: 415.433.5530

Attorneys for Creditor Centennial Bank

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| In re<br><br>EVANDER FRANK KANE,<br><br>Debtors. | Case No. 21-50028-SJL<br><br>Chapter 7<br><br>CENTENNIAL BANK'S MOTION TO DISMISS LIQUIDATION<br><br>Date:    TBD *<br>Time:    TBD<br>Place;    Via Zoom Videoconference<br>Judge:    Hon. Stephen L. Johnson |

COOPER, WHITE
& COOPER LLP
ATTORNEYS AT LAW
201 CALIFORNIA STREET
SAN FRANCISCO, CA 94111-5002

Case: 21-50028    Doc# 83    Filed: 03/29/21    Entered: 03/29/21 17:43:18    Page 1 of 19

# TABLE OF CONTENTS

| | Page |
|---|---|
| I. STATEMENT OF FACTS | 1 |
| II. JURISDICTION AND STANDING | 3 |
| III. LEGAL ANALYSIS | 3 |
|    A. Statutory Framework | 3 |
|    B. The Debtor Owes Primarily Consumer Debt | 3 |
|    C. Presumption of Abuse under §707(b)(2) | 5 |
|    D. The Debtor's Filing Constitutes Abuse Under §707(b)(3)(B) | 7 |
|      i. Totality of the Circumstances Supports Dismissal | 7 |
|    E. The Debtor's Filing Constitutes Bad Faith Pursuant to §707(b)(3)(A) | 9 |

COOPER, WHITE
& COOPER LLP
ATTORNEYS AT LAW
201 CALIFORNIA STREET
SAN FRANCISCO, CA 94111-5002

# TABLE OF AUTHORITIES

**Cases**

Bushkin v. Singer (In re Bushkin),
    BAP No. CC-15-1285-KiKuF, 2016 WL 4040679, at *7 (B.A.P. 9th Cir. July 22, 2016) .......... 4

Calhoun v. United States Trustee,
    650 F.3d 338 (4th Cir. 2011) ................................................................................................ 8

In re Egebjerg,
    574 F.3d 1045 (9th Cir. 2009) .............................................................................................. 7

In re Kaminski,
    387 B.R. 190 (Bankr.N.D. Ohio 2008) ............................................................................... 11

In re Katz,
    451 B.R. 512 (Bankr. C.D. Cal. 2011) ................................................................................ 12

In re Krohn,
    886 F.2d 123 (6th Cir. 1989) ............................................................................................ 8, 9

In re Mitchell,
    357 B.R. 142 (Bankr. C.D. Cal. 2006) ............................................................................ 9, 10

In re Reed,
    422 B.R. 214 (C.D. Cal. 2009) ............................................................................................. 8

In re Scarberry,
    428 B.R. 403 (Bankr. N.D. Ohio 2009) ................................................................................ 9

In re Violanti,
    397 B.R. 852 (Bankr. N.D. Ohio 2008) ..................................................................... 9, 11, 13

In re Webb,
    447 B.R. 821 (Bankr. N.D. Ohio 2010) ................................................................................ 3

Leavitt v. Soto (In re Leavitt),
    171 F.3d 1219 (9th Cir. 1999) ............................................................................................ 10

Miller v. Gilliam (In re Miller),
    BAP No. CC-15-1328-KiTaKu, 2016 WL 5957270 (B.A.P. 9th Cir. Oct. 13, 2016) ............... 10

Price v. United States Trustee (In re Price), 353 F.3d 1135 (9th Cir. 2003) .................................... 9

Zolg v. Kelly (In re Kelly),
    841 F.2d 908 (9th Cir. 1988) ............................................................................................ 3, 8

**Statutes**

11 U.S.C. § 707 ............................................................................................................... passim
28 U.S.C. § 1334 ...................................................................................................................... 3
28 U.S.C. § 151 ........................................................................................................................ 3
28 U.S.C. § 157 ........................................................................................................................ 3
Bankruptcy Code §101 .......................................................................................................... 12

COOPER, WHITE
& COOPER LLP
ATTORNEYS AT LAW
201 CALIFORNIA STREET
SAN FRANCISCO, CA 94111-5002

ii

Case: 21-50028    Doc# 83    Filed: 03/29/21    Entered: 03/29/21 17:43:18    Page 3 of 19


Bankruptcy Code §707 ............................................................................................................. passim
Federal Rule of Bankruptcy Procedure 1017 .................................................................................. 1

**Other Authorities**

Black's Law Dictionary 166 (10th ed. 2014) ..................................................................................... 3

COOPER, WHITE
& COOPER LLP
ATTORNEYS AT LAW
201 CALIFORNIA STREET
SAN FRANCISCO, CA 94111-5002

Pursuant to 11 U.S.C. §§ 707(b)(1), (b)(2), and (b)(3), Federal Rule of Bankruptcy Procedure 1017, and other applicable law, Centennial Bank, an Arkansas state-chartered bank, by and through its undersigned counsel of record, hereby moves on the following grounds for an order of this Court dismissing the above-captioned chapter 7 bankruptcy case (this "Liquidation") initiated by Evander Frank Kane (the "Debtor"), on January 9, 2021.[1]

## I. STATEMENT OF FACTS

1. The Debtor filed for relief under chapter 7 of the Bankruptcy Code on January 9, 2021.

2. Just two (2) days prior to the Debtor's initiation of this Liquidation, Centennial initiated loan enforcement litigation as against the Debtor in the United States District Court in and for the Southern District of Florida, Fort Lauderdale Division, Case No. 21-cv-60045 (the "Centennial Federal Litigation"), pursuant to which Centennial sought, inter alia, bind the San Jose Sharks to a judicial determination that the Debtor was obligated under his Security Agreement in favor of Centennial to direct monthly payments due under the Player's Contract to Centennial. Thus, Centennial sought to preclude the Debtor from further interfering with Centennial's rights under its Security Agreement.

3. The Debtor has disclosed that he is a professionally ice hockey player who has played in the National Hockey League for the last eleven (11) years. Under the Debtor's current Player's Contract with the San Jose Shark, the Debtor has received approximately $20,000,000 in compensation over the immediate three (3) preceding the Debtor's initiation of this Liquidation. Moreover, pursuant to the terms of the Player's Contract, the Debtor is due to receive approximately $29,000,000 over the course of the next four (4) seasons. Despite this fact, the Debtor has listed his monthly income as being solely derived from a podcast show that the Debtor admits has never aired

---

\* As soon as the transcripts to Mr. Kane's Rule 2004 Examination are ready, Centennial will submit a supporting declaration and a Notice of Hearing on this matter, and possibly on a time shortened basis.

[1] For purposes of brevity, Centennial utilizes those terms that are more fully defined in its proof of claim [POC-5] filed on March 18, 2021.

a show and is no longer viable.[2]

4. Having grossly undervalued his current monthly income, the Debtor proceeds to disclose the extravagant lifestyle he enjoys as a professional athlete, encompassing (i) the leasing of two (2) Mercedes G-wagons, (ii) ownership of three (3) multimillion dollar residences for himself and his immediate family members, (iii) multimillion gambling losses, (iv) $8,000 in monthly food and housekeeping supplies, (v) $12,000 in childcare expenses, and (vi) $15,000 in monthly transfers to his mother, father, grandmother, and uncles. In total, the Debtor estimates his monthly expenses to $93,214.46 – or $91,131.13 greater than the fictitious $2,083.33 the Debtor never planned to receive from his failed podcast arrangement.

5. Although the Debtor has amended his Schedules multiple times in a short period of time – including the Debtor's expenses to remove his mother, father, grandmother, and two (2) uncles as dependents – the Debtor has never amended his Schedule I regarding his income, despite having played in every game that the San Jose Sharks have competed in this season, leading his team in points earned.

6. Although the Debtor's Schedules indicate that the Debtor has substantial liabilities – liabilities that the Debtor can only explain at the most basic level – what the Schedules do not show is the Debtor's substantial income. When compared to each other, it is quite clear that the Debtor is able to substantially pay his debts in their entirety. However, the Debtor wishes to utilize the bankruptcy process not to receive a "fresh start," but to gain a "head start" over his poor financial decisions, seeking to only selectively assume those liabilities that actually benefit him – i.e. the several mortgages on the three (3) residential properties and the two (2) leases on his luxury vehicles – and asking this Court to discharge the rest of the liabilities that he willingly entered into and simply chooses not to be accountable for. But choosing to waste $1,500,000 in gambling debts, maintain three (3) residences, and drive two (2) luxury vehicles in lieu of servicing his debts, is not the type of behavior the bankruptcy process was intended to protect.

---

[2] This income further ignores the Debtor's $1,250,000 federal tax return that he anticipates receiving.

7. Accordingly, and as more fully described herein, the Debtor's demonstrated abuse of the bankruptcy process and bad faith filing requires that this Court should dismiss the Debtor's case under 11 U.S.C. §§707(b)(2), (b)(3)(A), or (b)(3)(B).

## II. JURISDICTION AND STANDING

This Court has jurisdiction of this matter under 28 U.S.C. § 1334(a) and (b), 28 U.S.C. § 157(a) and (b)(1) and 28 U.S.C. § 151. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (B). This motion is filed pursuant to 11 U.S.C. §§707(b)(1), (b)(2), and (b)(3).

## III. LEGAL ANALYSIS

### A. Statutory Framework

"The principal purpose of the Bankruptcy Code is to grant a fresh start to the honest but unfortunate debtor." Marrama v. Citizen Bank of Mass, 549 U.S. 365, 367 (2007). A discharge allows a debtor to start a new financial life. A debtor engaged in bad faith filing of the petition will not be granted discharge. A bad faith filing is a voluntary petition "that is inconsistent with the purposes of the Bankruptcy Code or an abuse of the bankruptcy system." Black's Law Dictionary 166 (10th ed. 2014); In re Webb, 447 B.R. 821, 824 (Bankr. N.D. Ohio 2010).

In line with this longstanding principle, Bankruptcy Code §707(b)(1) provides that, after notice and a hearing, this Court may dismiss a case filed by an individual whose debts are primarily consumer debts if it finds that granting relief would be an abuse of the provisions of chapter 7. 11 U.S.C. § 707(b)(1). Bankruptcy Code §707(b)(3) provides that, in considering whether granting relief would be an abuse, in a case in which the presumption under Bankruptcy Code §707(b)(2)(A)(i) does not arise, this Court shall consider whether the Debtor filed the Petition in bad faith or whether the totality of the circumstances of the Debtor's financial situation demonstrates abuse.

### B. The Debtor Owes Primarily Consumer Debt

"Consumer debt" is defined as a "debt incurred by an individual primarily for a personal, family, or household purpose." 11 U.S.C. § 101(8). Conversely, the Ninth Circuit has held that "[d]ebt incurred for business ventures or other profit-seeking activities is plainly not consumer debt." Zolg v. Kelly (In re Kelly), 841 F.2d 908, 913 (9th Cir. 1988). Courts determine the debtor's

COOPER, WHITE
& COOPER LLP
ATTORNEYS AT LAW
201 CALIFORNIA STREET
SAN FRANCISCO, CA 94111-5002

Case: 21-50028    Doc# 83    Filed: 03/29/21    Entered: 03/29/21 17:43:18    Page 7 of 19

purpose as of the time the debt was incurred. See Bushkin v. Singer (In re Bushkin), BAP No. CC-15-1285-KiKuF, 2016 WL 4040679, at *7 (B.A.P. 9th Cir. July 22, 2016). The Ninth Circuit further interprets "primarily" to mean that the overall ratio of consumer to non-consumer debt is greater than fifty (50%) percent. Kelly, 841 F.2d at 913. Although the Debtor checked the box on his Petition indicating that his debts are primarily "business debts," a review of the Schedules, together with the Debtor's own testimony at the 341 Meeting and 2004 Examination, conclusively confirms that such a statement is false.

Nothing within the Schedules filed by the Debtor indicates that the Debtor has been engaged in any meaningful business other than the playing of professional ice hockey. While the Debtor states that he, along with his spouse, is a one hundred (100%) percent owner of Lions Properties LLC, the Debtor further indicates that such business "has no assets." [Doc. 1 at ¶14]. The only other business entity the Debtor identifies as having any membership interest in is Ascher Capital II and III LLC; however, the Debtor states that he only borrowed $750,000 for such investment (the "Loan Shark Debt"). Id. The Debtor's Schedules confirm that the Debtor does not own any bonds, investment accounts with any brokerage firms, money market accounts, or stock in any publicly traded company. [Doc. 1 at ¶13]. The Debtor does not list any "business-related property" that he either owns or has any legal or equitable interest in. [Doc. 1 at ¶16]. The Debtor does not receive any "[n]et income from rental property and from operating a business, profession, or farm." [Doc. 1 at ¶40]. Additionally, within the last four (4) years preceding the Debtor's initiation of this Liquidation, the Debtor states within his Schedules that he has not owned a business or have any connection to a business, including not being a (i) sole proprietor or self-employed in a trade, profession, or other activity, either full time or part time, (ii) member of a limited liability company (LLC) or limited liability partnership (LLP), (iii) partner in a partnership, (iv) officer, director, or managing executive of a corporation, or (v) owner of at least five (5%) percent of the voting or equity securities of a corporation. [Doc. 1 at ¶53]. Although the Debtor amended his statement of financial affairs ("Amended Form 107") on February 17, 2021, the Debtor only identified three (3) business entitles he had some involvement in, all of which are either now dissolved or not operating as they have no assets or purpose. [Doc. 29 at ¶9].

COOPER, WHITE
& COOPER LLP
ATTORNEYS AT LAW
201 CALIFORNIA STREET
SAN FRANCISCO, CA 94111-5002

4

Case: 21-50028    Doc# 83    Filed: 03/29/21    Entered: 03/29/21 17:43:18    Page 8 of 19

The Debtor does not dispute that he has taken out sizable loans with Centennial (listed at $8,360,000), Zions Bancorporation (listed at $4,250,000), and Professional Bank (listed at $1,354,000), which collectively amount to $13,964,000 (the "Non-Residential Bank Debt")– or forty-nine and a half (49.5%) percent of the Debtor's total claimed liabilities. When questioned about the purpose of the Non-Residential Bank Debt, the Debtor confirmed that he utilized it to pay off prior high-interest loans (the "Prior High-Interest Loans") that he had taken out in years prior. However, when questioned about the purpose of the Prior High-Interest Loans, the Debtor was unable to answer basic questions regarding the amount of said loans, the date in which the Prior High-Interest Loans were incurred, the financial institutions who lent the Prior High-Interest Loans, or what the funds from the High-Interest Loans were used for. What the Debtor was able to confirm, however, was that none of the funds received by the Debtor from the Non-Residential Bank Debt was used to (i) purchase any real property, (ii) purchase any operating business, (iii) fund any operating business, or (iv) invest in any other business enterprise or investment opportunity. Accordingly, it is quite clear that the Non-Residential Bank Debt was not incurred for purposes of "business ventures or other profit-seeking activities." Instead, it would see that the only potential non-consumer debt incurred by the Debtor is the Loan Shark Debt the Debtor took out less than a month after initiating this Liquidation.

C. **Presumption of Abuse under §707(b)(2)**

Because the Debtor is an individual with primarily consumer debts, he was required to file a Chapter 7 Means-Test Calculation using approved Official Form 122A-2 (the "Means Test"). The Debtor has failed to do because he falsely and erroneously stated on his Schedules that his debt was primarily nonconsumer in nature. However, the function of the Means Test is to determine the Debtor's disposable income and to estimate the ability of debtors to repay their debts. When a debtor fails the Means Test, and thus has the ability to repay a minimum amount of his or her debts over a period of sixty (60) months, a presumption of abuse arises under Bankruptcy Code §707(b)(2), resulting in the dismissal of his or her bankruptcy filing. 11 U.S.C. §707(b)(2). When one properly computes the Means Test, it is clear that the Debtor's case is presumed to be an abuse of the chapter 7 process. The Debtor's annualized income greatly exceeds the applicable

COOPER, WHITE
& COOPER LLP
ATTORNEYS AT LAW
201 CALIFORNIA STREET
SAN FRANCISCO, CA 94111-5002

5

Case: 21-50028   Doc# 83   Filed: 03/29/21   Entered: 03/29/21 17:43:18   Page 9 of 19

median family income, and he has enough "disposable income" to pay at least $13,650 over sixty (60) months. See 11 U.S.C. §707(b)(2). To be sure, pursuant to Official Form 122A-1 and Bankruptcy Code §101(10A), in calculating the Debtor's "current monthly income" ("CMI") the Debtor is to, inter alia, compute the average monthly income that he received from all sources and that was derived during the six (6) full months before the Debtor's initiation of this Liquidation on January 9, 2021 – or, from July 1, 2020 through December 31, 2020. Although not accounted for on the Schedules, the evidence shows that the Debtor received $3,000,000 on July 1, 2020 [or within the six (6) month period ending on the last day of the calendar month immediately preceding January 9, 2021] as part of the Debtor's signing bonus under the Player's Contract. Accordingly, the Debtor's true CMI pursuant to Bankruptcy Code §101(10A) is greater than $500,000. See In re Katz, 451 B.R. 512 (Bankr. C.D. Cal. 2011) (a chapter 7 debtor's currently monthly income includes any bonuses or other compensation that may have been earned at an earlier date so long as if it was received during the six-month current monthly income period).

The Debtor has claimed a number of expenses on his Schedule J that would need to be adjusted if the Debtor properly completed the Means Test as they are far above the IRS National Standards.[3] However, this Court need not even delve into what purported monthly expense of the Debtor are appropriate, as even if this Court were to accept the full $93,214.46 as listed on Schedule J, would net the Debtor approximately $406,785.34 – or the Debtor's monthly disposable income. See 11 U.S.C. §707(b)(2). Multiplying the Debtor's calculated monthly disposable income by sixty (60) months, computes to $16,410,812.40 of potential loan payments over a five (5) year plan (the "Projected Monthly Income"). Not only is the Debtor's Projected Monthly Income larger than the statutory allotted $13,650, but it is even greater than twenty-five (25%) of the Debtor's listed

---

[3] For example, the Debtor lists $8,000 a month as an expense for food and housekeeping supplies for a household that appears to include, at most, the Debtor, his wife, and his six (6) month year old daughter (note, while the Debtor stated that his daughter, sister, mother, father, grandmother, and two uncles live with him as dependents in Part 1 of Schedule J, in Part 2 of the same Schedule J the Debtor states that his mother, father, grandmother, and uncles do not live with him.). The Debtor further list an expense of $12,000 a month for childcare and children's education costs for a single sixth (6) month year-old.

COOPER, WHITE
& COOPER LLP
ATTORNEYS AT LAW
201 CALIFORNIA STREET
SAN FRANCISCO, CA 94111-5002

Case: 21-50028    Doc# 83    Filed: 03/29/21    Entered: 03/29/21 17:43:18    Page 10 of 19

6

nonpriority unsecured debt.[4] There is a clear and present presumption of abuse in the Debtor's Liquidation.

### D. The Debtor's Filing Constitutes Abuse Under §707(b)(3)(B)

Alternatively, to the extent that this Court is not inclined to find that the presumption of abuse arises under Bankruptcy Code §707(b)(2), this Liquidation should be dismissed as an abuse under Bankruptcy Code §707(b)(3)(B), based upon the totality of the circumstances surrounding the Debtor's financial situation, because the Debtor has the ability to repay a sufficient amount, if not all, of the scheduled unsecured debt.

In pertinent part, Bankruptcy Code §707(b)(3) provides:

> In considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this chapter in a case in which the presumption in subparagraph (A)(1) of such paragraph does not arise or is rebutted, the court shall consider –
>
> (A) whether the debtor filed the petition in bad faith; or
>
> (B) the totality of the circumstances … of the debtor's financial situation demonstrates abuse.

The Ninth Circuit determined that under Bankruptcy Code §707(b)(3)(B), "[e]ven if a debtor's financial situation does not create a presumption of abuse (or if the presumption is rebutted), the bankruptcy court may still dismiss the petition if the debtor filed in bad faith or if the 'totality of the circumstances' demonstrates 'abuse' of Chapter 7." In re Egebjerg, 574 F.3d 1045, 1048 (9th Cir. 2009). Therefore, even if this Court finds that the presumption of abuse does not arise under Bankruptcy Code §707(b)(2), this Court should find that the totality of the circumstances warrants dismissal of this Liquidation under Bankruptcy Code §707(b)(3)(B).

Cases such as the present chapter 7 Liquidation initiated by the Debtor demonstrate the type of abuse and bad faith that Bankruptcy Code §707(b)(1) was intended to prevent.

### i. Totality of the Circumstances Supports Dismissal

The Debtor's ability to repay unsecured debts, standing alone, is sufficient to find an abuse under Bankruptcy Code §707(b)(3)(B) necessitating dismissal of this Liquidation. See e.g. In re

---

[4] $4,396,525 multiplied by twenty-five (25%) percent, equates to $1,099,131.25.

Reed, 422 B.R. 214 (C.D. Cal. 2009) (holding that the debtor's ability to repay is, by itself, sufficient to find abuse under the totality of the circumstances test under §707(b)(3)); Kelly, 841 F.2d at 914 ("The rule adopted by the overwhelming majority of the courts considering the issue appears to be that a debtor's ability to pay his debts will, standing alone, justify a section 707(b) dismissal"); Calhoun v. United States Trustee, 650 F.3d 338 (4th Cir. 2011) (dismissing the debtor's case under §707(b)(3) because they were able to pay their creditors based on the totality of the circumstances of their financial situation); In re Krohn, 886 F.2d 123 (6th Cir. 1989) (stating that "ability to pay" "alone may be sufficient to warrant dismissal" for substantial abuse).

The Debtor has enjoyed and continues to enjoy a stable income that is substantially more than the applicable median family income in California. The Debtor has enjoyed a career as a professional ice hockey player over the course of the last eleven (11) years that appears to be extremely rewarding to him in terms of compensation. [Doc. 1 at ¶39]. Over the last three (3) years immediately preceding the Debtor's initiation of this Liquidation, the Debtor has received approximately $20,000,000 in wages under his Player's Contract with the Sharks. [Doc. 29 at ¶2]. And as set forth above, the Debtor is expected to receive approximately $3,000,000 under his Player's Contract for the current 2020-21 season.[5] If the Debtor's $3,000,000 2020-21 season salary is spread over a twelve (12) month period, the Debtor's monthly income is $250,000[6], plus the additional $1,200,000 federal tax return that the Debtor expects to receive this year. [Doc. 29 at ¶2]. Even if this Court were to accept the Debtor's excessive monthly expenses of $93,214.46 as reported

---

[5] The Player's Contract further provides that the Debtor is to receive $7,000,000, $5,000,000, $6,000,000, and $4,000,000 in regular compensation for the 2021-22, 2022-23, 2023-24, and 2024-25 seasons respectively, as well as an additional payment of $4,000,000 as part of his signing bonus to be paid out in two (2) equal $2,000,000 installments on July 1, 2022 and July 1, 2024.

[6] Although the Debtor has intimated that his monthly salary is significantly lower in light of the current Collective Bargaining Agreement ("CBA") between the NHL owners and the NHL Player's Association, which calls for twenty (20%) percent of the Debtor's salary to be escrowed and withheld from paychecks and an additional ten (10%) percent deferred to be paid out in following years. However, the percentage of salary to be escrowed is due to reduce season after season, and the Debtor has the ability to obtain said escrowed funds under certain circumstances. Additionally, the Debtor will indeed receive the full amount of the deferred funds, and such deferral percentage does not continue on past the current 2020-21 season.

on the Schedules, which this Court should not, the Debtor's disposable monthly income is $158,8683.87. When the foregoing sum is again multiplied by sixty (60), the Debtor would be able to make a debt payment equal to $9,532,132.20 over a five-year period. Of course, this number would drastically increase in light of the fact that the Debtor is due to receive significant multi-million dollar increases to his yearly salary in 2022, 2023, 2024, and 2025, along with two (2) signing bonus payments totaling an additional $4,000,000.

Based upon the foregoing, the record reflect that the Debtor is not a "needy" debtor in the sense that his financial predicament warrants a discharge of his debts, instead, the Debtor is merely seeking an advantage over his creditors. The Debtor's clear want for need tethered with the lack of honesty that preeminates the Petition requires dismissal of this Liquidation as an abuse of the entire Bankruptcy Code and statutory framework – the Debtor's monthly expenditures, coupled with his exorbitant gambling losses, are more than a luxury than a necessity for the Debtor. See In re Scarberry, 428 B.R. 403, 427 (Bankr. N.D. Ohio 2009) (citing In re Krohn, 886 F.2d 123 (6th Cir. 1989)); In re Violanti, 397 B.R. 852 (Bankr. N.D. Ohio 2008).

**E.     The Debtor's Filing Constitutes Bad Faith Pursuant to §707(b)(3)(A)**

A third basis for dismissal of this Liquidation is further present, and that is the Debtor's bad faith filing of the Petition under Bankruptcy Code §707(b)(3)(A). In addition to dismissing this Liquidation under the totality of the circumstances, Bankruptcy Code §707(b)(3)(A) provides an independent basis for dismissal that is separate and not dependent on this Court's review of the totality of the circumstances.

Although "bad faith" is not specifically defined in the Bankruptcy Code, the courts have begun to develop a standard for determining a finding of "bad faith" borrowing from the Ninth Circuit's pre-BAPCPA "substantial abuse" test and from chapter 11 and 13 bad faith cases. In re Mitchell, 357 B.R. 142 (Bankr. C.D. Cal. 2006) (citing Price v. United States Trustee (In re Price), 353 F.3d 1135, 1139-40 (9th Cir. 2003) (using a six factor test to determine "substantial abuse" under pre-BAPCPA §707(b))). The Mitchell court set fort the following nonexclusive factors to be considered in determining whether to dismiss a chapter 7 case for bad faith under Bankruptcy Code §707(b)(3)(A):

1. Whether debtor has a likelihood of sufficient future income to fund a chapter 11, 12 or 13 plan which would pay a substantial portion of the unsecured claims;

2. Whether debtor's petition was filed as a consequence of illness, disability, unemployment, or other calamity;

3. Whether debtor obtained cash advances and consumer goods on credit exceeding his or her ability to repay;

4. Whether debtor's proposed family budget is excessive or extravagant;

5. Whether debtor's statement of income and expenses misrepresents debtor's financial condition;

6. Whether debtor made eve of bankruptcy purchases;

7. Whether debtor has a history of bankruptcy petition filings and dismissals;

8. Whether debtor has invoked the automatic stay for improper purposes, such as to delay or defeat state court litigation;

9. Whether egregious behavior is present.

Id. at 154-55; see also Miller v. Gilliam (In re Miller), BAP No. CC-15-1328-KiTaKu, 2016 WL 5957270 (B.A.P. 9th Cir. Oct. 13, 2016). In addition to the nine-part test as set forth in Mitchell, the Ninth Circuit in Leavitt "indicated that whether the debtor misrepresented facts in his or her bankruptcy filings, unfairly manipulated the Bankruptcy Code, or otherwise filed the petition in an inequitable manner should also be considered." Miller, 2016 WL 5957270 at *7 (citing Leavitt v. Soto (In re Leavitt), 171 F.3d 1219, 1224 (9th Cir. 1999)). Despite the factors used, however, no single factor is considered dispositive. Id.

This Court should find, after analyzing the facts of this Liquidation with the Mitchell and Leavitt factors identified above, that dismissal under Bankruptcy Code §707(b)(3)(A) is warranted. The Debtor's intention in filing a bankruptcy petitions is clearly inconsistent with the chapter 7 goals of providing a "fresh start" to debtors and maximizing the return to creditors. Mitchell, 357 B.R. at 154-155.

i. "Whether the debtor has a likelihood of sufficient future income to fund a Chapter 11, 12, or 13 plan which would pay a substantial portion of unsecured claims": The Debtor has

seriously misrepresented his income and, thus, his ability to pay debt by omitting a significant amount of income from his Player's Contract.

ii. "Whether the debtor's petition was filed as a consequence of illness, disability, unemployment or some other calamity": There is no evidence that any negative life event such as serious illness or death, catastrophic loss, or termination of employment is the cause of the Debtor's purported financial problems. Instead, it appears that the Debtor's financial difficulties were precipitated, at least in large part, by his desire to participate in excessive gambling and sports activity betting, as well as the purchase of extravagant properties and vehicles beyond his ability to pay. With the Debtor's stated intention to reaffirm on his obligations on each of the three (3) residential properties listed – despite the Debtor only occupying one – as well as the Debtor's current vehicle obligations, the Debtor is clearly seeking to utilize the bankruptcy process to retain property to the direct detriment of his other creditors. "The bankruptcy process, however, was never 'meant to be used as a means by which a debtor can perpetrate bad financial decisions." In re Violanti, 397 B.R. at 859 (quoting In re Kaminski, 387 B.R. 190, 196 (Bankr.N.D. Ohio 2008)).

iii. "Whether the schedules suggest the debtor obtained cash advancements and consumer good on credit exceeding his or her ability to repay them": The Debtor's Schedules reflect that the Debtor owes approximately $88,593 in credit card charges, [Doc. 18 at ¶11], despite paying $240,591 of credit card charges in the three (3) months leading up to the Debtor's initiation of this Liquidation. [Doc. 29 at ¶3].

iv. "Whether the debtor's proposed family budget is excessive or extravagant": The Debtor's proposed family budget is clearly excessive. The Debtor's Schedule I and J list an average monthly expense of $93,214.46 for what appears to be a household comprising of two (2) adults and one (1) six-month year old. [Doc. 1 at ¶¶43 and 44][7]. By the Debtor's own

---

[7] Although the Debtor checks the box for "Yes" when identifying those purported dependents who live with the Debtor in Part 1 of Schedule J, the Debtor in Part 2 of the same schedule later confirms that five (5) of the seven (7) purported dependents in fact do not live with him, including his mother, father, grandmother, and two (2) uncles.

admission, his monthly net income is negative $91,131.13. [Doc. 1 at ¶44][8]. This means that even if the Debtor were to receive a chapter 7 discharge of his debts, one month thereafter, he would be almost $91,000 in debt, and one year thereafter, he would be almost $1,100,000 into debt. Therefore, the Debtor's proposed budget is excessive.[9]

v. "Whether the debtor's statement of income and expenses is misrepresentative of the debtor's financial condition": The Debtor's statement of income and expenses is misrepresentative of the Debtor's financial condition. The Debtor has substantially under-reported his monthly gross income on his Schedule I. The instructions to Schedule I require the Debtor to "give details about the monthly income [he] currently expects to receive [] [and to] show all totals as monthly payments, even if income is not received in monthly payments." As of the date of filing the Petition, the Debtor knew he would be entering the 2020-21 professional ice hockey season a mere five (5) days later, and thus, under his Player's Contract, but due to receive approximately $3,000,000 in compensation for his services. This would come down to approximately $250,000 a month over a twelve (12) month period. Moreover, the evidence shows that the Debtor received $3,000,000 on July 1, 2020 [or within the six (6) month period ending on the last day of the calendar month immediately preceding January 9, 2021] as part of the Debtor's signing bonus under the Player's Contract. Accordingly, the Debtor's true "current monthly income" pursuant to Bankruptcy Code §101(10A)(A) is $500,000. See In re Katz, 451 B.R. 512 (Bankr. C.D. Cal. 2011) (a chapter 7 debtor's currently monthly income includes any bonuses or other compensation that may have been earned at an earlier date so long as if it was received during the six-month current monthly income period).

vi. "Whether the debtor has engaged in eve-of-bankruptcy purchases": The Debtor's Schedules

---

[8] Obviously, this number is fictitious as the Debtor admits he has received significant monthly income since the 2020-21 hockey season started, and yet, the Debtor fails to update his Schedule I to reflect the Debtor's new monthly income, instead continuing to suggest that the Debtor will walk away from his Player's Contract altogether.

[9] The Debtor's proposed expenses includes the payment of other secured debts on properties the Debtor does not occupy, as well as the payment of two excessive motor vehicle leases.

COOPER, WHITE
& COOPER LLP
ATTORNEYS AT LAW
201 CALIFORNIA STREET
SAN FRANCISCO, CA 94111-5002

show that less than thirty (30) days of initiating this Liquidation, and a mere four (4) days preceding the Debtor's payment of $5,000 to his current bankruptcy counsel, the Debtor entered into a $750,000 lending relationship – the Loan Shark Debt – for the purpose of investing in the Ascher II and Ascher III LLC investment. Additionally, the Debtor entered into two (2) new leases requiring a combined monthly payment of $8,910.83 in late November 2020 that the Debtor intends to assume. Moreover, just five (5) months before initiating the Liquidation, four (4) months from engaging present counsel, and while under the legal counsel of well-known bankruptcy practitioners, the Debtor purchased a residence valued at approximately $3,000,000 obtaining separate financing in the amount of $2,320,000 with the balance paid for by the Debtor. While not exactly the "eve of bankruptcy," it is highly suspect that the Debtor would purchase such an extravagant residence requiring a mortgage payment well above amount allowed under the Means Test at the same time that the Debtor was unable to service his Non-Residential Bank Debt in the ordinary course. See In re Violanti, 397 B.R. at 859 (finding debtor's purchase of her present residence in the middle of 2007 along with her vehicle in March 2008, leading to her bankruptcy filing in June 2008, as eve of bankruptcy purchases that are not viewed favorably).

vii. "Whether the debtor has a history of bankruptcy petition filings and case dismissals": Centennial has no knowledge of prior filings and case dismissals related to the Debtor. However, the lack of this factor does not preclude dismissal of a case based on bad faith.

viii. "Whether the debtor intended to invoke the automatic stay for improper purposes, such as for the sole objective of defeating state court litigation": Although the Debtor had been involved in various state court litigation with multiple creditors for some time, the Debtor did not initiate this Liquidation until Centennial filed the Centennial Federal Litigation. The Debtor initiated this Liquidation a mere two (2) days after Centennial's filing of the Centennial Federal Lawsuit.

ix. "Whether egregious behavior is present": Egregious behavior is present in this Liquidation. The Debtor made serious misrepresentations on his Schedules that he has not been able to

explain or prove. Unless the Debtor can affirmatively prove otherwise, it appears the Debtor has intentionally manipulated his Schedules in such a way so that the presumption of abuse would not arise.

For all of the foregoing reasons stated above, this Court should conclude that the instant Liquidation constitutes an abuse of the bankruptcy process and has been initiated in bad faith in violation of 11 U.S.C. §§707(b)(2), (b)(3)(A), and (b)(3)(B), and accordingly dismiss this Liquidation.

WHEREFORE, Centennial respectfully requests that order of this Court dismissing the present Liquidation under 11 U.S.C. §§707(b)(1) and (3), and grant any such further relief as may be appropriate.

DATED: March 29, 2021　　　　ANTHONY & PARTNERS, LLC

By:　　*/s/John A. Anthony*
　　　　John A. Anthony
　　　　Attorneys for Creditor Centennial Bank

DATED: March 29, 2021　　　　COOPER, WHITE & COOPER LLP

By:　　*/s/ Peter C. Califano*
　　　　Peter C. Califano
　　　　Attorneys for Creditor Centennial Bank

1501274.1

# CERTIFICATE OF SERVICE

## In re EVANDER FRANK KANE
## 21-50028-SJL

**STATE OF CALIFORNIA, COUNTY OF SAN FRANCISCO**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of San Francisco, State of California. My business address is 201 California Street, Seventeenth Floor, San Francisco, CA 94111-5002.

On March 29, 2021, I served true copies of the following document(s) described as **CENTENNIAL BANK'S MOTION TO DISMISS LIQUIDATION** on the interested parties in this action as follows:

**BY CM/ECF NOTICE OF ELECTRONIC FILING:** I electronically filed the document(s) with the Clerk of the Court by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system. Participants in the case who are not registered CM/ECF users will be served by mail or by other means permitted by the court rules.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on March 29, 2021, at San Francisco, California.

_____
Mercedes Stuefen