Jonathan J. Lewis, Esq. (SBN: 221082)
**J. LEWIS & ASSOCIATES, APLC**
3985 University Avenue, Second Flood
Riverside, CA 92501
Telephone: 951.682.0488
Facsimile: 951.682.0496
Email: jonlewis@jlewislaw.com

Attorneys for Plaintiff / Creditor
HOPE PARKER

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| In Re:<br><br>EVANDER FRANK KANE,<br><br>        Debtor<br>_____<br>HOPE PARKER, an individual,<br><br>        Creditor / Plaintiff,<br><br>v.<br><br>EVANDER FRANK KANE an individual,<br><br>        Debtor / Defendant.<br>_____ | CHAPTER 7<br>CASE NO. 21-50028-SLJ<br><br>ADV. NO.:<br><br>**ADVERSARY COMPLAINT FOR NONDISCHARGEABILITY OF DEBT PURSUANT TO: 11 U.S.C. §523(a)(2); AND 11 U.S.C. §§727(a)(2)-(a)(7)**<br><br>**FEDERAL RULES OF BANKRUPTCY PROCEDURE § 7001 ET SEQ.**<br><br>**JURY TRIAL DEMANDED** |

TO THE HONORABLE STEPHEN L. JOHNSON UNITED STATES BANKRUPTCY JUDGE:

**COMES NOW,** Plaintiff / Creditor HOPE PARKER and alleges as follows:

**JURISDICTION AND VENUE**

1. This Court has jurisdiction over the subject matter of this adversary proceeding pursuant to 28 U.S.C. section 1334 and the reference order of the United States District Court for

the Northern District of California. Pursuant to 28 U.S.C. section157, the U.S. Bankruptcy Court has jurisdiction to hear and determine adversary proceedings brought pursuant to the Federal Rules and United State Code relevant herein, including FRBP 7001, 11 U.S.C. section 523 and 11.U.S.C. 727.

2. Venue in this Court is proper because this is the Court where the instant Bankruptcy Petition is pendin. (28 U.S.C. § 1409(a))

3. This adversary proceeding relates to the Chapter 7 case of Evander Frank Kane, Case No. 21-50028-SLJ, now pending in the United States Bankruptcy Court for the Northern District of California. This matter is a core proceeding pursuant to 28 U.S.C. §157.

## GENERAL ALLEGATIONS

3. Plaintiff HOPE PARKER (hereinafter "Plaintiff") at all times mentioned or referenced herein was and is and individual, residing in the County of Los Angeles, California.

4. Defendant EVANDER FRANK KANE (hereinafter "Debtor") at times mentioned or referenced herein was and is and individual, residing in the County of Santa Clara, California.

6. In early 2016 through June 2018, Plaintiff Hope Parker ("Plaintiff" or "Ms. Parker") and Defendant Evander Kane ("Defendant" or "Mr. Kane") saw each other romantically. During the relationship, the parties engaged in sexual relations. Defendant was aware and advised by Ms. Parker that she was not using birth control as it upset her system. During each encounter, the parties rarely, if ever used contraception.

7. In early 2016, as a result of the relations with Defendant, Ms. Parker became pregnant. Defendant insisted that Ms. Parker terminate the pregnancy. Ms. Parker, feeling pressure from Defendant, terminated the pregnancy.

8. In or about October 2017, Defendant Kane and Ms. Parker again had relations that resulted in pregnancy. It was confirmed via a blood test that Defendant was the father of Ms. Parker's unborn child. Defendant again pressured Ms. Parker to end the pregnancy through abortion. Ms. Parker at first refused, and told Defendant that she did not want to go through that process as it had caused her both physical and emotional distress. Defendant continued to put unrelenting pressure on Ms. Parker to abort, telling her it would ruin his life. The unrelenting pressure from

Defendant resulted in Ms. Parker acquiescing to another abortion.

9. As a result of the second abortion, Ms. Parker experienced physical and mental harm and suffering. Ms. Parker made Defendant aware of that harm and suffering, and told him that she would never have another abortion. Defendant, of his own volition, deposited $125,000.00 into Ms. Parker's account. Ms. Parker had never asked for any money.

10. On May 13, 2018, Ms. Parker and Defendant again had consensual sexual relations that resulted in pregnancy.

11. After learning she was pregnant for the third time, Ms. Parker informed Defendant of the pregnancy on or about May 31, 2018. During that same time frame, Ms. Parker also let Defendant know that she would not abort this pregnancy as she had done with the two prior pregnancies.

12. Regarding that third pregnancy, Defendant has made the following statements:

* "I was concerned about the impact Plaintiff's pregnancy would have on my career . . . ."

* "I was . . . deeply concerned about the impact an unwanted pregnancy would have on my personal relationships . . . ."

* "I wanted Plaintiff to terminate the pregnancy shortly after she informed me she was pregnant . . . ."

* "Plaintiff stated that she did not want to have an abortion due to the medical risks."

* "I knew that the sooner Plaintiff had the abortion . . . the less likely Plaintiff would suffer complications . . . , which I knew was a concern to Plaintiff."

* "At this time, I was open to . . . giving her some amount of money to terminate the pregnancy"

13. Defendant, knowing that Ms. Parker would not abort this third pregnancy, offered one million dollars to Ms. Parker if Ms. Parker would terminate the pregnancy. Ms. Parker refused.

14. Defendant confirmed that he had offered Ms. Parker money to terminate the pregnancy in a declaration he signed under penalty of perjury. In that declaration he stated: "Subsequently, I informed Plaintiff that I would give her some amount of money to have an abortion."

Case: 21-50028   Doc# 90   Filed: 04/01/21   Entered: 04/01/21 17:46:07   Page 3 of 9

3

15. During the following days, Ms. Parker and Defendant had discussions regarding the pregnancy, both orally and through text messages.

16. Defendant sent text messages to Ms. Parker stating such things as: "this is a huge mistake[;]" "this will not be a good thing for anyone [;]" and "It's not going to work, it can't happen."

17. Ms. Parker responded to Defendant, letting Defendant know that she was not going to let him bully her into having an abortion as he had with the first two (2) pregnancies. In response, Defendant continued to send text messages, stating such things as: "it will be terrible [;]" "this will ruin everything my career I know [;]" and "I'm begging [] you please."

18. As Ms. Parker continued to refuse to terminate the pregnancy, Defendant sent further text messages, to wit: "This is going to be to [be] ugly [;]" "Come on!! This is stupid [;]" "Take the pills [;]" and "This will not be good."

19. When Defendant's repeated attempts to pressure Ms. Parker into having an abortion did not work, Defendant again decided to renew his financial offer to Ms. Parker: "But I have a (sic) idea how to make you feel more comfortable . . . I will take care of you like I said last night, but also pay for any future issues to get pregnant [if] you have them." Ms. Parker, despite being worn down and scared from being bullied, told Defendant that the one million dollar offer he had made the night before was not enough.

20. Ms. Parker confirmed her pregnancy through a medical examination with her gynecologist. Defendant's response was to assure Ms. Parker that he would pay her in excess of one million dollars if she would terminate the pregnancy.

21. On or about June 4, 2018, after further discussions, Defendant agreed to pay Ms. Parker between two million and three million dollars to terminate the pregnancy. Defendant stated in a declaration that he understood that Ms. Parker would terminate the pregnancy if Defendant paid her a sum between two million and three million dollars. Defendant told Ms. Parker that he would pay her that sum. Defendant texted Ms. Parker, wherein he stated: "Hope I just said I'm going to do everything I can! You know my situation I'm literally going to be broke after this. So you don't need to worry about me doing everything g (sic) on my end."

22. Unbeknownst to Ms. Parker was the fact that at the time Ms. Parker and Defendant reached an agreement for a sum between two million and three million dollars, Defendant had no intention of paying Ms. Parker anywhere near the agreed upon amount. Despite Defendant knowing he was never going to pay the agreed upon amount of two million and three million dollars, he continued to tell Ms. Parker that he would pay the agreed upon amount.

23. Even though Defendant never intended to pay the agreed upon amount, he communicated to Ms. Parker that there was an agreement for two million and three million dollars. Based on Defendant's representations that he and Ms. Parker had reached an agreement, Ms. Parker then began the process of terminating the pregnancy.

24. Ms. Parker received injections terminating the pregnancy. During that process, Defendant continued to assure Ms. Parker that he was obtaining the agree upon two million to three million dollars. He sent her such text messages as: "I'm going to do everything I can! You know my situation I'm literally going to be broke after this [;]" and "I'm working on it trust me! Just need some time. You'll be good." During that same time, Defendant requested than Ms. Parker provide him with proof that she was terminating the pregnancy, and she did so.

25. On June 13, 2018, Ms. Parker sent Defendant a text message with pictures of her lab results, showing Defendant that the termination process was completed. Whereas just days before Defendant had told Ms. Parker that he was working on getting the agreed upon sum, Defendant changed his tune as he knew the pregnancy was terminated. Thus, when Ms. Parker requested that Defendant update her on the status of payment. Defendant, for the first time, told Ms. Parker that he was not going to pay her, stating: "I'll have my lawyer contact you I'm not dealing with this any further then."

26. As Defendant continued to refuse to honor the contract, Ms. Parker filed suit in Los Angeles Superior Court (Case Number: 18SMCV00095) ), pleading causes of action for breach of contract, fraud, intentional infliction of emotional distress, quantum meruit and promissory estoppel.

27. Defendant demurred to the complaint, alleging that the agreement was not enforceable as it violated public policy. On or about June 6, 2019, Judge Elaine Mandel heard Defendant's demurrer. Judge Mandel, after reviewing the moving papers and opposition thereto,

overruled the demurrer. Judge Mandel set the matter for trial for July 2020. However, as the parties were still in the process of conducting discovery and due to COVID-19, the trial date was taken off calendar. At the time that Defendant filed his bankruptcy petition, there was no trial date.

28. On January 9, 2021, Defendant filed his bankruptcy petition. As other parties have sent forth in their various motions, Defendant failed to disclose his future earnings. At the meeting of creditors, Defendant failed to explain where all of his earnings have gone.

# FIRST CLAIM FOR RELIEF
# DEBT NON-DISCHARGEABILITY PURSUANT TO
# 11 U.S.C. §523(a)(2)

29. Plaintiff incorporates paragraphs 1 through 28 as though fully set forth herein.

30. Pursuant to 11 U.S.C. section 523(a), "[a] discharge under section 727 . . . of this title does not discharge an individual debtor from any debt . . (2) for money, property, services . . . to the extent obtained by - (a) false pretenses, a false representation, or actual fraud . . . ."

31. As Defendant made his false representations / false promises to Ms. Parker while she was located within the State of California, California law governs the necessary elements for false representations. Per California law, "The elements of fraud that will give rise to a tort action for deceit are: "'(a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage.'" (*Engalla v. PermanenteMedical Group, Inc.* 15 Cal.4th 951, 974 (1997); *see also California Civil Jury Instruction* 1900, *et seq.*)

32. Defendant represented to Ms. Parker that he would pay her an amount of two million to three million dollars if she terminated the pregnancy. That representation was false, as Defendant never did give Ms. Parker that sum or any sum. Defendant made further false representations to Ms. Parker that he was working on obtaining the amount of two million to three million dollars when he was not doing any such thing. Instead, Defendant was stringing her along by his misrepresentations until such time as he knew that the pregnancy was terminated.

33. Defendant told Ms. Parker and agreed with Ms. Parker that he would pay her an amount of two million to three million dollars with the intent to deceive Ms. Parker into terminating

the pregnancy. The fact that he subsequently stated that never agreed to pay Ms. Parker an amount of two million to three million dollars shows that he never intended to pay Ms. Parker that amount.

34. Additionally, Defendant's statement that he never agreed to pay Ms. Parker the agreed amount of two million to three million dollars demonstrates that at the time he made the representations to Ms. Parker that he would pay her the amount of two million to three million dollars, Defendant knew that he was never going to do so. Moreover, his subsequent conduct of continually stating that he was working on obtaining the agreed upon amount, but his failure to obtain that amount shows that he knowingly intended to never pay her. The fact that when he learned the pregnancy was terminated, he stopped communicating to Ms. Parker that he was working on obtaining the funds, but instead told her to speak to his lawyer also shows that he knew during all relevant times that he was never going to pay Ms. Parker the agreed upon amount of two million to three million dollars.

35. Ms. Parker justifiably relied on the promises and representations that Defendant was going to pay her an amount of two million to three million dollars. Defendant, who was a professional athlete that had earned more than thirty million dollars and had just signed a contract guaranteeing him future earnings of forty nine million dollars, had the wherewithal to pay that amount. Defendant had voluntarily wired $125,000.00 into Ms. Parker's account after she agree to terminate the second pregnancy. Defendant also told Ms. Parker that the pregnancy would "ruin his career," which at that time had a value of upwards of forty nine million dollars. Thus, to avoid millions in child support and the responsibilities of fatherhood, it made sense to Ms. Parker, as it would a reasonable person that Defendant was willing and able to pay an amount of two million to three million dollars to avoid those consequences.

36. Ms. Parker, based upon Defendant's false representation that Defendant would pay her an amount of two million to three million dollars, took all necessary actions to terminate the pregnancy, the proof of which she sent to Defendant. Thus, as a direct and proximate result of his false representations, Ms. Parker terminated her pregnancy, resulting in damages.

37. Defendants fraudulent actions and each of them authorize this Court to determine that the debt owed to Plaintiff is not dischargeable pursuant to 11 U.S.C. section 523(a)(2), as well as

other provisions of the United States Code and applicable case law.

## SECOND CLAIM FOR RELIEF
## DEBT NON-DISCHARGEABILITY PURSUANT TO
## 11 U.S.C. §§727(a)(2)-(a)(7)

38. Plaintiff incorporates paragraphs 1 through 37 as though fully set forth herein.

39. At the time of filing this adverse action, multiple creditors, as well as both the U.S. Trustee and the Bankruptcy Trustee have extensions to file adverse proceedings to determine whether a debt is non-dischargeable until May 5, 2021. However, as Plaintiff has no such extension, she alleges in this adverse action that the her debt is also non-dischargeable pursuant to 11 U.S.C. section 727 (a)(2) through (a)(7).

40. Defendant failed to disclose all of his earnings in his petition. Defendant failed to disclose where the near fifty million he had earned in 11 years he played professional hockey had gone. Defendant only claimed three significant assets (three homes), but also claimed that all three were encumbered with mortgages that nearly equated to the value of each property. Thus, Defendant alleged that despite earning nearly fifty million dollars and that after borrowing another sixteen million, that he had no assets.

41. Defendant failed to provide satisfactory answers at his meeting of creditors as to where all of that money (sixty six million) had gone. While gambling debts were alleged to have taken a portion of that amount, Defendant did not claim at his meeting of creditors or in his petition that he lost anywhere near that amount gambling. As Defendant failed to provide a satisfactory explanation as to his financial state, and as Plaintiff's deadline to file in April 5, 2021, Plaintiff incorporates into her adverse complaint a request that Defendant's debt to her be deemed non-dischargeable pursuant to 11 U.S.C. section 727 (a)(2) through (a)(7). Those sub-sections allow this Court to determine that the debt owed to Plaintiff is not dischargeable. Defendant's actions of failing to provide full disclosure in his petition and at the subsequent meeting of creditors require Plaintiff to request that this Court dismiss the Petition and/or deny Defendant a discharge pursuant to 11 U.S.C. section 727, as well as other provisions of the United States Code and applicable case law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

1. A determination that the indebtedness owed to Plaintiff HOPE PARKER is non-dischargeable under 11 U.S.C. §§ 523(a)(2);
2. A determination that the indebtedness owed to Plaintiff HOPE PARKER is non-dischargeable under 11 U.S.C. §§ 727(a)(2) - (a)(7);
3. The dismissal with prejudice of Debtor's Petition under 11 U.S.C. §§ 727(a)(2) - (a)(7);
4. The denial of Debtor's bankruptcy under 11 U.S.C. §§ 727(a)(2) - (a)(7);
5. For prejudgment interest;
6. For attorney fees as may be allowed by law;
7. For costs of suit; and
8. For such other relief as the Court may deem just and proper.

Dated: April 1, 2021

J. LEWIS & ASSOCIATES, APLC

By /s/ Jonathan J. Lewis
Jonathan J. Lewis, Esq.
Attorney for Plaintiff