ANTHONY & PARTNERS, LLC
JOHN A. ANTHONY (SBN0731013)
  janthony@anthonyandpartners.com
ANDREW J. GHEKAS (SBN 0119169)
  aghekas@anthonyandpartners.com
*Both admitted Pro Hac Vice*
100 S. Ashley Drive, Suite 1600
Tampa, Florida 33602
Telephone: 813.273.5616
Facsimile: 813.221.4113

COOPER, WHITE & COOPER LLP
PETER C. CALIFANO (SBN 129043)
  pcalifano@cwclaw.com
201 California Street, 17th Floor
San Francisco, California 94111
Telephone: 415.433.1900
Facsimile: 415.433.5530

Attorneys for Creditor CENTENNIAL BANK

## UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| In re<br><br>EVANDER FRANK KANE,<br><br>      Debtor. | CASE NO. 21-50028 SLJ<br><br>Chapter 7<br><br>**DECLARATION OF ANDREW J. GHEKAS IN SUPPORT OF CENTENNIAL BANK'S MOTION TO DISMISS LIQUIDATION [DOC. 83]**<br><br>**Date: May 18, 2021**<br>**Time:2:00 PM**<br>**Place: Via Zoom Video Conference**<br>**Judge: Hon. Stephen L. Johnson** |

I, Andrew J. Ghekas, know the following matters to be true of my own, personal knowledge and, if called as a witness, could and would testify competently thereto:

1.     I am a member of the State Bar of Florida in good standing and am admitted *pro hac vice* to practice before this Court in this case. I am a partner employed by Anthony & Partners, LLC, counsel of record for creditor Centennial Bank ("Centennial"). This declaration is offered in

COOPER, WHITE
& COOPER LLP
ATTORNEYS AT LAW
201 CALIFORNIA STREET
SAN FRANCISCO, CA 94111-5002

support of the "Centennial Bank's Motion to Dismiss Liquidation" (the "Dismissal Motion") regarding Debtor Evander Kane's ("Kane") Chapter 7 bankruptcy case (this "Liquidation").

2.      Centennial is scheduled as a secured creditor in the amount of $8,360,000 [Doc. 18, Schedule D, Creditor No. 2.3]. Centennial has filed its "Proof of Claim" (the "Centennial Obligation") [POC 5] on March 18, 2021.

3.      On March 24, 2021, and pursuant to the "Order Approving Stipulation Regarding Centennial Bank Rule 2004 Examination" [Doc. 61], I conducted a Rule 2004 examination (the "2004 Examination") of Kane. During the 2004 Examination, I asked Kane, and Kane answered under oath, a series of questions regarding his personal use of the loan proceeds Kane received from Centennial as part of the Centennial Obligation. In response to this line of questioning, Kane testified as follows:

    a.   Kane utilized the loan proceeds to pay off other outstanding debt obligations.

    b.  Kane did not use the loan proceeds to purchase any real estate.

    c.  Kane did not use the loan proceeds in order to operate any ongoing business.

    d.  Kane did not use the loan proceeds to purchase any operating business.

    e.  Kane did not use the loan proceeds to invest in any other sort of investment vehicle or activity.

See Attached Ex. A.

4.      During his testimony, Kane referred to his prior debt obligations (the "Hard Money Loans") as "business loans," but when I questioned him further, Kane admitted that the only reason he referred to them as "business loans" was that is what the document said. Through further questioning at the 2004 Examination, Kane could not recall why he had taken out these Hard Money Loans, when he had taken out the Hard Money Loans, the total amount of outstanding debt associated with the Hard Money Loans, or all of the financial institutions and third parties that make up the various lenders who lent Kane the Hard Money Loans. See Attached Ex. B.

5.      As the 2004 Examination continued, I asked Kane a similar line of questioning relating to the loan proceeds Kane received from both Professional Bank ("Professional") and Zions Bancorporation ("Zions"). In response, Kane testified that he did not utilize any of the loan

COOPER, WHITE
& COOPER LLP
ATTORNEYS AT LAW
201 CALIFORNIA STREET
SAN FRANCISCO, CA 94111-5002

proceeds from either Professional or Zions to (a) purchase any property, (b) invest in any ongoing business, or (c) to start any new business venture. Instead, Kane testified that, similar to the loan proceeds representing the Centennial Obligation, Kane utilized the loan proceeds from Professional and Zions to pay off or down other outstanding debt obligations – i.e. the Hard Money Loans. Again, Kane could not recall what the purpose of these Hard Money Loans was for. See Attached Ex. C.

6.      In addition to the foregoing, I proceeded to question Kane regarding approximately $2,150,000 of unsecured loans Kane has listed on his Schedules that were lent to him by various personal and family friends. Kane testified, to the extent that he could recall, that these unsecured loans were borrowed to (a) pay bills, (b) stay current, (c) pay credit cards, (d) pay mortgage, or (e) to pay other people he had borrowed money from. See Attached Ex. D.

7.      Kane further testified that of the three (3) business entities that he has listed on his Schedules as having an interest in, two (2) of them have zero assets and are nonoperating – the Lions Properties, LLC and EK9 Marketing LLC. The other entity, Ascher Capital II and Ascher Capital III, is an entity that Kane invested in, by borrowing money on the eve of initiating this Liquidation, in the amount of $750,000. Kane could not recall if he has had any interest in any other business entity or enterprise or if he had ever purchased any other real estate other than the real estate listed on his Schedules. See Attached Ex. E.

8.      Kane further confirmed that he has not made any material changes to his lifestyle after initiating this Liquidation, but instead, in order to keep up with his monthly expenses of approximately $93,000, has had his wife borrow money from friends and family. See Attached Ex. F.

9.      Kane also testified that for the months of January and February 2021, after initiating this Liquidation, he has received approximately $111,709.03 in salary compensation, far more than what he listed on his Schedules. Kane additional anticipates received a federal tax refund in the amount of approximately $1,200,000. See Attached Ex. G.

10.     The testimony of Kane at the 2004 Examination further confirms that Kane made eve of bankruptcy purchases in the form of borrowing $750,000 in order to invest in a speculative

COOPER, WHITE
& COOPER LLP
ATTORNEYS AT LAW
201 CALIFORNIA STREET
SAN FRANCISCO, CA 94111-5002

venture – Ascher Capital II and Ascher Capital III, as well as utilizing a portion of his $3,000,000 signing bonus that he received on July 1, 2020 – within the six (6) months preceding Kane's initiating of this Liquidation – as a down payment on his California residence. <u>See</u> Attached Ex. H.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct, and that this declaration was executed on this 15th day of April, 2021, at Tampa, Florida.

Andrew J. Ghekas

1501611.1

COOPER, WHITE
& COOPER LLP
ATTORNEYS AT LAW
201 CALIFORNIA STREET
SAN FRANCISCO, CA 94111-5002

# EXHIBIT "A"

1           UNITED STATES BANKRUPTCY COURT
            NORTHERN DISTRICT OF CALIFORNIA
2                  SAN JOSE DIVISION
             CASE NO.: 21-50028-SLJ
3                    Chapter 7

4     In re

5     EVANDER FRANK KANE,

6          Debtor.
      _____/
7

8

9

      RULE 2004
10    EXAMINATION AND
      DUCES TECUM
11    DEPOSITION OF:         **EVANDER FRANK KANE**

12    TAKEN:                 Pursuant to Notice by
                             Counsel for Centennial Bank
13
      DATE:                  March 24, 2021
14
      TIME:                  2:01 p.m. to 5:14 p.m. (EST)
15
      LOCATION:              Zoom videoconference
16
      REPORTED BY:           Melanie Keefe, FPR
17                           Notary Public
                             State of Florida at Large
18

19

20

21

22

23

24

25

```
1    APPEARANCES:      ANDREW J. GHEKAS, ESQUIRE
                       Anthony & Partners, LLC
2                      100 South Ashley Drive
                       Suite 1600
3                      Tampa, Florida  33602

4                           Attorney for Centennial Bank

5                      STEPHEN D. FINESTONE, ESQUIRE
                       Finestone Hayes LLP
6                      456 Montgomery Street
                       20th Floor
7                      San Francisco, California  94104

8                           Attorney for the Debtor

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              MR. GHEKAS:  For me it's page 3.

 2              MR. FINESTONE:  Yeah.  No, you're right.  My --

 3         sorry.  Sorry for the confusion.  My little page number

 4         indicator didn't turn over.  I apologize, Andrew.

 5              MR. GHEKAS:  Oh, no problem.

 6         Q.   So, Mr. Kane, if you open up D2, Third Amendment

 7    to Secured Financial Transaction and Security Agreement, do

 8    you recognize this document?

 9         A.   Yes.

10         Q.   And is that your signature on page 4?

11         A.   Yes.

12         Q.   Okay.  So, Mr. Kane, let me ask you, what did you

13    need the $8 million for?

14         A.   It was used to pay off other business debt and

15    loans that were previously taken.

16         Q.   Other business debt and loans, is that what you

17    said?

18         A.   Yes.

19         Q.   So you didn't use it to purchase any properties?

20         A.   No, not at all.

21         Q.   And you didn't use it to purchase any operating

22    business?

23         A.   No.

24         Q.   And you didn't use it to fund any operating

25    business?
```

_REGENCY REPORTING SERVICE, INC. (813)224-0224_

1        A.   No.

2        Q.   And you didn't use it to invest in any

3 investments or other business ventures or anything like

4 that?

5        A.   No.

6        Q.   So you said you used it for other business debts

7 and loans.  What's the other business debts?

8        A.   What I meant when I said "debt," I meant loans.

9        Q.   Oh, okay.  You used it to pay off other loans?

10       A.   Other business loans and hard money loans and

11 private money loans that I had taken out, yes.

12       Q.   Okay.  All right.  When did you take out these

13 prior loans?

14       A.   I don't recall.

15       Q.   You don't recall.  Okay.

16            And do you know what the purpose of those prior

17 loans was for?

18       A.   I couldn't recall at this time.

19       Q.   Do you know why you referred to them as business

20 loans?

21       A.   Because that's what the documents said --

22       Q.   Okay.

23       A.   -- I believe.

24       Q.   You don't own or operate any businesses, do you?

25       A.   Not at this time, no.

1                    CERTIFICATE OF REPORTER

2     STATE OF FLORIDA              )

3     COUNTY OF HILLSBOROUGH        )

4

5              I, Melanie Keefe, Court Reporter, certify that I
      was authorized to and did stenographically report remotely
6     the deposition of EVANDER FRANK KANE; that a review of the
      transcript was requested; and that the transcript, pages 5
7     through 102, inclusive, is a true and complete record of my
      stenographic notes.
8
               I further certify that I am not a relative,
9     employee, attorney, or counsel of any of the parties, nor am
      I a relative or employee of any of the parties' attorney or
10    counsel connected with the action, nor am I financially
      interested in the action.
11
                         _s/ Melanie Keefe_____
12                       Melanie Keefe, FPR
                         Court Reporter
13    _____

14                     CERTIFICATE OF OATH

15    STATE OF FLORIDA              )

16    COUNTY OF HILLSBOROUGH        )

17             I, the undersigned authority, certify that
      EVANDER FRANK KANE personally appeared before me remotely
18    and was duly sworn.

19             WITNESS my hand and official seal this 8th day of
      April, 2021.
20

21                       _s/ Melanie Keefe_____
                         Melanie Keefe, FPR
22                       Notary Public
                         State of Florida
23                       My Commission No.:  HH055410
                         Expires:  December 9, 2024
24

25

            —REGENCY REPORTING SERVICE, INC. (813)224-0224—

# EXHIBIT "B"

1      A.   No.

2      Q.   And you didn't use it to invest in any

3 investments or other business ventures or anything like

4 that?

5      A.   No.

6      Q.   So you said you used it for other business debts

7 and loans.  What's the other business debts?

8      A.   What I meant when I said "debt," I meant loans.

9      Q.   Oh, okay.  You used it to pay off other loans?

10     A.   Other business loans and hard money loans and

11 private money loans that I had taken out, yes.

12     Q.   Okay.  All right.  When did you take out these

13 prior loans?

14     A.   I don't recall.

15     Q.   You don't recall.  Okay.

16       And do you know what the purpose of those prior

17 loans was for?

18     A.   I couldn't recall at this time.

19     Q.   Do you know why you referred to them as business

20 loans?

21     A.   Because that's what the documents said --

22     Q.   Okay.

23     A.   -- I believe.

24     Q.   You don't own or operate any businesses, do you?

25     A.   Not at this time, no.

1      Q.    Have you ever?

2      A.    I don't recall.

3      Q.    You don't recall.  Okay.

4            Do you recall how much these other loans were,

5      the total amount?

6      A.    I do not, no.

7      Q.    Was it one loan, two loans, three?  Do you know?

8      A.    I don't know the number, but there were -- it was

9      more than one, multiple loans.

10     Q.    And you don't -- do you recall who you took them

11     out with?

12     A.    Not all of them, no.

13     Q.    Which ones do you remember?

14     A.    I know there is a loan with East West Bank, I

15     believe, and I -- I don't want to guess exactly what the

16     names of the other ones were.

17     Q.    That is perfectly fine.

18           But for these other loans that you used -- so did

19     you use the total $8 million lent from Centennial to pay off

20     or pay down these prior loans?

21     A.    I don't -- I'm not a hundred percent sure on

22     exactly where the totality of the 8 million went.  But to my

23     knowledge, a great majority of it, yes, was used to pay down

24     previous loans.

25     Q.    Okay.  And you can't recall right now what those

─────── REGENCY REPORTING SERVICE, INC. (813)224-0224 ───────

1    prior loans were for; correct?

2         A.    Correct.

3         Q.    Okay.  Do you -- so do you maintain any books or

4    records or -- or documents regarding these prior loans?

5         A.    Personally, no.

6         Q.    You said "personally, no," so somebody else?

7         A.    I have an accountant or I had an accountant that

8    I've worked with for the last couple of years and kind of

9    coupled with Sure Sports lending, so they would have, I

10   believe, those documents, records.

11        Q.    And who -- who is the accountant you referred to?

12        A.    Tony is his name.

13        Q.    Does he have a last name?

14        A.    Chiricosta.

15             MR. FINESTONE:  Why don't you go ahead and spell

16        that for Melanie, Mr. Kane, if you could.

17             THE WITNESS:  One second here.  I'm not sure how

18        to spell it either.  It's C-h-i-r-i-c-o-s-t-a.

19        Q.    Okay.  All right.  Mr. Kane, if I could have you

20   go back to the petition that we were previously looking at.

21   If you closed it again, it's F. Voluntary Chapter 7

22   Petition.

23        A.    Yes.

24        Q.    And if you could, go to page 8 of that document

25   and at the bottom it will be in red, page 8 of 73.

REGENCY REPORTING SERVICE, INC. (813)224-0224

# EXHIBIT "C"

1    you were going to file bankruptcy at the time in which you

2    made this investment into Ascher Capital II and III?

3         A.    Yes, it is.

4         Q.    Okay.  So let's go to 2.6, Pacific Private Money,

5    the next one.  We already discussed that credit.  So if we

6    continue to page 5 of 19, at the top Professional Bank

7    listed at 1,364,000.  What -- what was this loan for?

8         A.    That loan was for the exact same reasons, and I

9    believe roughly around the same time when I took out the

10   loans -- or the additional loan with Centennial and the loan

11   with California Bank & Trust.

12        Q.    Okay.  Okay.  And again, you don't recall what

13   those other loans -- who those other loans were taken with?

14        A.    Correct.

15        Q.    And you don't recall what those other loans --

16   what the purpose of those other loans were for?

17        A.    Correct.

18        Q.    And so you didn't -- did you receive any of the

19   portion of the $1,354,000 lent by Professional Bank?

20        A.    I don't recall.  It would be, again, the same

21   answer.  A great majority of those funds went to pay off

22   preexisting loans.  I might've received a small portion of

23   that amount, but I'm not sure.

24        Q.    Okay.  So just to confirm briefly, you didn't use

25   the Professional Bank funds to buy any property; correct?

—— REGENCY REPORTING SERVICE, INC. (813)224-0224 ——

1      A.    Correct.

2      Q.    You didn't use it to invest in any ongoing

3   business; correct?

4      A.    Correct.

5      Q.    You didn't use it to start a new business;

6   correct?

7      A.    Correct.

8      Q.    All right.  Let's -- so the next two are Scotia

9   Bank, and these look to be first mortgages on the two

10  Canadian properties?

11     A.    Correct.

12     Q.    All right.  And are you current on those

13  mortgages?

14     A.    Yes.

15     Q.    And then -- so 2.10 on page 6 of 19, South River

16  Capital LLC, $1,074,494.87, what was this loan for?

17     A.    That number was not the loan amount.  I believe

18  that's a judgment that I was unaware of that even

19  transpired.  I just received something in the mail regarding

20  that.  I believe the original loan was 600,000, and that

21  loan, again, was to help pay off some debt.

22           I'm not exactly sure what that -- what it was at

23  the time.  And I don't believe I received any additional --

24  or extra funds outside of that, but again, not a hundred

25  percent.  If it would've been, it would've been, again,

REGENCY REPORTING SERVICE, INC. (813)224-0224

1    small comparatively.

2         Q.   And so you said it was to help pay off debt.  Do

3    you -- do you know what debt that was?

4         A.   I'm not sure what that specific money was used to

5    pay off at the time.

6         Q.   Okay.  And so that was May 2019, it says here?

7         A.   Yeah.  Yeah, that would be correct.

8         Q.   Continuing to page 7 of 19, Zions Bancorporation,

9    which has a loan for 4,250,000, do you know what that loan

10   was for?

11        A.   For -- yeah.  For the exact same things I was

12   just talking about previously.  I believe I had mentioned

13   them.  I think Zions Bank is California Bank & Trust, as I

14   referred to earlier, or that's what it was known to me as.

15   So those -- that money was, again, used to pay off

16   preexisting loans.

17        Q.   And so when you say it is for the exact same

18   thing as you previously discussed, you mean it was the same

19   type of loan that you took out at both Centennial and

20   Professional Bank?

21        A.   Sorry --

22        Q.   Yes, that was a bad question.  You indicated that

23   the loan was taken out for the same kind of things that you

24   just previously discussed, and I just want to confirm that

25   you're referring to the loans taken out at Centennial and

—— REGENCY REPORTING SERVICE, INC. (813)224-0224 ——

1    Professional Bank?

2         A.   Correct.

3         Q.   And so, again, to confirm, you didn't use any of

4    the Zions Bancorporation or California Bank & Trust loan to

5    buy any property?

6         A.   Correct.

7         Q.   You didn't use it to invest in any ongoing

8    business?

9         A.   Correct.

10        Q.   You didn't start a new business with it?

11        A.   Correct.

12        Q.   If we can skip to page 12 of this document and

13   there's a series of unsecured loans that you have listed

14   there.  I just want to briefly go through each one.  Davis

15   Sanchez you identify as a $150,000 loan.  Do you know what

16   that loan was for?

17        A.   Yeah.  It was money I borrowed from him.

18        Q.   And what was the purpose of borrowing the money?

19        A.   To basically just be able to pay my bills.

20        Q.   And do you know when you took out -- or sorry,

21   not took out.  Do you know when you borrowed this money?

22        A.   It wasn't all at the same time.  It was over the

23   course of a number of years.

24        Q.   Are there any payment terms to this loan?

25        A.   On paper or...

REGENCY REPORTING SERVICE, INC. (813)224-0224

# EXHIBIT "D"

1    Professional Bank?

2         A.    Correct.

3         Q.    And so, again, to confirm, you didn't use any of

4    the Zions Bancorporation or California Bank & Trust loan to

5    buy any property?

6         A.    Correct.

7         Q.    You didn't use it to invest in any ongoing

8    business?

9         A.    Correct.

10        Q.    You didn't start a new business with it?

11        A.    Correct.

12        Q.    If we can skip to page 12 of this document and

13   there's a series of unsecured loans that you have listed

14   there.  I just want to briefly go through each one.  Davis

15   Sanchez you identify as a $150,000 loan.  Do you know what

16   that loan was for?

17        A.    Yeah.  It was money I borrowed from him.

18        Q.    And what was the purpose of borrowing the money?

19        A.    To basically just be able to pay my bills.

20        Q.    And do you know when you took out -- or sorry,

21   not took out.  Do you know when you borrowed this money?

22        A.    It wasn't all at the same time.  It was over the

23   course of a number of years.

24        Q.    Are there any payment terms to this loan?

25        A.    On paper or...

─────────────────────────────────────────────

REGENCY REPORTING SERVICE, INC. (813)224-0224

1        Q.   Yes, on paper.

2        A.   No.

3        Q.   And who is Davis Sanchez to you?

4        A.   Just a friend of mine.

5        Q.   And going to page 13, the first one, Hebron

6 Shyng?

7        A.   Yep.

8        Q.   430,000, what was that loan for?

9        A.   Again, to help pay off some debt that I had and

10 also to stay current on my bills.

11        Q.   And do you know what debt you're referring to?

12        A.   There's probably some credit card debt, some

13 bills that I was behind on, so I can be able to pay my

14 mortgages, rent at the time, food.

15        Q.   And -- and who is Mr. Shyng?

16        A.   He's a friend of my parents.

17        Q.   And then the page 14, Mike Lispti?

18        A.   Um-hmm.

19        Q.   750,000, what was that loan for?

20        A.   That was some money that I had borrowed.

21        Q.   And what was the purpose of borrowing that money?

22        A.   Just to help pay off some -- some other people

23 that I borrowed money from.

24        Q.   And do you know when this loan was incurred?

25        A.   Not exactly, no.

1          Q.   Is there any documentation to it?

2          A.   No.

3          Q.   And continuing to page 15 -- I'm sorry.   Skip 15.

4 Page 16, Pete Gianakas?

5          A.   Um-hmm.

6          Q.   400,000, what was this loan for?

7          A.   Again, just to pay off some other people that I

8 had borrowed money from in the past.

9          Q.   Did you know who those people were?

10          A.   I don't recall at this time.

11          Q.   Do you know the date in which you took out -- or

12 took this loan?

13          A.   No, I do not.

14          Q.   Is there any documentation?

15          A.   No.

16          Q.   And then same page, Raj Bhangu?

17          A.   Bhangu, yeah.

18          Q.   Bhangu.   Sorry.   A hundred thousand, same

19 question, do you know why -- why this loan was taken out?

20          A.   Yeah.   He loaned me the money because I was

21 behind on some bills and needed -- needed the cash to -- to

22 stay current and make up some late payments.

23          Q.   And do you know when this loan was taken out?

24          A.   I don't recall, no.

25          Q.   And is it documented?

1      A.    It is not.

2      Q.    And then the last one I have on this, page 17 of

3    19, Tony Veltri?

4      A.    Yes.

5      Q.    320,000, again, do you know what this loan was

6    taken out for?

7      A.    Yes.  It was money used to pay off other people

8    that I had borrowed money from in the past.

9      Q.    And do you recall who those other people were?

10     A.    I do not.

11     Q.    And do you know the date in which you took out

12   this loan?

13     A.    No.  It was money pieced together over time.

14     Q.    And there's no written documentation regarding

15   it?

16     A.    No.

17     Q.    Okay.  So now I'm going to want to have you open

18   up a document entitled Wells Fargo 2020 Statements

19   Combined.

20     A.    Yep.

21     Q.    All right.  If you could, what -- what is -- what

22   is your Wells Fargo account primarily used for?

23     A.    There's nothing specific about what the account

24   is used for.

25     Q.    Okay.  And you just have seven accounts.  I

# EXHIBIT "E"

1     there are --

2          A.    Sorry to interrupt.

3          Q.    Yeah, no problem.

4          A.    I just want to make sure I'm on the right thing

5     here.  We're not -- we're not on the Doc 42 anymore?

6          Q.    That is correct.  We are on our amended Schedules

7     A, B, and C, Docket 37.

8          A.    Got it.  And page 11, you said?

9          Q.    Page 5.

10         A.    Page 5.  Okay.  I'm on it.

11         Q.    I just want to confirm excluding the community

12    property interest account that you have there, the last one,

13    the Bank of America, the Wells Fargo, the two Scotia Banks,

14    and the two Royal Bank of Canada accounts, those are the

15    only depository accounts that you have?

16         A.    Yes.

17         Q.    And then let's continue on to page 6.  In the

18    middle there, No. 19 regarding interests and any LLCs,

19    partnerships, or joint ventures you may have, you have three

20    listed there.  Do you see that?

21         A.    Yes.

22         Q.    And the -- the last two, Lions Properties, LLC,

23    and EK9 Marketing, LLC, you list both as having zero value;

24    correct?

25         A.    Correct.

1       Q.   And is that because -- well, for Lions Property,

2  LLC, you indicated it has no assets.  Is that the same for

3  EK9 Marketing, LLC?

4       A.   Correct.

5       Q.   So are they essentially nonoperating?

6       A.   Yes.

7       Q.   Okay.  And then for the -- the first one you have

8  here, you -- you identify membership interests in Ascher

9  Capital II and III LLC.  What -- do you actually have a

10  membership interest in those two entities?

11      A.   Yes.

12      Q.   Do you know what that membership interest is?

13      A.   Sorry.  I don't quite understand that -- that

14  question pertaining to -- what do you mean "is," like --

15      Q.   Like percentage-wise, do you know what percent of

16  the LLC you own?

17      A.   No.  To be honest, I'm very -- I'm unsure of the

18  -- the exact details in that agreement.  I'm not sure if --

19  if Mr. Finestone sent over those loan documents and business

20  documents with Ascher Capital.

21      MR. FINESTONE:  I believe we did, yeah.

22      A.   So I -- I think that would probably answer all of

23  your questions pertaining to that.  I -- I couldn't give you

24  a better answer.

25      Q.   So do you know exactly what you were investing in

REGENCY REPORTING SERVICE, INC. (813)224-0224

1    when you invested in Ascher Capital II and III LLC?

2         A.   Yeah, it was explained to me two years ago and

3    ended up not doing it and then this past year ended up

4    having that -- those same conversations with the people at

5    Ascher Capital and decided to -- to do it.  And it was

6    explained to me at the time, but for me to try to summarize

7    all the details right now would be too much.

8         Q.   Okay.  And so you invested in Ascher Capital II

9    and III in December of 2020; correct?

10        A.   Correct.

11        Q.   And how did you fund that investment?

12        A.   It was through a loan that was borrowed.  The

13   numbers are small -- small compared to the investment amount

14   of money that I personally put forth.

15        Q.   Do you have any documents actually showing that

16   you -- that your monies that you invested has been utilized

17   in any way by the companies?

18        A.   The only documents I have are, I believe, the

19   ones that Mr. Finestone sent to your office.

20        Q.   And so do you know the exact date in which you

21   invested in these two entities?

22        A.   I don't recall, no, the exact date.

23        Q.   All right.  Would December 14 sound about right?

24        A.   I'd be guessing, but possibly, yes.

25        Q.   All right.  And I can pull them up just quickly

REGENCY REPORTING SERVICE, INC. (813)224-0224

1      I'm just trying to figure out what exactly -- what you've

2      done with your funds.

3              MR. FINESTONE:  I'm going to object to the

4              question.  It's -- it's vague.  It calls for lots of

5              speculation.  You're talking about a period since

6              Mr. Kane was 19 years old, and I don't think it's

7              relevant to anything.

8              But you can attempt to answer it to the extent

9              you can remember or generalize about what you spent

10             money on, I guess.

11      A.      Yeah, there's -- there's no way I can generalize

12      or remember for all those years what --

13      Q.      Did you purchase any real estate?

14      A.      Well, yes.  As we went through, I've purchased

15      some real estate during that time.

16      Q.      Did you purchase real estate other than the three

17      properties that you have listed on your schedules?

18      A.      I don't recall.

19      Q.      Have you ever invested in any businesses?

20      A.      I have, I believe.  I don't really recall.

21      Q.      And have you ever purchased any watercrafts or

22      sports vehicles, anything of that nature?

23      A.      No.  Sorry.  When you say "sports vehicles," are

24      you talking, like, cars?

25      Q.      No.  Like ATVs --

# EXHIBIT "F"

1    property?

2         MR. FINESTONE:  Same -- same objection, but he

3         can go ahead and answer if he can.

4         A.    I'm unsure.

5         Q.    You're unsure as to whether if you had terminated

6    your player's contract, whether or not you would be able to

7    continue to pay the mortgage on the California property?

8         A.    Correct.

9         Q.    Okay.  If we go back to what we were looking at

10   previously -- sorry.  If -- so going back to the Part 4 --

11   or sorry -- Part 3 where it says your expenses and it gives

12   a number $93,214.46 as your monthly expenses; is that

13   accurate?

14        MR. FINESTONE:  Was this on what you just did

15        share screen or on the voluntary petition document?

16        MR. GHEKAS:  I apologize.  It's on the voluntary

17        petition document.

18        MR. FINESTONE:  Okay.  Thank you.

19        Q.    And again, Mr. Kane, it's page 8 of 73 of that

20   document.

21        A.    Sorry.  Can you repeat the question?  I just got

22   there.

23        Q.    Yes.  I just wanted you to confirm that your

24   monthly expenses at the date of filing your petition was

25   $93,214.46?

REGENCY REPORTING SERVICE, INC. (813)224-0224

1      A.    Yes.

2      Q.    And is that still what your monthly expenses are?

3      A.    I'm not sure exactly the amount.

4      Q.    Are you able to estimate whether or not it's gone

5   down or higher?

6      A.    I'm not at this time, no.

7      Q.    Mr. Kane, other than your player's contract, do

8   you have any other source of income?

9      A.    No.

10     Q.    The -- so the -- the monthly expenses that is

11  reflected here, I know you were asked a number of questions

12  regarding it at the 341, so I don't want to repeat all of

13  those.  My -- my one question is did you pay these expenses

14  in January of 2021?

15     A.    That amount is -- sorry.  I don't understand the

16  question.

17     Q.    Yeah.  So this says your monthly expenses is this

18  amount, and so I'm just confirming whether or not this

19  amount or something similar to it you paid in January of

20  2021?

21     A.    Something similar to that, yes.

22     Q.    And also for February 2021?

23     A.    I -- I couldn't tell you exactly what I paid at

24  the moment.

25     Q.    Would it have been close to this number?  Are you

—————— REGENCY REPORTING SERVICE, INC. (813)224-0224 ——————

1    able to estimate?

2          A.    I'm not able to estimate at this time, no.

3          Q.    Well, have you done anything different in your --

4    in your lifestyle that would have caused the monthly

5    expenses to go down any?

6          A.    I'm not sure, to be honest.

7          Q.    So in January with the season having started, do

8    you recall what your first paycheck was?

9          A.    I don't recall exactly, but I believe you have

10   it.

11         Q.    Yeah.  And I'll -- we can go to that document.

12   It's the January 13, '21, to January 21, '21.

13              MR. FINESTONE:  I'm not seeing that, Andrew.  Do

14         you?  Am I missing it?

15              THE WITNESS:  I had trouble too.  It's -- it's

16         actually the February ones.  See it?

17              MR. FINESTONE:  Okay.  Okay.  Found it.  Thank

18         you.

19         Q.    So do you have it open?

20         A.    I do.

21         Q.    Okay.  So this shows that this was for the period

22   January 13, 2021, through January 21, 2021, and a pay date

23   of January 29, 2021.  So is -- is that standard where you

24   usually get paid a week after the period ends?

25         A.    To be honest, I'm unsure on the exact -- how the

REGENCY REPORTING SERVICE, INC. (813)224-0224

1    in February, but you did testify that you believe they were

2    close to the $93,000 in January.  Did -- did I -- did I hear

3    that correctly?

4         A.   Yeah.  It was probably somewhere around that.

5    Again, I'm not a hundred percent what that number was.

6         Q.   And so my question is then if your only payment

7    in January was $38,709, what other funds did you use to make

8    up that difference in your expenses?

9         A.   My wife had borrowed some money from friends and

10   family.

11        Q.   All right.  If you -- we're going to be done with

12   those pay stubs, so you can close those out if you want.

13   And then open up, if you would, it's titled Centennial Kane

14   Doc 29.  And it's the amended statement of financial

15   affairs.

16        A.   I have it.

17        Q.   All right.  And if you go to page 2 of that

18   document --

19        A.   Yes.

20        Q.   -- do -- do you see at the top for the last three

21   years, you have listed amounts and gross income totaling 21

22   million; correct?

23        A.   Correct.

24        Q.   All right.  And so that -- that was actually

25   pretty close to the -- the number --

# EXHIBIT "G"

1    for the next three seasons, and we will not be getting any

2    of that money back.

3           Q.    I'm sorry.  What was the last part?

4           A.    And we will not be getting any of that money

5    back.

6           Q.    Oh, okay.  So that's for the next withholding?

7           A.    For the next -- I believe for the duration of

8    this collective bargaining agreement, we won't see any of

9    that escrow money back, yes.

10          Q.    All right.  And so we look at the bottom after we

11   go through the deferral, the withholding, and then the

12   taxes, the net pay to you for this pay period was

13   $38,709.03; correct?

14          A.    Correct.

15          Q.    And was this your only payment in January?

16          A.    Yes.

17          Q.    All right.  So I want to move on to -- you'll see

18   there were three separate documents for February 5, '21, to

19   February 18, '21.  And if we open them all, I was curious --

20          A.    Sorry.  When I open it, there's only one page.

21          Q.    Yes.  It's actually three separate documents.

22          A.    Okay.

23          Q.    They just all so happen to be for the same pay

24   period, but it's different payment amounts.

25          A.    Um-hmm.

1    Q.    And so that was actually my -- my first question

2    is why there are three separate checks, it looks like?

3    A.    I do not know why there are three separate

4    checks.

5    Q.    Okay.

6    A.    I -- I know that they total my pay for that pay

7    period.  But with regards to why there were three separate

8    individual checks, I do not know.

9    Q.    Okay.  And -- and so did you, in fact, receive

10   the total of 73,000 or --

11   A.    Yes.

12   Q.    Yes?  Okay.

13   A.    Yeah, approximately, whatever those three totals

14   add up to.

15   Q.    Okay.  And so here it says this pay period was

16   for February 5th through February 18.  And the -- and the

17   January check that we just looked at, that pay period ended

18   -- I believe it was January 21.  So was -- was there not a

19   pay period in between these two checks?

20   A.    Yeah, I -- again, I don't make these documents or

21   these checks, but no, there is no pay period in between

22   that.  No.

23   Q.    Okay.  And so previously when we covered your

24   expense number -- your monthly expense number, you weren't

25   able to testify whether or not you -- what your checks were

1          A.    Totaling 20 million.

2          Q.    You're absolutely right, 20 million.  Yes, that

3     is the exact -- the exact number that we got to earlier on

4     in the -- in this examination.  So if we go to the middle

5     here, 5, this lists other sources of income that you

6     received for this year, the two previous calendar years.

7     And in this box, you have listed for the calendar year

8     January 1 to December 31, 2020, three separate sources of

9     income.  And the one I want to focus on is the middle one,

10    the federal tax return that you have listed as

11    1,200,000.  Did you actually receive that?

12          A.    I have not.

13          Q.    Have not.  But you anticipate receiving that?

14          A.    At the time, I did.  I -- I believe I still do,

15    but I am unsure.

16          Q.    So have you actually completed your 2020 tax

17    return?

18          A.    I believe so.

19          Q.    Okay.  So now if we could close out of that and I

20    want you to open up what's labeled -- I want to make sure I

21    get the right one because there were two amendments.  It

22    should be R. Amended Schedule A_B and C - Doc 37.

23          A.    Yep.

24          Q.    And so this has a file date of February 26, 2021,

25    correct, at the bottom there, just to make sure we're on the

REGENCY REPORTING SERVICE, INC. (813)224-0224

# EXHIBIT "H"

1    A.    Yeah, I -- I did receive those.

2    Q.    And do you recall what you used those funds for?

3    A.    The same thing.  To pay down a portion of my loan

4    with California Bank & Trust, I believe.

5    Q.    Okay.  And then the third line here, the most

6    recent installment is July 1, 2020.  It reflects that you

7    were to have received a $3 million installment payment.  Did

8    you, in fact, receive that?

9    A.    Yes.

10    Q.    And is that the installment payment you testified

11    earlier that you used a portion of that to pay for the down

12    payment on the California residence?

13    A.    Correct.

14    Q.    Did you use the -- so what you used to pay down

15    -- or pay the down payment, that wasn't the entirety of the

16    installment payment that you received, was it?

17    A.    No.

18    Q.    Do you recall what you used the remainder of

19    those funds for?

20    A.    Yeah.  I used a portion of those funds to pay

21    down -- or to pay off the -- a second mortgage that I had on

22    my two Vancouver properties.

23    Q.    So previously you testified that you took out a

24    second mortgage on the two Vancouver properties in order to

25    cover a portion of the down payment, but then you also -- so

```
 1          A.    The same account.

 2          Q.    Okay.  All right.  So if we continue on to page 3

 3     of 19, back on P, amended Schedule D, you have -- you have

 4     that same creditor listed twice, but it's not a -- it's not

 5     two $600,000 loans; correct?  It's just a single one that's

 6     cross-collateralized?

 7          A.    Correct.

 8          Q.    So then Centennial Bank, 2.3, we've already gone

 9     through that obligation and what the funds were used for.

10     So let's continue to the next page, 4 of 19.  At the top

11     there, Lone Shark Holdings, LLC, listed for 750,000, so is

12     that -- is that the lender who lent you the money to make

13     the investment in Ascher Capital II and III?

14          A.    Correct.

15          Q.    Okay.  So that -- again, that was on December 14,

16     2020.  Isn't it true that you engaged Mr. Finestone around

17     that same time?

18          A.    I don't recall when I engaged Mr. Finestone.

19          Q.    Do you recall making a $5,000 payment to him on

20     December 16, 2020?

21          A.    If that was in the statements and that was the

22     date, then -- then, yes, I do.

23          Q.    And so that was just two days after you made this

24     investment.  So again, at the time -- are you still -- is it

25     still your testimony that you -- you were not sure whether
```

—— REGENCY REPORTING SERVICE, INC. (813)224-0224 ——