1  Stephen D. Finestone (125675)
   Ryan A. Witthans (301432)
2  FINESTONE HAYES LLP
   456 Montgomery Street, Floor 20
3  San Francisco, CA 94104
   Tel.:   (415) 616-0466
4  Fax:    (415) 398-2820
   Email: sfinestone@fhlawllp.com
5  Email: rwitthans@fhlawllp.com

6  Attorneys for Debtor,
   Evander Frank Kane

# UNITED STATES BANKRUPTCY COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| In re<br><br>EVANDER FRANK KANE,<br><br>Debtor. | Case No. 21-50028-SLJ<br>Chapter 7<br><br>**DEBTOR'S OPPOSITION TO CENTENNIAL BANK'S MOTION TO DISMISS LIQUIDATION**[1]<br><br>Hearing:<br>Date:  May 18, 2021<br>Time:  2:00 p.m. Pacific Prevailing Time<br>Place: Tele/Videoconference<br><br>**Remote appearances only.**<br><br>*Please check www.canb.uscourts.gov for information regarding the Court's operations due to the COVID-19 pandemic.* |

---

[1] Unless specified otherwise, all chapter and code references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532. "Bankruptcy Rule" references are to the Federal Rules of Bankruptcy Procedure and "B.L.R." references are to the Bankruptcy Local Rules for the Northern District of California. "ECF" references are to the docket in the above-captioned proceeding.

OPPOSITION TO MOTION TO DISMISS                                                                                                1

Centennial Bank ("Centennial") moved to dismiss the Chapter 7 case of Evander Frank Kane ("Kane" or the "Debtor") under Section 707 (the "Motion"). ECF 83. Creditors Professional Bank ("Professional") and Zions Bancorporation ("Zions") filed joinders to the Motion.[2] ECF 84 and 119. Kane submits the following opposition (the "Opposition") to the Motion. As shown below, Centennial has failed to meet its burden of proof, Kane's obligations are not primarily consumer debts, and this case is not abusive nor filed in bad faith. Accordingly, the Court should deny the Motion.

I. SUMMARY

As the Court is well aware, Zions filed a motion to convert Kane's case to a Chapter 11, acknowledging that his debt was non-consumer/business debt and arguing that creditors would be better off in a Chapter 11 with a court-appointed trustee. ECF 84. A group of creditors, primarily lenders joined in the motion to convert. The Court denied the motion to convert, deciding that Zions failed to satisfy its burden to demonstrate that Chapter 11 was an appropriate alternative to Kane's Chapter 7. ECF 101.

Now, another one of Kane's lenders, Centennial, asserts that despite the vast imbalance between Kane's assets and liabilities and his facing eight lawsuits in state or federal court at the time he filed this case, Kane should be kicked out of bankruptcy, a result Zions argued was akin to Kane being dismembered.[3] Centennial argues in cursory fashion that Kane's debts are consumer, and therefore this case should be dismissed as an abuse under § 707(b)(2). Alternatively, Centennial argues for dismissal under the totality of the circumstances under § 707(b)(3)(B). Finally, Centennial argues that Kane's alleged bad faith in filing bankruptcy is a third basis for dismissal under § 707(b)(3)(A).

Centennial's gambit is based on its belief that it can enforce its asserted security interest in Kane's future income from his contract with the San Jose Sharks (the "Sharks") in the

---

[2] Professional also joined the motion to convert this case, which stated that "*Kane needs to stay in bankruptcy.*" ECF 33 at 7 n.4 (emphasis in original), ECF 41 (joinder, which states Professional's counsel's "belie[f] at the very outset of this case that it should be a Chapter 11 case and not a Chapter 7 case."). Professional apparently sees no inconsistency in its positions.

[3] See audio recording of hearing on the motion to convert.

OPPOSITION TO MOTION TO DISMISS 2

litigation it commenced in the U.S. District Court for the Southern District of Florida and effectively jump ahead of the other creditors.[4] The legal arguments are a cover for this underlying strategy. As discussed below, Centennial fails to meet its burden of proof on its Motion and there can be no doubt that Kane belongs in bankruptcy.

## II. FACTUAL BACKGROUND[5]

The lead-up to Kane's filing bankruptcy is discussed extensively in the *Debtor's Opposition to Motion to Convert and for Appointment of Chapter 11 Trustee*, ECF 65, and are incorporated in this Opposition. The facts are also discussed thoroughly in the Court's decision denying the Motion to Convert. For the sake of brevity, Kane provides a streamlined discussion of the relevant facts below.

### A. Secured Debt Information

Kane is 29 years old. He is a professional hockey player who started playing professional hockey at the age of 18. He is currently under contract with the Sharks and has played for the club since 2018. Kane lives in San Jose, California, with his wife and their infant daughter.

Kane purchased the property known as 8447 Isabel Place, Vancouver, BC, Canada (the "Isabel Property") in approximately 2011. He purchased this property as an investment and does not use it as a residence. As of the date of filing bankruptcy, the Isabel Property had secured debt against it of approximately $2,000,000 (USD) owed on a first deed of trust to Scotia Bank.

Kane acquired another property in Vancouver, located at 3457 W. 35th Ave (the "35th Avenue Property") in 2016 or 2017 as an investment. Kane has not lived in this property and it has been rented from time to time since it was acquired. As of the petition date, the 35th Avenue Property had secured debt against it of approximately $2,439,000 (USD) owed on a first deed of trust to Scotia Bank.

---

[4] *See* Motion at 1:9–16.

[5] The facts are based on the accompanying declaration of Evander Kane ("Kane Decl.") and the previous findings made by this Court in its *Order Denying Motion to Convert*. ECF 101.

There is a second deed of trust secured against both the Isabel Property and the 35th Ave. Property. The amount of this debt is approximately $486,000 (USD). Kane used the proceeds from this loan, along with some of his salary, to make the down payment on his San Jose home.

There is additional secured debt owed to Lone Shark Holdings, LLC ("Lone Shark"). This debt was incurred in relation to an investment in a tax conservation easement with Asher Capital. The amount of this debt is $715,000 and is secured against Kane's potential tax refund.

B.  Unsecured or Under-Secured Debt Information

There are loans from other creditors that are listed and filed as secured debt, though it is likely those creditors do not have any security for their loans. The creditors are Zions, Centennial, Professional, and South River Capital, LLC ("South River"). Zions, Centennial, Professional and South River are referred to collectively as the "Lenders." The loans from the Lenders were all arranged and underwritten by Sure Sports, LLC ("Sure Sports") pursuant to an Underwriting Fee Payment Agreement that Kane entered into with Sure Sports in August 2018.

Each of the Lenders entered into loan agreements with Kane in relation to the loans. Kane Decl. at Exhibits A–C. The Lenders all required that Kane sign additional documents, such as UCC-1 financing statements, to purportedly secure their loans against the salary due to Kane in the future from the Sharks. Zions, South River, and Professional filed their respective claims in the following amounts: Zions – $3,740,305, South River – $1,101,429, and Professional – $1,354,541.

With respect to Centennial, Kane entered into several loan agreements as the amount of the loan was increased over time. Kane Decl. at Exhibit D. As of the petition date, the approximate debt to Centennial was $8,340,000. The idea that close to $15 million of loans arranged by a specialized underwriter/broker, all allegedly secured by complicated and questionable transaction documents, should be considered consumer debt, is simply not credible.

Kane paid Sure Sports hundreds of thousands of dollars in connection with the underwriting and arranging of these loans. The vast majority of these loans were used to pay off existing lenders and proceeds were disbursed directly from escrow to the existing lenders.

The proceeds from the South River loan did not go from escrow directly to existing lenders. The loan proceeds of approximately $520,000 (after deducting almost $80,000 for origination fees, interest reserve, insurance, and legal fees) were deposited into Kane's bank account and used for various obligations.

In additional to the claims by the Lenders, other claims were filed in this case and are discussed briefly below:

    a. Michigan Dept. of Revenue – $12,978 in tax debt.
    b. Sure Sports – $1,187,950, which it alleges is due under the Underwriting Fee Payment Agreement.
    c. Wells Fargo – $79,791 for a revolving credit account.
    d. Raj Bhangu – $100,000 for a personal loan.
    e. Pachulski Stang Ziehl & Jones LLP – $80,390 for attorneys' fees and costs incurred in attempting to assist Kane in restructuring his finances and defending litigation filed by the Lenders.
    f. Lipsitz Green Scime Cambria LLP – $85,300 for attorneys' fees and costs incurred in litigation in New York and California.
    g. Newport Sports Management, Inc – $534,400 for fees incurred as Kane's sports agent.
    h. Genovese Joblove & Batista, P.A. – $6,947 for attorneys' fees and costs incurred in the litigation with Sure Sports.

For ease of review, a table representing the various claims and the type of debt related to is set forth later in this brief.

Kane appeared for a Bankruptcy Rule 2004 exam conducted by Centennial on March 24, 2021. He duly turned over documents requested prior to the exam, answered all non-objectionable questions diligently and to the best of his knowledge, and referred counsel for Centennial to the documents when those documents would provide the best answer to the questions being provided.

In short, and contrary to the erroneous depiction in the Motion, Kane has been a responsible and transparent Chapter 7 debtor and has fulfilled his duties under § 521 in what is, without question, a complicated and unusual case. As the bankruptcy case progresses, Kane continues to cooperate with the Chapter 7 trustee and has now made three payments totaling $155,000 out of the five payments due the Chapter 7 trustee under a previous settlement agreement (which is being challenged by the creditors). Kane also continues to provide requested documents and information.

## III. LEGAL ANALYSIS

### A. Centennial Has Failed to Meet Its Burden of Proof

A party moving for relief under § 707(b) has the burden of proof. *Harris v. United States Trustee (In re Harris)*, 279 B.R. 254, 259 (B.A.P. 9th Cir. 2002) (stating that the "moving party must establish (1) that the debtor owes primarily consumer debts; and (2) granting of Chapter 7 relief represents substantial abuse of that chapter."). "While dismissal for substantial abuse is discretionary, the determination of abuse must be based on factual findings supported by admissible evidence, and not by what amounts to inappropriate judicial notice of the court's own value judgments." *Id.* Kane agrees with Centennial that "primarily consumer debts" means that more than 50% of the debt must be consumer debt. Section 101(8) defines consumer debts as debts "incurred by an individual for personal, family, or household purpose." The Bankruptcy Code does not define non-consumer debt. Consumer debt is, however, distinguished from "non-consumer" debt with the latter being debt incurred with a "profit motive." *Citizens Nat'l Bank v. Burns (In re Burns),* 894 F.2d 361, 363 (10th Cir. 1990).

As stated above, Centennial has failed to satisfy its burden of proof. Kane agrees that his Amended Schedules and Statement of Financial Affairs are properly before the Court, yet Centennial does not rely upon the Schedules or the filed claims to establish that Kane's debts are primarily consumer. The only evidence submitted by Centennial is the supporting declaration of Andrew W. Ghekas (the "Ghekas Declaration") which attached a portion of a transcript of Kane's testimony at a Bankruptcy Rule 2004 exam. The Ghekas Declaration then summarizes the testimony as establishing that Kane did not use loan proceeds to "(a) purchase property, (b)

invest in any ongoing business, or (c) to start a new business venture." *See* Ghekas Declaration at ¶ 5. This, Centennial argues, is sufficient to establish Kane's debts as consumer. Other than a brief discussion of the debt to Lone Shark, admitting that its $750,000 claim is non-consumer, Centennial fails to discuss any of Kane's other debts. Centennial also claims Kane has no investment. However, both pieces of encumbered real property located in Vancouver, British Columbia, are investment properties. Instead of analysis, the Motion recites the creditors' oft-repeated laundry list of "bad facts" which they hope sway the Court against Kane. Those facts, many of which Kane disputes, have little or no bearing on the Motion and the Court's consideration in ruling on it.

Paragraphs 3 through 10 of the Ghekas Declaration discuss Kane's testimony at the Bankruptcy Rule 2004 exam. The majority of the Ghekas Declaration is inadmissible as either misstatements of testimony, or as argumentation presented as evidence. Centennial has submitted scant evidence regarding the nature of Kane's debts, certainly far less than required to meet its burden of proof, and the Motion should be denied.

B. <u>Kane's Obligations Are Not Primarily Consumer Debts</u>

While Centennial concedes that the Bankruptcy Code defines a consumer debt as a "debt incurred by an individual primarily for a personal, family, or household purpose," the Motion proceeds to take a strained view of both the Debtor's schedules and what constitutes non-consumer debt. According to Centennial, all debt not directly related to operating a traditional business or investment in a business, must be a consumer debt. This is not true and Centennial cites no case law supporting its view. Any debt not incurred primarily for a personal, family, or household purpose, falls outside of the definition of consumer debt, and is necessarily non-consumer debt. Kane's declaration filed along with this opposition provides information regarding the various debts scheduled or filed. For convenience, pursuant to the Debtor's Amended Schedules and the claims register, the amount and type of debt owed by Kane follows:

| Creditor | Outstanding Debt | Type of Debt |
|---|---|---|
| Scotia Bank | $2,000,000 (First DOT on Isabel Property) | Non-consumer |

OPPOSITION TO MOTION TO DISMISS 7

| Creditor | Amount | Type |
|---|---|---|
| Scotia Bank | $2,439,000.00 (First DOT on 35th Ave. Property) | Non-consumer |
| 1000568 B.C. Ltd. | $486,000 (Second DOT on 35th Avenue Property and Isabel Property) | Consumer |
| Pacific Private Holdings | $2,320,000.00 (Mortgage on San Jose Residence) | Consumer |
| Lone Shark Holdings | $715,000 | Non-consumer |
| Centennial | $8,340,000. | Non-consumer |
| Sure Sports | $1,187,950.94 | Non-consumer |
| South River | $1,101,429.87 | Non-consumer |
| Michigan Dept. of Revenue | $12,978 | Non-consumer |
| Wells Fargo | $79,791 | Consumer |
| Raj Bhangu | $100,000 | Consumer |
| Pachulski Stang Ziehl & Jones LLP | $80,390 | Non-consumer |
| Lipsitz Green Scime Cambria LLP | $85,300 | Non-consumer |
| Newport Sports Management, Inc | $534,400 | Non-consumer |
| Genovese Joblove & Batista, P.A. | $6,947 | Non-consumer |

| TOTALS: | CONSUMER TOTAL: $2,985,791 | NON-CONSUMER TOTAL: $16,503,395.81 |
|---|---|---|

Of the secured debt, $5,430,000 relates to the two properties in Vancouver, British Columbia. Mr. Kane purchased the properties for investments and has not lived in them. The secured debt includes a first deed of trust on the Isabel Property for approximately $2,000,000 and a first deed of trust on the 35th Avenue Property for approximately $2,439,000. Though the Motion fails to analyze any of the debt related to the Canadian properties, Mr. Kane's declaration further explains that the second deed of trust on the properties should be considered consumer debt as it was used to purchase the home he owns in San Jose, California with his wife. The remaining mortgages on each property are non-consumer debt. *See, e.g., Aspen Skiing Co. v. Cherrett (In re Cherrett)*, 873 F.3d 1060 (9th Cir. 2017) (purchasing real estate "as a business investment, albeit an investment in herself or himself" may be considered a non-consumer

OPPOSITION TO MOTION TO DISMISS 8

business debt); *Citizens Nat'l Bank v. Burns (In re Burns)*, 894 F.2d 361, 363 (10th Cir. 1990) ("Consumer debt" is further distinguished from "non-consumer" debt as a debt incurred with a "profit motive."); *Cypher Chiropractic Ctr. v. Runski (In re Runski)*, 102 F.3d 744, 747 (4th Cir. 1996). Another $1,074,494.87 relates to a business loan from creditor South River. Another $4,250,000 is a business loan from Zions. Another $750,000 is a business loan from Lone Shark.

The Lenders' loans are clearly non-consumer in nature, and in some cases are specifically titled "Business Loans." Notably, the loans, arranged by Sure Sports, which was highly compensated for its underwriting, did not include any of the customary consumer disclosures and protections. Instead, the loans included loan agreements, promissory notes, and sophisticated transactional documents seeking to securitize the loan against Kane's future wages.

Centennial's loan documents include a promissory note, security agreement, cooperation agreement, garnishment waiver, and notably lacked any consumer disclosures. The Centennial loan documents acknowledge that its loan shall be combined with the Zions business loan and another loan to pay off existing loans. *See* Claim 5 at Exhibit B. It is difficult to argue that this multi-million-dollar loan arranged through a specialized a loan broker, meant to be used in conjunction with other business loans, and collateralized through a sophisticated, and unenforceable, interest in future wages contrary to the UCC and state law, can be considered consumer debt.

Of Kane's unsecured debts, $1,282,302 is for business loan underwriting fees from creditor Sure Sports; and $528,730 relates to a debt to Kane's sports agent Newport Sports Management, Inc.

Based on this data, non-consumer debt totals at least $16,503,395.81 and consumer debt totals at most $2,985,791. It follows that more than 50% of Debtors debt is non-consumer debt and the Motion should be denied.[6]

---

[6] Kane finds it prudent to note here that Lenders generally assert a security interest in his future wages. Kane maintains that any security interest based on his future wages is void and unenforceable. *Local Loan Co. v. Hunt*, 292 U.S. 234, 243 (1934) (finding that a lien in future wages is merely a prospective lien and the "effect of discharge upon the prospective liens was the same as though they had been paid before the assigned wages were earned. The wages earned after the adjudication became the property of the bankrupt clear of the claims of all creditors."); *In re Skagit Pac. Corp.*, 316 B.R. 330, 336 (B.A.P. 9th Cir. 2004) ("Revenue generated post-

OPPOSITION TO MOTION TO DISMISS 9

C. <u>The Means Test Does Not Apply, and the Totality of the Circumstances Does Not Apply to Debtor's Bankruptcy, and Centennial Has Failed to Show Circumstances That Merit Dismissal</u>

As established, Debtor's bankruptcy consists of primarily non-consumer debts. However, Centennial's Motion is based solely on § 707(b), which deals only with consumer bankruptcy cases. *See* § 707(b)(1) ("the court . . . may dismiss a case under this chapter whose debts are primarily consumer debts . . . ."). The issues of the means test, abuse, or bad faith are therefore not reached. Because Centennial has not and cannot meet its burden to establish that Kane is a consumer debtor, the Court need not proceed with an analysis under § 707(b)(3). Nevertheless, Centennial has failed to demonstrate that the Debtor's bankruptcy case constitutes an abuse of the Bankruptcy Code or bad faith and in an abundance of caution, Kane responds to Centennial's position below.

Centennial argues that under the totality of the circumstances pursuant to § 707(b)(3)(B) constitutes abuse of the Code and supports dismissal. However, the only circumstance asserted by Centennial is that, in Centennial's opinion, the Kane is simply not enough of a pauper to be worthy of the fresh start the Bankruptcy Code provides.

First, under a very strained accounting of the Kane's finances, Centennial claims his monthly income is enough to pay all unsecured debts as they come due. With respect to the salary for his current year, Centennial claims that Kane has monthly disposable income of $158,000 by taking his current annual contract salary and dividing it by 12 and subtracting his monthly expenses. The Debtor has exhaustively run through this exercise in his opposition the motion to convert. ECF 65. The Court, in denying the motion to convert, clearly set forth an understanding that Kane's take-home pay is significantly less than his on-paper salary and subject to future uncertainty. ECF 101. Centennial's simplistic calculations are based upon gross

---

petition solely as a result of a debtor's labor is not subject to a creditor's pre-petition interest."); *see also* § 552(b) (postpetition effect of security interest). While this does not affect the non-consumer nature of the loans, Kane reiterates that while for scheduling purposes he scheduled the loans as secured, the secured status is disputed and Kane asserts these are unsecured liabilities.

OPPOSITION TO MOTION TO DISMISS 10

income and fail to account for taxes or any other deductions from Kane's salary. Centennial's argument is not tenable.

Next, citing only Ohio bankruptcy caselaw, Centennial argues that because of his higher-than-average income and expenses, Kane is not an honest or "needy" debtor. The premise that abuse can be predicated on "want of need" and a vague finding of it is based solely on a Sixth Circuit case, *In re Kohn*, 886 F.2d 123 (6th Cir. 1989). This test has not been accepted by the Ninth Circuit. Other courts have found even when a debtor's income may be high by state standards, "a high income is not sufficient for a bad faith/cause finding under 707(b)" and that despite a high income, a debtor may still have "legitimate need for bankruptcy relief." *In re Snyder*, 509 B.R. 945, 953 (Bankr. D. N.M. 2014). *See also Perlin v. Hitachi Capital Am. Corp (In re Perlin)*, 497 F.3d 364, 372, 374 (3rd Cir. 2007) (a debtor's ability to repay his debts out of disposable income is not a sufficient reason to dismiss a bankruptcy as a bad faith filing; "finding of bad faith may not be based exclusively or primarily on a debtor's substantial financial means.") ; *In re Tamecki*, 229 F.3d 205, 208–209 (3rd Cir. 2000) (lack of good faith should not be inferred lightly; dismissal should only be used in egregious situations).

Kane has been forthright in this bankruptcy, amending schedules as necessary to provide the clearest financial picture to creditors and to the Court, and responding at lengthy § 341 meetings and a Bankruptcy Rule 2004 exam. Kane has cooperated with the Chapter 7 trustee's requests for information and has already made a total of $155,000 in payments to the Chapter 7 trustee pursuant to the proposed settlement agreement regarding his exemptions. Kane's higher than average expenses and unusual profession do not preclude him from needing, or from being entitled to, a fresh start. Kane was financially upside down and facing a plethora of litigation across the country when he sought bankruptcy protection.[7]

---

[7] Creditors' conduct since the case was filed is further proof of why Kane needs bankruptcy protection. They sought conversion. They now seek dismissal. They have filed adversary proceedings, appealed the Court's ruling on the motion to convert, and objected to the Chapter 7 trustee's proposed settlement. As the Court noted in its ruling on the motion to convert, subjecting himself to this litigation onslaught is part of the bargain Kane accepted by filing Chapter 7. Having this bankruptcy case at least focuses the litigation in one court, limits

OPPOSITION TO MOTION TO DISMISS 11

D. <u>Debtor Filed Bankruptcy in Good Faith</u>

To reiterate, because the majority of Kane' debts are non-consumer debts, grounds for dismissal under either subsection of § 707(b)(3) are not applicable to this case. Even so, Centennial's argument that Kane's case was filed in bad faith rings hollow . Citing *In re Mitchell*, 357 B.R. 142 (Bankr. C.D. Cal. 2006), Centennial sets forth multiple non-dispositive factors a court may use to determine a debtor's good or bad faith:

<u>Factor 1:</u> First, whether the Debtor has a likelihood of sufficient income to fund a chapter 11 or 13 plan is not relevant. The Court's denial of the motion to convert does note that Kane's income stream would mean there would be some money available for payments to creditors in the future, but the likelihood of sufficient income to fund a Chapter 11 plan is too uncertain due to the nature of the Kane's contract, the constant potential for career-ending injury, the fights among creditors as to who had priority to future income, and the interplay of likely dischargeability litigation. Centennial argues that Kane has "seriously misrepresented his income". Motion 10–11. This is a repetition of an already discredited argument. Kane's Schedule I provides an explanation of his income. Moreover, as Centennial and similarly situation creditors have admitted, they were all in possession of Kane's contract with the Sharks.

<u>Factor 2:</u> The second factor, whether the Debtor's bankruptcy was filed as a consequence of illness, unemployment, disability, or other calamity, is also irrelevant. Bankruptcy is not solely the purview of the unemployed and infirm. Facing multi-front litigation and an inability to pay back burgeoning loans, many of which contained unenforceable security claims in all of his future wages, Kane filed bankruptcy.

<u>Factor 3:</u> The third factor, whether the schedules suggest Debtor obtained cash advancements or consumer goods on credit beyond his ability to repay, is another factor in Kane's favor. Centennial argues that Kane's Schedules reflect credit card charges of $88,593, but there is no evidence of when those charges were incurred and the amount is not significant in Kane's overall debt picture.

---

the issues and procedures and provides Kane with the opportunity to defend himself and move forward. A dismissal would provide no such protection.

OPPOSITION TO MOTION TO DISMISS 12

Factor 4: The fourth factor is "whether the Debtor's family budget is excessive or extravagant." Centennial's argument on this factor is confusing. As discussed above, Centennial argues that Kane will have approximately $158,000 in disposable income after meeting his monthly expenses. When discussing this factor, however, Centennial asserts that he has negative income and would be $1.1 million in debt after one year if his expenses continue apace, thereby "proving" that his lifestyle is excessive.[8] While Kane has high monthly expenses, as he has admitted before, Centennial has not shown how this factor is in its favor.

Factor 5: The fifth factor, whether the Debtor's statement of income and expenses is misrepresentative of the Debtor's financial condition, is inapplicable. The only argument Centennial again presents under this factor is the inaccurate allegation that Kane understated his income. Again, as explained above and acknowledged by the Court, Kane's attachment to his Schedule I provides a clear picture of his anticipated income as a hockey player with the San Jose Sharks, which is substantially less than what Centennial alleges.

Factor 6: The sixth factor, whether Debtor has engaged in "eve of bankruptcy purchases," is also not disqualifying. Centennial argues Kane's Lone Shark loan and subsequent investment, vehicle leases and home purchase are eve of bankruptcy purchases meriting dismissal, while at the same time acknowledging that Kane's purchase of his home was "not exactly the 'eve of bankruptcy.'" Motion at 13. As discussed in the Debtor's opposition to the motion to convert, Debtor borrowed $750,000 from Lone Shark to invest in a tax investment structure pursuant to various private placement memoranda. He was only required to pay an initial fee of $35,000 in connection with the investment, which he was advised should result in a tax refund of approximately $1.8 million. Debtor made this investment at the time as a way to raise funds to pay back creditors and has provided all the documents related to this investment to the Chapter 7 trustee and U.S. Trustee, and currently expects to realize on the investment for the benefit of his creditors.

---

[8] Centennial then inserts a footnote suggesting its analysis of this factor is not meant to be taken seriously. Motion at 12 n.8 ("Obviously, this number is fictitious . . . .").

OPPOSITION TO MOTION TO DISMISS 13

Kane did enter into two higher-end vehicle leases, but this is not disqualifying. *See In re Gomez*, No. 13-32210, 2014 Bankr. LEXIS 1117 (Bankr. N.D. Ohio Mar. 21, 2014) (finding purchase of two high-end vehicles close to bankruptcy filing was not in bad faith because the purchases were necessary for the debtor's day to day function and employment).

Further, Centennial acknowledges Kane's residence was not purchased on the eve of bankruptcy, and its reliance on *In re Violanti*, 397 B.R. 852 (Bankr. N.D. Ohio 2008), is inapposite. In that case the debtor took out a first mortgage on a residence about a year before filing bankruptcy, and then a second and third mortgage shortly before filing. Those mortgages constituted the majority of the debtor's debt profile. Those facts are not applicable here, in which Kane's mortgage is fully secured, a small fraction of his debt profile, and the real estate is already subject to a settlement with the Chapter 7 trustee.

<u>Factor 7:</u> The seventh factor, whether the Debtor has a history of prior bankruptcy filings, is a factor in favor of retaining the bankruptcy case. This is Kane's first bankruptcy filing, which he did not enter into lightly. Only after hiring counsel and a restructuring advisor/accountant to negotiate with lenders engaging in aggressive litigation tactics and finding those negotiations to be futile and unable to pay debts imminent, did Kane opt for bankruptcy.

<u>Factor 8:</u> The eighth factor, whether the Debtor intended to invoke the stay for improper purposes such as defeating state court litigation, is also not on point here. Kane admits he filed bankruptcy because he was faced with multi-front litigation and far more debt than he could conceivably manage, but this is not akin to filing bankruptcy to "defeat" litigation. *See In re Silberkraus*, 253 B.R. 890, 905 (Bankr. C.D. Cal. 2000). *Silberkaus* lists a variety of cases in which debtors were found to have the purpose of filing bankruptcy to defeat state court litigation. Those cases involved filing bankruptcy just prior to case dispositive motions, or prior to enforcement actions after a judgment had been entered. This is not Kane's situation. No dispositive actions had been taken in the coordinated litigation Kane was facing prior to bankruptcy.

<u>Factor 9:</u> The ninth factor, whether "egregious behavior" is present, does not apply. Centennial's only evidence for this factor is, again, an incorrect allegation that Kane

OPPOSITION TO MOTION TO DISMISS 14

misrepresented the information on his schedules. As set forth above, Kane scrupulously documented and amended all schedules, including verification of his income, which conclusively show both that no egregious behavior was undertaken, and that this bankruptcy falls outside all factors of § 707(b)(3)(A).

E. Zions and Professional Bank Are Judicially Estopped from Joining This Motion

Under federal law, the doctrine of judicial estoppel is designed in part "to prevent a party from gaining an advantage by taking inconsistent positions." *Cannata v. Wyndham Worldwide Corp.*, 798 F. Supp. 2d 1165, 1171 (D. Nev. 2011). When applying judicial estoppel, courts consider the following (1) "whether a party's later position is inconsistent with its earlier position"; (2) whether a party was successful in convincing the court of its first position, so that acceptance of an incompatible position in a later decision would "create the perception that either the first or second court was misled"; and (3) "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id.* (*quoting New Hampshire v. Maine*, 532 U.S. 742, 743 (2001)).

Prior to filing joinders in this Motion, Zions filed its *Motion to Convert and for Appointment of Chapter 11 Trustee* and Professional joined it. ECF 33, 41. The motion to convert accepted and argued both that Kane's debts were primarily business debts, and that "*Kane needs to stay in bankruptcy.*" ECF 33 at 7 n.4 (emphasis in original). Professional noted that it joined in the motion, the arguments, and the requested result. ECF 41 at 4. Zions and Professional now take the opposite position that Kane's debts are not primarily business debts, and that he should not remain in bankruptcy. The first element of judicial estoppel is met.

As to the second element, Zions, Professional, and all other creditors who joined the motion to convert were not ultimately successful on the motion itself. However, in its order denying the motion to convert, the court noted that the motion did not challenge the Debtor's statutory eligibility to be in Chapter 7, and found "this being so, debtor has a statutory right to discharge and fresh start and to receive his future income free from financial encumbrances." ECF 101 at 19. It appears then, that the motion to convert was successful in convincing the Court that Debtor is entitled to, and should remain in, bankruptcy. Success on the instant Motion would

OPPOSITION TO MOTION TO DISMISS 15

necessarily be acceptance of an incompatible position, that Kane is not entitled to be a Chapter 7 debtor.

As to the third element, it is clear whether Zions' and Professional's previous positions followed by their joinder in the Motion is an attempt to derive an unfair advantage, by threatening Kane's ability to obtain a fresh start in hopes of gaining a better position somehow either inside or outside bankruptcy.

Zions, Professional, and any other creditor who joined or argued in favor of the motion to convert should be estopped from joining this Motion.[9]

## IV. CONCLUSION

As discussed above, Centennial's Motion falls far short of the required showing. It fails to establish that this is a consumer case. Nor can it do so; it would be difficult to conceive of a case involving close to $27 million in debt as consumer in nature. While Kane's creditors have been in constant attack mode since this case was filed, there is at least one thing on which Kane can agree. In its motion to convert, Zions argued that "*Kane needs to stay in bankruptcy.*" Kane concurs, and for the reasons set forth in this brief and his declaration he requests that the Court deny the motion.

Dated May 4, 2021                              FINESTONE HAYES LLP

                                                         */s/ Stephen D. Finestone*
                                                         Stephen D. Finestone
                                                         Attorneys for Debtor, Evander Frank Kane

---

[9] Professional has also filed an adversary proceeding seeking a variety of relief, including a determination that its claim is nondischargeable. ECF 112.