1  ANTHONY & PARTNERS, LLC
   JOHN A. ANTHONY (SBN0731013)
2    janthony@anthonyandpartners.com
   ANDREW J. GHEKAS (SBN 0119169)
3    aghekas@anthonyandpartners.com
   100 S. Ashley Drive, Suite 1600
4  Tampa, Florida 33602
   Telephone: 813.273.5616
5  Facsimile: 813.221.4113

6  COOPER, WHITE & COOPER LLP
   PETER C. CALIFANO (SBN 129043)
7    pcalifano@cwclaw.com
   201 California Street, 17th Floor
8  San Francisco, California 94111
   Telephone: 415.433.1900
9  Facsimile: 415.433.5530

10 Attorneys for Creditor Centennial Bank

11                 **UNITED STATES BANKRUPTCY COURT**

12                 **NORTHERN DISTRICT OF CALIFORNIA,**

13                          **San Jose Division**

14 In re                              | CASE NO. 21-50028 SLJ

15 EVANDER FRANK KANE,                | Chapter 7

16            Debtor.                 | Adv. No.

17                                    |
                                      | **COMPLAINT TO DETERMINE**
18                                    | **NONDISCHARGEABILITY OF DEBT**
                                      | **PURSUANT TO:  11 U.S.C. §523(a)(2)(A);**
19                                    | **and 11 U.S.C. §§727(a)(2)-(a)(5)**

20

21 _____

22 CENTENNIAL BANK, an Arkansas state
   chartered bank,
23
24            Plaintiff.

25    vs.

26 EVANDER FRANK KANE,

27            Defendant.

28

COOPER, WHITE
& COOPER LLP
ATTORNEYS AT LAW
201 CALIFORNIA STREET

Centennial Bank, an Arkansas state chartered bank ("Centennial"), a creditor and party in interest in the above captioned chapter 7 bankruptcy case (the "Bankruptcy Case") of Evander Frank Kane (the "Debtor"), by and through its undersigned counsel, hereby sues the Debtor and states as follows:

## I.    THE PARTIES

1.    On January 9, 2021 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 7 of Title 11, United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of California, San Jose Division (the "Bankruptcy Court").

2.    The Debtor is the debtor in the underlying Bankruptcy Case, is an individual who resides in San Jose County, California, and is otherwise sui juris.

3.    Centennial is an Arkansas state-chartered bank with its principal place of business in Conway, Arkansas. For FRBP Section 7007.1(a) disclosure purposes, Centennial is entirely held by Home BancShares, Inc., a publicly held company.

## II.    JURISDICTION AND VENUE

4.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

5.    Venue is proper in this Court pursuant to 28 U.S.C. § 1409 as this adversary proceeding arises in or relates to the Bankruptcy Case pending before this Court.

6.    The basis for relief sought in this adversary proceeding is pursuant to Bankruptcy Code §§523 and 727 and Federal Rule of Bankruptcy Procedure 7001 for a judgment (i) determining the dischargeability of debt owed to Centennial and (ii) denying the Debtor's discharge.

7.    This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and otherwise; and pursuant to Bankruptcy Local Rule 7008-1, Centennial consents to the Court's entry of a final judgment in this adversary proceeding.

COOPER, WHITE
& COOPER LLP
ATTORNEYS AT LAW
201 CALIFORNIA STREET
SAN FRANCISCO, CA 94111-5002

# III. FACTUAL ALLEGATIONS

## A. Centennial's Claim Against the Debtor

8. On September 5, 2018, the Debtor into a loan agreement with Centennial where the Debtor borrowed an amount equal to $3,900,000 from Centennial, and executed and delivered a "Promissory Note" (the "Original Note") to Centennial in the original principal amount of $3,900,000 (the "Loan") in connection therewith. A true and correct coy of the Note is attached hereto as Exhibit "A."

9. In addition to the Note, the Loan was secured by and pursuant to the terms of that certain "Secured Financial Transaction and Security Agreement" (the "Original Security Agreement"), a copy of which is attached hereto as Exhibit "B." Pursuant to the terms of the Security Agreement, the Debtor granted Centennial a perfected security interest in any and all salary payments, bonus, or other form of compensation (the "Pledged Payments") due and payable to the Debtor under that certain "Standard Player's Contract" (the "Player's Contract") dated as of May 25, 2018, as between the Debtor and San Jose Sharks, LLC (the "Sharks"). A copy of the Player's Contract is attached hereto as Exhibit "C."

10. In connection therewith, the Debtor agreed to have all Pledged Payments electronically deposited by the Sharks into a controlled deposit account opened with Centennial (the "Designated Account"). Centennial was then further authorized to automatically remit funds deposited into the Designated Account in payment of the amounts due under the Loan. In this manner, Centennial ensured that it would be paid as required by the Note, i.e., by routing the Debtor's Pledged Payments under the Player's Contract directly to Centennial without the need for the Debtor to take any further action.

11. Consistent with the terms of the Original Note and Original Security Agreement, the Debtor executed in favor of Centennial a "Florida Agreement to Waive Garnishment Protection" (the "Garnishment Waiver"), a copy of which is attached hereto as Exhibit "D." In executing the Garnishment Waiver, the Debtor agreed to waive protection from garnishment otherwise potentially afforded under Florida law, thereby confirming the Debtor's promises made to Centennial pursuant to the terms of the Original Security Agreement.

COOPER, WHITE
& COOPER LLP
ATTORNEYS AT LAW
201 CALIFORNIA STREET
SAN FRANCISCO, CA 94111-5002

12.     In receipt of the Original Note, Original Security Agreement, and Garnishment Waiver, as the same are amended from time to time (collectively, the "Loan Documents"), Centennial advanced all funds as required under the Original Note in accordance with the terms of the same.

13.     At the request of the Debtor, the Loan and Original Note were amended three (3) times, thereby renewing, increasing, and amending the Loan as follows:

    a.   On October 17, 2018, the Loan was renewed and increased by an additional $2,000,000, resulting in a new principal amount of $5,900,000, as evidenced by that certain "First Amendment to Promissory Note" (the "First Amended Note"), a copy of which is attached hereto as Exhibit "E."

    b.   On February 28, 2019, the Loan was renewed and increased from $5,181,691.17 to $5,900,000, as evidenced by that certain "Second Amendment to Promissory Note" (the "Second Amended Note"), a copy of which is attached hereto as Exhibit "F."

    c.   On April 30, 2019, the Loan was renewed and increased from $5,530,501.89 to $8,000,000, as evidenced by that certain "Third Amendment to Promissory Note" (the "Third Amended Note"), a copy of which is attached hereto as Exhibit "G."

The Original Note, First Amended Note, Second Amended Note, and Third Amended Note, are collectively referred to herein as the "Note."

14.     At each stage in which the Debtor executed each of the foregoing amendments to the Loan, the Debtor additionally executed a corresponding amendment document to the Original Security Agreement as follows:

    a.   On October 17, 2018, the Debtor executed in favor of Centennial that certain "First Amendment to Secured Financial Transaction and Security Agreement" (the "First Amended Security Agreement"), a copy of which is attached hereto as Exhibit "H."

    b.   On February 28, 2019, the Debtor executed in favor of Centennial that certain "Second Amendment to Secured Financial Transaction and Security Agreement" (the "Second Amended Security Agreement"), a copy of which is attached hereto as Exhibit "I."

COOPER, WHITE
& COOPER LLP
ATTORNEYS AT LAW
201 CALIFORNIA STREET
SAN FRANCISCO, CA 94111-5002

c. On April 30, 2019, the Debtor executed in favor of Centennial that certain "Third Amendment to Secured Financial Transaction and Security Agreement" (the "Third Security Agreement"), a copy of which is attached hereto as Exhibit "J."

Each of the three (3) foregoing amendments to the Original Security Agreement expressly references the new amount of the Loan, and act to amend the Original Security Agreement to simply reflect the same as well as the Debtor's new payment and amortization schedule. In all other respects, and to the extent not set forth within the foregoing amendments, the terms, conditions, and provisions of the Original Security Agreement continue in full force and effect. The Original Security Agreement, First Amended Security Agreement, Second Amended Security Agreement, and Third Amended Security Agreement, are collectively referred to herein as the "Security Agreements."

15. The Note and Security Agreements provided Centennial with significant and material rights in and to the Player's Contract in order to secure repayment of the Loan, including inter alia the following:

a. Section M(1) of the Note provides that the "[Debtor] agrees to direct payments from the Team (as defined above) to Lender for all payments due under this Note."

b. Section B(3) of the Security Agreements provides that the "[Debtor] agrees to authorize the Sharks … to electronically deposit into [the Designated Account] the Pledged Payments that would otherwise be paid directly to [Debtor] by the Pirates … under the Player's Contract…

c. Section B(4) of the Security Agreements provides that the "[Debtor] agrees to allow Lender to directly provide to Sharks … [the Debtor] financial institution information and account and routing numbers, as well as any other relevant instructions for [the Designated Account], so the Sharks may directly deposit the Pledged Payments …"

Each of the foregoing provisions, as well as the remaining provisions within the Note and Security Agreements, were material to Centennial's decision to agree to enter into and fund the Loan with the Debtor.

16. Within a few short months after executing the Third Amended Note and Third Amended Security Agreement, the Debtor failed to direct deposit any of the Pledged Payments into

COOPER, WHITE
& COOPER LLP
ATTORNEYS AT LAW
201 CALIFORNIA STREET
SAN FRANCISCO, CA 94111-5002

Case: 21-50028    Doc# 123    Filed: 05/05/21    Entered: 05/05/21 13:04:36    Page 5 of
94
5

the Designated Account as required and as promised under the terms of the Note and Security Agreement. Instead, the Debtor began to request "live" checks from the Sharks for compensation purportedly owed to him by the Shark's under the Player's Contract.

17. As evidenced by the Debtor's refusal to directly deposit the Pledged Payments into the Designated Account within only a few short months after obtaining a renewal and increase of the Note from Centennial, it is evidence that the Debtor never intended to honor its agreement with Centennial, and accordingly obtained the Loan under false pretenses and/or through actual fraud.

**B. The Debtor's False Oaths**

18. The Debtor filed his first set of Schedules (the "Original Schedules") and Statement of Financial Affairs (the "Original Statement of Financial Affairs") on the Petition Date [Doc. 1]. Since the Petition Date, the Debtor's Schedule A/B has been amended three times, with the latest amended having been filed on February 26, 2021 [Doc. 37]. The Debtor has further caused his Schedule D and E/F to be amended by filing dated January 31, 2021 [Doc. 18], his Schedule J to be amended by filing dated February 19, 2021 [Doc. 30], and his Schedule C to be amended by filing dated February 26, 2021 [Doc. 37]. Additionally, the Debtor amended his Original Statement of Financial Affairs") on February 17, 2021 (the "Statement of Financial Affairs") [Doc. 29]. Despite the numerous amendments filed by the Debtor, the Debtor's Schedules and Statement of Financial Affairs are still littered with numerous discrepancies and omissions.

19. First, the Debtor indicated on his sworn voluntary petition (the "Petition") [Doc. 1], that his debts are primarily business debts – likely in a preemptive and premediated effort to avoid the means tens under Bankruptcy Code §707(b) by arguing that his debts are not primarily consumer debts. However, contrary to this effort, the Debtor only lists <u>three</u> (3) business interest on his amended Schedule A/B [Doc. 37], namely (i) Ascher Capital II and III LLC which the Debtor made a $750,000 investment but is uncertain of his actual membership share, (ii) Lions Properties LLC which the Debtor identifies as having no assets, and (iii) Ownership of EK9 Marketing LLC that the Debtor has testified is inactive and has no assets. Both Lions Properties LLC and EK9 Marketing LLC are additional listed as two of the three business interest listed under question 27 of the Debtor's Statement of Financial Affairs [Doc. 29] in regard to "[w]ithin 4 years before you filed for

COOPER, WHITE
& COOPER LLP
ATTORNEYS AT LAW
201 CALIFORNIA STREET
SAN FRANCISCO, CA 94111-5002

bankruptcy, did you own a business or have any of the following connections to any business?" The third entity listed in question 27 is Evander Kane LLC, but the Debtor confirms that this entity has since been dissolved. In addition, on the amended Schedule A/B [Doc. 37], question 18, which requires disclosure of "bonds, mutual funds, or publicly traded stocks," the Debtor responded that he had no such interest. Moreover, on the Statement of Financial Affairs [Doc. 29], in response to question 4, "[d]id you have any income from employment or from operating a business during this year or the two previous calendar years," the Debtor only source of income is identified of having been derived from the Player's Contract. Given the above, it is incomprehensible that the majority of the Debtor's debt could be considered business related. Lastly, an das set forth below, the Debtor has not been able to explain, and has made no apparent effort to investigate and locate, the disposition of millions of in player salary. Since he apparently cannot, or does not wish to, explain the use and disposition of such funds, it is hard to understand how he can claim that the debts are "primarily business debts." All at a time when the Debtor cannot recall whether or not he had every invested in any other business venture or entity other than those listed in his Schedules or owned any other real property other than what is currently listed on his Schedules.

20. The Debtor has failed to list on either his Original Statement of Financial Affairs or Statement of Financial Affairs as amended [Doc. 29], transfers that he made to insiders within one (1) year prior to the Petition Date as required by question 8. The Debtor failed to do so despite listed in his amended Schedule J [Doc. 30], a monthly expense of $15,000 in payments that the Debtor makes to support his mother, father, grandmother, and uncles. However, during Centennial's examination of the Debtor pursuant to Federal Rule of Bankruptcy Procedure 2004 (the "2004 Examination") that occurred on March 24, 2021, the Debtor testified under oath that during 2020 he (i) routinely transfers thousands of dollars to his mother monthly, (ii) pays for his families' credit card debt, (iii) pays for his father's monthly automobile loan payment, (iv) pays for the mortgage on a property purportedly owned jointly by the Debtor and his mother, and (v) covers for the living expenses of his mother and father in Canada. The Debtor's payments to his family members were also not disclosed in response to question 12 of the Statement of Financial Affairs. No amendments have been filed by the Debtor with this critical information.

COOPER, WHITE
& COOPER LLP
ATTORNEYS AT LAW
201 CALIFORNIA STREET
SAN FRANCISCO, CA 94111-5002

21.     The Debtor also failed to disclose in his Statement of Financial Affairs [Doc. 29] that within the two (2) years prior to the Petition Date the Debtor sold, traded, or otherwise transferred property as required by question 18.  In the Debtor's dealings with Centennial, the Debtor or an agent of the Debtor identified certain personal assets owned by the Debtor in order to induce Centennial to make the Loan.  Part of these assets included the two (2) Canadian properties identified on the Debtor's Schedule A/B [Doc. 37]; however, a third Canadian property was also identified but the Debtor has failed to list the same on his Schedules (the "Undisclosed Residential Property").  Given that the Debtor's dealings with Centennial began in late 2018, to the extent the Debtor no longer claims an interest in the Undisclosed Residential Property, the Debtor should have identified the same in question 18 -  as the sale, trade, or transfer of the Debtor's interest in the Undisclosed Residential Property would have occurred within the two (2) years preceding the Petition Date.  Instead, the Debtor only discloses the fact that he transferred two (2) Rolex watches to pay certain gambling debt.  To the extent that the Debtor now contends that he has never owned the third Undisclosed Residential Property, then this confirms that the Debtor communicated false information regarding his financial affairs to Centennial in order to obtain the Loan.  Centennial reserves the right to amend this complaint, and specifically Count I below, to the extent the Debtor denies this allegation.

22.     The Debtor has significantly undervalued and underreported his monthly income as listed on the Debtor's Schedule I [Doc. 1].  In part 2 of Schedule I, the Debtor states that his gross monthly is $0.  And while the Debtor list additional monthly income on line 8.h as $2,083.33 as "[i]ncome from podcast," the Debtor has confirmed that said podcast never produced an episode and is not expecting to in the future.  Although the Debtor attempts to provide an explanation for his grossly underreported monthly income in an "Attachment to Schedule I," the Debtor has failed to amend his Schedule I to account for the fact that the Debtor's year to date gross earnings as of February 26, 2021 was $879, 387.93.

**C.     The Debtor's Inability to Account for and Explain Dissipation of Assets**

23.     At both the 2004 Examination and the Debtor's 341 Meeting, the Debtor had only the most superficial knowledge regarding his assets and liabilities.  Most importantly, the Debtor

COOPER, WHITE
& COOPER LLP
ATTORNEYS AT LAW
201 CALIFORNIA STREET
SAN FRANCISCO, CA 94111-5002

8

had no real knowledge, or simply did not wish to disclose, the use and disposition of the many millions of dollars the Debtor has earned as a professional ice hockey player of the course of eleven (11) years.

24. In addition to the Loan described above, the Debtor identifies that he has taken out additional loans at both Zions Bancorporation ("Zions") and Professional Bank ("Professional"), the "Zions Loan" and "Professional Loan" respectively. The Debtor has testified that the Loan, Zions Loan, and Professional Loan (collectively, the "Non-Residential Property Loans") were incurred by the Debtor in order to pay off certain high interest loans the Debtor had previously taken out at several different institutions (collectively, the "High Interest Loans"). However, when questioned at his 341 Meeting, the Debtor could not recall for what purpose the High Interest Loans were incurred. Even with the benefit of a passage of time of nearly thirty (30) days between the 341 Meeting and 2004 Examination, when presented with a series of questions regarding the High Interest Loans the Debtor was unable to explain what the funds were actually used for or when the debt was incurred.

25. During both the Debtors 341 Meeting and 2004 Examination, the Debtor could not explain a significant number of charges, withdrawals, and deposits listed within the Debtor's various banking accounts. For example, in the Debtor's Ryal Bank of Canada Account ending in -0532, three (3) transfers totaling $50,000 can be identified as leaving the Debtor's account on January 17, 2020, but the Debtor was unable to explain to what account the money was being transferred too and for what purpose. Similarly, on March 31, 2020, the Debtor received $100,000 into his Royal Bank of Canada account ending in -5955, but could not explain where said money came from. The same explanation was given for another $100,000 deposit that the Debtor received into his -5955 account. Similarly, on October 14, 2020, the Debtor received a total of $131,000 in deposits into the -5955 account that he could not explain. Additionally, there are number of entries in the Debtor's Wells Fargo account ending in -1607 where the Debtor was unable to recall why certain withdraws were made. This is just a sample of the Debtor's inability to explain the source and use of funds.

26. Furthermore, for certain unsecured loans listed in the Debtor's amended Schedule E/F [Doc. 18], including the unsecured loans listed for Davis Sanchez, Mike Lispti, Pete Gianakas,

COOPER, WHITE
& COOPER LLP
ATTORNEYS AT LAW
201 CALIFORNIA STREET
SAN FRANCISCO, CA 94111-5002

Raj Banghu, and Tony Veltri, the Debtor does not have any documentation relating to said unsecured loans, does not know exactly when each debt was incurred, and does not know exactly what each loan was used for.

27. Although the Debtor has testified that he lost approximately $1,500,000 in gambling and sports betting during the one (1) year prior to the Petition Date, the Debtor, as his 341 Meeting, was unable to approximate the total gambling losses he has incurred before 2020.

28. The Debtor further could not recall whether or not he had every invested in any other business venture or entity other than those listed in his Schedules or owned any other real property other than what is currently listed on his Schedules.

## COUNT I

### (NONDISCHARGEABILITY OF DEBT PURSUANT TO 11 U.S.C. §523(a)(2)(A)

29. Centennial realleges and reincorporates paragraphs 1 through 28 above as though fully set forth herein.

30. Pursuant to 11 U.S.C. §523(a), "[a] discharge under section 727 … of this title does not discharge an individual debtor from any debt … (2) for money, property, services … to the extent obtained by – (A) false pretenses, a false representation, or actual fraud …."

31. Centennial entered into the Note and Security Agreement in good faith, and performed its part under the Note and Security Agreement in full.

32. At the time of entering in to the Third Amended Note and Third Amended Security Agreement, the Debtor falsely represented to Centennial that he agreed to the provisions of the same, i.e.

33. Centennial reasonably relied on the Debtor's representations that was entering into the Note and Security Agreement in good faith and with every intention of complying with the terms of the same. Had Centennial known that the Debtor intended not to abide by the terms of the Security Agreement, Centennial would not have entered into the Note, or at the very least, would not have entered into the Third Amended Note, thereby not extending to the Debtor an additional $

COOPER, WHITE
& COOPER LLP
ATTORNEYS AT LAW
201 CALIFORNIA STREET
SAN FRANCISCO, CA 94111-5002

34.     The Debtor's conduct at the time that he entered into the Third Amended Note and Third Amended Security Agreement with Centennial constitutes false pretenses and/or false representations, which the Debtor knew to be false.

35.     Centennial believes that additional discovery may uncover additional fraudulent statements made by the Debtor, specifically, the Debtor's financial condition as communicated to Centennial at the time in which the Debtor requested the Loan.  As identified above, certain personal assets were disclosed to Centennial in order to induce Centennial to enter into its lending relationship with the Debtor; however, the certain of those assets have not been disclosed in the Bankruptcy Case, leading to only one of two conclusions either (i) the Debtor lied to Centennial in order to receive the Loan, or (ii) the Debtor lied in his Schedules.  Accordingly, Centennial reserves the right to amend this complaint, and more specifically this Count I.

36.     Accordingly, Centennial requests that this Court enter a judgment declaring that Centennial's claim against the Debtor is non-dischargeable.

WHEREFORE, Centennial respectfully requests a judgment (i) declaring that Centennial's claim against the Debtor is non-dischargeable pursuant to 11 U.S.C. §523(a)(2)(A); (ii) awarding costs and fees if applicable; and (iii) granting such other and further relief as is proper.

## COUNT II

### (DENIAL OF DISCHARGE PURSUANT TO 11 U.S.C. §727(a)(2))

37.     Centennial realleges and reincorporates paragraphs 1 through 28 above as though fully set forth herein.

38.     Pursuant to 11 U.S.C. §727(a)(2), an individual debtor is not entitled to a discharge if the debtor, with the "intent to hinder, delay, or defraud a creditor or an officer of the estate…has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed…property of the debtor, within one year before the date of the filing of the petition."

39.     Through the Debtor's dealings with Centennial, including as late as March 2019, the Debtor indicated to Centennial that he owned the Undisclosed Residential Property.

COOPER, WHITE
& COOPER LLP
ATTORNEYS AT LAW
201 CALIFORNIA STREET
SAN FRANCISCO, CA 94111-5002

40.     In filing the Bankruptcy Case, the Debtor has failed to identify the Undisclosed Residential Property as an asset.

41.     In light of the foregoing, and upon information and belief, the Debtor transferred or removed, or permitted to be transferred or removed, his equity in the Undisclosed Residential Property.

42.     As of the date of the foregoing transfer or removal, the Debtor had one or more unsecured creditors.

43.     The transfer or removal of the Debtor's property has prevented the distribution of the same to the Debtor's unsecured creditors.

44.     Upon information and belief, the Debtor, with intent to hinder, delay, or defraud at least one of his creditors, transferred or removed, or permitted to be transferred or removed, the Debtor's property.

45.     By transferring or removing, or permitting the transfer or removal of the Debtor's property with the intent to hinder, delay, or defraud at least on of his creditors, the Debtor has violated the provisions of 11 U.S.C. §727(a)(2)(A).

WHEREFORE, Centennial respectfully requests a judgment (i) denying the Debtor's discharge pursuant to 11 U.S.C. §727(a)(2); (ii) awarding costs and fees if applicable; and (iii) granting such other and further relief as is proper.

## COUNT III

### (DENIAL OF DISCHARGE PURSUANT TO 11 U.S.C. §727(a)(3))

46.     Centennial realleges and reincorporates paragraphs 1 through 28 above as though fully set forth herein.

47.     Pursuant to 11 U.S.C. §727(a)(3), an individual debtor is not entitled to a discharge if the debtor has "concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information … from which the debtor's financial condition or business transactions might be ascertained …."

48.     The Debtor has testified under oath that the Non-Residential Bank Loans were used

COOPER, WHITE
& COOPER LLP
ATTORNEYS AT LAW
201 CALIFORNIA STREET
SAN FRANCISCO, CA 94111-5002

by the Debtor to pay off the preexisting High Interest Loans. However, the Debtor has failed to explain and cannot explain what the High Interest Loans were used for, when High Interest Loans were incurred, or through what financial institution the Debtor received the High Interest Loans from. The Debtor has confirmed that he personally does not maintain any books or records, or any documents whatsoever, regarding the High Interest Loans.

49. The Debtor's bank statements for the year 2020 contain a number of entries that the Debtor cannot explain, including (i) where certain deposits came from, (ii) where certain transfers or withdrawals were made, and (iii) for what purpose certain funds were withdrawn or transferred out of certain accounts. The Debtor's lack of written records regarding the foregoing deters creditors like Centennial's ability to fully ascertain the Debtor's financial condition.

50. The Debtor cannot recall whether or not he has owned any other real property or held any other ownership, membership, or partnership interest in any other business venture other than those minimal business entities and real property listed on the Debtor's Schedules, thus confirming either (i) the Debtor has held no such additional interest and therefore is unable to satisfactorily explain the dissipation of assets, or (ii) failed maintain adequate records regarding said interests.

51. As identified below, the Debtor failed to list on his Schedules his prior ownership and sale of the Undisclosed Residential Property, and therefore presumably has failed to maintain appropriate records regarding the same.

52. By virtue of the foregoing, and without limitation, the Debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers from which a creditor like Centennial can reasonably ascertain the Debtor's financial condition or business transactions. Accordingly, the Debtor's discharge should be denied under 11 U.S.C. §727(a)(3).

WHEREFORE, Centennial respectfully requests a judgment (i) denying the Debtor's discharge pursuant to 11 U.S.C. §727(a)(3); (ii) awarding costs and fees if applicable; and (iii) granting such other and further relief as is proper.

COOPER, WHITE
& COOPER LLP
ATTORNEYS AT LAW
201 CALIFORNIA STREET
SAN FRANCISCO, CA 94111-5002

## <u>COUNT IV</u>

## (DENIAL OF DISCHARGE PURSUANT TO 11 U.S.C. §727(a)(4)(A))

53.  Centennial realleges and reincorporates paragraphs 1 through 28 above as though fully set forth herein.

54.  Pursuant to 11 U.S.C. §727(a)(4)(A), as a consequence of knowingly and fraudulently making a false oath or account in or in connection with the Bankruptcy Case, the Debtor is not entitled to a discharge under Bankruptcy Code §727.

55.  The Debtor intentionally omitted from his Statement of Affairs disclosure of the fact that the Debtor sold, traded, or otherwise transferred the Undisclosed Residential Property within two (2) years preceding the Petition Date. Such sale, trade, or transfer of the Undisclosed Residential Property was not in the ordinary course of the Debtor's business or financial affairs, as the Debtor is a professional ice hockey player who has no active business enterprise. During the Debtor's 2004 Examination, the Debtor testified under oath that he was could not recall whether or not he owned any other property other than the Residential Property listed on his Schedules. Such testimony was demonstratively false as the Debtor failed to disclose his ownership of the Undisclosed Residential Property.

56.  The Debtor further intentionally omitted from his Statement of Affairs disclosure of the fact that within the one (1) year preceding the Petition Date, the Debtor not only made payments on account of debts that benefited insiders of the Debtor, but that the Debtor gave gifts to insiders with a total value of more than $600 per person. To be sure, the Debtor routinely transfers thousands of dollars to his mother on a monthly basis. Moreover, the Debtor (i) routinely pays off the credit card debt of his family members, (ii) covers the monthly automobile loan payment for his father, (iii) covers the monthly mortgage payment on a property purportedly jointly owned by the Debtor and his mother, and (iv) covers the living expenses of his parents in Canada.

57.  The Debtor intentionally grossly underreported his monthly income derived under his Player's contract.

58.  The Debtor intentionally misrepresented in his sworn Petition that his debts were

COOPER, WHITE
& COOPER LLP
ATTORNEYS AT LAW
201 CALIFORNIA STREET
SAN FRANCISCO, CA 94111-5002

primarily business debts, a preemptive and premediated effort to avoid the means test under Bankruptcy Code §707(b).

59. The false oaths described hereinabove were made knowingly and fraudulently by the Debtor because, at the time of the specified filings or testimony, the Debtor knew that the information being provided was not true nor complete, but nonetheless made such false oaths for the purpose of concealing property or information.

60. By virtue of the foregoing, and without limitation, the Debtor has knowingly and fraudulently, in or in connection with the Bankruptcy Case, made a false oath or account.

61. Centennial believes that further discovery will reveal further material falsehoods and omissions made by the Debtor in connection with the Bankruptcy Case.

WHEREFORE, Centennial respectfully requests a judgment (i) denying the Debtor's discharge pursuant to 11 U.S.C. §727(a)(4)(A); (ii) awarding costs and fees if applicable; and (iii) granting such other and further relief as is proper.

## COUNT V

### (DENIAL OF DISCHARGE PURSUANT TO 11 U.S.C. §727(a)(5))

62. Centennial realleges and reincorporates paragraphs 1 through 28 above as though fully set forth herein.

63. Pursuant to 11 U.S.C. §727(a)(5), an individual debtor is not entitled to a discharge if the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities.

64. Based upon the filed poof of claims submitted by creditors in the Bankruptcy Case, as well as information sworn to by the Debtor in his Schedules, between 2017 and 2020, the Debtor received a combination of loan funds and salary totaling at least $40,000,000. Specifically, starting with the 2017-2018 season and through the 2019-2020 season (i.e. not even taking into account the 2020-2021 current hockey season), the Debtor received $20,000,000 in compensation under the Player's Contract. During that same time period, the Debtor received at minimum: (i) $8,000,000 in borrowed funds from Centennial, (ii) $4,250,000 in borrowed funds from Zions, (iii) $1,500,000

COOPER, WHITE
& COOPER LLP
ATTORNEYS AT LAW
201 CALIFORNIA STREET
SAN FRANCISCO, CA 94111-5002

in borrowed funds from Professional, (iv) $600,000 in borrowed funds from South River Capital, LLC, and (v) $100,000 in borrowed funds from Raj Bhangu. In addition to the foregoing, the Debtor's Schedules lists additional unsecured claims totaling $2,050,000 arising from borrowed funds from various personal and/or family friends of which the Debtor does not know the date in which such loans were incurred. Moreover, the Debtor identifies that shortly before this period an during, the Debtor borrowed an additional $7,150,000 in funds from other financial institutions that are secured by the Debtor's Real Properties – the only meaningful assets identified in the Schedules.

65.     What is more, throughout his eleven (11) year career as a professional ice hockey player, the Debtor has earned nearly $50,000,000, and yet, the Debtor is unable to provide basic information as to where said monies has disappeared too.

66.     The Debtor has provided no meaningful explanation as to what happened to that money, where it went, what it was spent on, and whether it still exists in bank accounts or assets. Clearly, the assets listed on the Debtor's Schedules, giving the Debtor the full benefit of the doubt on values, are worth only $10,229,096.65. Therefore, a substantial amount of money is missing, unexplained, and unaccounted for.

67.     Between the millions of dollars of loan proceeds received by the Debtor, together with the $20,000,000 of income received over the last three (3) years immediately preceding the Petition Date, and the significant monthly income projected to be received by the Debtor both under the Player's Contract and from Federal Tax Returns, the assets of this estate should be more than sufficient to meet the Debtor's liabilities. Yet, there is reportedly only $10,229,096.65 in assets with filed claims of nearly $28,191,340. Notably, of the Debtor's listed assets, $7,150,000 worth of identified assets are encumbered by loans that are otherwise not the Non-Residential Properties Loans.

68.     Amazingly the Debtor has not and cannot explain where his money has been spent or where his assets have gone. The Debtor has failed to provide a sufficient explanation anywhere in his Schedules or Statement of Financial Affairs regarding the loss and deficiency of assets sufficient to meet his liabilities, and has certainly not otherwise provided a satisfactory explanation.

WHEREFORE, Centennial respectfully requests a judgment (i) denying the Debtor's

COOPER, WHITE
& COOPER LLP
ATTORNEYS AT LAW
201 CALIFORNIA STREET
SAN FRANCISCO, CA 94111-5002

discharge pursuant to 11 U.S.C. §727(a)(5); (ii) awarding costs and fees if appliable; and (iii) granting such other and further relief as is proper.

## **PRAYER FOR RELIEF**

WHEREFORE, Centennial prays for judgment against the Debtor on all counts above and as follows:

a. For a determination that Centennial's claim against the Debtor is non-dischargeable pursuant to 11 U.S.C. §523(a)(2)(A);

b. For a determination that the Debtor is not entitled to a discharge pursuant to 11 U.S.C. §727(a)(2);

c. For a determination that the Debtor is not entitled to a discharge pursuant to 11 U.S.C. §727(a)(3);

d. For a determination that the Debtor is not entitled to a discharge pursuant to 11 U.S.C. §727(a)((4)(A);

e. For a determination that the Debtor is not entitled to a discharge pursuant to 11 U.S.C. §727(a)(5);

f. For costs of suit incurred herein;

g. For such reasonable attorneys' fees as are recoverable according to applicable law; and

h. For such other and further relief that this Court deems to be just and proper.

DATED: May 5, 2021

ANTHONY & PARTNERS, LLC                    COOPER, WHITE & COOPER LLP


By: _____/s/ John A. Anthony_____          By: _____/s/ Peter C. Califano_____
     John A. Anthony                             Peter C. Califano
     Attorneys for Creditor Centennial Bank      Attorneys for Creditor Centennial Bank

1503225.1

COOPER, WHITE
& COOPER LLP
ATTORNEYS AT LAW
201 CALIFORNIA STREET
SAN FRANCISCO, CA 94111-5002

# EXHIBIT "A"

This Secured Financial Transaction and Security Agreement ("Agreement"), having an effective date of September 5, 2018 ("Effective Date"), is hereby entered into by and between **Evander Kane**, who resides at 8447 Isabel Place, Vancouver, BC, Canada V6P 6R8, and his agents, successors in interest, heirs, executors, representatives, successors and assignors (hereinafter referred to collectively as "Borrower") and Centennial Bank, an Arkansas banking corporation, with a mailing address of P.O. Box 966, Conway, Arkansas 72033, and its representatives, successors and assignors (hereinafter referred to collectively as "Lender"), who hereby agree as follows:

## RECITALS

**WHEREAS**, simultaneous to the execution of this Agreement, Lender is providing a loan ("Loan") to Borrower in the principal amount of $3,900,000.00 ("Loan Amount"), which is more specifically set forth in the Promissory Note ("Note") also entered on this same date and in the related loan documents (collectively "Loan Documents"). The repayment of the Loan Amount is identified in the repayment terms and schedule set forth in the Note (the "Repayment Amount"). The Note provides evidence of Borrower's indebtedness to Lender and his promise to pay to the Lender the Repayment Amount, in full, under the terms as set forth in this Agreement and the Note; and,

**WHEREAS**, in order to secure the Repayment Amount due to Lender, Borrower agrees to grant to the Lender a perfected security interest in those payments (including, wages, bonuses, all payments defined as "Compensation" in the NHL Contract (defined below) and any other payments due Borrower) set forth in: (a) that certain National Hockey League Standard Player's Contract ("NHL Contract") by and between the Borrower and the San Jose Sharks, LLC (hereinafter referred to as the "Sharks") dated on or about May 25, 2018, having an effective date of July 1, 2018, and their representatives, successors and assigns, and (b) any other subsequent contract or arrangement pursuant to which the Borrower enters into respective of services performed by Borrower for playing professional hockey (together hereinafter referred to as the "Borrower Contract" or "Borrower's Contract"). These payments are referred to as the "Pledged Payments"; and,

**WHEREAS**, as a material condition of the Loan, during the term of the Loan, Borrower shall be required to have all of the Pledged Payments electronically deposited directly into a controlled deposit account opened with Lender for the benefit of Borrower, wherein such funds shall be used to pay the Lender its monthly payment due pursuant to the Note, including insurance escrows, and Borrower shall be responsible to maintain a minimum balance necessary to satisfy the monthly obligations each month during the term of the Note; and,

**WHEREAS**, to the extent of any inconsistency exists between the terms of this Agreement and the Note, the terms of this Agreement shall control.

**NOW, THEREFORE**, for value received, Borrower and Lender have entered into this Agreement in order to secure (a) the timely repayment of all sums due under the terms of the Note and this Agreement; (b) the performance of all of the Borrower's obligations set forth herein below and in the Note; and (c) the repayment of any and all other agreed-upon liabilities of Borrower to Lender, of any kind of nature, whether direct or indirect, arising by operation of law or otherwise, whether now existing or in the future.

**TERMS**

## A. SCHEDULE OF REPAYMENT.

1. As set forth in the Note, Borrower shall make monthly payments on the Loan, payable in arrears, commencing with the first payment due on September 15, 2018, and each monthly payment due shall thereafter be paid on the 15th day of each consecutive month thereafter through the Maturity Date. The amount of each monthly payment, and the breakdown of the amounts applied toward principal and/or interest, is specifically set forth on the Loan Amortization Schedule attached as Exhibit "A" hereto, which is identical to Exhibit "A" to the Note. In particular, each monthly payment due is identified under the "Repayment Amount" category on Exhibit "A." As the interest rate is schedule to adjust after the 50th month of the term, the monthly payments due pursuant to the Note, and the amounts stated in the "Repayment Amount" category on Exhibit "A," will likely be adjusted at that time (unless the variable rate is the same as the existing rate).

2. It is noted that, with the exception of the payment due July 15, 2024, the regularly scheduled monthly payments due on the 15th day of May through October each year, rather than paid during those months, shall be paid during the preceding 15th day of November through April, as stated under the "Repayment Amount" on Exhibit "A." Further, in addition to the monthly payments due under the "Repayment Amount" set forth on Exhibit "A," Borrower shall further be required to pay the amounts due for the insurance escrows, on the 15th day of each November through April, in the amounts identified under the "Insurance Escrow" category on Exhibit "A." Accordingly, Borrower's monthly payments due pursuant to the Loan shall be the aggregate of the amounts due under the "Repayment Amount" and Insurance Escrow" categories on Exhibit "A" (subject to any adjustments made after the 50th month of the term).

3. Notwithstanding anything to the contrary stated herein or in the Note, in the event the NHL Contract is Terminated prior to the final scheduled payment due April 15, 2025, Borrower shall be required to make a final balloon payment to Lender in an amount equal to the remaining principal balance, plus all accrued interest, advances and all other fees then due, within five (5) calendar days of the date of the Termination as defined in the NHL Contract. In the event the Maturity Date remains April 15, 2025, the entire remaining principal balance of this Note, plus all accrued but unpaid interest, advances and fee shall be due and payable in full as a final payment on the Maturity Date.

4. All payments made pursuant to the Note shall be credited first to accrued interest on the unpaid balance, next to the payment of principal, then to late fees and other fees charged on the account, and lastly to the repayment of any monies paid by Lender for the protection of the collateral securing the Note; however, in the event any default in the Note or this Agreement, Lender may, at its sole discretion, and in such order as it may choose, apply any payment to interest, principal, protection of the collateral securing the Note and/or lawful charges and expenses then accrued.

## B. BORROWER'S OBLIGATIONS UNDER THIS AGREEMENT

1. As consideration for Lender extending the Loan to Borrower, Borrower shall pay to the Lender the fees and costs identified on the **Closing Statement** that is included in the Loan Documents, wherein said fees and costs shall be added to and reflected in the repayment amount set forth in this Agreement. Borrower agrees and acknowledges that the above fees are not and should not be construed to be interest for any purpose.

2. At Closing, as part of the other closing costs and fees, Lender shall receive from Borrower an interest reserve in the amount of $28,870.83, and said funds shall be applied toward Borrower's

2

initial two (2) monthly interest-only payments due September 15, 2018 and October 15, 2018; and (b) an interest reserve in the amount of $7,041.67, which is equal to 10 days of interest payments at the initial non-default interest rate.

3. As a condition to the Lender disbursing to Borrower the proceeds of the Loan, Borrower agrees to authorize the Sharks or any future contract holder to electronically deposit into a designated account (the "designated account") the Pledged Payments that would otherwise be paid directly to Borrower by the Sharks, or any future contract holder, under the terms of the NHL Contract and/or Borrower's Contract, until such time that the Lender receives the full repayment amount agreed to by Borrower and as set forth under the terms of this agreement. Such authorization shall be in the form of an "Automatic Payment Authorization Form" attached hereto and made a part hereof, and said payments shall be made no later than five (5) calendar days after each of the scheduled payment dates set forth on Exhibit "A." Failure to timely make any of the required scheduled payments as set forth herein and in the Note shall be deemed an event of default.

4. Borrower agrees to allow Lender to directly provide to the Sharks, or any future contract holder, Borrowers financial institution information and account and routing numbers, as well as any other relevant instructions for the designated account, so the Sharks may directly deposit the Pledged Payments in accordance with subparagraph 3, above.

5. Borrower shall notify Lender, in writing, when there is any change in Borrower's health status that could affect the Borrower contract.

6. Borrower shall immediately notify Lender if there is any change in the Borrower's contact information including, but not limited to, a change of address, telephone number, or email address.

7. Borrower shall immediately notify Lender of a Termination of the NHL Contract within one (1) business day of Borrower receiving a Notice of Termination or one (1) business day of Borrower providing a Notice of Termination of the NHL Contract. Borrower acknowledges his obligation to satisfy in full the remaining principal, interest and fees due pursuant to the Note within five (5) calendar days of a Termination of the NHL Contract if such termination occurs prior to the final scheduled payment due date of April 15, 2025.

8. Borrower agrees to provide Lender with notice of any changes to the Borrower's contract within two (2) business days of such change, including, but not limited to, any notices of default, notices of retirement, changes in terms or any other changes, and during that same time period, shall provide Lender with a copy of any notice and/or revised or amended contract.

9. Borrower agrees that the loan amount shall not be funded to Borrower unless and until Borrower executes and delivers to the Lender the Note and other Loan Documents required to be delivered to lender hereunder.

10. Lender shall be authorized and empowered to debit the designated account and any securities account by an automated clearinghouse (ACH) transaction, for the purpose of making the payments required under this Agreement and the Note as set forth on Exhibit "A," including any other payments due or to become due pursuant to this Agreement and the Note.

3

## C. BORROWER'S REPRESENTATIONS AND WARRANTIES AND GRANTING OF A SECURITY INTEREST

1. Borrower warrants and represents that he owns all rights, title and interest in and to the Borrower Contract and is entitled to all of the benefits afforded to it and to the Borrower Contract, including, but not limited to, any and all payments to be made to Borrower thereunder and Borrower further acknowledges the Borrower is hereby granting a perfected security interest in into the Pledged Payments in order to satisfy the repayment amount on the terms as set forth in this Agreement.

2. Borrower warrants and represents that, in addition to the Loan from Lender, he recently obtained financing from California Bank & Trust ("CB&T"), for a loan in the principal amount of $4,250,000.00 (56 month term) ("CB&T Loan"), and is scheduled to obtain another loan from another institution in the principal amount of around $4,550,000.00 (80 month term) (hereinafter the "Other Institutional Loan" or the "OI Loan"). The aggregate funds received from the Loan, the CB&T Loan and the Other Institutional Loan shall predominantly be used to pay off four existing loans Borrower has with other lenders, resulting in Borrower having the Loan, CB&T Loan and OI Loan.

3. Borrower warrants and represents that the CB&T Loan and the OI Loan are both structured similarly to the Loan herein, wherein monthly payments on those loans shall be paid directly by from the Sharks or any other subsequent hockey club.

4. With the exception of the CB&T Loan and the OI Loan, Borrower's Contract and Pledged Payments are free and clear of any liens, judgments and or security interests.

5. Borrower warrants and represents that, with the exception of the CB&T Loan and the OI Loan, he has not entered into or granted, and will not enter into or grant during the term of this Loan, any security interest, and has not permitted the filing or attachment of any security interests, and will not permit the filing or attachment of any security interests during the term of the Loan, on or affecting any of the Collateral that, directly or indirectly, secures the repayment of Borrower's Loan and Promissory Note unless first approved in writing by Lender.

6. Borrower warrants and represents that, subject to the CB&T Loan and the OI Loan he has the unrestricted right to assign to the Lender any portion of the Borrower's Contract, including the Pledged Payments and Borrower has not previously assigned, sold or otherwise transferred any portion of the Borrower Contract to the pledged payments, in whole or in part, to any other party, including the granting of any liens and or judgments if applicable except as set forth in this Agreement.

7. Borrower warrants and represents that he has a legal capacity and the mental competency to execute this Agreement and shall perform all obligations set forth within the terms of this agreement and that it is doing so voluntarily and of its own free will.

8. Borrower warrants and represents that he is under no contractual obligations or other restrictions that are adverse to the Lender with regard to the terms of this Agreement, the Borrower's Contract, or the Pledged Payments.

9. Borrower warrants and represents that the execution, delivery and performance of this Agreement, and the consummation of the transaction contemplated in this Agreement, does not violate any laws, rules, regulations, order, or other agreement or instrument.

4

10. Borrower warrants and represents that there are no bankruptcies or insolvency proceedings in progress or in prospect, either personally, or with regard to any entity owned, in whole or in part, that could affect the repayment amount or Lender's interest in the repayment amount.

11. Borrower warrants and represents that he is not subject to any legal proceeding that could in anyway adversely affect the terms of this Agreement or pledged payments, and or Borrower's right, title, or interest in the Borrower's Contract or the Pledged Payments. Borrower further warrants that the Borrower contract has not been and is not in jeopardy of being subject to a levy or any other type of adverse interest.

12. Borrower warrants and represents that the information he has provided to the Lender prior to the execution of this Agreement is true, accurate, and complete. Borrower further acknowledges that the Lender has relied and will continue to rely on this information in acquiring, protecting and otherwise dealing with the terms of this Agreement.

13. Borrower warrants and represents that he has not engaged in any acts or conduct or made any omissions that could potentially result in Lender receiving less than the full amount of the Repayment Amount and there are no other parties that hold a similar interest in the Borrower's Contract or the Pledged Payments except as set forth in this agreement.

14. Borrower warrants and represents that he has paid all federal state and local taxes or has made adequate and acceptable terms for any tax payment due with the appropriate tax agency responsible for excepting such payment.

15. Borrower warrants and represents that there are no outstanding tax liens or judgments against the Borrower, liens owed by them to any county, city or state government entity, or other liens owed to the United States government, or other person or entity for any social service or other benefit that Borrower has received and is obligated to pay, including but not limited to child support or alimony.

16. This Agreement constitutes Borrower's legal, valid and binding obligation and is legally enforceable in a court of law and that the Agreement is binding upon Borrower, his successors and assigns.

## D. BREACH BY BORROWER

A Breach of this agreement shall occur, upon one or more of the following events:

1. Borrower makes a material misrepresentation or false statement in this Agreement or in any financial documentation provided to Lender.

2. Borrower voluntarily files for bankruptcy, or in involuntary bankruptcy is filed against him;

3. Borrower incurs any federal, state or other tax lien or judgment;

4. Borrower fails to stay current in any federal, state or other tax payment due;

5. Borrower or the Pledged Payments become the subject of a civil lien and or civil judgment;

5

6. Borrower becomes indebted to any present or former spouse for support, maintenance or similar obligations, or becomes indebted to any child or to a guardian of any child for any child support or similar payments;

7. Borrower is convicted of a felony involving a crime of fraud theft perjury or other moral turpitude;

8. Borrower engages in any other action or behavior that, in the sole opinion of the Lender, could create a default under the Borrower contract, or encumber the Pledged Payments; or

9. Borrower becomes in default or suffers a default under any provision of the Note or this Agreement.

## E. MISCELLANEOUS PROVISIONS

1. **NOTWITHSTANDING ANYTHING TO THE CONTRARY ABOVE, IT SHALL BE AN IMMEDIATE DEFAULT OF THIS AGREEMENT, THE NOTE AND LOAN DOCUMENTS IF BORROWER, DIRECTLY OR INDIRECTLY, TAKES ANY ACTION, OR FAILS TO TAKE ANY ACTION, THAT RESULTS IN THE PLEDGED PAYMENTS BEING NO LONGER ELECTRONICALLY DEPOSITED DIRECTLY INTO THE DEPOSIT ACCOUNT REFERENCED HEREINABOVE AT ANYTIME PRIOR TO THE SATISFACTION OF THE FULL BALANCE DUE UNDER THE NOTE. UPON SUCH IMMEDIATE DEFAULT AS DESCRIBED HEREIN, LENDER SHALL HAVE THE RIGHT TO ACCELRATE THE FULL BALANCE DUE, EXECUTE ON THE BALANCE DUE, AND SHALL FURTHER HAVE THE RIGHT TO DISBURSE TO LENDER AND APPLY TOWARD THE LOAN BALANCE ALL AMOUNTS HELD IN THE DEPOSIT ACCOUNT. NO NOTICE SHALL BE REQUIRED TO BE PROVIDED BY LENDER TO BORROWER UNDER SUCH IMMEDIATE DEFAULT.**

2. Borrower and Lender agree that, in addition to any other legal rights and remedies available to Lender for any breach by the Borrower, Lender shall be entitled to enforce Borrower's obligations hereunder by court injunction, or court ordered affirmative action, which injunction or ordered action they also serve to restrain a future breach of this Agreement if there are reasonable grounds to believe that such a breach is threatened.

3. If Borrower breaches this Agreement, Lender may terminate its obligations under this Agreement and shall immediately be entitled to the full payment of the repayment amount, plus interest calculated at the highest non-usurious rate permitted by the laws of the State of Florida.

4. In the event of any material change in the Borrower's Contract, including, but not limited to, the termination of the Borrower's Contract, any material violation by Borrower of the Borrower's Contract, the suspension of Borrower by the National Hockey League, the Sharks or any future contract holder, or the withholding of Compensation as described in the NHL Contract, all payments under the Note and any payments due under this Agreement shall be immediately due and payable by the Borrower to Lender.

5. In the event of a breach by Borrower under this Agreement, Borrower shall pay to the Lender all fees, cost and expenses incurred by the lender, including Lender's reasonable attorney's fees, incurred by Lender to enforce the terms of this Agreement.

6. During the entire term of the Loan and the Promissory Note, Borrower shall be required to maintain a Death & Disgrace insurance policy naming Lender as the insured or primary beneficiary, with said policy being issued by an insurance company acceptable to Lender, with a policy limit in an

6

amount no less than the then outstanding principal balance of the Note. Borrower shall be required to provide Lender with written confirmation of such policy on an annual basis. Borrower authorizes the Bank the right to automatically debit the Loan Account for all insurance premiums and related other charges associated with the Death & Disgrace insurance policy. Borrower acknowledges that the Lender will collect payments from Borrower to hold in escrow for the Insurance premiums set forth herein, in the amounts stated under the "Insurance Escrow" category on Exhibit "A." Borrower further acknowledges that the amounts shown in the "Insurance Escrow" category are only estimates, and if the insurance premiums are greater than the aggregate amount collected by Lender, Borrower shall be required to remit to Lender additional funds to satisfy the shortfall.

7. During the entire term of the Loan, Borrower shall not be permitted to obtain unsecured debt exceeding $100,000.00 or secured debt exceeding $100,000.00 without the prior written consent of the Lender.

8. On an annual basis, Borrower shall deliver to Lender his individual U.S. and Canadian federal (and any state or province) income tax returns within 10 days of each said return being filed. Additionally, should any extensions on filing these returns be sought, Borrower shall provide Lender a copy of any such signed extensions.

IN WITNESS WHEREOF, Borrower and Lender have executed this Agreement effective on the 5th day of September 2018.

**BORROWER:**

Evander Kane

STATE OF $\underline{IL}$
COUNTY OF $\underline{COOK}$

I HEREBY CERTIFY that on this day, before me, an officer duly authorized in the State aforesaid and in the County aforesaid to take acknowledgements, the foregoing instrument was acknowledged before me by Evander Kane, who is: ____ either personally known to me or $\underline{V}$ has produced _Passport_ as identification.

WITNESS by hand and official seal in the County and State last aforesaid this 5th day of _September_ 2018.

NOTARY PUBLIC
Print Name: Wendy N Davis
My commission expires: 5/24/2020

*(remainder of page left blank – Lender's signature page to follow)*

7

## INDIVIDUAL ACKNOWLEDGMENT

State/Commonwealth of ___Illinois___

County of ___Cook___ } ss.

On this the ___5th___ day of ___September___ ___2018___, before me,
Day / Month / Year

___Wendy N Davis___
Name of Notary Public

, the undersigned Notary Public,

personally appeared ___Evander Kane___
Name(s) of Signer(s)

☐ personally known to me – OR –

☒ proved to me on the basis of satisfactory evidence

to be the person(s) whose name(s) is/are subscribed to the within instrument, and acknowledged to me that he/she/they executed the same for the purposes therein stated.

WITNESS my hand and official seal.

_[signature]_

Signature of Notary Public

___Wendy N Davis___

___5/2/2020___

Any Other Required Information
(Printed Name of Notary, Expiration Date, etc.)

WENDY N DAVIS
Official Seal
Notary Public · State of Illinois
My Commission Expires May 2, 2020

Place Notary Seal/Stamp Above

---

### OPTIONAL

*This section is required for notarizations performed in Arizona but is optional in other states. Completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**

Title or Type of Document: ___Secured Financial Transaction and Security agreement___

Document Date: ___9/5/2018___     Number of Pages: ___8___

Signer(s) Other Than Named Above: ___N/A___

©2014 National Notary Association · www.NationalNotary.org · 1-800-US NOTARY (1-800-876-6827)   Item #25938

**LENDER:**

**CENTENNIAL BANK**
An Arkansas banking corporation

By: 

Eric Servaites, Executive Vice President

STATE OF FLORIDA
COUNTY OF BROWARD

    I HEREBY CERTIFY that on this day, before me, an officer duly authorized in the State aforesaid and in the County aforesaid to take acknowledgements, the foregoing instrument was acknowledged before by Eric Servaites, as Executive Vice President of Centennial Bank, an Arkansas banking corporation, who does freely and voluntarily under authority duly vested in him by said company.  He is: ✓ either personally       known       to       me       or       ____       has       produced
_____ as identification.

    WITNESS by hand and official seal in the County and State last aforesaid this 10 day of September 2018.



RENE MARIE DUCHESNEAU
Notary Public - State of Florida
Commission # GG 045869
My Comm. Expires Jan 15, 2021
Bonded through National Notary Assn.

NOTARY PUBLIC
Print Name: Rene Duchesneau
My commission expires: 1/15/21

*(remainder of page left blank – Exhibit "A" to follow)*

8

# EXHIBIT "B"

<u>**Secured Financial Transaction and Security Agreement**</u>
<u>**(Centennial Bank Loan No.        221)**</u>

This Secured Financial Transaction and Security Agreement ("Agreement"), having an effective date of September 5, 2018 ("Effective Date"), is hereby entered into by and between **Evander Kane**, who resides at 8447 Isabel Place, Vancouver, BC, Canada V6P 6R8, and his agents, successors in interest, heirs, executors, representatives, successors and assignors (hereinafter referred to collectively as "Borrower") and Centennial Bank, an Arkansas banking corporation, with a mailing address of P.O. Box 966, Conway, Arkansas 72033, and its representatives, successors and assignors (hereinafter referred to collectively as "Lender"), who hereby agree as follows:

**RECITALS**

**WHEREAS**, simultaneous to the execution of this Agreement, Lender is providing a loan ("Loan") to Borrower in the principal amount of $3,900,000.00 ("Loan Amount"), which is more specifically set forth in the Promissory Note ("Note") also entered on this same date and in the related loan documents (collectively "Loan Documents"). The repayment of the Loan Amount is identified in the repayment terms and schedule set forth in the Note (the "Repayment Amount"). The Note provides evidence of Borrower's indebtedness to Lender and his promise to pay to the Lender the Repayment Amount, in full, under the terms as set forth in this Agreement and the Note; and,

**WHEREAS**, in order to secure the Repayment Amount due to Lender, Borrower agrees to grant to the Lender a perfected security interest in those payments (including, wages, bonuses, all payments defined as "Compensation" in the NHL Contract (defined below) and any other payments due Borrower) set forth in: (a) that certain National Hockey League Standard Player's Contract ("NHL Contract") by and between the Borrower and the San Jose Sharks, LLC (hereinafter referred to as the "Sharks") dated on or about May 25, 2018, having an effective date of July 1, 2018, and their representatives, successors and assigns, and (b) any other subsequent contract or arrangement pursuant to which the Borrower enters into respective of services performed by Borrower for playing professional hockey (together hereinafter referred to as the "Borrower Contract" or "Borrower's Contract"). These payments are referred to as the "Pledged Payments"; and,

**WHEREAS**, as a material condition of the Loan, during the term of the Loan, Borrower shall be required to have all of the Pledged Payments electronically deposited directly into a controlled deposit account opened with Lender for the benefit of Borrower, wherein such funds shall be used to pay the Lender its monthly payment due pursuant to the Note, including insurance escrows, and Borrower shall be responsible to maintain a minimum balance necessary to satisfy the monthly obligations each month during the term of the Note; and,

**WHEREAS**, to the extent of any inconsistency exists between the terms of this Agreement and the Note, the terms of this Agreement shall control.

**NOW, THEREFORE**, for value received, Borrower and Lender have entered into this Agreement in order to secure (a) the timely repayment of all sums due under the terms of the Note and this Agreement; (b) the performance of all of the Borrower's obligations set forth herein below and in the Note; and (c) the repayment of any and all other agreed-upon liabilities of Borrower to Lender, of any kind of nature, whether direct or indirect, arising by operation of law or otherwise, whether now existing or in the future.

**TERMS**

**A.  SCHEDULE OF REPAYMENT.**

1.  As set forth in the Note, Borrower shall make monthly payments on the Loan, payable in arrears, commencing with the first payment due on September 15, 2018, and each monthly payment due shall thereafter be paid on the 15th day of each consecutive month thereafter through the Maturity Date.  The amount of each monthly payment, and the breakdown of the amounts applied toward principal and/or interest, is specifically set forth on the Loan Amortization Schedule attached as Exhibit "A" hereto, which is identical to Exhibit "A" to the Note.  In particular, each monthly payment due is identified under the "Repayment Amount" category on Exhibit "A."  As the interest rate is schedule to adjust after the 50th month of the term, the monthly payments due pursuant to the Note, and the amounts stated in the "Repayment Amount" category on Exhibit "A," will likely be adjusted at that time (unless the variable rate is the same as the existing rate).

2.  It is noted that, with the exception of the payment due July 15, 2024, the regularly scheduled monthly payments due on the 15th day of May through October each year, rather than paid during those months, shall be paid during the preceding 15th day of November through April, as stated under the "Repayment Amount" on Exhibit "A."  Further, in addition to the monthly payments due under the "Repayment Amount" set forth on Exhibit "A," Borrower shall further be required to pay the amounts due for the insurance escrows, on the 15th day of each November through April, in the amounts identified under the "Insurance Escrow" category on Exhibit "A."  Accordingly, Borrower's monthly payments due pursuant to the Loan shall be the aggregate of the amounts due under the "Repayment Amount" and Insurance Escrow" categories on Exhibit "A" (subject to any adjustments made after the 50th month of the term).

3.  Notwithstanding anything to the contrary stated herein or in the Note, in the event the NHL Contract is Terminated prior to the final scheduled payment due April 15, 2025, Borrower shall be required to make a final balloon payment to Lender in an amount equal to the remaining principal balance, plus all accrued interest, advances and all other fees then due, within five (5) calendar days of the date of the Termination as defined in the NHL Contract.  In the event the Maturity Date remains April 15, 2025, the entire remaining principal balance of this Note, plus all accrued but unpaid interest, advances and fee shall be due and payable in full as a final payment on the Maturity Date.

4.  All payments made pursuant to the Note shall be credited first to accrued interest on the unpaid balance, next to the payment of principal, then to late fees and other fees charged on the account, and lastly to the repayment of any monies paid by Lender for the protection of the collateral securing the Note; however, in the event any default in the Note or this Agreement, Lender may, at its sole discretion, and in such order as it may choose, apply any payment to interest, principal, protection of the collateral securing the Note and/or lawful charges and expenses then accrued.

**B.  BORROWER'S OBLIGATIONS UNDER THIS AGREEMENT**

1.  As consideration for Lender extending the Loan to Borrower, Borrower shall pay to the Lender the fees and costs identified on the **Closing Statement** that is included in the Loan Documents, wherein said fees and costs shall be added to and reflected in the repayment amount set forth in this Agreement.  Borrower agrees and acknowledges that the above fees are not and should not be construed to be interest for any purpose.

2.  At Closing, as part of the other closing costs and fees, Lender shall receive from Borrower an interest reserve in the amount of $28,870.83, and said funds shall be applied toward Borrower's

2

initial two (2) monthly interest-only payments due September 15, 2018 and October 15, 2018; and (b) an interest reserve in the amount of $7,041.67, which is equal to 10 days of interest payments at the initial non-default interest rate.

3. As a condition to the Lender disbursing to Borrower the proceeds of the Loan, Borrower agrees to authorize the Sharks or any future contract holder to electronically deposit into a designated account (the "designated account") the Pledged Payments that would otherwise be paid directly to Borrower by the Sharks, or any future contract holder, under the terms of the NHL Contract and/or Borrower's Contract, until such time that the Lender receives the full repayment amount agreed to by Borrower and as set forth under the terms of this agreement. Such authorization shall be in the form of an "Automatic Payment Authorization Form" attached hereto and made a part hereof, and said payments shall be made no later than five (5) calendar days after each of the scheduled payment dates set forth on Exhibit "A." Failure to timely make any of the required scheduled payments as set forth herein and in the Note shall be deemed an event of default.

4. Borrower agrees to allow Lender to directly provide to the Sharks, or any future contract holder, Borrowers financial institution information and account and routing numbers, as well as any other relevant instructions for the designated account, so the Sharks may directly deposit the Pledged Payments in accordance with subparagraph 3, above.

5. Borrower shall notify Lender, in writing, when there is any change in Borrower's health status that could affect the Borrower contract.

6. Borrower shall immediately notify Lender if there is any change in the Borrower's contact information including, but not limited to, a change of address, telephone number, or email address.

7. Borrower shall immediately notify Lender of a Termination of the NHL Contract within one (1) business day of Borrower receiving a Notice of Termination or one (1) business day of Borrower providing a Notice of Termination of the NHL Contract. Borrower acknowledges his obligation to satisfy in full the remaining principal, interest and fees due pursuant to the Note within five (5) calendar days of a Termination of the NHL Contract if such termination occurs prior to the final scheduled payment due date of April 15, 2025.

8. Borrower agrees to provide Lender with notice of any changes to the Borrower's contract within two (2) business days of such change, including, but not limited to, any notices of default, notices of retirement, changes in terms or any other changes, and during that same time period, shall provide Lender with a copy of any notice and/or revised or amended contract.

9. Borrower agrees that the loan amount shall not be funded to Borrower unless and until Borrower executes and delivers to the Lender the Note and other Loan Documents required to be delivered to lender hereunder.

10. Lender shall be authorized and empowered to debit the designated account and any securities account by an automated clearinghouse (ACH) transaction, for the purpose of making the payments required under this Agreement and the Note as set forth on Exhibit "A," including any other payments due or to become due pursuant to this Agreement and the Note.

3

## C. **BORROWER'S REPRESENTATIONS AND WARRANTIES AND GRANTING OF A SECURITY INTEREST**

1. Borrower warrants and represents that he owns all rights, title and interest in and to the Borrower Contract and is entitled to all of the benefits afforded to it and to the Borrower Contract, including, but not limited to, any and all payments to be made to Borrower thereunder and Borrower further acknowledges the Borrower is hereby granting a perfected security interest in into the Pledged Payments in order to satisfy the repayment amount on the terms as set forth in this Agreement.

2. Borrower warrants and represents that, in addition to the Loan from Lender, he recently obtained financing from California Bank & Trust ("CB&T"), for a loan in the principal amount of $4,250,000.00 (56 month term) ("CB&T Loan"), and is scheduled to obtain another loan from another institution in the principal amount of around $4,550,000.00 (80 month term) (hereinafter the "Other Institutional Loan" or the "OI Loan"). The aggregate funds received from the Loan, the CB&T Loan and the Other Institutional Loan shall predominantly be used to pay off four existing loans Borrower has with other lenders, resulting in Borrower having the Loan, CB&T Loan and OI Loan.

3. Borrower warrants and represents that the CB&T Loan and the OI Loan are both structured similarly to the Loan herein, wherein monthly payments on those loans shall be paid directly by from the Sharks or any other subsequent hockey club.

4. With the exception of the CB&T Loan and the OI Loan, Borrower's Contract and Pledged Payments are free and clear of any liens, judgments and or security interests.

5. Borrower warrants and represents that, with the exception of the CB&T Loan and the OI Loan, he has not entered into or granted, and will not enter into or grant during the term of this Loan, any security interest, and has not permitted the filing or attachment of any security interests, and will not permit the filing or attachment of any security interests during the term of the Loan, on or affecting any of the Collateral that, directly or indirectly, secures the repayment of Borrower's Loan and Promissory Note unless first approved in writing by Lender.

6. Borrower warrants and represents that, subject to the CB&T Loan and the OI Loan he has the unrestricted right to assign to the Lender any portion of the Borrower's Contract, including the Pledged Payments and Borrower has not previously assigned, sold or otherwise transferred any portion of the Borrower Contract to the pledged payments, in whole or in part, to any other party, including the granting of any liens and or judgments if applicable except as set forth in this Agreement.

7. Borrower warrants and represents that he has a legal capacity and the mental competency to execute this Agreement and shall perform all obligations set forth within the terms of this agreement and that it is doing so voluntarily and of its own free will.

8. Borrower warrants and represents that he is under no contractual obligations or other restrictions that are adverse to the Lender with regard to the terms of this Agreement, the Borrower's Contract, or the Pledged Payments.

9. Borrower warrants and represents that the execution, delivery and performance of this Agreement, and the consummation of the transaction contemplated in this Agreement, does not violate any laws, rules, regulations, order, or other agreement or instrument.

4

10. Borrower warrants and represents that there are no bankruptcies or insolvency proceedings in progress or in prospect, either personally, or with regard to any entity owned, in whole or in part, that could affect the repayment amount or Lender's interest in the repayment amount.

11. Borrower warrants and represents that he is not subject to any legal proceeding that could in anyway adversely affect the terms of this Agreement or pledged payments, and or Borrower's right, title, or interest in the Borrower's Contract or the Pledged Payments. Borrower further warrants that the Borrower contract has not been and is not in jeopardy of being subject to a levy or any other type of adverse interest.

12. Borrower warrants and represents that the information he has provided to the Lender prior to the execution of this Agreement is true, accurate, and complete. Borrower further acknowledges that the Lender has relied and will continue to rely on this information in acquiring, protecting and otherwise dealing with the terms of this Agreement.

13. Borrower warrants and represents that he has not engaged in any acts or conduct or made any omissions that could potentially result in Lender receiving less than the full amount of the Repayment Amount and there are no other parties that hold a similar interest in the Borrower's Contract or the Pledged Payments except as set forth in this agreement.

14. Borrower warrants and represents that he has paid all federal state and local taxes or has made adequate and acceptable terms for any tax payment due with the appropriate tax agency responsible for excepting such payment.

15. Borrower warrants and represents that there are no outstanding tax liens or judgments against the Borrower, liens owed by them to any county, city or state government entity, or other liens owed to the United States government, or other person or entity for any social service or other benefit that Borrower has received and is obligated to pay, including but not limited to child support or alimony.

16. This Agreement constitutes Borrower's legal, valid and binding obligation and is legally enforceable in a court of law and that the Agreement is binding upon Borrower, his successors and assigns.

### D. **BREACH BY BORROWER**

A Breach of this agreement shall occur, upon one or more of the following events:

1. Borrower makes a material misrepresentation or false statement in this Agreement or in any financial documentation provided to Lender.

2. Borrower voluntarily files for bankruptcy, or in involuntary bankruptcy is filed against him;

3. Borrower incurs any federal, state or other tax lien or judgment;

4. Borrower fails to stay current in any federal, state or other tax payment due;

5. Borrower or the Pledged Payments become the subject of a civil lien and or civil judgment;

5

6. Borrower becomes indebted to any present or former spouse for support, maintenance or similar obligations, or becomes indebted to any child or to a guardian of any child for any child support or similar payments;

7. Borrower is convicted of a felony involving a crime of fraud theft perjury or other moral turpitude;

8. Borrower engages in any other action or behavior that, in the sole opinion of the Lender, could create a default under the Borrower contract, or encumber the Pledged Payments; or

9. Borrower becomes in default or suffers a default under any provision of the Note or this Agreement.


E. **MISCELLANEOUS PROVISIONS**

1. **NOTWITHSTANDING ANYTHING TO THE CONTRARY ABOVE, IT SHALL BE AN IMMEDIATE DEFAULT OF THIS AGREEMENT, THE NOTE AND LOAN DOCUMENTS IF BORROWER, DIRECTLY OR INDIRECTLY, TAKES ANY ACTION, OR FAILS TO TAKE ANY ACTION, THAT RESULTS IN THE PLEDGED PAYMENTS BEING NO LONGER ELECTRONICALLY DEPOSITED DIRECTLY INTO THE DEPOSIT ACCOUNT REFERENCED HEREINABOVE AT ANYTIME PRIOR TO THE SATISFACTION OF THE FULL BALANCE DUE UNDER THE NOTE. UPON SUCH IMMEDIATE DEFAULT AS DESCRIBED HEREIN, LENDER SHALL HAVE THE RIGHT TO ACCELERATE THE FULL BALANCE DUE, EXECUTE ON THE BALANCE DUE, AND SHALL FURTHER HAVE THE RIGHT TO DISBURSE TO LENDER AND APPLY TOWARD THE LOAN BALANCE ALL AMOUNTS HELD IN THE DEPOSIT ACCOUNT. NO NOTICE SHALL BE REQUIRED TO BE PROVIDED BY LENDER TO BORROWER UNDER SUCH IMMEDIATE DEFAULT.**

2. Borrower and Lender agree that, in addition to any other legal rights and remedies available to Lender for any breach by the Borrower, Lender shall be entitled to enforce Borrower's obligations hereunder by court injunction, or court ordered affirmative action, which injunction or ordered action they also serve to restrain a future breach of this Agreement if there are reasonable grounds to believe that such a breach is threatened.

3. If Borrower breaches this Agreement, Lender may terminate its obligations under this Agreement and shall immediately be entitled to the full payment of the repayment amount, plus interest calculated at the highest non-usurious rate permitted by the laws of the State of Florida.

4. In the event of any material change in the Borrower's Contract, including, but not limited to, the termination of the Borrower's Contract, any material violation by Borrower of the Borrower's Contract, the suspension of Borrower by the National Hockey League, the Sharks or any future contract holder, or the withholding of Compensation as described in the NHL Contract, all payments under the Note and any payments due under this Agreement shall be immediately due and payable by the Borrower to Lender.

5. In the event of a breach by Borrower under this Agreement, Borrower shall pay to the Lender all fees, cost and expenses incurred by the lender, including Lender's reasonable attorney's fees, incurred by Lender to enforce the terms of this Agreement.

6. During the entire term of the Loan and the Promissory Note, Borrower shall be required to maintain a Death & Disgrace insurance policy naming Lender as the insured or primary beneficiary, with said policy being issued by an insurance company acceptable to Lender, with a policy limit in an

6

amount no less than the then outstanding principal balance of the Note. Borrower shall be required to provide Lender with written confirmation of such policy on an annual basis. Borrower authorizes the Bank the right to automatically debit the Loan Account for all insurance premiums and related other charges associated with the Death & Disgrace insurance policy. Borrower acknowledges that the Lender will collect payments from Borrower to hold in escrow for the Insurance premiums set forth herein, in the amounts stated under the "Insurance Escrow" category on Exhibit "A." Borrower further acknowledges that the amounts shown in the "Insurance Escrow" category are only estimates, and if the insurance premiums are greater than the aggregate amount collected by Lender, Borrower shall be required to remit to Lender additional funds to satisfy the shortfall.

7. During the entire term of the Loan, Borrower shall not be permitted to obtain unsecured debt exceeding $100,000.00 or secured debt exceeding $100,000.00 without the prior written consent of the Lender.

8. On an annual basis, Borrower shall deliver to Lender his individual U.S. and Canadian federal (and any state or province) income tax returns within 10 days of each said return being filed. Additionally, should any extensions on filing these returns be sought, Borrower shall provide Lender a copy of any such signed extensions.

IN WITNESS WHEREOF, Borrower and Lender have executed this Agreement effective on the 5th day of September 2018.

**BORROWER:**

Evander Kane

STATE OF ⏤IL⏤
COUNTY OF ⏤COOK⏤

I HEREBY CERTIFY that on this day, before me, an officer duly authorized in the State aforesaid and in the County aforesaid to take acknowledgements, the foregoing instrument was acknowledged before me by Evander Kane, who is: ____ either personally known to me or __✓__ has produced ⏤Passport⏤ as identification.

WITNESS by hand and official seal in the County and State last aforesaid this 5th day of September 2018.



NOTARY PUBLIC
Print Name: Wendy A Davis
My commission expires: 5/2/2020

*(remainder of page left blank – Lender's signature page to follow)*

7

## INDIVIDUAL ACKNOWLEDGMENT

State/Commonwealth of Illinois

County of Cook } ss.

On this the 5th day of September 2018, before me,
Wendy N Davis
Name of Notary Public, the undersigned Notary Public,

personally appeared Evander Kane
Name(s) of Signer(s)

☐ personally known to me – OR –

☒ proved to me on the basis of satisfactory evidence

to be the person(s) whose name(s) is/are subscribed to the within instrument, and acknowledged to me that he/she/they executed the same for the purposes therein stated.

WITNESS my hand and official seal.

WENDY N DAVIS
Official Seal
Notary Public • State of Illinois
My Commission Expires May 2, 2020

Place Notary Seal/Stamp Above

_____
Signature of Notary Public

Wendy N Davis
5/2/2020
Any Other Required Information
(Printed Name of Notary, Expiration Date, etc.)

--------- OPTIONAL ---------

*This section is required for notarizations performed in Arizona but is optional in other states. Completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**

Title or Type of Document: Secured Financial Transaction and Security agreement

Document Date: 9/5/2018     Number of Pages: 8

Signer(s) Other Than Named Above: N/A

©2014 National Notary Association • www.NationalNotary.org • 1-800-US NOTARY (1-800-876-6827)   Item #25936

**LENDER:**

**CENTENNIAL BANK**
An Arkansas banking corporation



By: _____
Eric Servaites, Executive Vice President

STATE OF FLORIDA
COUNTY OF BROWARD

I HEREBY CERTIFY that on this day, before me, an officer duly authorized in the State aforesaid and in the County aforesaid to take acknowledgements, the foregoing instrument was acknowledged before by Eric Servaites, as Executive Vice President of Centennial Bank, an Arkansas banking corporation, who does freely and voluntarily under authority duly vested in him by said company. He is: ☑ either personally        known        to        me        or        ____        has        produced _____ as identification.

WITNESS by hand and official seal in the County and State last aforesaid this 10 day of September 2018.

RENE MARIE DUCHESNEAU
Notary Public - State of Florida
Commission # GG 045869
My Comm. Expires Jan 15, 2021
Bonded through National Notary Assn.

NOTARY PUBLIC
Print Name: Rene Duchesneau
My commission expires: 1/15/21

*(remainder of page left blank – Exhibit "A" to follow)*

8

# EXHIBIT "C"

# EXHIBIT 1
## STANDARD PLAYER'S CONTRACT

### IMPORTANT NOTICE TO PLAYER

Before signing this Standard Player's Contract ("SPC") you should carefully examine it to be sure that all terms and conditions agreed upon have been incorporated herein, and if any has been omitted, you should insist upon having it inserted in the SPC before you sign.

---

## NATIONAL HOCKEY LEAGUE
### STANDARD PLAYER'S CONTRACT
### (2013 FORM)

BETWEEN      San Jose Sharks

Hereinafter called the "Club," a member of the National Hockey League, hereinafter called the "League"

AND      Evander Kane

hereinafter called the "Player"

State/Province/Country

of   Vancouver   in   BC   of   CANADA

In consideration of the respective obligations herein and hereby assumed, the parties to this SPC severally agree as follows:

1. The Club hereby employs the Player as a skilled hockey Player for the term of eight (7) League Year(s) commencing the later of July 1, 2018 or upon execution of this SPC and agrees, subject to the terms and conditions hereof, to pay the Player a salary of _____ US Dollars ($ _____ ).

| | | |
|---|---|---|
| 2018/19: | Six Million Dollars | $6,000,000 |
| 2019/20: | Six Million Dollars | $6,000,000 |
| 2020/21: | Three Million Dollars | $3,000,000 |
| 2021/22: | Seven Million Dollars | $7,000,000 |
| 2022/23: | Five Million Dollars | $5,000,000 |
| 2023/24: | Six Million Dollars | $6,000,000 |
| 2024/25: | Four Million Dollars | $4,000,000 |

Payment of such Paragraph 1 Salary shall be in consecutive semi-monthly installments on the 15th and 30th day of each month following the commencement of the NHL Regular Season or

following the dates of reporting, whichever is later (provided that the pay period shall not close more than three (3) days prior to payroll dates); provided, however, that if the Player is not in the employ of the Club for the whole period of the Club's NHL Regular Season Games, then he shall receive only part of such Paragraph 1 Salary in the ratio of the number of days of actual employment to the number of days of the NHL Regular Season.

And it is further mutually agreed that if the SPC and rights to the services of the Player are Loaned or otherwise transferred to a club in another league, the Player shall only be paid at an annual salary rate of

| | | |
|---|---|---|
| 2018/19: | N/A | Dollars--------------------------------in the AHL |
| 2019/20: | N/A | Dollars--------------------------------in the AHL |
| 2020/21: | N/A | Dollars--------------------------------in the AHL |
| 2021/22: | N/A | Dollars--------------------------------in the AHL |
| 2022/23: | N/A | Dollars--------------------------------in the AHL |
| 2023/24: | N/A | Dollars--------------------------------in the AHL |
| 2024/25: | N/A | Dollars--------------------------------in the AHL |

2.      The Player agrees to give his services and to play hockey in all NHL Games, All Star Games, International Hockey Games and Exhibition Games to the best of his ability under the direction and control of the Club in accordance with the provisions hereof.

The Player further agrees,

(a)     to report to his Club's Training Camp at the time and place fixed by the Club, in good physical condition,

(b)     to keep himself in good physical condition at all times during the season,

(c)     to give his best services to the Club and to play hockey only for the Club unless his SPC is Assigned, Loaned or terminated by the Club,

(d)     to co-operate with the Club and participate in any and all reasonable promotional activities of the Club which will in the opinion of the Club promote the welfare of the Club and to cooperate in the promotion of the League and professional hockey generally,

(e)     to conduct himself on and off the rink according to the highest standards of honesty, morality, fair play and sportsmanship, and to refrain from conduct detrimental to the best interest of the Club, the League or professional hockey generally.

3.      In order that the Player shall be fit and in proper condition for the performance of his duties as required by this SPC and the Agreement, the Player agrees to report for practice at such time and place as the Club may reasonably designate and participate in such Exhibition Games as may be arranged by the Club.

4.      The Club may from time to time during the continuance of this SPC establish reasonable rules governing the conduct and conditioning of the Player, and such reasonable rules shall form part of this SPC and the Agreement as fully as if herein written. For violation of any such rules

or for any conduct impairing the thorough and faithful discharge of the duties incumbent upon the Player, the Club may impose a reasonable fine upon the Player and deduct the amount thereof from any money due or to become due to the Player. The Club may also suspend the Player for violation of any such rules. When the Player is fined or suspended, he shall be given notice in writing stating the amount of the fine and/or the duration of the suspension and the reason therefor. Copies of the rules referred to herein shall be filed at the main offices of the League and the National Hockey League Players' Association ("NHLPA").

5.　　(a)　　Should the Player be disabled or unable to perform his duties under this SPC he shall submit himself for medical examination and treatment by a physician selected by the Club, and such examination and treatment, when made at the request of the Club, shall be at its expense unless made necessary by some act or conduct of the Player contrary to the terms and provisions of this SPC or the rules established under Paragraph 4. At any time a physician selected by a Club makes a determination as to whether or not a Player is disabled and unable to perform his duties as a hockey Player for purposes of this Paragraph 5 of this SPC, such physician shall evidence such determination by fully completing the form attached to the CBA as Exhibit 25-A, which shall be provided to the Player at the time such determination is made and immediately provided to the Club as well. Upon receipt of such fully completed form, the Club shall send an electronic copy forthwith to the Player, his Certified Agent, the NHL, and the NHLPA (the "Recipients"), which shall contain the language from CBA Exhibit 25-A contained in the "Message to Player", provided, however, that the Club's failure to include such language shall not affect the time frames set out in this Paragraph 5, or otherwise prejudice the Club.

　　　　(b)　　If the Player, in the judgment of the Club's physician, is disabled or is not in good physical condition at the commencement of the season or at any subsequent time during the season (unless such condition is the direct result of any injury sustained during the course of his employment as a hockey Player with the Club, including travel with his team or on business requested by the Club) so as to render him unfit to play skilled hockey, then it is mutually agreed that the Club shall have the right to suspend the Player for such period of disability or unfitness, and no compensation shall be payable for that period under this SPC.

　　　　(c)　　If the Player is injured during the course of his employment as a hockey Player with the Club, including travel with his team or on business requested by the Club, the Club will pay the Player's reasonable hospitalization until discharged from the hospital, and his medical expenses and doctor's bills, provided that the hospital and doctor are approved by the Club. This approval will not be unreasonably withheld.

　　　　(d)　　It is also agreed that if the Player, in the sole judgment of the Club's physician, is disabled and unable to perform his duties as a hockey Player by reason of an injury sustained during the course of his employment as a hockey Player, including travel with his team or on business requested by the Club, he shall be entitled to receive his remaining Paragraph 1 Salary and Signing Bonuses due in accordance with the terms of this SPC for the remaining stated term of this SPC as long as the said disability and inability to perform continue but in no event beyond the expiration date of the fixed term of this SPC. In consideration of the payment of such Paragraph 1 Salary, as well as payments made by the Club to fund the Hospital, Major Medical, Visioncare and Dental Plan, career ending disability policy and serious disability policy and other consideration (including the payment of salary referenced herein, where applicable), the

Player does hereby covenant that in the event he receives full payment of a claim under such career ending disability policy or serious disability policy, he personally releases and will release, and will cause his corporation if a corporate contract is involved to release, the Club, the League, the NHLPA, all other Clubs, the insurance carrier, and the servants, employees, officers and agents of each of the above from any and every additional obligation, liability, claim or demand for any additional salary or other payments, arising out of or relating to such injury or the treatment thereof, including without limitation liability in tort, and extending to all damages, whenever arising.

(e)     In the event that the Player wishes to seek a second opinion in respect of the Club Physician's determination regarding the Player's fitness or unfitness to play, the Player shall provide electronic notice to the Club (unless the Player provides notice by any other means to the General Manager, Assistant General Manager or the Head Athletic Trainer) that he is seeking a second opinion pursuant to Paragraph 5 of the SPC by no later than 5:00 pm New York time on the third day after the electronic notice referred to in Paragraph 5(a) above is sent, except that, if the notice referred to in Paragraph 5(a) above is sent after 5:00 pm New York time the Player shall have until 5:00 pm New York time on the fourth day to provide such notice. Upon receiving notice that the Player is seeking a second opinion, the Club shall promptly provide the Player its complete medical file on the Player in respect of the Player's condition that is the subject of the Club Physician's determination. The Player must obtain a second opinion within five (5) days (or later only upon showing of good cause) of the electronic notice from the Club.

(f)     The physician consulted by the Player ("Player's Physician") in accordance with Paragraph 5(e) must make a determination as to whether the Player is disabled and unable to perform his duties as a hockey Player and shall evidence such determination by fully completing the form attached to the CBA as Exhibit 25-A, which shall be provided to the Player at the time of the examination, with an electronic copy sent forthwith to the Club and the Recipients. The Club Physician and the Player's Physician must consult as expeditiously as possible and, in any event, by no later than 5:00 pm New York time on the third day after the Player is sent electronic notice of the determination by the Player's Physician (referenced in this Paragraph 5(f) above) (or later only upon a showing of good cause).

(g)     (i)     If, after consulting as provided for in Paragraph 5(f), the Club Physician and the Player's Physician agree that the Player is either disabled and unable to perform, or not disabled and able to perform, his duties as a hockey Player, their agreed-upon determination shall be evidenced by fully completing the form attached to the CBA as Exhibit 25-B (as set forth in Paragraph 5(g)(iii)). Such determination shall be conclusive, final and binding upon the Club and the Player, absent a showing of improper interference with the procedures set forth in CBA Section 17.7 and Paragraph 5 of the SPC.

(ii)     If after consulting as provided for in Paragraph 5(f), the Club physician and the Player's Physician cannot agree on whether the Player is disabled and unable to perform his duties as a hockey Player, they shall evidence such disagreement by fully completing the form attached to the CBA as Exhibit 25-B (as set forth in Paragraph 5(g)(iii)).

(iii)     Pursuant to either Paragraph 5(g)(i) or 5(g)(ii) above, the Player's Physician shall complete his/her portion of Exhibit 25-B first and then shall send such form to

the Club Physician. The Club Physician shall then complete his/her portion of Exhibit 25-B and then shall send such fully completed form to the Club, the Player's Physician and the Recipients.

(iv)     If the Club Physician and the Player's Physician cannot agree on whether the Player is disabled and unable to perform his duties as a hockey Player pursuant to Paragraph 5(g)(ii) above, they shall confer and agree on an independent physician to examine the Player. The independent physician must be selected as expeditiously as possible and, in any event, within the time frame referred to in Paragraph 5(f) above (or later only upon a showing of good cause). If the Player's Physician and the Club Physician are unable to select the independent physician within such period, the independent physician shall be selected jointly by a medical designee appointed by the NHL and a medical designee appointed by the NHLPA. That selection shall take place as expeditiously as possible, but not later than 5:00 pm New York time on the second day after referral to the NHL and NHLPA medical designees.

(h)     Following the selection of the independent physician pursuant to Paragraph 5(g)(iv), the NHLPA (with a copy sent forthwith to the Club and the Recipients) shall provide the independent physician with a completed form set out in CBA Exhibit 25-C. The Club also shall send to the independent physician a copy of the medical file that it had forwarded to the Player pursuant to Paragraph 5(e). The Player shall direct the Player's Physician to forward to the independent physician a complete copy of his medical file in respect of the condition that is the subject of the Player's Physician's second opinion pursuant to Paragraph 5(h). The Player must submit himself to examination, and the independent physician must examine the Player, within five (5) business days of his selection (or later only upon a showing of good cause). The independent physician shall make a determination of whether the Player is disabled and unable to perform his duties as a hockey Player and evidence such determination by fully completing the form attached as Exhibit 25-A, which shall be provided to the Player at the time of the examination and an electronic copy sent forthwith to the Club and the Recipients.

(i)     The independent physician's determination as to whether the Player is disabled and unable to perform his duties as a hockey Player shall be conclusive, final and binding upon the Club and the Player, absent a showing of improper interference with the procedures set forth in CBA Section 17.7 and Paragraph 5 of the SPC.

(j)     If, pursuant to Paragraph 5(g) or Paragraph 5(h) a Player examined in connection with Paragraph 5(d) is declared to be unfit for play by reason of an injury sustained during the course of his employment as a hockey Player, including travel with his team or on business requested by the Club, he shall continue to receive the full benefits of this Agreement in accordance with the provisions of Paragraph 5(d). If such Player is declared to be physically able to play and refuses to do so, he shall be liable to immediate suspension without pay. For the avoidance of doubt, if the Player is deemed to have had a separation from service (as defined in Treas. Reg. section 1.409A-1(h)) and, prior to such separation, the Player has not been disabled for purposes of Section 409A(a)(2)(C) of the Internal Revenue Code, any amount payable pursuant to this Paragraph 5(j) shall be paid over the Buy-Out Period prescribed by Paragraph 13(d) (i.e., over twice the remaining term of the SPC).

(k)     If either the Club or the Player fail to timely comply with any of the requirements set forth in Paragraph 5, absent a showing of good cause, then such non-complying party shall be deemed to have acceded to the other party's position in such dispute.

(l)     The Club and Player shall cooperate, and shall cause their respective physicians to cooperate, for the purpose of making medical records available to any physician who examines the Player pursuant to this Paragraph 5.

(m)     For purposes of clarity, the Club physician, the Player's Physician and the independent physician shall be charged only with determining whether the Player is disabled and unable to perform his duties as a hockey Player. Any other determinations, including whether a Player's disability is a hockey related injury, shall be within the jurisdiction of the Impartial Arbitrator.

(n)     In connection with a disability which is not caused by an injury sustained during the course of his employment as a hockey Player including travel with his team or on business requested by his Club, the procedures set forth in this Paragraph 5 shall also apply to the Club doctor's determination regarding the Player's physical fitness to return to play. If the Player is declared to be fit for play, by the Club doctor and Player doctor, or by the independent doctor, he must perform his duties hereunder and shall be entitled to receive the full benefits of this Agreement. If he is declared to be not physically able to play, he shall not be entitled to the benefits of this Agreement until he has been declared to be physically fit to play by the independent medical specialist.

(o)     The reasonable costs incurred by the Player in the course of obtaining a second opinion pursuant to this Paragraph 5 shall be borne equally by the Club and the Player.

6.     The Player represents and agrees that he has exceptional and unique knowledge, skill and ability as a hockey Player, the loss of which cannot be estimated with certainty and cannot be fairly or adequately compensated by damages. The Player therefore agrees that the Club shall have the right, in addition to any other rights which the Club may possess, to enjoin him by appropriate injunctive proceedings without first exhausting any other remedy which may be available to the Club, from playing hockey for any other team and/or for any breach of any of the other provisions of this SPC.

7.     The Player and the Club recognize and agree that the Player's participation in other sports may impair or destroy his ability and skill as a hockey Player. Accordingly the Player agrees that he will not during the period of this SPC or during any period when he is obligated under this SPC to enter into a further SPC with the Club engage or participate in football, baseball, softball, hockey, lacrosse, boxing, wrestling or other athletic sport without the written consent of the Club, which consent will not be unreasonably withheld.

8.     (a)     The Club recognizes that the Player owns exclusive rights to his individual personality, including his likeness. The Player recognizes that the Club owns exclusive rights to its name, emblems and uniform, which the Player wears as a hockey Player for the Club.

The Player hereby irrevocably grants to the Club during the period of this SPC and during any period when he is obligated under this SPC to enter into a further SPC with the Club

the right to permit or authorize any firm, person or corporation to take and make use of any still photographs, motion pictures or electronic (including television) images of himself in uniform and agrees that thereafter all rights in such photographs, pictures and images (including the right to identify him by name) shall belong to the Club exclusively for the purposes of telecasts, film or video documentaries or features, advertisements and promotions of the Club's games, use by the media for reportorial purposes, game programs, yearbooks, magazines and the like, and purposes in which the focus is on the Club or game and not the individual Player.

The Club hereby irrevocably grants to the Player during the period of this SPC and thereafter the right to use the name of the Club (but not the emblem or uniform unless otherwise agreed) to identify himself, truthfully, as a Player of the Club, past or present.

All obligations and rights set forth in this Paragraph 8(a) shall be subject to modification from time to time by the provisions of the CBA.

(b)     The Player further agrees that during the period of this SPC and during any period when he is obligated under this contract to enter into a further contract with the Club, he will not make public appearances, participate in radio or television programs, or permit his picture to be taken, or write or sponsor newspaper or magazine articles, or sponsor commercial products without the written consent of the Club which consent shall not be unreasonably withheld.

9.      It is mutually agreed that the Club will not pay, and the Player will not accept from any person, any bonus or anything of value for winning or otherwise attempting to affect the outcome of any particular game or series of games except as authorized by the League By-Laws.

10.     The Player agrees he will not tamper with or enter into negotiations with any Player under SPC or reservation to any Club of the League for or regarding such Player's current or future services, without the written consent of the Club with which such Player is connected under penalty of a fine to be imposed by the Commissioner of the League.

11.     It is mutually agreed that the Club shall have the right to Assign or to Loan this SPC, and the Player agrees to accept and be bound by such Assignment or Loan, and will faithfully perform and carry out this SPC with the same purpose and effect as if it had been entered into by the Player and such other club.

It is further mutually agreed that in the event that this SPC is Assigned, or the Player's services are Loaned, to another club, the club shall by notice in writing delivered to the Player advise the Player of the name and address of the club to which he has been Assigned or Loaned, and specify the time and place of reporting. If the Player fails to report to such other club, he may be suspended by such other club and no Paragraph 1 Salary shall be payable to him during the period of such suspension.

12.     *Default.* If a Club defaults in the payment of any compensation to the Player provided for in his SPC or fails to perform any other obligation under his SPC, the Player may, by notice in writing to the Club and to the League and the NHLPA, specify the nature of any and all defaults and thereafter:

(a)     If the Club fails to remedy the default within fourteen (14) days from receipt of such notice, except as hereinafter provided in Paragraphs 12(b), (c) and (d), the SPC shall be terminated, and, upon the date of such termination, all obligations of both parties shall cease, except the obligation of the Club to pay the Player's compensation to that date, provided, however, that;

(b)     the player hereby irrevocably offers the League an option to cure said default within the seven (7) days next succeeding the fourteen (14) days within which the Club may cure the default upon the condition that, in the event the League may accept this offer, the League would then guarantee payment of that portion of the Player's compensation, as set forth in the Player's SPC, as may become due for a period of twenty-one (21) days from receipt by the League of any notice of default. The League may accept this offer by notification to the Player and the NHLPA in writing of such acceptance and of its guarantee of said twenty-one (21) day compensation period as soon as possible following receipt of notice of default from Player but in no event later than fourteen (14) days following receipt of such notice. This offer will be deemed rejected if not accepted as set forth above;

(c)     said option may be assigned by the League to any other Club and, upon such assignment, the assignee Club shall inure to all of the rights of and assume all obligations of the League under this Paragraph 12;

(d)     the Player further agrees that, if the League has given due notice as set forth in Paragraph 12 (b), he will continue to perform all of his obligations under his SPC for the full twenty-one (21) day period and, in the event the Club does not cure the default within the fourteen (14) day period, as set forth in subsection (a), the League, or any Club to which its option has been assigned, may cure the default within the seven (7) days following the first fourteen (14) days next succeeding receipt of notice of default; and

(e)     the Club agrees if it does not cure the default within the fourteen (14) day period, as set forth in Paragraph 12 (a) above, and the League, or an assignee Club, cures said default in accordance with Paragraph 12 (b), (c) and (d) then, in such event, all rights and obligations of the Club under this SPC shall be transferred to the League, or such assignee Club, provided, however, that no obligation with respect to a default or defaults claimed to exist at the time of notice of default, as provided above, but not specifically included and set forth in said notice shall be assumed by the League or such assignee Club and the League or such assignee Club shall have no liability with respect thereto.

(f)     The Club and/or the League may dispute the Player's assertion of a default through an expedited arbitration proceeding in which case the Arbitrator shall be directed both to hear and decide such case within fourteen (14) days of receipt of notice from the Player pursuant to this Paragraph 12 absent a showing of good cause by the League and/or the Club as to why it requires additional time in order to adequately investigate and try such case. In such event, it is nonetheless the intention of the parties that the case be heard and decided as expeditiously as possible. During the pendency of the Grievance concerning the existence of a default, the Player's SPC shall remain in full force and effect.

13.    The Club, in addition to other rights hereunder, at its option, by written notice delivered to the Player in accordance with Exhibit 3, may terminate this SPC on the following conditions:

(a)    The Club shall offer the Player on Unconditional Waivers, either before or promptly after the notice of intention to exercise the Ordinary Course Buy-Out option (herein called "notice of termination") is given.

(b)    Termination pursuant to this Paragraph shall be effective upon receipt by the Player of the notice of termination and the Player clearing Unconditional Waivers pursuant to Paragraph 13(a) above.

(c)    The notice of termination shall be effective if given in the form attached as CBA Exhibit 20, with a copy to the NHLPA and Central Registry as follows:

(i)    beginning the later of June 15 or forty-eight (48) hours after the conclusion of the Stanley Cup Finals and ending at 5:00 p.m. New York time on June 30; and

(ii)    For Clubs who have Club or Player elected Salary Arbitration filings pursuant to Article 12, within the forty-eight (48) hour period beginning on the third day following the later of: (i) the Club's receipt of its last salary arbitration award; or (ii) settlement of its last case (provided such award was received or such settlement occurred prior to 7:00 p.m. New York time; awards or settlements that occurred or were received after 7:00 p.m. New York time will be deemed to have occurred or received the following business day for purposes of this provision).

(d)    If the Club elects to terminate this SPC pursuant to this Paragraph 13, it shall be obligated to pay to the Player, in equal semi-monthly installments, to be paid in accordance with the payroll payment schedule applicable to the Club's Active Roster, over twice the remaining term of the SPC (the "Buy-Out Period"):

(i)    if the Player is under 26 years of age at the time the termination is effective, an amount equal to 1/3 of; or

(ii)    if the Player is 26 years of age or older at the time the termination is effective, an amount equal to 2/3 of the total fixed amount of the Player's Paragraph 1 NHL Salary, for the unexpired fixed-term of this SPC, reduced by any advance payment of Paragraph 1 Salary received by the Player prior to the date the termination is effective.

(e)    Upon termination, the Player shall immediately be an Unrestricted Free Agent and shall no longer be obligated to perform under this SPC.

(f)    Waiver claim of Player by another Club shall pre-empt and relinquish Club's Buy-Out obligation, due to failure to clear Waivers.

(g)    Clubs shall file their Buy-Out agreements, the form of which is attached hereto as Exhibit 21, with Central Registry and the NHLPA within 24 hours of such agreements becoming effective.

14.    The Club may also terminate this SPC upon written notice to the Player (but only after obtaining Waivers from all other Clubs) if the Player shall at anytime:

(a)    fail, refuse, or neglect to obey the Club's rules governing training and conduct of Players, if such failure, refusal or neglect should constitute a material breach of this SPC,

(b)    fail, refuse or neglect to render his services hereunder or in any other manner materially breach this SPC.

In the event of termination under Paragraph 14 (a) or (b) the Player shall only be entitled to compensation due to him to the earlier of the date such notice is personally delivered to him or the date such notice is e-mailed to him.

In the event this SPC is terminated by the Club while the Player is "away" with the Club for the purpose of playing games the installment then falling due shall be paid on the first week-day after the return "home" of the Club.

15.    The Player further agrees that the Club may carry out and put into effect any order or ruling of the League or its Commissioner for his suspension or expulsion and that in the event of suspension his Paragraph 1 Salary shall cease for the duration thereof and that in the event of expulsion this SPC shall terminate forthwith.

16.    Except as otherwise provided in CBA Article 18, the Player agrees that, in the event of his suspension without pay pursuant to any of the provisions of this SPC, there shall be deducted from the Paragraph 1 Salary an amount equal to the exact proportion of such salary as the number of days' suspension bears to the total number of days of the Regular Season Games.

17.    If because of any condition arising from a state of war or other cause beyond the control of the League or of the Club, it shall be deemed advisable by the League or the Club to suspend or cease or reduce operations, then:

(a)    in the event of suspension of operations, the Player shall be entitled only to the proportion of Paragraph 1 Salary due at the date of suspension,

(b)    in the event of cessation of operations, the Paragraph 1 Salary shall be automatically canceled on the date of cessation, and

(c)    in the event of reduction of operations, the Paragraph 1 Salary shall be replaced by that mutually agreed upon between the Club and the Player, or, in the absence of mutual agreement, by that determined by neutral arbitration.

18.    The Club and the Player severally and mutually promise and agree to be legally bound by the League Rules that affect any terms or conditions of employment of any Player and by any Collective Bargaining Agreement that has been or may be entered into between the member Clubs of the League and the NHLPA, and by all of the terms and provisions thereof. This SPC is entered into subject to the CBA between the NHL and the NHLPA and any provisions of this SPC inconsistent with such CBA are superseded by the provisions of the CBA.

The Club and the Player further agree that in case of dispute between them, except as to the compensation to be paid to the Player on a new SPC, the dispute shall be referred within one year from the date it arose to the Commissioner of the League, as an arbitrator and his decision shall be accepted as final by both parties, unless, and to extent that, other arbitration procedures are provided in any Collective Bargaining Agreement between the member Clubs of the League and the NHLPA to cover such dispute.

The Club and the Player further agree that all fines imposed upon the Player under the Playing Rules, or under the provisions of the League By-Laws, shall be deducted from the Paragraph 1 Salary of the Player and be remitted by the Club to the NHL Players' Emergency Assistance Fund.

19. The Club and the Player represent and warrant that there are no undisclosed agreements of any kind, express or implied, oral or written and that there are no promises, undertakings, representations, commitments, inducements, assurances of intent, supplements or understandings of any kind between the Player or his Certified Agent and the Club that have not been disclosed to the NHL, with regard to: (i) any consideration of any kind to be paid, furnished or made available during the term of the SPC or thereafter; and/or (ii) and future renegotiation, extension, amendment or termination of this SPC.

20. Capitalized terms shall have the meaning set forth in the CBA, to the extent not otherwise defined in this SPC.

21. Unless otherwise specified, the service of all notices pursuant to the provisions of the SPC shall be effected in accordance with Exhibit 3 of the CBA.

22. The parties agree that the rights provided herein and in the CBA and in any addendum hereto and the promise of the Player to play hockey only with the Club, or such other club as provided in Paragraphs 2, 11 and 12, and the Club's right to take pictures of and to televise the Player as provided in Paragraph 8 of this SPC have all been taken into consideration in determining the Paragraph 1 Salary payable to the Player.

23. It is severally and mutually agreed that this SPC and the CBA contain the entire agreement between the parties and there are no oral or written inducements, promises or agreements except as provided herein.

**In Witness Whereof,** the parties have signed this _____ day of _____ A.D.20____.

Witnesses:

_____
San Jose Sharks
Club

_____
525 W. Santa Clara St., San Jose, CA 95113
Address of Club

By:

_____
Doug Wilson, EVP and General Manager

_____
Evander Kane

_____
8447 Isabel Place, Vancouver, BC  V6P 6R8
Home Address of Player

I hereby certify that I have, at this date, received, examined and noted of record the within SPC, and that it is in regular form.

Dated _____ , 20 ___   _____
                                                for the National Hockey League

Les parties ont par les présentes exprimé leur volonté expresse que ce contrat soit rédigé en anglais.

The parties hereby state their expressed wish that this SPC be drafted in the English language.

**SAN JOSE SHARKS**
**ADDENDUM "A"**
**ADDENDUM TO NATIONAL HOCKEY LEAGUE**
**STANDARD PLAYER'S CONTRACT**

This Addendum A is attached to and made part of that certain National Hockey League Standard Player's Contract ("SPC") entered into by and between **SAN JOSE SHARKS, LLC** ("Club") and **EVANDER KANE** ("Player"). The SPC together with this Addendum constitute the "Contract". Any capitalized terms not defined herein shall have the meaning(s) as defined in the SPC, the current Collective Bargaining Agreement between NHL and NHLPA. and/or the League Rules.

## 1. SIGNING BONUS:

In consideration of the Player entering into and fully performing his obligations under this Contract, the Club agrees to pay the Player the total sum of $12,000,000 (the "Signing Bonus") payable in installments (each an "Installment") and on the dates as specified in the following table:

| Season | Installment | Date |
|--------|-------------|------|
| 2018-19 | $3.000,000 | July 1, 2018 |
| 2019-20 | $2,000,000 | July 1, 2019 |
| 2020-21 | $3,000,000 | July 1, 2020 |
| 2022-23 | $2,000,000 | July 1, 2022 |
| 2024-25 | $2,000,000 | July 1, 2024 |

Notwithstanding the foregoing, if at any time during the term of this Contract, Player refuses to perform or otherwise withholds his services from Club, or Player elects to voluntarily retire, or Player materially breaches the Contract in any way, including by being injured in a contractually prohibited endeavor, the Club shall immediately and automatically be relieved of any obligations whatsoever with respect to any unpaid portion of the Signing Bonus, but only during the period of his refusal to perform, material breach, and/or voluntary retirement. Any retirement as a result of illness or injury, with the exception of an injury sustained in the course of Player's participation in an inherently dangerous activity (including without limitation, an injury sustained in violation of Section 7 of the SPC), shall not be deemed refusal to perform, voluntary retirement, or material breach of the Contract for purposes of calculating the Signing Bonus. Furthermore, any withholding of Player's services in the course of a work-stoppage between the NHL and the NHLPA shall not be considered a refusal to perform, voluntary retirement, or material breach of the Contract for purposes of this section.

If, during the term of the Contract, Player returns to play for Club after a period of refusal to perform, material breach, or voluntary retirement, Player will be entitled to begin receiving Installment payments in accordance with the table above, based on the League Year of Player's return to play and, in the event that no Installment payment has been made in the League Year of the Player's return to play, the Player shall be entitled to payment of a portion of the scheduled Installment for the League Year in which he returns to play pro rated on the basis of the formula set out in the paragraph below. The Club shall make any such payment within 15 days of the Player's return to play.

In the event that Club has already paid any Installment to Player for a League Year during which he refuses to perform or withholds his services from Club, or elects to retire, or materially breaches the Contract, Player agrees he will be entitled to keep only a portion of the applicable Installment equal to the product of multiplying the applicable Installment by the ratio of number of days of performing services during the Regular Season

Case: 21-50028    Doc# 123    Filed: 05/05/21    Entered: 05/05/21 13:04:36    Page 51 of 94

prior to withholding services, retiring, or breaching the Contract to the total number of days of the Regular Season for that League Year. Player shall immediately pay to Club any remaining Installment funds.

*For purposes of example only, if Player refused to perform, voluntarily retired, or otherwise materially breached the Contract during the 2018-19 Regular Season and returned to play during that same season after missing 60 days of the 2018-19 Regular Season (assuming 180 day season, Player has 120 days of performance), then the Player would be entitled to $2,000,000.00. [ = $3,000,000.00 x (120/180)] of the 2018-19 Installment and shall immediately repay Club $1,000,000.00. The Club would be obligated to make further Installment payments in subsequent League Years.*

*For purposes of further example, if Player is injured while engaging in an inherently dangerous activity on June 15, 2019 and he returns to play 45 days after the commencement of the 2019-2020 Regular Season (assuming 180 day Regular Season, Player has 135 days of performance), the Player would be entitled to $1,500,000.00 [ =$2,000,000.00 x (135/180)] of the 2019-2020 Installment, which amount would be paid by the Club within 15 days of his return to play. Player's entitlement to payments made during 2018-2019 League Year would not be affected. The Club would be obligated to make further Installment payments in subsequent League Years.*

2. MODIFIED NO-TRADE CLAUSE:

For the period beginning on July 1, 2018 and ending on June 30, 2025, the Club shall not trade the Player; provided that for each of the 2018-19, 2019-20, 2020-21, 2021-22, 2022-23, 2023-24 and 2024-25 League Years, the Player shall provide to the Club a written list of three (3) NHL Member Clubs to which the Club may trade the Player during the applicable League Year (the "Trade List"). For each such League Year, the Player shall provide the Trade List via email, receipt acknowledgment requested, to the Club's then-current General Manager or Assistant General Manager of record no later than 5:00 PM Pacific Time on June 30 of the immediately preceding League Year. In the event the Player fails to provide the Trade List in a timely manner for any such League Year, the most recently submitted Trade List shall remain in effect for such League Year. If the Player never submits a Trade List, the Club shall have the right to trade the player to any NHL Member Club of its choosing.

3. MISCELLANEOUS

    a. Governing Law. This Contract will be governed and construed in accordance with the laws of the State of California without regard to conflict of law principles. Subject to the League Rules, any and all actions arising out of this Contract shall be instituted and maintained in a court of competent jurisdiction in Santa Clara County, California.

    b. Withholding. All payments made under the Contract shall be in United States Dollars and shall be subject to required withholdings pursuant to federal, state, local, and other applicable income tax laws, regulations, and rulings and such withholdings or source deductions shall be made by the Club in accordance with its then-current payroll policies and practices.

ACCEPTED AND AGREED TO:               ACCEPTED AND AGREED TO:

By: _____          By: _____
    Evander Kane                          Doug Wilson, General Manager
    Player                                for San Jose Sharks, LLC

Case: 21-50028    Doc# 123    Filed: 05/05/21    Entered: 05/05/21 13:04:36    Page 52 of 94

OK (DA) 05-25-18

EXHIBIT 1
STANDARD PLAYER'S CONTRACT

IMPORTANT NOTICE TO PLAYER

Before signing this Standard Player's Contract ("SPC") you should carefully examine it to be sure that all terms and conditions agreed upon have been incorporated herein, and if any has been omitted, you should insist upon having it inserted in the SPC before you sign.

NATIONAL HOCKEY LEAGUE
STANDARD PLAYER'S CONTRACT
(2013 FORM)

buy 3672
NHL CENTRAL REGISTRY

BETWEEN        San Jose Sharks
               Hereinafter called the "Club," a member of the National Hockey League, hereinafter called the "League"

AND            Evander Kane
               hereinafter called the "Player"

                              State/Province/Country

of   Vancouver    in   BC    of   CANADA

In consideration of the respective obligations herein and hereby assumed, the parties to this SPC severally agree as follows:

1.    The Club hereby employs the Player as a skilled hockey Player for the term of seven (7) League Year(s) commencing the later of July 1, 2018 or upon execution of this SPC and agrees, subject to the terms and conditions hereof, to pay the Player a salary of _____ US Dollars ($_____).

2018/19:  Six Million Dollars--------------------------------------------------$6,000,000
2019/20:  Six Million Dollars--------------------------------------------------$6,000,000
2020/21:  Three Million Dollars------------------------------------------------$3,000,000
2021/22:  Seven Million Dollars------------------------------------------------$7,000,000
2022/23:  Five Million Dollars-------------------------------------------------$5,000,000
2023/24:  Six Million Dollars--------------------------------------------------$6,000,000
2024/25:  Four Million Dollars-------------------------------------------------$4,000,000

following the dates of reporting, whichever is later (provided that the pay period shall not close more than three (3) days prior to payroll dates); provided, however, that if the Player is not in the employ of the Club for the whole period of the Club's NHL Regular Season Games, then he shall receive only part of such Paragraph 1 Salary in the ratio of the number of days of actual employment to the number of days of the NHL Regular Season.

And it is further mutually agreed that if the SPC and rights to the services of the Player are Loaned or otherwise transferred to a club in another league, the Player shall only be paid at an annual salary rate of

| | | | |
|---|---|---|---|
| 2018/19: | N/A | Dollars------------------ | in the AHL |
| 2019/20: | N/A | Dollars------------------ | in the AHL |
| 2020/21: | N/A | Dollars------------------ | in the AHL |
| 2021/22: | N/A | Dollars------------------ | in the AHL |
| 2022/23: | N/A | Dollars------------------ | in the AHL |
| 2023/24. | N/A | Dollars------------------ | in the AHL |
| 2024/25. | N/A | Dollars------------------ | in the AHL |

2    The Player agrees to give his services and to play hockey in all NHL Games, All Star Games, International Hockey Games and Exhibition Games to the best of his ability under the direction and control of the Club in accordance with the provisions hereof.

The Player further agrees.

(a)    to report to his Club's Training Camp at the time and place fixed by the Club, in good physical condition.

(b)    to keep himself in good physical condition at all times during the season.

(c)    to give his best services to the Club and to play hockey only for the Club unless his SPC is Assigned, Loaned or terminated by the Club.

(d)    to co-operate with the Club and participate in any and all reasonable promotional activities of the Club which will in the opinion of the Club promote the welfare of the Club and to cooperate in the promotion of the League and professional hockey generally.

(e)    to conduct himself on and off the rink according to the highest standards of honesty, morality, fair play and sportsmanship, and to refrain from conduct detrimental to the best interest of the Club, the League or professional hockey generally.

3.    In order that the Player shall be fit and in proper condition for the performance of his duties as required by this SPC and the Agreement, the Player agrees to report for practice at such time and place as the Club may reasonably designate and participate in such Exhibition Games as may be arranged by the Club.

4.    The Club may from time to time during the continuance of this SPC establish reasonable rules governing the conduct and conditioning of the Player, and such reasonable rules shall form part of this SPC and the Agreement as fully as if herein written. For violation of any such rules

NHL CENTRAL REGIS

MAY 24'18 AM 11:4

In Witness Whereof, the parties have signed this _24_ day of _May_ A.D.20_18_

Witnesses:

_____
San Jose Sharks
Club

_____
525 W. Santa Clara St., San Jose, CA 95113
Address of Club

By:

_____
Doug Wilson, EVP and General Manager

_____
Evander Kane

_____
8447 Isabel Place, Vancouver, BC  V6P 6R8
Home Address of Player

I hereby certify that I have, at this date, received, examined and noted of record the within SPC, and that it is in regular form.

Dated _____MAY 2 5 2018_____ , 20 ___    _____
for the National Hockey League

Les parties ont par les présentes exprimé leur volonté expresse que ce contrat soit rédigé en anglais.

The parties hereby state their expressed wish that this SPC be drafted in the English language.

NHL CENTRAL REGISTRY

MAY24'18 AM 11:46

This Addendum A is attached to and made part of that certain National Hockey League Standard Player's Contract ("SPC") entered into by and between SAN JOSE SHARKS, LLC ("Club") and EVANDER KANE ("Player"). The SPC together with this Addendum constitute the "Contract". Any capitalized terms not defined herein shall have the meanings as defined in the SPC, the current Collective Bargaining Agreement between NHL and NHLPA, and/or the League Rules.

**1.  SIGNING BONUS:**

In consideration of the Player entering into and fully performing his obligations under this Contract, the Club agrees to pay the Player the total sum of $12,000,000 (the "Signing Bonus") payable in installments (each an "installment") and on the dates as specified in the following table:

| Season | Installment | Date |
|--------|-------------|------|
| 2018-19 | $3,000,000 | July 1, 2018 |
| 2019-20 | $2,000,000 | July 1, 2019 |
| 2020-21 | $3,000,000 | July 1, 2020 |
| 2022-23 | $2,000,000 | July 1, 2022 |
| 2024-25 | $2,000,000 | July 1, 2024 |

Notwithstanding the foregoing, if at any time during the term of this Contract, Player refuses to perform or otherwise withholds his services from Club, or Player elects to voluntarily retire, or Player materially breaches the Contract in any way, including by being injured in a contractually prohibited endeavor, the Club shall immediately and automatically be relieved of any obligations whatsoever with respect to any unpaid portion of the Signing Bonus, but only during the period of his refusal to perform, material breach, and/or voluntary retirement. Any retirement as a result of illness or injury, with the exception of an injury sustained in the course of Player's participation in an inherently dangerous activity (including without limitation, an injury sustained in violation of Section 7 of the SPC), shall not be deemed refusal to perform, voluntary retirement, or material breach of the Contract for purposes of calculating the Signing Bonus. Furthermore, any withholding of Player's services in the course of a work-stoppage between the NHL and the NHLPA shall not be considered a refusal to perform, voluntary retirement, or material breach of the Contract for purposes of this section.

If, during the term of the Contract, Player returns to play for Club after a period of refusal to perform, material breach, or voluntary retirement, Player will be entitled to begin receiving Installment payments in accordance with the table above, based on the League Year of Player's return to play and, in the event that no Installment payment has been made in the League Year of the Player's return to play, the Player shall be entitled to payment of a portion of the scheduled Installment for the League Year in which he returns to play pro rated on the basis of the formula set out in the paragraph below. The Club shall make any such payment within 15 days of the Player's return to play.

In the event that Club has already paid any Installment to Player for a League Year during which he refuses to perform or withholds his services from Club, or elects to retire, or materially breaches the Contract, Player agrees he will be entitled to keep only a portion of the applicable Installment equal to the product of multiplying the applicable Installment by the ratio of number of days of performing services during the Regular Season

NHL CENTRAL REGISTRY

MAY 24 '18 AM 11:47

prior to withholding services, retiring, or breaching the Contract to the total number of days of the Regular Season for that League Year, Player shall immediately pay to Club any remaining Installment funds.

*For purposes of example only, if Player refused to perform, voluntarily retired, or otherwise materially breached the Contract during the 2018-19 Regular Season and returned to play during that same season after missing 60 days of the 2018-19 Regular Season (assuming 180 day season, Player has 120 days of performance), then the Player would be entitled to $2,000,000.00, [ = $3,000,000.00 x (120÷180)] of the 2018-19 Installment and shall immediately repay Club $1,000,000.00. The Club would be obligated to make further Installment payments in subsequent League Years.*

*For purposes of further example, if Player is injured while engaging in an inherently dangerous activity on June 15, 2019 and he returns to play 45 days after the commencement of the 2019-2020 Regular Season (assuming 180 day Regular Season Player has 135 days of performance), the Player would be entitled to $1,500,000.00 [=$2,000,000.00 x (135÷180)] of the 2019-2020 Installment, which amount would be paid by the Club within 15 days of his return to play. Player's entitlement to payments made during 2018-2019 League Year would not be affected. The Club would be obligated to make further Installment payments in subsequent League Years.*

2. MODIFIED NO-TRADE CLAUSE:

For the period beginning on July 1, 2018 and ending on June 30, 2025, the Club shall not trade the Player; provided that for each of the 2018-19, 2019-20, 2020-21, 2021-22, 2022-23, 2023-24 and 2024-25 League Years, the Player shall provide to the Club a written list of three (3) NHL Member Clubs to which the Club may trade the Player during the applicable League Year (the "Trade List"). For each such League Year, the Player shall provide the Trade List via email, receipt acknowledgment requested, to the Club's then-current General Manager or Assistant General Manager of record no later than 5:00 PM Pacific Time on June 30 of the immediately preceding League Year. In the event the Player fails to provide the Trade List in a timely manner for any such League Year, the most recently submitted Trade List shall remain in effect for such League Year. If the Player never submits a Trade List, the Club shall have the right to trade the player to any NHL Member Club of its choosing.

3. MISCELLANEOUS

   a. Governing Law. This Contract will be governed and construed in accordance with the laws of the State of California without regard to conflict of law principles. Subject to the League Rules, any and all actions arising out of this Contract shall be instituted and maintained in a court of competent jurisdiction in Santa Clara County, California.

   b. Withholding. All payments made under the Contract shall be in United States Dollars and shall be subject to required withholdings pursuant to federal, state, local, and other applicable income tax laws, regulations, and rulings and such withholdings or source deductions shall be made by the Club in accordance with its then-current payroll policies and practices.

ACCEPTED AND AGREED TO:                    ACCEPTED AND AGREED TO:

By: _____                By: _____
Evander Kane                               Doug Wilson, General Manager
Player                                     for San Jose Sharks, LLC


NHL CENTRAL REGISTRY

MAY 24'18 AM 11:47

# EXHIBIT "D"

## FLORIDA AGREEMENT TO WAIVE GARNISHMENT PROTECTION

Loan Number ███ 1221

**IF YOU PROVIDE MORE THAN ONE-HALF OF THE SUPPORT FOR A CHILD OR OTHER DEPENDENT, ALL OR PART OF YOUR INCOME IS EXEMPT FROM GARNISHMENT UNDER FLORIDA LAW. YOU CAN WAIVE THIS PROTECTION ONLY BY SIGNING THIS DOCUMENT. BY SIGNING BELOW, YOU AGREE TO WAIVE THE PROTECTION FROM GARNISHMENT.**

Borrower:

_____        Sep 5/18
Evander Kane, an individual              Date

I have fully explained this document to the consumer.

Lender:

**Centennial Bank**

By: _____      9/10/18
Authorized Signor                          Date

# EXHIBIT "E"

## FIRST AMENDMENT TO PROMISSORY NOTE
Loan Number █████ 1221

**THIS FIRST AMENDMENT TO PROMISSORY NOTE** ("Amendment") having an effective date of October 17, 2018 ("Effective Date"), is by and between **Evander Kane**, an individual ("Borrower"), who resides at 8447 Isabel Place, Vancouver, BC, Canada V6P 6R8 and **CENTENNIAL BANK**, an Arkansas banking corporation ("Lender"), whose address is PO Box 966, Conway, Arkansas 72033.

### RECITALS

A.      On September 5, 2018, Lender provided a loan to Borrower in the principal amount of Three Million Nine Hundred Thousand and 00/100 ($3,900,000.00) ("Loan"), which Loan is evidenced by a Promissory Note ("Note"), a Secured Financial Transaction and Security Agreement ("Agreement") and other loan documents ("Original Loan Documents").

B.      Borrower has approached Lender and requested Lender increase the balance of the Note by an additional $2,000,000.00, to a new principal amount of $5,900,000.00, which the Lender has agreed to pursuant to the terms and conditions set forth in this Amendment, First Amendment to Secured Financial Transaction and Security Agreement, and other documents (collectively "Amended Loan Documents").

C.      The parties agree that this Amendment shall not constitute a novation, but is an amendment to an existing Note.

**NOW, THEREFORE**, in consideration of the Premises, and of the mutual covenants and agreements set forth below, the parties agree as follows:

### TERMS

1.      Recitals.  The recitals above are true and correct.

2.      Loan Amount.  The new principal amount of the Note shall be $5,900,000.00.

3.      Loan Amortization Schedule.  The Loan Amortization Schedule attached as Exhibit "A" to the Note is no longer valid, and is hereby deemed null and void.  The new Loan Amortization Schedule attached hereto and incorporated herein as Exhibit "A-1" replaces the original Loan Amortization Schedule attached as Exhibit "A" to the Note.

4.      Loan Payments.  Borrower's payments pursuant to this Amendment to the Promissory Note shall be pursuant to new Loan Amortization Schedule attached hereto as Exhibit "A-1."  The categories on the New Loan Amortization Schedule shall have the same meaning as previously described in the Note.

5.      Interest Rate.  The interest rate in the Note shall remain the same, but the interest rate adjustment set forth in Section A of the Note (and referenced in Section C1 of the Note) shall now occur after the 48th monthly payment (rather than after the 50th monthly payment), beginning with the monthly payment due November 15, 2022.

6.      Documentary Stamps in the amount of $2,450.00 were already paid to the Florida Department of Revenue ("DOR") upon the execution of the Original Promissory Note.  As Documentary Stamps are capped at $2,450.00 for this Note, Lender shall not be required to remit any additional payment for Documentary Stamps to the Florida DOR.  Should the Florida "DOR" request additional payment for Documentary Stamps related to this Amendment, Borrower herein authorizes Lender to pay such additional Documentary Stamps and agrees to reimburse Lender for all such amounts paid.

7.    The parties desire to amend the terms of the Note based on the terms and provisions set forth herein.

8.    Except as expressly set forth herein or in the Amended Loan Documents, this Amendment shall not be deemed to have amended, modified or altered any of the terms, conditions or provisions of the Note, and such terms, conditions and provisions shall, in all respects, continue in full force and effect.  If there shall be any conflict between the terms and provisions of this Amendment and the Note, the terms and provisions of this Amendment shall control.

**IN WITNESS WHEREOF**, the undersigned have caused this Amendment, duly executed and delivered on the day and year first above written.

**BORROWER:**


_____
Evander Kane

STATE OF   _CALIFORNIA_
COUNTY OF _SANTA CLARA_

    I HEREBY CERTIFY that on this day, before me, an officer duly authorized in the State aforesaid and in the County aforesaid to take acknowledgements, the foregoing instrument was acknowledged before me by Evander Kane, who is: _____ either personally known to me or _✓_ has produced _U.S. PASSPORT_____ as identification.

    WITNESS by hand and official seal in the County and State last aforesaid this _17_ day of October 2018.

VAN T. MACH
COMM. #2138554
Notary Public · California
Santa Clara County
My Comm. Expires Dec. 26, 2019

NOTARY PUBLIC
Print Name: _VAN T. MACH_
My commission expires: _DEC 26, 2019_


*(remainder of page left blank – Lender's acceptance to follow)*

2



**AMENDMENT ACCEPTED BY LENDER:**

**CENTENNIAL BANK**
An Arkansas banking corporation


By: _Karen B Roth_
Karen Roth, Vice President


STATE OF FLORIDA
COUNTY OF BROWARD

I HEREBY CERTIFY that on this day, before me, an officer duly authorized in the State aforesaid and in the County aforesaid to take acknowledgements, the foregoing instrument was acknowledged before by Karen Roth, as Vice President of Centennial Bank, an Arkansas banking corporation, who does freely and voluntarily under authority duly vested in her by said company. She is: __X__ either personally known to me or _____ has produced _____ as identification.

WITNESS by hand and official seal in the County and State last aforesaid this 9 day of October 2018.

RENE MARIE DUCHESNEAU
Notary Public - State of Florida
Commission # GG 045889
My Comm. Expires Jan 15, 2021
Bonded through National Notary Assn.

NOTARY PUBLIC
Print Name: _Rene Duchesneau_
My commission expires: _1/15/21_

*(remainder of page left blank – Exhibit "A-1" to follow)*

3

# EXHIBIT "F"

**SCANNED**

AUG 0 9 2019

Initial: ___JW___

1221

## SECOND AMENDMENT TO PROMISSORY NOTE
Loan Number ▮▮▮ 1221

THIS **SECOND AMENDMENT TO PROMISSORY NOTE** ("Second Amendment") having an effective date of February 28, 2019 ("Effective Date"), is by and between **Evander Kane**, an individual ("Borrower"), who resides at 8447 Isabel Place, Vancouver, BC, Canada V6P 6R8 and **CENTENNIAL BANK**, an Arkansas banking corporation ("Lender"), whose address is PO Box 966, Conway, Arkansas 72033.

### RECITALS

A.     On September 5, 2018, Lender provided a loan to Borrower in the principal amount of Three Million Nine Hundred Thousand and 00/100 ($3,900,000.00) ("Loan"), which Loan is evidenced by a Promissory Note ("Note"), a Secured Financial Transaction and Security Agreement ("Agreement") and other loan documents ("Original Loan Documents").

B.     On October 17, 2018, upon Borrower's request, Lender agreed to increase the balance of the Note by an additional $2,000,000.00, resulting in a new principal amount of $5,900,000.00, which increase is evidenced by the First Amendment to Promissory Note ("First Amended Note"), First Amendment to Secured Financial Transaction Agreement and other loan documents (collectively "First Amended Loan Documents").

C.     As of the Effective Date, prior to the execution of this Second Amended Note, the principal balance of the Loan is $5,183,691.17.

D.     Borrower has approached Lender and requested Lender again increase the balance of the Note from $5,183,691.17 to $5,900,000.00, which the Lender has agreed to pursuant to the terms and conditions set forth in this Second Amendment to Promissory Note ("Second Amended Note"), the Second Amendment to Secured Financial Transaction and Security Agreement, and other documents (collectively "Second Amended Loan Documents").

E.     The parties agree that this Second Amended Note shall not constitute a novation, but is an amendment to the existing Note and First Amended Note.

**NOW, THEREFORE,** in consideration of the Premises, and of the mutual covenants and agreements set forth below, the parties agree as follows:

### TERMS

1.     <u>Recitals.</u> The recitals above are true and correct.

2.     <u>Loan Amount.</u> The new principal amount of the Note shall be $5,900,000.00.

3.     <u>Loan Amortization Schedule.</u> The Loan Amortization Schedule attached as Exhibit "A-1" to the First Amended Note is no longer valid and is hereby deemed null and void. The new Loan Amortization Schedule attached hereto and incorporated herein as Exhibit "A-2" replaces the amended Loan Amortization Schedule attached as Exhibit "A-1" to the First Amended Note.

4.     <u>Loan Payments.</u> Borrower's payments pursuant to this Second Amended Note shall be pursuant to new Loan Amortization Schedule attached hereto as Exhibit "A-2." The categories on the New Loan Amortization Schedule shall have the same meaning as previously described in the Note.

5.     <u>Interest Rate.</u> The interest rate in the Note shall remain the same, but the interest rate adjustment set forth in Section A of the Note (and referenced in Section C1 of the Note) shall now occur after

the 44th monthly payment (rather than after the 50th monthly payment), beginning with the monthly payment due November 15, 2022.

     6.     Documentary Stamps in the amount of $2,450.00 were already paid to the Florida Department of Revenue ("DOR") upon the execution of the Original Promissory Note. As Documentary Stamps are capped at $2,450.00 for this Note, Lender shall not be required to remit any additional payment for Documentary Stamps to the Florida DOR. Should the Florida "DOR" request additional payment for Documentary Stamps related to this Amendment, Borrower herein authorizes Lender to pay such additional Documentary Stamps and agrees to reimburse Lender for all such amounts paid.

     7.     The parties desire to amend the terms of the Note and the First Amended Note based on the terms and provisions set forth herein.

     8.     Except as expressly set forth herein or in the Second Amended Loan Documents, this Second Amended Note shall not be deemed to have amended, modified or altered any of the terms, conditions or provisions of the Note or the First Amended Note, and such terms, conditions and provisions shall, in all respects, continue in full force and effect. If there shall be any conflict between the terms and provisions of this Second Amended Note and the Note or the First Amended Note, the terms and provisions of this Second Amended Note shall control.

     **IN WITNESS WHEREOF**, the undersigned have caused this Second Amended Note, duly executed and delivered on the day and year first above written.

**BORROWER:**

Evander Kane

STATE OF _CALIFORNIA_
COUNTY OF _SANTA CLARA_

     I HEREBY CERTIFY that on this day, before me, an officer duly authorized in the State aforesaid and in the County aforesaid to take acknowledgements, the foregoing instrument was acknowledged before me by Evander Kane, who is: ____ either personally known to me or __X__ has produced _U.S PASSPORT_ as identification. The notary is not an obligor.

     WITNESS by hand and official seal in the County and State last aforesaid this _2nd_ day of ~~February~~ _MARCH_ 2019.

VAN T. MACH
COMM. #2138554
Notary Public - California
Santa Clara County
My Comm. Expires Dec. 26, 2019

NOTARY PUBLIC
Print Name: _VAN T. MACH_
My commission expires: _DEC 26, 2019_

*(remainder of page left blank – Lender's acceptance to follow)*

2

**AMENDMENT ACCEPTED BY LENDER:**

**CENTENNIAL BANK**
An Arkansas banking corporation


By: _Karen B Roth_
Karen Roth, Vice President


STATE OF FLORIDA
COUNTY OF BROWARD

    I HEREBY CERTIFY that on this day, before me, an officer duly authorized in the State aforesaid and in the County aforesaid to take acknowledgements, the foregoing instrument was acknowledged before by Karen Roth, as Vice President of Centennial Bank, an Arkansas banking corporation, who does freely and voluntarily under authority duly vested in her by said company. She is: ✓ either personally known to me or ____ has produced _____ as identification.

    WITNESS by hand and official seal in the County and State last aforesaid this 4 day of ~~February~~ March 2019.

> RENE MARIE DUCHESNEAU
> Notary Public - State of Florida
> Commission # GG 045889
> My Comm. Expires Jan 15, 2021
> Bonded through National Notary Assn.

NOTARY PUBLIC
Print Name: Rene Duchesneau
My commission expires: _____

*(remainder of page left blank – Exhibit "A-2" to follow)*

3

Case: 21-50028   Doc# 123   Filed: 05/05/21   Entered: 05/05/21 13:04:36   Page 68 of 94

# EXHIBIT "G"

## THIRD AMENDMENT TO PROMISSORY NOTE

Loan Number ███ 1221

**THIS THIRD AMENDMENT TO PROMISSORY NOTE** ("Second Amendment") having an effective date of April 30, 2019 ("Effective Date"), is by and between **Evander Kane**, an individual ("Borrower"), who resides at 8447 Isabel Place, Vancouver, BC, Canada V6P 6R8 and **CENTENNIAL BANK**, an Arkansas banking corporation ("Lender"), whose address is PO Box 966, Conway, Arkansas 72033.

### RECITALS

A.      On September 5, 2018, Lender provided a loan to Borrower in the principal amount of Three Million Nine Hundred Thousand and 00/100 ($3,900,000.00) ("Loan"), which Loan is evidenced by a Promissory Note ("Note"), a Secured Financial Transaction and Security Agreement ("Agreement") and other loan documents ("Original Loan Documents").

B.      On October 17, 2018, upon Borrower's request, Lender agreed to increase the balance of the Note by an additional $2,000,000.00, resulting in a new principal amount of $5,900,000.00, which increase is evidenced by the First Amendment to Promissory Note ("First Amended Note"), First Amendment to Secured Financial Transaction Agreement and other loan documents (collectively "First Amended Loan Documents").

C.      On February 28, 2019, upon Borrower's request, Lender agreed to increase the balance of the Note from $5,183,691.17 to $5,900,000.00, which is evidenced by the Second Amendment to Promissory Note ("Second Amended Note"), Second Amendment to Secured Financial Transaction Agreement ("Second Amendment") and other loan documents (collectively "Second Amended Loan Documents").

D.      As of the Effective Date, prior to the execution of this Third Amended Note, the principal balance of the Loan is $5,539,501.89.

E.      Borrower has approached Lender and requested Lender again increase the balance of the Note from $5,539,501.89 to $8,000,000.00, which the Lender has agreed to pursuant to the terms and conditions set forth in this Third Amendment to Promissory Note ("Third Amended Note"), the Third Amendment to Secured Financial Transaction and Security Agreement, and other documents (collectively "Third Amended Loan Documents").

F.      The parties agree that this Third Amended Note shall not constitute a novation, but is an amendment to the existing Note, First Amended Note and Second Amended Note.

**NOW, THEREFORE,** in consideration of the Premises, and of the mutual covenants and agreements set forth below, the parties agree as follows:

### TERMS

1.      <u>Recitals.</u> The recitals above are true and correct.

2.      <u>Loan Amount.</u> The new principal amount of the Note shall be $8,000,000.00.

3.      <u>Loan Amortization Schedule.</u> The Loan Amortization Schedule attached as Exhibit "A-2" to the Second Amended Note is no longer valid and is hereby deemed null and void. The new Loan Amortization Schedule attached hereto and incorporated herein as Exhibit "A-3" replaces the amended Loan Amortization Schedule attached as Exhibit "A-2" to the Second Amended Note.

4. <u>Loan Payments</u>. Borrower's payments pursuant to this Third Amended Note shall be pursuant to new Loan Amortization Schedule attached hereto as Exhibit "A-3." The categories on the New Loan Amortization Schedule attached as Exhibit "A-3" are the same as the categories on Exhibit "A-2."

5. <u>Interest Rate</u>. The interest rate in the Note shall remain the same, but the interest rate adjustment set forth in Section A of the Note (and referenced in Section C1 of the Note) shall now occur after the 42nd monthly payment (rather than after the 50th monthly payment), beginning with the monthly payment due November 15, 2022.

6. <u>July 15, 2024 Payment</u>. Exhibit "A-3" requires Borrower to make a lump sum principal reduction payment of $1,060,000.00 on (or before) July 15, 2024. The parties acknowledge that this $1,060,000.00 lump sum payment shall actually be due on or before July 1, 2024.

7. Documentary Stamps in the amount of $2,450.00 were already paid to the Florida Department of Revenue ("DOR") upon the execution of the Original Promissory Note. As Documentary Stamps are capped at $2,450.00 for this Note, Lender shall not be required to remit any additional payment for Documentary Stamps to the Florida DOR. Should the Florida "DOR" request additional payment for Documentary Stamps related to this Amendment, Borrower herein authorizes Lender to pay such additional Documentary Stamps and agrees to reimburse Lender for all such amounts paid.

8. The parties desire to amend the terms of the Note, the First Amended Note and Second Amended Note based on the terms and provisions set forth herein.

9. Except as expressly set forth herein or in the Third Amended Loan Documents, this Third Amended Note shall not be deemed to have amended, modified or altered any of the terms, conditions or provisions of the Note, the First Amended Note or the Second Amended Note, and such terms, conditions and provisions shall, in all respects, continue in full force and effect. If there shall be any conflict between the terms and provisions of this Third Amended Note and the Note, the First Amended Note or the Second Amended Note, the terms and provisions of this Third Amended Note shall control.

**IN WITNESS WHEREOF**, the undersigned have caused this Third Amended Note, duly executed and delivered on the day and year first above written.

*(remainder of page left blank – signature page to follow)*

Case: 21-50028    Doc# 123    Filed: 05/05/21    Entered: 05/05/21 13:04:36    Page 71 of 94

**BORROWER:**

_[signature]_

Evander Kane

STATE OF _Colorado_
COUNTY OF _Denver_

     I HEREBY CERTIFY that on this day, before me, an officer duly authorized in the State aforesaid and in the County aforesaid to take acknowledgements, the foregoing instrument was acknowledged before me by Evander Kane, who is: _____ either personally known to me or _✓_ has produced _CA Drivers License_ as identification. The notary is not an obligor.

     WITNESS by hand and official seal in the County and State last aforesaid this _30th_ day of April 2019.

```
+------------------------------+
|        KAREN COFFEY          |
|        NOTARY PUBLIC         |
|      STATE OF COLORADO       |
|     NOTARY ID 20064012163    |
| MY COMMISSION EXPIRES 3-29-22|
+------------------------------+
```

_[signature] Karen Coffey_
NOTARY PUBLIC
Print Name: _Karen Coffey_
My commission expires: _3/29/22_

3

**AMENDMENT ACCEPTED BY LENDER:**

**CENTENNIAL BANK**
An Arkansas banking corporation

By: 
Karen Roth, Vice President

STATE OF FLORIDA
COUNTY OF BROWARD

I HEREBY CERTIFY that on this day, before me, an officer duly authorized in the State aforesaid and in the County aforesaid to take acknowledgements, the foregoing instrument was acknowledged before by Karen Roth, as Vice President of Centennial Bank, an Arkansas banking corporation, who does freely and voluntarily under authority duly vested in her by said company. She is: ✓ either personally known to me or _____ has produced _____ as identification.

WITNESS by hand and official seal in the County and State last aforesaid this 30 day of April 2019.

RENE MARIE DUCHESNEAU
Notary Public - State of Florida
Commission # GG 045889
My Comm. Expires Jan 15, 2021
Bonded through National Notary Assn.

NOTARY PUBLIC
Print Name: Rene Duchesneau
My commission expires: 4/5/21

*(remainder of page left blank – Exhibit ".1-3" to follow)*

Case: 21-50028   Doc# 123   Filed: 05/05/21   Entered: 05/05/21 13:04:36   Page 73 of 94

**SURESPORTS**
BETTER BANKING FOR ATHLETES

April 30, 2019

Evander Kane
C/O PMR Inc. 8012 Wiles Road
Coral Springs, FL 33067

RE: $2.46M Loan Increase between Centennial Bank and Evander Kane

As per my Fee Agreement with Sure Sports, I, Evander Kane, authorize the following wires (account information listed below) released out of my loan proceeds for the following:

- $1,916,666.67    Payoff South River Capital, LLC
- $7,500.00    Legal/Closing Fee
- $31,071.83    Replacement of Prior Advance from California Bank & Trust
- $399,847.55    (Est) Net Proceeds to Borrower

**South River Capital – $1,916,666.67**
M&T Bank
4800 Hampden Lane
Bethesda, MD 20814
███████████ 046
███████████ 4190
Ref:         Evander Kane

**Sure Sports Lending – $7,500.00**
Wells Fargo Bank
1807 N Young Circle
Hollywood, FL 33020
███████████ 248
███████████ 7966
Ref:         Evander Kane

**Evander Kane - $31,071.83**
California Bank & Trust
███████████ 109
███████████ 9163
Ref:         Evander Kane - $26,243.09 to replace advance from Money Market Account + SSL Deferred



**Please have the remaining funds wired to my account as follows:**

<u>**Evander Kane - $399,847.55 (Est)**</u>
East West Bank
135 N. Los Robles Ave.
Pasadena, CA 91101
██████████████ 381
██████████████ 5783


Sincerely,


_____
Evander Kane

# EXHIBIT "H"

## First Amendment to Secured Financial Transaction and Security Agreement
### (Centennial Bank Loan No. ▮▮▮▮1221)

This First Amendment to Secured Financial Transaction and Security Agreement ("Amendment"), having an effective date of October 17, 2018 ("Effective Date"), is hereby entered into by and between **Evander Kane,** who resides at 8447 Isabel Place, Vancouver, BC, Canada V6P 6R8, and his agents, successors in interest, heirs, executors, representatives, successors and assignors (hereinafter referred to collectively as "Borrower") and **Centennial Bank,** an Arkansas banking corporation, with a mailing address of P.O. Box 966, Conway, Arkansas 72033, and its representatives, successors and assignors (hereinafter referred to collectively as "Lender"), who hereby agree as follows:

### RECITALS

**WHEREAS**, on September 5, 2018, Lender provided a loan to Borrower in the principal amount of Three Million Nine Hundred Thousand and 00/100 ($3,900,000.00) ("Loan"), which Loan is evidenced by a Promissory Note ("Note"), a Secured Financial Transaction and Security Agreement ("Agreement") and other loan documents ("Original Loan Documents");

**WHEREAS**, Borrower has approached Lender and requested Lender increase the balance of the Loan by an additional $2,000,000.00, to a new loan amount of $5,900,000.00, which Lender has agreed to do pursuant to the terms of this Amendment, the First Amendment to the Promissory Note and other documents (collectively "Amended Loan Documents").

**WHEREAS,** the parties agree that the amendments to the Loan and Loan Documents as set forth herein shall not constitute a novation, but is an amendment to an existing loan.

**NOW, THEREFORE,** in consideration of the Premises, and of the mutual covenants and agreements set forth below, the parties agree as follows:

### TERMS

1.  Recitals.  The recitals above are true and correct.

2.  Promissory Note.  The Note shall be amended as set forth in the First Amendment to the Promissory Note.

3.  Loan Amount.  The new loan amount of the Loan shall be $5,900,000.00 ("New Loan Amount"), and all of the Original Loan Documents are hereby amended to reflect the New Loan Amount.

4.  Loan Amortization Schedule.  The Loan Amortization Schedule attached as Exhibit "A" to the Agreement and the Note is no longer valid, and is hereby deemed null and void.  The new Loan Amortization Schedule attached hereto and incorporated herein as Exhibit "A-1" replaces the original Loan Amortization Schedule attached as Exhibit "A" to the Agreement and the Note.

5.  Loan Payments.  Borrower's payments pursuant to the First Amendment to the Promissory Note and as set forth herein shall be pursuant to new Loan Amortization Schedule attached hereto as Exhibit "A-1." The categories on the New Loan Amortization Schedule are the same as the old.

6.  Other Loans.  As set forth in Section C of the Agreement, in addition to the Loan from Lender, Borrower had also anticipated receiving a $4,550,000.00 loan from another lender, wherein said loan was identified in the Agreement as the "Other Institutional Loan."  The parties herein acknowledge that Borrower did not receive the "Other Institutional Loan."



7.    Borrower's Representation.  In further consideration of the amendments and modifications set forth herein and in the Amended Loan Documents, and in order to induce the Lender to modify the Loan and Original Loan Documents, Borrower hereby represents and warrants that as of this date: (a) Borrower has no defenses to any actions by the Lender based on or arising out of the Loan; (b) Borrower has no claims or causes of actions against the Lender based on or arising out of the Loan or any of the transactions involving same; and (c) the Lender is not in breach or default of any of the Original Loan Documents as amended herein.

8.    Fees.  As consideration for Lender increasing the loan amount and agreeing to enter into this Amendment and the First Amendment to the Promissory Note, Borrower shall pay to Lender the fees and costs identified on the Loan Closing Statement for Amendment to Loan.

9.    Validity of the Original Loan Documents.  Except as expressly set forth herein, in the First Amendment to the Promissory Note or in the Amended Loan Documents, this Amendment shall not be deemed to have amended, modified or altered any of the terms, conditions or provisions of the Agreement, the Note or other Original Loan Documents, and such terms, conditions and provisions shall, in all respects, continue in full force and effect.  If there shall be any conflict between the terms and provisions of this Amendment and the Original Loan Documents, the terms and provisions of this Amendment shall control.

IN WITNESS WHEREOF, Borrower and Lender have executed this Agreement effective on the 17th day of October 2018.

**BORROWER:**

Evander Kane

STATE OF __CALiFORNiA__
COUNTY OF __SANTA CLARA__

I HEREBY CERTIFY that on this day, before me, an officer duly authorized in the State aforesaid and in the County aforesaid to take acknowledgements, the foregoing instrument was acknowledged before me by Evander Kane, who is: _____ either personally known to me or __✓__ has produced __UG PASSPORT__ as identification.

WITNESS by hand and official seal in the County and State last aforesaid this __17__ day of October 2018.

NOTARY PUBLIC
Print Name: __VAN T. MACH__
My commission expires: __DEC 26, 2019__

VAN T. MACH
COMM. #2138554
Notary Public - California
Santa Clara County
My Comm. Expires Dec. 26, 2019

*(remainder of page left blank – Lender's signature page to follow)*

2

# EXHIBIT "I"

<u>**Second Amendment to Secured Financial Transaction and Security Agreement**</u>
<u>**(Centennial Bank Loan No.      1221)**</u>

This Second Amendment to Secured Financial Transaction and Security Agreement ("Second Amendment"), having an effective date of February 28, 2019 ("Effective Date"), is hereby entered into by and between **Evander Kane**, who resides at 8447 Isabel Place, Vancouver, BC, Canada V6P 6R8, and his agents, successors in interest, heirs, executors, representatives, successors and assignors (hereinafter referred to collectively as "Borrower") and **Centennial Bank**, an Arkansas banking corporation, with a mailing address of P.O. Box 966, Conway, Arkansas 72033, and its representatives, successors and assignors (hereinafter referred to collectively as "Lender"), who hereby agree as follows:

## RECITALS

**WHEREAS**, on September 5, 2018, Lender provided a loan to Borrower in the principal amount of Three Million Nine Hundred Thousand and 00/100 ($3,900,000.00) ("Loan"), which Loan is evidenced by a Promissory Note ("Note"), a Secured Financial Transaction and Security Agreement ("Agreement") and other loan documents ("Original Loan Documents");

**WHEREAS**, on October 17, 2018, upon Borrower's request, Lender agreed to increase the balance of the Note by an additional $2,000,000.00, resulting in a new principal amount of $5,900,000.00, which increase is evidenced by the First Amendment to Promissory Note ("First Amended Note"), First Amendment to Secured Financial Transaction Agreement ("First Amendment") and other loan documents (collectively "First Amended Loan Documents").

**WHEREAS**, as of the Effective Date, prior to the execution of this Second Amendment, the principal balance of the Loan is $5,183,691.17.

**WHEREAS**, Borrower has approached Lender and requested Lender again increase the balance of the Note from $5,183,691.17 to $5,900,000.00, which the Lender has agreed to pursuant to the terms and conditions set forth in this Second Amendment, the Second Amendment to Promissory Note ("Second Amended Note"), and other documents (collectively "Second Amended Loan Documents").

**WHEREAS,** the parties agree that the amendments to the Loan and Loan Documents, as previously amended, and again as set forth herein, shall not constitute a novation, but is an amendment to an existing loan.

**NOW, THEREFORE**, in consideration of the Premises, and of the mutual covenants and agreements set forth below, the parties agree as follows:

## TERMS

1.    <u>Recitals.</u> The recitals above are true and correct.

2.    <u>Promissory Note.</u> The Note, as previously amended by the First Amended Note, shall be amended as set forth in the Second Amended Note.

3.    <u>Loan Amount.</u> The new loan amount of the Loan shall be $5,900,000.00 ("New Loan Amount"), and all of the Original Loan Documents, as previously amended by the First Amended Loan Documents, are hereby amended to reflect the New Loan Amount.

4.    <u>Interest Reserves.</u> At Closing, Lender shall receive from Borrower, based on the new money being provided: (a) an interest reserve in the amount of $23,473.32, and said funds shall be applied monthly toward Borrower's payments due from May 15, 2019 through the October 15, 2019; and (b) an

additional interest reserve in the amount of $1,293.34 which is equal to 10 days of interest payments at the initial non-default interest rate.

5. <u>Insurance Escrows</u>. At Closing, Lender shall receive from Borrower the sum of $15,011.62 to be held in escrow by Lender for the estimated Death & Disgrace insurance policy renewal that is scheduled to be due on September 5, 2019. Borrower acknowledges that the amount collected is only an estimate, and if the insurance premiums are greater than the amount collected, Borrower shall be required to remit to Lender additional funds to satisfy the shortfall. The amounts collected herein are in addition to all other insurance escrows to be collected by Lender as set forth on Exhibit "A-2."

6. <u>Loan Amortization Schedule</u>. The Loan Amortization Schedule attached as Exhibit "A-1" to the First Amendment and the First Amended Note are no longer valid and are hereby deemed null and void. The new Loan Amortization Schedule attached hereto and incorporated herein as Exhibit "A-2" replaces the prior Loan Amortization Schedule attached as Exhibit "A-1" to the First Amendment and First Amended Note.

7. <u>Loan Payments</u>. Borrower's payments pursuant to the Second Amended Note and as set forth herein shall be pursuant to new Loan Amortization Schedule attached hereto as Exhibit "A-2." The categories on the New Loan Amortization Schedule are the same as the old versions.

8. <u>Borrower's Representation</u>. In further consideration of the amendments and modifications set forth herein and in the Second Amended Loan Documents, and in order to induce the Lender to modify the Loan and Original Loan Documents, as further amended by the First Amended Loan Documents, Borrower hereby represents and warrants that as of this date: (a) Borrower has no defenses to any actions by the Lender based on or arising out of the Loan; (b) Borrower has no claims or causes of actions against the Lender based on or arising out of the Loan or any of the transactions involving same; and (c) the Lender is not in breach or default of any of the Original Loan Documents or First Amended Loan Documents, as amended herein.

9. <u>Fees.</u> As consideration for Lender increasing the loan amount and agreeing to enter into this Second Amendment and the Second Amended Note, Borrower shall pay to Lender the fees and costs identified on the Loan Closing Statement for Second Amendment to Loan.

10. <u>Validity of the Original Loan Documents</u>. Except as expressly set forth herein, in the Second Amended Promissory Note or in the Second Amended Loan Documents, this Second Amendment shall not be deemed to have amended, modified or altered any of the terms, conditions or provisions of the Agreement or First Amendment, the Note or the First Amended Note or other Original Loan Documents or First Amended Loan Documents, and such terms, conditions and provisions shall, in all respects, continue in full force and effect. If there shall be any conflict between the terms and provisions of this Second Amendment and the Original Loan Documents or First Amended Loan Documents, the terms and provisions of this Second Amendment shall control.

IN WITNESS WHEREOF, Borrower and Lender have executed this Second Amendment effective on the 28th day of February 2019.

*(remainder of page left blank – signature page to follow)*

2



**Signature Page - Borrower**
**Second Amendment to Secured Financial Transaction and Security Agreement**

**BORROWER:**

_____
Evander Kane

STATE OF _CALIFORNIA_
COUNTY OF _SANTA CLARA_

     I HEREBY CERTIFY that on this day, before me, an officer duly authorized in the State aforesaid and in the County aforesaid to take acknowledgements, the foregoing instrument was acknowledged before me by Evander Kane, who is: _____ either personally known to me or _X_ has produced _US PASSPORT_ as identification.

     WITNESS by hand and official seal in the County and State last aforesaid this _2nd_ day of ~~February~~ MARCH 2019.

VAN T. MACH
COMM. #2138554
Notary Public - California
Santa Clara County
My Comm. Expires Dec. 26, 2019

NOTARY PUBLIC
Print Name: _VAN T. MACH_
My commission expires: _DEC 26, 2019_

3

**Signature Page - Lender**
**Second Amendment to Secured Financial Transaction and Security Agreement**

**LENDER:**

**CENTENNIAL BANK**
An Arkansas banking corporation

By: _Karen B Roth_
Karen Roth, Vice President

STATE OF FLORIDA
COUNTY OF BROWARD

  I HEREBY CERTIFY that on this day, before me, an officer duly authorized in the State aforesaid and in the County aforesaid to take acknowledgements, the foregoing instrument was acknowledged before by Karen Roth, as Vice President of Centennial Bank, an Arkansas banking corporation, who does freely and voluntarily under authority duly vested in her by said company. She is: ✓ either personally known to me or ____ has produced _____ as identification.

  WITNESS by hand and official seal in the County and State last aforesaid this 4 day of ~~February~~ *march* 2019.

RENE MARIE DUCHESNEAU
Notary Public - State of Florida
Commission # GG 045889
My Comm. Expires Jan 15, 2021
Bonded through National Notary Assn.

NOTARY PUBLIC
Print Name: _Rene Duchesneay_
My commission expires: _____

*(remainder of page left blank – Exhibit "A-2" to follow)*

4

Repayment Amount includes Scheduled Payment + 1/6 of Interest reserve for the next 6th season.
Total includes Repayment Amount, Insurance Escrow and Guarantor's Fees.

| PMT NUM | PAYMENT DATE | BEGINNING BALANCE | INTEREST PAYMENT RESERVE | INTEREST RESERVE | SCHEDULED PAYMENT | PRINCIPAL | INTEREST | ENDING BALANCE | INSURANCE ESCROW | GUARANTOR'S FEE | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 3/15/2018 | $5,900,000.00 | $296,541.51 | $28,541.01 | $210,000.00 | $192,056.56 | $17,044.44 | $5,707,944.44 | $16,804.00 | $8,983.00 | $201,729.51 |
| 2 | 4/15/2018 | $5,707,944.44 | $238,541.51 | $29,541.51 | $210,000.00 | $179,050.49 | $31,043.50 | $5,528,989.94 | $16,804.00 | $8,983.00 | $201,729.51 |
| 3 | 5/15/2018 | $5,528,989.94 | $0.00 | $0.00 | $29,949.84 | $0.00 | $29,949.84 | $5,528,989.94 | $0.00 | $0.00 | $0.00 |
| 4 | 6/15/2018 | $5,528,989.94 | $0.00 | $0.00 | $30,948.89 | $0.00 | $30,948.89 | $5,528,989.94 | $0.00 | $0.00 | $0.00 |
| 5 | 7/15/2018 | $5,528,989.94 | $0.00 | $0.00 | $29,949.84 | $0.00 | $29,949.84 | $5,528,989.94 | $0.00 | $0.00 | $0.00 |
| 6 | 8/15/2018 | $5,528,989.94 | $0.00 | $0.00 | $30,948.97 | $0.00 | $30,948.97 | $5,528,989.94 | $0.00 | $0.00 | $0.00 |
| 7 | 9/15/2018 | $5,528,989.94 | $0.00 | $0.00 | $30,948.97 | $0.00 | $30,948.97 | $5,528,989.94 | $0.00 | $0.00 | $0.00 |
| 8 | 10/15/2018 | $5,528,989.94 | $0.00 | $0.00 | $29,949.89 | $0.00 | $29,949.89 | $5,528,989.94 | $0.00 | $0.00 | $0.00 |
| 9 | 11/15/2018 | $5,528,989.94 | $142,615.51 | $27,615.51 | $115,000.00 | $84,053.03 | $30,946.97 | $5,444,936.02 | $17,333.00 | $8,983.00 | $168,331.51 |
| 10 | 12/15/2018 | $5,444,936.02 | $142,615.51 | $27,615.51 | $115,000.00 | $85,508.60 | $29,491.40 | $5,359,428.61 | $17,333.00 | $8,983.00 | $168,331.51 |
| 11 | 1/15/2019 | $5,359,428.61 | $142,615.51 | $27,615.51 | $115,000.00 | $85,002.08 | $29,997.91 | $5,274,426.52 | $17,333.00 | $8,983.00 | $168,331.51 |
| 12 | 2/15/2019 | $5,274,426.52 | $142,615.51 | $27,615.51 | $115,000.00 | $85,417.86 | $29,582.14 | $5,189,948.46 | $17,333.00 | $8,983.00 | $168,331.51 |
| 13 | 3/15/2019 | $5,189,948.46 | $142,615.51 | $27,615.51 | $115,000.00 | $87,930.00 | $27,169.91 | $5,101,118.37 | $17,333.00 | $8,983.00 | $168,331.51 |
| 14 | 4/15/2019 | $5,101,118.37 | $142,615.51 | $27,615.51 | $115,000.00 | $80,447.91 | $28,552.09 | $5,014,670.47 | $17,333.00 | $8,983.00 | $168,331.51 |
| 15 | 5/15/2019 | $5,014,670.47 | $0.00 | $0.00 | $27,167.93 | $0.00 | $27,167.93 | $5,014,670.47 | $0.00 | $0.00 | $0.00 |
| 16 | 6/15/2019 | $5,014,670.47 | $0.00 | $0.00 | $28,069.22 | $0.00 | $28,069.22 | $5,014,670.47 | $0.00 | $0.00 | $0.00 |
| 17 | 7/15/2019 | $5,014,670.47 | $0.00 | $0.00 | $27,182.90 | $0.00 | $27,182.90 | $5,014,670.47 | $0.00 | $0.00 | $0.00 |
| 18 | 8/15/2019 | $5,014,670.47 | $0.00 | $0.00 | $28,069.22 | $0.00 | $28,069.22 | $5,014,670.47 | $0.00 | $0.00 | $0.00 |
| 19 | 9/15/2019 | $5,014,670.47 | $0.00 | $0.00 | $28,069.22 | $0.00 | $28,069.22 | $5,014,670.47 | $0.00 | $0.00 | $0.00 |
| 20 | 10/15/2020 | $5,014,670.47 | $0.00 | $0.00 | $27,182.90 | $0.00 | $27,182.90 | $5,014,670.47 | $0.00 | $0.00 | $0.00 |
| 21 | 11/16/2020 | $5,014,670.47 | $59,000.24 | $27,448.24 | $32,481.00 | $4,966.79 | $28,069.22 | $5,010,271.80 | $17,333.00 | $8,583.00 | $85,715.24 |
| 22 | 12/15/2020 | $5,010,271.80 | $59,000.24 | $27,448.24 | $32,481.00 | $5,322.00 | $27,159.00 | $5,004,965.89 | $17,333.00 | $8,583.00 | $85,715.24 |
| 23 | 1/15/2021 | $5,004,965.89 | $59,000.24 | $27,448.24 | $32,481.00 | $34,447.15 | $28,013.85 | $5,000,008.04 | $17,333.00 | $8,583.00 | $85,715.24 |
| 24 | 2/15/2021 | $5,000,008.04 | $59,000.24 | $27,448.24 | $32,481.00 | $5,472.04 | $27,818.20 | $4,990,000.00 | $17,333.00 | $8,583.00 | $85,715.24 |
| 25 | 3/15/2021 | $4,990,000.00 | $59,000.24 | $27,448.24 | $32,481.00 | $37,803.35 | $26,557.74 | $4,986,833.04 | $17,333.00 | $8,583.00 | $85,715.24 |
| 26 | 4/15/2021 | $4,986,833.04 | $59,000.24 | $27,448.24 | $32,481.00 | $54,537.39 | $27,523.93 | $4,984,295.85 | $17,333.00 | $8,583.00 | $85,715.24 |
| 27 | 5/15/2021 | $4,984,295.85 | $0.00 | $0.00 | $26,849.27 | $0.00 | $26,846.27 | $4,984,295.85 | $0.00 | $0.00 | $0.00 |
| 28 | 6/15/2021 | $4,984,295.85 | $0.00 | $0.00 | $27,938.21 | $0.00 | $27,938.21 | $4,984,295.85 | $0.00 | $0.00 | $0.00 |
| 29 | 7/15/2021 | $4,984,295.85 | $0.00 | $0.00 | $28,998.27 | $0.00 | $26,998.27 | $4,984,295.85 | $0.00 | $0.00 | $0.00 |
| 30 | 8/15/2021 | $4,984,295.85 | $0.00 | $0.00 | $27,938.21 | $0.00 | $27,938.21 | $4,984,295.85 | $0.00 | $0.00 | $0.00 |
| 31 | 9/15/2021 | $4,984,295.85 | $0.00 | $0.00 | $27,398.21 | $0.00 | $27,398.21 | $4,984,295.85 | $0.00 | $0.00 | $0.00 |
| 32 | 10/15/2021 | $4,984,295.85 | $0.00 | $0.00 | $28,998.27 | $0.00 | $28,998.27 | $4,984,295.85 | $0.00 | $0.00 | $0.00 |
| 33 | 11/15/2021 | $4,984,295.85 | $245,820.42 | $20,820.42 | $225,000.00 | $192,707.09 | $32,292.91 | $4,787,704.06 | $13,071.00 | $8,583.00 | $247,480.42 |
| 34 | 12/15/2021 | $4,787,194.06 | $245,820.42 | $20,820.42 | $225,000.00 | $198,083.37 | $26,918.83 | $4,588,124.70 | $13,071.00 | $8,583.00 | $247,480.42 |
| 35 | 1/15/2022 | $4,588,124.70 | $245,820.42 | $20,820.42 | $225,000.00 | $199,239.05 | $25,060.95 | $4,000,008.54 | $13,071.00 | $8,583.00 | $247,480.42 |
| 36 | 2/15/2022 | $4,388,925.45 | $245,820.42 | $20,820.42 | $225,000.00 | $202,434.28 | $24,505.72 | $4,188,339.37 | $13,071.00 | $8,583.00 | $247,480.42 |
| 37 | 3/15/2022 | $4,186,310.52 | $245,820.42 | $20,820.42 | $225,000.00 | $203,325.46 | $21,174.54 | $3,984,945.11 | $13,071.00 | $8,583.00 | $247,480.42 |
| 38 | 4/15/2022 | $3,984,945.11 | $245,820.42 | $20,820.42 | $225,000.00 | $202,767.52 | $22,322.90 | $3,781,047.49 | $13,071.00 | $8,583.00 | $247,480.42 |
| 39 | 5/15/2022 | $3,781,047.49 | $0.00 | $0.00 | $20,480.01 | $0.00 | $20,480.01 | $3,781,047.49 | $0.00 | $0.00 | $0.00 |
| 40 | 6/15/2022 | $3,781,047.49 | $0.00 | $0.00 | $21,167.84 | $0.00 | $21,167.84 | $3,781,047.49 | $0.00 | $0.00 | $0.00 |
| 41 | 7/15/2022 | $3,781,047.49 | $0.00 | $0.00 | $20,480.01 | $0.00 | $20,480.01 | $3,781,047.49 | $0.00 | $0.00 | $0.00 |
| 42 | 8/15/2022 | $3,781,047.49 | $0.00 | $0.00 | $21,167.84 | $0.00 | $21,167.84 | $3,781,047.49 | $0.00 | $0.00 | $0.00 |
| 43 | 9/15/2022 | $3,781,047.49 | $0.00 | $0.00 | $21,167.84 | $0.00 | $21,167.04 | $3,781,047.49 | $0.00 | $0.00 | $0.00 |
| 44 | 10/15/2022 | $3,781,047.49 | $0.00 | $0.00 | $20,480.01 | $0.00 | $20,480.01 | $3,781,047.49 | $0.00 | $0.00 | $0.00 |
| 45 | 11/15/2022 | $3,781,047.49 | $181,663.50 | $18,663.50 | $165,000.00 | $129,832.16 | $21,167.84 | $3,650,015.33 | $10,451.00 | $8,583.00 | $180,707.56 |
| 46 | 12/15/2022 | $3,650,015.33 | $181,663.50 | $18,663.50 | $145,000.00 | $126,103.75 | $18,814.25 | $3,532,826.58 | $10,451.00 | $8,583.00 | $180,707.56 |
| 47 | 1/15/2023 | $3,532,826.58 | $181,663.50 | $18,663.50 | $145,000.00 | $125,326.97 | $19,474.83 | $3,407,002.62 | $10,451.00 | $8,583.00 | $180,707.56 |
| 48 | 2/15/2023 | $3,407,002.62 | $181,663.50 | $18,663.50 | $145,000.00 | $126,609.59 | $19,623.11 | $3,281,826.73 | $10,451.00 | $8,583.00 | $180,707.56 |
| 49 | 3/15/2023 | $3,281,826.73 | $181,663.50 | $18,663.50 | $145,000.00 | $128,606.20 | $17,040.80 | $3,153,282.43 | $10,451.00 | $8,583.00 | $180,707.56 |
| 50 | 4/15/2023 | $3,153,282.43 | $181,663.50 | $18,693.58 | $145,000.00 | $127,350.49 | $17,849.51 | $3,025,919.97 | $10,451.00 | $8,583.00 | $180,707.56 |
| 51 | 5/15/2023 | $3,025,919.97 | $0.00 | $0.00 | $16,396.72 | $0.00 | $16,396.72 | $3,025,919.97 | $0.00 | $0.00 | $0.00 |
| 52 | 6/15/2023 | $3,025,919.97 | $0.00 | $0.00 | $16,936.73 | $0.00 | $16,938.73 | $3,025,919.97 | $0.00 | $0.00 | $0.00 |
| 53 | 7/15/2023 | $3,025,919.97 | $0.00 | $0.00 | $16,390.36 | $0.00 | $16,390.36 | $3,025,919.97 | $0.00 | $0.00 | $0.00 |
| 54 | 8/15/2023 | $3,025,919.97 | $0.00 | $0.00 | $16,938.73 | $0.00 | $16,938.73 | $3,025,919.97 | $0.00 | $0.00 | $0.00 |
| 55 | 9/15/2023 | $3,025,919.97 | $0.00 | $0.00 | $16,938.73 | $0.00 | $16,936.73 | $3,025,919.97 | $0.00 | $0.00 | $0.00 |
| 56 | 10/15/2023 | $3,025,919.97 | $0.00 | $0.00 | $16,390.36 | $0.00 | $16,390.36 | $3,025,919.97 | $0.00 | $0.00 | $0.00 |
| 57 | 11/15/2023 | $3,025,919.97 | $232,652.42 | $7,652.42 | $225,000.00 | $208,063.22 | $16,936.73 | $2,817,856.70 | $3,810.00 | $8,583.00 | $245,250.42 |
| 58 | 12/15/2023 | $2,817,855.70 | $232,652.42 | $7,652.42 | $225,000.00 | $209,736.62 | $15,263.37 | $2,608,117.07 | $3,810.00 | $8,583.00 | $245,250.42 |
| 59 | 1/15/2024 | $2,608,117.07 | $232,652.42 | $7,652.42 | $225,000.00 | $211,287.41 | $14,412.58 | $2,397,775.05 | $3,810.00 | $8,583.00 | $245,250.42 |
| 60 | 2/15/2024 | $2,397,775.05 | $232,652.42 | $7,652.42 | $225,000.00 | $211,776.45 | $13,223.55 | $2,188,135.83 | $3,810.00 | $8,583.00 | $245,250.42 |
| 61 | 3/15/2024 | $2,188,135.83 | $232,652.42 | $7,652.42 | $225,000.00 | $213,959.02 | $11,040.98 | $1,972,582.05 | $3,810.00 | $8,583.00 | $245,250.42 |
| 62 | 4/15/2024 | $1,972,582.05 | $232,652.42 | $7,652.42 | $225,000.00 | $213,318.91 | $11,264.02 | $1,758,623.95 | $3,810.00 | $8,583.00 | $245,250.42 |
| 63 | 5/15/2024 | $1,758,623.95 | $0.00 | $0.00 | $9,843.49 | $0.00 | $9,843.49 | $1,758,623.95 | $0.00 | $0.00 | $0.00 |
| 64 | 6/15/2024 | $1,758,623.95 | $990,000.00 | | $990,000.00 | $980,157.40 | $9,625.60 | $768,823.86 | $0.00 | $0.00 | $990,000.00 |
| 65 | 7/15/2024 | $768,823.86 | $0.00 | $0.00 | $5,140.24 | $0.00 | $5,149.24 | $768,823.86 | $0.00 | $0.00 | $0.00 |
| 66 | 8/15/2024 | $768,823.86 | $0.00 | $0.00 | $5,399.03 | $0.00 | $5,399.03 | $768,823.86 | $0.00 | $0.00 | $0.00 |
| 67 | 9/15/2024 | $768,823.86 | $0.00 | $0.00 | $5,399.03 | $0.00 | $5,399.03 | $768,823.86 | $0.00 | $0.00 | $0.00 |
| 68 | 10/15/2024 | $768,823.86 | $0.00 | $0.00 | $5,220.22 | $0.00 | $5,220.22 | $768,823.86 | $0.00 | $0.00 | $0.00 |
| 69 | 11/15/2024 | $768,823.86 | $191,663.50 | $187,853.50 | $187,662.00 | $181,981.84 | $5,360.36 | $602,842.02 | $3,810.00 | $8,583.00 | $188,055.00 |
| 70 | 12/15/2024 | $602,842.02 | $187,662.00 | $187,662.00 | $187,662.00 | $183,364.91 | $4,297.09 | $419,477.10 | $3,810.00 | $8,583.00 | $188,055.00 |
| 71 | 1/15/2025 | $419,477.10 | $187,662.00 | $187,662.00 | $187,662.00 | $184,715.69 | $2,946.31 | $234,761.41 | $3,810.00 | $8,583.00 | $188,245.00 |
| 72 | 2/15/2025 | $234,761.41 | $187,662.00 | $187,662.00 | $187,662.00 | $186,010.26 | $1,651.75 | $48,751.16 | $0.00 | $8,583.00 | $188,245.00 |
| 73 | 3/15/2025 | $48,751.16 | $187,662.00 | $0.00 | $187,662.00 | $186,310.31 | $351.28 | $0.00 | $0.00 | $8,583.00 | $188,245.00 |
| 74 | 4/15/2025 | $0.00 | $187,662.00 | $0.00 | $187,662.00 | $186,051.83 | $1,610.17 | $0.00 | $0.00 | $8,583.00 | $188,245.00 |

# EXHIBIT "J"

## Third Amendment to Secured Financial Transaction and Security Agreement
### (Centennial Bank Loan No. ████1221)

This Third Amendment to Secured Financial Transaction and Security Agreement ("Third Amendment"), having an effective date of April 30, 2019 ("Effective Date"), is hereby entered into by and between **Evander Kane**, who resides at 8447 Isabel Place, Vancouver, BC, Canada V6P 6R8, and his agents, successors in interest, heirs, executors, representatives, successors and assignors (hereinafter referred to collectively as "Borrower") and **Centennial Bank,** an Arkansas banking corporation, with a mailing address of P.O. Box 966, Conway, Arkansas 72033, and its representatives, successors and assignors (hereinafter referred to collectively as "Lender"), who hereby agree as follows:

### RECITALS

**WHEREAS**, on September 5, 2018, Lender provided a loan to Borrower in the principal amount of Three Million Nine Hundred Thousand and 00/100 ($3,900,000.00) ("Loan"), which Loan is evidenced by a Promissory Note ("Note"), a Secured Financial Transaction and Security Agreement ("Agreement") and other loan documents ("Original Loan Documents"):

**WHEREAS**, on October 17, 2018, upon Borrower's request, Lender agreed to increase the balance of the Note by an additional $2,000,000.00, resulting in a new principal amount of $5,900,000.00, which increase is evidenced by the First Amendment to Promissory Note ("First Amended Note"), First Amendment to Secured Financial Transaction Agreement ("First Amendment") and other loan documents (collectively "First Amended Loan Documents").

**WHEREAS**, on February 28, 2019, upon Borrower's request, Lender agreed to increase the balance of the Note from $5,183,691.17 to $5,900,000.00, which is evidenced by the Second Amendment to Promissory Note ("Second Amended Note"), Second Amendment to Secured Financial Transaction Agreement ("Second Amendment") and other loan documents (collectively "Second Amended Loan Documents").

**WHEREAS**, as of the Effective Date, prior to the execution of this Third Amendment, the principal balance of the Loan is $5,539,501.89.

**WHEREAS**, Borrower has approached Lender and requested Lender again increase the balance of the Note from $5,539,501.89 to $8,000,000.00, which the Lender has agreed to pursuant to the terms and conditions set forth in this Third Amendment, the Third Amendment to Promissory Note ("Third Amended Note"), and other documents (collectively "Third Amended Loan Documents").

**WHEREAS**, the parties agree that the amendments to the Loan and Loan Documents, as previously amended, and again as set forth herein, shall not constitute a novation, but is an amendment to an existing loan.

**NOW, THEREFORE**, in consideration of the Premises, and of the mutual covenants and agreements set forth below, the parties agree as follows:

### TERMS

1.     Recitals. The recitals above are true and correct.

2.     Promissory Note. The Note, as previously amended by the First Amended Note and Second Amended Note, shall be amended as set forth in the Third Amended Note.

3.     Loan Amount. The new loan amount of the Loan shall be $8,000,000.00 ("New Loan Amount"), and all of the Original Loan Documents, as previously amended by the First Amended Loan Documents and Second Amended Loan Documents, are hereby amended to reflect the New Loan Amount.

4. <u>Interest Reserves</u>. At Closing, Lender shall receive from Borrower, based on the new money being provided: (a) an interest reserve in the amount of $75,079.37, and said funds shall be applied monthly toward Borrower's payments due from May 15, 2019 through the October 15, 2019; and (b) an additional interest reserve in the amount of $4,442.57, which is equal to 10 days of interest payments at the initial non-default interest rate.

5. <u>Insurance Escrows</u>. At Closing, Lender shall also receive from Borrower the sum of $6,136.38 to be held in escrow by Lender for the additional premium for the estimated Death & Disgrace insurance policy renewal that is scheduled to be due on September 5, 2019. Borrower acknowledges that the amount collected is only an estimate, and if the insurance premiums are greater than the amount collected, Borrower shall be required to remit to Lender additional funds to satisfy the shortfall. The amounts collected herein are in addition to all other insurance escrows to be collected by Lender as set forth on Exhibit "A-3."

6. <u>Loan Amortization Schedule</u>. The Loan Amortization Schedule attached as Exhibit "A-2" to the Second Amendment and the Second Amended Note is no longer valid and are hereby deemed null and void. The new Loan Amortization Schedule attached hereto and incorporated herein as Exhibit "A-3" replaces the prior Loan Amortization Schedule attached as Exhibit "A-2" to the Second Amendment and Second Amended Note.

7. <u>Loan Payments</u>. Borrower's payments pursuant to the Third Amended Note and as set forth herein shall be pursuant to new Loan Amortization Schedule attached hereto as Exhibit "A-3." The categories on the New Loan Amortization Schedule attached as Exhibit "A-3" are the same as the categories on Exhibit "A-2."

8. <u>Borrower's Representation</u>. In further consideration of the amendments and modifications set forth herein and in the Third Amended Loan Documents, and in order to induce the Lender to modify the Loan and Original Loan Documents, as further amended by the First Amended Loan Documents and Second Amended Loan Documents, Borrower hereby represents and warrants that as of this date: (a) Borrower has no defenses to any actions by the Lender based on or arising out of the Loan: (b) Borrower has no claims or causes of actions against the Lender based on or arising out of the Loan or any of the transactions involving same; and (c) the Lender is not in breach or default of any of the Original Loan Documents, First Amended Loan Documents or Second Amended Loan Documents, as amended herein.

9. <u>Work Stoppage</u>.

    a. The NHL currently operates under a ten (10) year Collective Bargaining Agreement ("CBA"), which expires on September 15, 2022. Pursuant to Article 3.1(b) of the CBA, both the League and the Players' Association have the right to terminate (i.e., opt out of) the current CBA prior to the scheduled expiration date of September 15, 2022. To do so, the League would need to notify the Players' Association on or before September 1, 2019 of its intention to opt of the CBA effective September 15, 2020, or if the League does not first opt out, the Players' Association would need to notify the League on or before September 15, 2019 of its intention to opt of the of the CBA effective September 15, 2020.

    b. In the event the League or the Players' Association elect to opt out of the CBA effective September 15, 2020 or at any time prior to the currently scheduled expiration date of September 15, 2022, the Loan and Note, as amended, shall be in default on the date that such notice is provided by the League or Players' Association to the other party (hereinafter "Trigger Date"). Borrower shall have an opportunity to cure the default as follows: within 30 days of the Trigger Date, Borrower and Lender shall enter into another amendment to the Security Agreement that addresses and satisfies all of Lender's concerns of repayment should a potential work stoppage result due to the CBA being terminated. Borrower acknowledges and understands that Lender is not under any obligation to enter into an amendment unless it determines, in its own discretion, that the amendment satisfactorily and fully addresses its insecurity of repayment should a work stoppage result.

Case: 21-50028    Doc# 123    Filed: 05/05/21    Entered: 05/05/21 13:04:36    Page 87 of 94

c.    If the NHL has a work stoppage due to the expiration of the CBA on September 15, 2022 or on any other date prior to the Maturity Date of the Loan, and in the event that no notice was previously provided prior to a work stoppage and, as such, there is no Trigger Date as defined above, the Loan and Note, as amended, shall be in default on the first date of a work stoppage. Under such circumstances, Borrower shall have an opportunity to cure the default as follows: within 30 days of the default date, Borrower and Lender shall enter into an amendment to the Security Agreement that addresses and satisfies all of Lender's concerns of repayment during the work stoppage. Borrower acknowledges and understands that Lender is not under any obligation to enter into an amendment unless it determines, in its own discretion, that the amendment satisfactorily and fully addresses its insecurity of repayment during the work stoppage.

10.    July 15, 2024 Payment.    Exhibit "A-3" requires Borrower to make a lump sum principal reduction payment of $1,060,000.00 on (or before) July 15, 2024.    The parties acknowledge that this $1,060,000.00 lump sum payment shall actually be due on or before July 1, 2024.

11.    Fees.    As consideration for Lender increasing the loan amount and agreeing to enter into this Third Amendment and the Third Amended Note, Borrower shall pay to Lender the fees and costs identified on the Loan Closing Statement for Third Amendment to Loan.

12.    Validity of the Original Loan Documents.    Except as expressly set forth herein, in the Third Amended Promissory Note or in the Third Amended Loan Documents, this Third Amendment shall not be deemed to have amended, modified or altered any of the terms, conditions or provisions of the Agreement, the First Amendment or Second Amendment, the Note, the First Amended Note or Second Amended Note, or other Original Loan Documents, First Amended Loan Documents or Second Amended Loan Documents, and such terms, conditions and provisions shall, in all respects, continue in full force and effect. If there shall be any conflict between the terms and provisions of this Third Amendment and the Original Loan Documents, First Amended Loan Documents or Second Amended Loan Documents, the terms and provisions of this Third Amendment shall control.

IN WITNESS WHEREOF, Borrower and Lender have executed this Third Amendment effective on the 30th day of April 2019.

*(remainder of page left blank – signature page to follow)*

3

Signature Page - Borrower
Third Amendment to Secured Financial Transaction and Security Agreement

**BORROWER:**

Evander Kane

STATE OF Colorado
COUNTY OF Denver

     I HEREBY CERTIFY that on this day, before me, an officer duly authorized in the State aforesaid and in the County aforesaid to take acknowledgements, the foregoing instrument was acknowledged before me by Evander Kane, . who is: _____ either personally known to me or __X__ has produced _CA Drivers License_ as identification.

     WITNESS by hand and official seal in the County and State last aforesaid this 30th day of April 2019.

> KAREN COFFEY
> NOTARY PUBLIC
> STATE OF COLORADO
> NOTARY ID 20064012163
> MY COMMISSION EXPIRES 3-29-22

NOTARY PUBLIC
Print Name: Karen Coffey
My commission expires: 3|29|22

4

Signature Page - Lender
Third Amendment to Secured Financial Transaction and Security Agreement

**LENDER:**

**CENTENNIAL BANK**
An Arkansas banking corporation

By: _Karen B Roth_
Karen Roth, Vice President

STATE OF FLORIDA
COUNTY OF BROWARD

    I HEREBY CERTIFY that on this day, before me, an officer duly authorized in the State aforesaid and in the County aforesaid to take acknowledgements, the foregoing instrument was acknowledged before by Karen Roth, as Vice President of Centennial Bank, an Arkansas banking corporation, who does freely and voluntarily under authority duly vested in her by said company. She is: _X_ either personally known to me or ____ has produced _____ as identification.

    WITNESS by hand and official seal in the County and State last aforesaid this 30 day of April 2019.

RENE MARIE DUCHESNEAU
Notary Public - State of Florida
Commission # GG 045889
My Comm. Expires Jan 15, 2021
Bonded through National Notary Assn.

NOTARY PUBLIC
Print Name: _Rene Duchesneau_
My commission expires: _1/15/21_

*(remainder of page left blank – Exhibit "A-3" to follow)*

5

# EXHIBIT "A-3" - LOAN AMORTIZATION SCHEDULE - EVANDER KANE $8MM Revised

Repayment Amount includes Scheduled Payment + 1/6 of interest reserve for the next off season
Total includes Repayment Amount, Insurance Escrow and SSL Fee

| PMT NO | PAYMENT DATE | BEGINNING BALANCE | REPAYMENT AMOUNT | INTEREST RESERVE | SCHEDULED PAYMENT | PRINCIPAL | INTEREST | ENDING BALANCE | INSURANCE ESCROW | SURESPORT $ FEE | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 5/15/2019 | $8,000,000.00 | $0.00 | $0.00 | $23,111.11 | $0.00 | $23,111.11 | $8,000,000.00 | $0.00 | $0.00 | $0.00 |
| 2 | 6/15/2019 | $8,000,000.00 | $0.00 | $0.00 | $44,717.78 | $0.00 | $44,717.78 | $8,000,000.00 | $0.00 | $0.00 | $0.00 |
| 3 | 7/15/2019 | $8,000,000.00 | $0.00 | $0.00 | $43,333.33 | $0.00 | $43,333.33 | $8,000,000.00 | $0.00 | $0.00 | $0.00 |
| 4 | 8/15/2019 | $8,000,000.00 | $0.00 | $0.00 | $44,777.78 | $0.00 | $44,777.78 | $8,000,000.00 | $0.00 | $0.00 | $0.00 |
| 5 | 9/15/2019 | $8,000,000.00 | $0.00 | $0.00 | $44,777.78 | $0.00 | $44,777.78 | $8,000,000.00 | $0.00 | $0.00 | $0.00 |
| 6 | 10/15/2019 | $8,000,000.00 | $0.00 | $0.00 | $43,333.33 | $0.00 | $43,333.33 | $8,000,000.00 | $0.00 | $0.00 | $0.00 |
| 7 | 11/15/2019 | $8,000,000.00 | $265,406.75 | $38,488.75 | $250,000.00 | $185,222.22 | $44,777.78 | $7,854,777.78 | $17,589.00 | $8,582.66 | $274,668.41 |
| 8 | 12/15/2019 | $7,854,777.78 | $265,406.75 | $38,496.75 | $250,000.00 | $207,561.82 | $42,438.18 | $7,647,216.15 | $17,589.00 | $8,582.66 | $274,668.41 |
| 9 | 1/15/2020 | $7,647,216.15 | $265,406.75 | $38,496.75 | $250,000.00 | $207,084.88 | $42,915.11 | $7,440,131.27 | $17,589.00 | $8,582.66 | $274,668.41 |
| 10 | 2/15/2020 | $7,550,131.27 | $265,406.75 | $38,496.75 | $250,000.00 | $208,509.16 | $41,929.90 | $7,232,111.17 | $17,589.00 | $8,582.66 | $274,668.41 |
| 11 | 3/15/2020 | $7,232,111.17 | $265,406.75 | $38,496.75 | $250,000.00 | $211,713.88 | $38,286.75 | $7,192,362.92 | $17,589.00 | $8,582.66 | $274,668.41 |
| 12 | 4/15/2020 | $7,192,362.92 | $265,406.75 | $38,496.75 | $250,000.00 | $185,921.02 | $40,078.93 | $6,990,581.85 | $17,589.00 | $8,582.66 | $274,668.41 |
| 13 | 5/15/2020 | $6,990,581.85 | $0.00 | $0.00 | $37,465.65 | $0.00 | $37,465.65 | $6,990,581.85 | $0.00 | $0.00 | $0.00 |
| 14 | 6/15/2020 | $6,990,581.85 | $0.00 | $0.00 | $39,127.84 | $0.00 | $39,127.84 | $6,990,581.85 | $0.00 | $0.00 | $0.00 |
| 15 | 7/15/2020 | $6,990,581.85 | $0.00 | $0.00 | $37,855.85 | $0.00 | $37,855.85 | $6,990,581.85 | $0.00 | $0.00 | $0.00 |
| 16 | 8/15/2020 | $6,990,581.85 | $0.00 | $0.00 | $39,127.84 | $0.00 | $39,127.84 | $6,990,581.85 | $0.00 | $0.00 | $0.00 |
| 17 | 9/15/2020 | $6,990,581.85 | $0.00 | $0.00 | $39,127.84 | $0.00 | $39,127.84 | $6,990,581.85 | $0.00 | $0.00 | $0.00 |
| 18 | 10/15/2020 | $6,990,581.85 | $0.00 | $0.00 | $37,855.85 | $0.00 | $37,855.85 | $6,990,581.85 | $0.00 | $0.00 | $0.00 |
| 19 | 11/15/2020 | $6,990,581.85 | $78,436.46 | $38,439.46 | $40,000.00 | $972.16 | $39,127.84 | $6,989,709.69 | $17,583.00 | $8,582.66 | $106,585.12 |
| 20 | 12/15/2020 | $6,989,709.69 | $78,439.46 | $38,439.46 | $40,000.00 | $2,173.07 | $37,806.93 | $6,987,570.61 | $17,583.00 | $8,582.66 | $106,585.12 |
| 21 | 1/15/2021 | $6,987,570.61 | $78,439.46 | $38,439.46 | $40,000.00 | $889.01 | $39,110.99 | $6,986,681.60 | $17,583.00 | $8,582.66 | $106,585.12 |
| 22 | 2/15/2021 | $6,986,681.60 | $78,439.46 | $38,439.46 | $40,000.00 | $4,682.86 | $35,317.04 | $6,981,104.63 | $17,583.00 | $8,582.66 | $106,585.12 |
| 23 | 3/15/2021 | $6,981,104.63 | $78,439.46 | $38,439.46 | $40,000.00 | $926.21 | $39,074.79 | $6,980,179.44 | $17,583.00 | $8,582.66 | $106,585.12 |
| 24 | 4/15/2021 | $6,980,179.44 | $0.00 | $0.00 | $37,809.71 | $0.00 | $37,809.71 | $6,980,179.44 | $0.00 | $0.00 | $0.00 |
| 25 | 5/15/2021 | $6,980,179.44 | $0.00 | $0.00 | $38,969.62 | $0.00 | $38,969.62 | $6,980,179.44 | $0.00 | $0.00 | $0.00 |
| 26 | 6/15/2021 | $6,980,179.44 | $0.00 | $0.00 | $37,809.72 | $0.00 | $37,809.72 | $6,980,179.44 | $0.00 | $0.00 | $0.00 |
| 27 | 7/16/2021 | $6,980,179.44 | $0.00 | $0.00 | $37,809.72 | $0.00 | $37,809.72 | $6,980,179.44 | $0.00 | $0.00 | $0.00 |
| 28 | 8/15/2021 | $6,980,179.44 | $0.00 | $0.00 | $39,969.62 | $0.00 | $39,969.62 | $6,980,179.44 | $0.00 | $0.00 | $0.00 |
| 29 | 9/15/2021 | $6,980,179.44 | $0.00 | $0.00 | $39,969.62 | $0.00 | $39,969.62 | $6,980,179.44 | $0.00 | $0.00 | $0.00 |
| 30 | 10/15/2021 | $6,980,179.44 | $0.00 | $0.00 | $37,809.31 | $0.00 | $37,809.31 | $6,980,179.44 | $0.00 | $0.00 | $0.00 |
| 31 | 11/15/2021 | $6,980,179.44 | $377,997.01 | $27,997.01 | $350,000.00 | $319,930.33 | $39,099.62 | $6,660,249.06 | $12,752.00 | $8,582.66 | $399,371.67 |
| 32 | 12/15/2021 | $6,660,249.06 | $377,997.01 | $27,997.01 | $350,000.00 | $313,874.92 | $36,125.10 | $6,350,374.15 | $12,752.00 | $8,582.66 | $399,371.67 |
| 33 | 1/15/2022 | $6,350,374.15 | $377,997.01 | $27,997.01 | $350,000.00 | $314,427.55 | $35,572.44 | $6,040,946.60 | $12,752.00 | $8,582.66 | $399,371.67 |
| 34 | 3/15/2022 | $6,040,946.60 | $377,997.01 | $27,997.01 | $350,000.00 | $316,187.44 | $33,812.50 | $5,724,759.12 | $12,752.00 | $8,582.66 | $326,371.67 |
| 35 | 3/15/2022 | $5,724,759.12 | $377,997.01 | $27,997.01 | $350,000.00 | $321,058.36 | $28,941.84 | $5,409,700.93 | $12,752.00 | $8,582.66 | $329,371.67 |
| 36 | 4/15/2022 | $5,409,700.93 | $377,997.01 | $27,997.01 | $350,000.00 | $319,754.28 | $30,245.12 | $5,083,946.87 | $12,752.00 | $8,582.66 | $339,371.67 |
| 37 | 5/15/2022 | $5,083,946.87 | $0.00 | $0.00 | $27,539.04 | $0.00 | $27,539.04 | $5,083,946.87 | $0.00 | $0.00 | $0.00 |
| 38 | 6/15/2022 | $5,083,946.87 | $0.00 | $0.00 | $28,455.96 | $0.00 | $28,455.96 | $5,083,946.87 | $0.00 | $0.00 | $0.00 |
| 39 | 7/15/2022 | $5,083,946.87 | $0.00 | $0.00 | $27,538.04 | $0.00 | $27,538.04 | $5,083,946.87 | $0.00 | $0.00 | $0.00 |
| 40 | 8/15/2022 | $5,083,946.87 | $0.00 | $0.00 | $28,455.98 | $0.00 | $28,455.98 | $5,083,946.87 | $0.00 | $0.00 | $0.00 |
| 41 | 9/15/2022 | $5,083,946.87 | $0.00 | $0.00 | $28,455.98 | $0.00 | $28,455.98 | $5,083,946.87 | $0.00 | $0.00 | $0.00 |
| 42 | 10/15/2022 | $5,083,946.87 | $0.00 | $0.00 | $27,538.04 | $0.00 | $27,538.04 | $5,083,946.87 | $0.00 | $0.00 | $0.00 |
| 43 | 11/15/2022 | $5,083,946.87 | $222,250.84 | $22,230.64 | $200,000.00 | $171,544.02 | $28,455.98 | $4,912,402.85 | $10,157.00 | $8,582.66 | $240,970.50 |
| 44 | 12/15/2022 | $4,912,402.85 | $222,230.84 | $22,230.84 | $200,000.00 | $173,251.15 | $26,690.85 | $4,739,011.50 | $10,157.00 | $8,582.66 | $240,970.50 |
| 45 | 1/15/2023 | $4,739,011.50 | $222,230.84 | $22,230.84 | $200,000.00 | $173,474.78 | $26,525.30 | $4,565,536.60 | $10,157.00 | $8,582.66 | $240,970.50 |
| 46 | 2/15/2023 | $4,565,536.60 | $222,230.84 | $22,230.84 | $200,000.00 | $174,445.69 | $25,554.32 | $4,391,091.12 | $10,157.00 | $8,582.66 | $240,970.50 |
| 47 | 3/15/2023 | $4,391,091.12 | $222,230.84 | $22,230.84 | $200,000.00 | $177,809.59 | $22,189.41 | $4,213,290.53 | $10,157.00 | $8,582.66 | $240,970.50 |
| 48 | 4/15/2023 | $4,213,290.53 | $222,230.84 | $22,230.84 | $200,000.00 | $178,412.26 | $23,682.72 | $4,035,678.26 | $10,157.00 | $8,582.66 | $240,970.50 |
| 49 | 5/15/2023 | $4,035,678.26 | $0.00 | $0.00 | $21,666.40 | $0.00 | $21,866.40 | $4,035,678.26 | $0.00 | $0.00 | $0.00 |
| 50 | 6/15/2023 | $4,035,673.26 | $0.00 | $0.00 | $22,555.39 | $0.00 | $22,555.39 | $4,035,673.26 | $0.00 | $0.00 | $0.00 |
| 51 | 7/15/2023 | $4,035,673.26 | $0.00 | $0.00 | $21,866.40 | $0.00 | $21,866.40 | $4,036,673.26 | $0.00 | $0.00 | $0.00 |
| 52 | 8/15/2023 | $4,035,673.26 | $0.00 | $0.00 | $22,361.79 | $0.00 | $22,365.38 | $4,036,673.26 | $0.00 | $0.00 | $0.00 |
| 53 | 9/15/2023 | $4,035,673.26 | $0.00 | $0.00 | $22,565.38 | $0.00 | $22,565.38 | $4,036,673.26 | $0.00 | $0.00 | $0.00 |
| 54 | 10/15/2023 | $4,035,673.26 | $0.00 | $0.00 | $21,866.40 | $0.00 | $21,866.40 | $4,035,673.26 | $0.00 | $0.00 | $0.00 |
| 55 | 11/15/2023 | $4,035,673.26 | $334,153.90 | $9,153.90 | $325,000.00 | $302,484.72 | $22,559.29 | $3,734,484.53 | $1,666.00 | $12,138.35 | $347,958.91 |
| 56 | 12/15/2023 | $3,734,484.53 | $334,153.90 | $9,153.90 | $325,000.00 | $304,271.63 | $20,228.37 | $3,429,586.90 | $1,666.00 | $12,138.35 | $347,958.31 |
| 57 | 1/15/2024 | $3,429,586.90 | $334,153.90 | $9,153.90 | $325,000.00 | $305,903.22 | $19,096.99 | $3,123,955.57 | $1,666.00 | $12,138.35 | $347,958.91 |
| 58 | 2/15/2024 | $3,123,093.87 | $334,153.90 | $9,153.90 | $325,000.00 | $307,514.37 | $17,485.35 | $2,816,129.60 | $1,666.00 | $12,138.35 | $347,958.31 |
| 59 | 3/15/2024 | $2,816,378.60 | $334,153.90 | $9,153.90 | $325,000.00 | $310,233.13 | $14,745.87 | $2,506,125.97 | $1,666.00 | $12,138.35 | $347,958.31 |
| 60 | 4/15/2024 | $2,506,125.97 | $334,153.90 | $9,153.90 | $325,000.00 | $310,972.93 | $14,027.52 | $2,195,153.01 | $1,666.00 | $12,138.35 | $347,958.31 |
| 61 | 5/15/2024 | $2,195,153.01 | $0.00 | $0.00 | $11,890.41 | $0.00 | $11,890.41 | $2,195,153.01 | $0.00 | $0.00 | $0.00 |
| 62 | 6/15/2024 | $2,195,153.01 | $0.00 | $0.00 | $12,288.70 | $0.00 | $12,288.70 | $2,195,153.01 | $0.00 | $0.00 | $0.00 |
| 63 | 7/15/2024 | $3,195,153.01 | $1,050,000.00 | $0.00 | $1,071,890.41 | $1,060,000.00 | $11,890.41 | $1,135,153.01 | $0.00 | $0.00 | $1,050,000.00 |
| 64 | 8/15/2024 | $1,135,153.01 | $0.00 | $0.00 | $6,350.70 | $0.00 | $6,350.70 | $1,135,153.01 | $0.00 | $0.00 | $0.00 |
| 65 | 9/15/2024 | $1,135,153.01 | $0.00 | $0.00 | $6,350.29 | $0.00 | $6,350.29 | $1,135,153.01 | $0.00 | $0.00 | $0.00 |
| 66 | 10/15/2024 | $1,135,153.01 | $0.00 | $0.00 | $6,148.75 | $0.00 | $6,148.75 | $1,135,153.01 | $0.00 | $0.00 | $0.00 |
| 67 | 11/15/2024 | $1,135,153.01 | $192,853.00 | $0.00 | $192,853.00 | $186,493.30 | $6,359.70 | $948,653.72 | $0.00 | $12,138.35 | $204,991.35 |
| 68 | 12/15/2024 | $948,653.72 | $192,853.00 | $0.00 | $192,853.00 | $187,714.49 | $5,138.51 | $760,939.20 | $0.00 | $12,138.35 | $204,991.35 |
| 69 | 1/15/2025 | $760,939.20 | $192,853.00 | $0.00 | $192,853.00 | $188,593.95 | $4,259.15 | $572,345.31 | $0.00 | $12,138.35 | $204,991.35 |
| 70 | 2/15/2025 | $572,345.31 | $192,853.00 | $0.00 | $192,853.00 | $189,649.49 | $3,203.51 | $382,695.96 | $0.00 | $12,138.35 | $204,991.35 |
| 71 | 3/15/2025 | $382,695.96 | $192,853.00 | $0.00 | $192,853.00 | $190,918.18 | $1,934.74 | $191,777.89 | $0.00 | $12,138.35 | $204,991.35 |
| 72 | 4/15/2025 | $191,777.89 | $192,853.00 | $0.00 | $192,853.00 | $191,779.58 | $1,073.42 | $0.00 | $0.00 | $12,138.35 | $204,991.35 |

# EXHIBIT "A-3" - LOAN AMORTIZATION SCHEDULE - EVANDER KANE $8MM Revised

Repayment Amount includes Scheduled Payment + 1/6 of Interest reserve for the next off season.
Total includes Repayment Amount, Insurance Escrow and SSL Fee

| PMT NO | PAYMENT DATE | BEGINNING BALANCE | REPAYMENT AMOUNT | INTEREST RESERVE | SCHEDULED PAYMENT | PRINCIPAL | INTEREST | ENDING BALANCE | INSURANCE ESCROW | SURESPORTS FEE | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 5/15/2019 | $8,000,000.00 | $0.00 | $0.00 | $23,111.11 | $0.00 | $23,111.11 | $8,000,000.00 | $0.00 | $0.00 | $0.00 |
| 2 | 6/15/2019 | $8,000,000.00 | $0.00 | $0.00 | $44,777.78 | $0.00 | $44,777.78 | $8,000,000.00 | $0.00 | $0.00 | $0.00 |
| 3 | 7/15/2019 | $8,000,000.00 | $0.00 | $0.00 | $43,333.33 | $0.00 | $43,333.33 | $8,000,000.00 | $0.00 | $0.00 | $0.00 |
| 4 | 8/15/2019 | $8,000,000.00 | $0.00 | $0.00 | $44,777.78 | $0.00 | $44,777.78 | $8,000,000.00 | $0.00 | $0.00 | $0.00 |
| 5 | 9/15/2019 | $8,000,000.00 | $0.00 | $0.00 | $44,777.78 | $0.00 | $44,777.78 | $8,000,000.00 | $0.00 | $0.00 | $0.00 |
| 6 | 10/15/2019 | $8,000,000.00 | $0.00 | $0.00 | $43,333.33 | $0.00 | $43,333.33 | $8,000,000.00 | $0.00 | $0.00 | $0.00 |
| 7 | 11/15/2019 | $8,000,000.00 | $248,496.75 | $38,496.75 | $210,000.00 | $165,222.22 | $44,777.78 | $7,834,777.78 | $17,589.00 | $8,582.66 | $274,668.41 |
| 8 | 12/15/2019 | $7,834,777.78 | $248,496.75 | $38,496.75 | $210,000.00 | $167,561.82 | $42,438.38 | $7,667,216.16 | $17,589.00 | $8,582.66 | $274,668.41 |
| 9 | 1/15/2020 | $7,667,216.16 | $248,496.75 | $38,496.75 | $210,000.00 | $167,084.93 | $42,915.11 | $7,500,131.27 | $17,589.00 | $8,582.66 | $274,668.41 |
| 10 | 2/15/2020 | $7,500,131.27 | $248,496.75 | $38,496.75 | $210,000.00 | $168,020.10 | $41,979.90 | $7,332,111.17 | $17,589.00 | $8,582.66 | $274,668.41 |
| 11 | 3/15/2020 | $7,332,111.17 | $248,496.75 | $38,496.75 | $210,000.00 | $171,608.25 | $38,391.75 | $7,160,502.92 | $17,589.00 | $8,582.66 | $274,668.41 |
| 12 | 4/15/2020 | $7,160,502.92 | $248,496.75 | $38,496.75 | $210,000.00 | $169,921.07 | $40,078.93 | $6,990,581.85 | $17,589.00 | $8,582.66 | $274,668.41 |
| 13 | 5/15/2020 | $6,990,581.85 | $0.00 | $0.00 | $37,865.65 | $0.00 | $37,865.65 | $6,990,581.85 | $0.00 | $0.00 | $0.00 |
| 14 | 6/15/2020 | $6,990,581.85 | $0.00 | $0.00 | $39,127.84 | $0.00 | $39,127.84 | $6,990,581.85 | $0.00 | $0.00 | $0.00 |
| 15 | 7/15/2020 | $6,990,581.85 | $0.00 | $0.00 | $37,865.65 | $0.00 | $37,865.65 | $6,990,581.85 | $0.00 | $0.00 | $0.00 |
| 16 | 8/15/2020 | $6,990,581.85 | $0.00 | $0.00 | $39,127.84 | $0.00 | $39,127.84 | $6,990,581.85 | $0.00 | $0.00 | $0.00 |
| 17 | 9/15/2020 | $6,990,581.85 | $0.00 | $0.00 | $39,127.84 | $0.00 | $39,127.84 | $6,990,581.85 | $0.00 | $0.00 | $0.00 |
| 18 | 10/15/2020 | $6,990,581.85 | $0.00 | $0.00 | $37,865.65 | $0.00 | $37,865.65 | $6,990,581.85 | $0.00 | $0.00 | $0.00 |
| 19 | 11/15/2020 | $6,990,581.85 | $78,439.46 | $38,439.46 | $40,000.00 | $872.16 | $39,127.84 | $6,989,709.69 | $17,563.00 | $8,582.66 | $104,585.12 |
| 20 | 12/15/2020 | $6,989,709.69 | $78,439.46 | $38,439.46 | $40,000.00 | $2,139.07 | $37,860.93 | $6,987,570.61 | $17,563.00 | $8,582.66 | $104,585.12 |
| 21 | 1/15/2021 | $6,987,570.61 | $78,439.46 | $38,439.46 | $40,000.00 | $889.01 | $39,110.99 | $6,986,681.60 | $17,563.00 | $8,582.66 | $104,585.12 |
| 22 | 2/15/2021 | $6,986,681.60 | $78,439.46 | $38,439.46 | $40,000.00 | $893.39 | $39,106.61 | $6,985,787.61 | $17,563.00 | $8,582.66 | $104,585.12 |
| 23 | 3/15/2021 | $6,985,787.61 | $78,439.46 | $38,439.46 | $40,000.00 | $4,682.96 | $35,317.04 | $6,981,104.65 | $17,563.00 | $8,582.66 | $104,585.12 |
| 24 | 4/15/2021 | $6,981,104.65 | $78,439.46 | $38,439.46 | $40,000.00 | $825.21 | $39,074.79 | $6,980,179.44 | $17,563.00 | $8,582.66 | $104,585.12 |
| 25 | 5/15/2021 | $6,980,179.44 | $0.00 | $0.00 | $37,809.31 | $0.00 | $37,809.31 | $6,980,179.44 | $0.00 | $0.00 | $0.00 |
| 26 | 6/15/2021 | $6,980,179.44 | $0.00 | $0.00 | $39,069.62 | $0.00 | $39,069.62 | $6,980,179.44 | $0.00 | $0.00 | $0.00 |
| 27 | 7/15/2021 | $6,980,179.44 | $0.00 | $0.00 | $37,809.31 | $0.00 | $37,809.31 | $6,980,179.44 | $0.00 | $0.00 | $0.00 |
| 28 | 8/15/2021 | $6,980,179.44 | $0.00 | $0.00 | $39,069.62 | $0.00 | $39,069.62 | $6,980,179.44 | $0.00 | $0.00 | $0.00 |
| 29 | 9/15/2021 | $6,980,179.44 | $0.00 | $0.00 | $39,069.62 | $0.00 | $39,069.62 | $6,980,179.44 | $0.00 | $0.00 | $0.00 |
| 30 | 10/15/2021 | $6,980,179.44 | $0.00 | $0.00 | $37,809.31 | $0.00 | $37,809.31 | $6,980,179.44 | $0.00 | $0.00 | $0.00 |
| 31 | 11/15/2021 | $6,980,179.44 | $377,997.01 | $27,997.01 | $350,000.00 | $310,930.38 | $39,069.62 | $6,669,249.06 | $12,792.00 | $8,582.66 | $399,371.67 |
| 32 | 12/15/2021 | $6,669,249.06 | $377,997.01 | $27,997.01 | $350,000.00 | $313,874.00 | $36,125.10 | $6,355,374.15 | $12,792.00 | $8,582.66 | $399,371.67 |
| 33 | 1/15/2022 | $6,355,374.15 | $377,997.01 | $27,997.01 | $350,000.00 | $314,427.56 | $35,572.44 | $6,040,946.60 | $12,792.00 | $8,582.66 | $399,371.67 |
| 34 | 2/15/2022 | $6,040,946.60 | $377,997.01 | $27,997.01 | $350,000.00 | $316,187.48 | $33,812.52 | $5,724,759.12 | $12,792.00 | $8,582.66 | $399,371.67 |
| 35 | 3/15/2022 | $5,724,759.12 | $377,997.01 | $27,997.01 | $350,000.00 | $321,055.16 | $28,941.84 | $5,403,700.95 | $12,792.00 | $8,582.66 | $399,371.67 |
| 36 | 4/15/2022 | $5,403,700.95 | $377,997.01 | $27,997.01 | $350,000.00 | $319,754.28 | $30,245.72 | $5,083,946.67 | $12,792.00 | $8,582.66 | $399,371.67 |
| 37 | 5/15/2022 | $5,083,946.67 | $0.00 | $0.00 | $27,538.04 | $0.00 | $27,538.04 | $5,083,946.67 | $0.00 | $0.00 | $0.00 |
| 38 | 6/15/2022 | $5,083,946.67 | $0.00 | $0.00 | $28,455.98 | $0.00 | $28,455.98 | $5,083,946.67 | $0.00 | $0.00 | $0.00 |
| 39 | 7/15/2022 | $5,083,946.67 | $0.00 | $0.00 | $27,538.04 | $0.00 | $27,538.04 | $5,083,946.67 | $0.00 | $0.00 | $0.00 |
| 40 | 8/15/2022 | $5,083,946.67 | $0.00 | $0.00 | $28,455.98 | $0.00 | $28,455.98 | $5,083,946.67 | $0.00 | $0.00 | $0.00 |
| 41 | 9/15/2022 | $5,083,946.67 | $0.00 | $0.00 | $28,455.98 | $0.00 | $28,455.98 | $5,083,946.67 | $0.00 | $0.00 | $0.00 |
| 42 | 10/15/2022 | $5,083,946.67 | $0.00 | $0.00 | $27,538.04 | $0.00 | $27,538.04 | $5,083,946.67 | $0.00 | $0.00 | $0.00 |
| 43 | 11/15/2022 | $5,083,946.67 | $222,230.84 | $22,230.84 | $200,000.00 | $171,544.02 | $28,455.98 | $4,912,402.65 | $10,157.00 | $8,582.66 | $240,970.50 |
| 44 | 12/15/2022 | $4,912,402.65 | $222,230.84 | $22,230.84 | $200,000.00 | $173,391.15 | $26,608.85 | $4,739,011.50 | $10,157.00 | $8,582.66 | $240,970.50 |
| 45 | 1/15/2023 | $4,739,011.50 | $222,230.84 | $22,230.84 | $200,000.00 | $173,474.70 | $26,525.30 | $4,565,536.80 | $10,157.00 | $8,582.66 | $240,970.50 |
| 46 | 2/15/2023 | $4,565,536.80 | $222,230.84 | $22,230.84 | $200,000.00 | $174,445.68 | $25,554.32 | $4,391,091.12 | $10,157.00 | $8,582.66 | $240,970.50 |
| 47 | 3/15/2023 | $4,391,091.12 | $222,230.84 | $22,230.84 | $200,000.00 | $177,800.59 | $22,199.41 | $4,213,290.53 | $10,157.00 | $8,582.66 | $240,970.50 |
| 48 | 4/15/2023 | $4,213,290.53 | $222,230.84 | $22,230.84 | $200,000.00 | $176,417.28 | $23,582.72 | $4,036,873.25 | $10,157.00 | $8,582.66 | $240,970.50 |
| 49 | 5/15/2023 | $4,036,873.25 | $0.00 | $0.00 | $21,866.40 | $0.00 | $21,866.40 | $4,036,873.25 | $0.00 | $0.00 | $0.00 |
| 50 | 6/15/2023 | $4,036,873.25 | $0.00 | $0.00 | $22,595.28 | $0.00 | $22,595.28 | $4,036,873.25 | $0.00 | $0.00 | $0.00 |
| 51 | 7/15/2023 | $4,036,873.25 | $0.00 | $0.00 | $21,866.40 | $0.00 | $21,866.40 | $4,036,873.25 | $0.00 | $0.00 | $0.00 |
| 52 | 8/15/2023 | $4,036,873.25 | $0.00 | $0.00 | $22,595.28 | $0.00 | $22,595.28 | $4,036,873.25 | $0.00 | $0.00 | $0.00 |
| 53 | 9/15/2023 | $4,036,873.25 | $0.00 | $0.00 | $22,595.28 | $0.00 | $22,595.28 | $4,036,873.25 | $0.00 | $0.00 | $0.00 |
| 54 | 10/15/2023 | $4,036,873.25 | $0.00 | $0.00 | $21,866.40 | $0.00 | $21,866.40 | $4,036,873.25 | $0.00 | $0.00 | $0.00 |
| 55 | 11/15/2023 | $4,036,873.25 | $334,153.96 | $9,153.96 | $325,000.00 | $302,404.72 | $22,595.28 | $3,734,468.53 | $1,866.00 | $12,138.35 | $347,368.31 |
| 56 | 12/15/2023 | $3,734,468.53 | $334,153.96 | $9,153.96 | $325,000.00 | $304,771.63 | $20,228.37 | $3,429,696.90 | $1,866.00 | $12,138.35 | $347,368.31 |
| 57 | 1/15/2024 | $3,429,696.90 | $334,153.96 | $9,153.96 | $325,000.00 | $305,803.22 | $19,196.78 | $3,123,893.67 | $1,866.00 | $12,138.35 | $347,368.31 |
| 58 | 2/15/2024 | $3,123,893.67 | $334,153.96 | $9,153.96 | $325,000.00 | $307,514.87 | $17,485.13 | $2,816,378.80 | $1,866.00 | $12,138.35 | $347,368.31 |
| 59 | 3/15/2024 | $2,816,378.80 | $334,153.96 | $9,153.96 | $325,000.00 | $310,253.13 | $14,746.87 | $2,506,125.67 | $1,866.00 | $12,138.35 | $347,368.31 |
| 60 | 4/15/2024 | $2,506,125.67 | $334,153.96 | $9,153.96 | $325,000.00 | $310,972.88 | $14,027.34 | $2,195,153.01 | $1,866.00 | $12,138.35 | $347,368.31 |
| 61 | 5/15/2024 | $2,195,153.01 | $0.00 | $0.00 | $11,890.41 | $0.00 | $11,890.41 | $2,195,153.01 | $0.00 | $0.00 | $0.00 |
| 62 | 6/15/2024 | $2,195,153.01 | $0.00 | $0.00 | $12,286.76 | $0.00 | $12,286.76 | $2,195,153.01 | $0.00 | $0.00 | $0.00 |
| 63 | 7/15/2024 | $2,195,153.01 | $1,060,000.00 | $0.00 | $1,071,890.41 | $1,060,000.00 | $11,890.41 | $1,135,153.01 | $0.00 | $0.00 | $1,060,000.00 |
| 64 | 8/15/2024 | $1,135,153.01 | $0.00 | $0.00 | $6,353.70 | $0.00 | $6,353.70 | $1,135,153.01 | $0.00 | $0.00 | $0.00 |
| 65 | 9/15/2024 | $1,135,153.01 | $0.00 | $0.00 | $6,353.70 | $0.00 | $6,353.70 | $1,135,153.01 | $0.00 | $0.00 | $0.00 |
| 66 | 10/15/2024 | $1,135,153.01 | $0.00 | $0.00 | $6,148.75 | $0.00 | $6,148.75 | $1,135,153.01 | $0.00 | $0.00 | $0.00 |
| 67 | 11/15/2024 | $1,135,153.01 | $192,853.00 | $0.00 | $192,853.00 | $186,499.30 | $6,353.70 | $948,653.72 | $0.00 | $12,138.35 | $204,991.35 |
| 68 | 12/15/2024 | $948,653.72 | $192,853.00 | $0.00 | $192,853.00 | $187,714.46 | $5,138.54 | $760,939.26 | $0.00 | $12,138.35 | $204,991.35 |
| 69 | 1/15/2025 | $760,939.26 | $192,853.00 | $0.00 | $192,853.00 | $188,593.85 | $4,259.15 | $572,345.41 | $0.00 | $12,138.35 | $204,991.35 |
| 70 | 2/15/2025 | $572,345.41 | $192,853.00 | $0.00 | $192,853.00 | $189,649.46 | $3,203.54 | $382,695.95 | $0.00 | $12,138.35 | $204,991.35 |
| 71 | 3/15/2025 | $382,695.95 | $192,853.00 | $0.00 | $192,853.00 | $190,918.26 | $1,934.74 | $191,777.69 | $0.00 | $12,138.35 | $204,991.35 |
| 72 | 4/15/2025 | $191,777.69 | $192,853.00 | $0.00 | $192,853.00 | $191,779.58 | $1,073.42 | $0.00 | $0.00 | $12,138.35 | $204,991.35 |

## LOAN CLOSING STATEMENT FOR THIRD AMENDMENT TO LOAN

| | | |
|---|---|---|
| **BORROWER:** | | **EVANDER KANE** |
| **LENDER:** | | **CENTENNIAL BANK** |
| **EFFECTIVE CLOSING DATE:** | | **APRIL 30, 2019** |
| **LOAN NUMBER:** | | ███1221 |

---

| | |
|---|---|
| **EXISTING BALANCE OF LOAN PRIOR TO AMENDMENT** | **$5,539,501.89** |
| **PRINCIPAL BALANCE OF LOAN AS OF EFFECTIVE DATE** | **$8,000,000.00** |
| **NEW MONEY PROVIDED:** | **$2,460,498.11** |

**1. LENDER FEES, EXPENSES & HOLDBACK**

| | | |
|---|---|---|
| Lender's Fee | $ | 18,453.74 |
| Lender's Attorney Fees to Joseph B. Heimovics, P.A. | $ | 1,300.00 |
| 10-day Interest Reserve Supplement | $ | 4,442.57 |
| Interest Reserve Holdback for 2019-20 Offseason | $ | 75,079.37 |
| Holdback for Death & Disgrace Ins. Escrow (est. on 9/5/2019 renewal) | $ | 6,136.38 |

**2. AMOUNTS TO BE PAID TO OTHERS ON BORROWER'S BEHALF**

| | | |
|---|---|---|
| Underwriting Fee to Sure Sports, LLC | $ | Deferred |
| Savings Fee to Sure Sports, LLC (on $106,199 Savings) | $ | Deferred |
| Legal/Closing Fee to Sure Sports, LLC (estimated) | $ | 7,500.00 |
| Replacement of Advance from Cal. Bank & Trust MMA ending 8899 | $ | 31,071.83 |

**3. PAYOFF TO EXISTING LENDERS**

| | |
|---|---|
| Payment to South River Capital, LLC for payoff of Loan dated 3/26/2019 | $1,916,666.67 |

| | |
|---|---|
| **TOTAL FEES, EXPENSES AND PAYOFFS** | **$2,060,650.56** |
| **CASH DUE BORROWER FROM LENDER:** | **$ 399,847.55** |

Joseph B. Heimovics, P.A.
15951 SW 41st Street, Suite 800
Davie, FL 33331

**CLOSING NOTES**

Borrower is responsible for all costs and expenses of the above-described Loan transaction, including, without limitation, insurances, surveys, appraisals, registration charges, Lender's attorney's fees and other matters required by the Lender. In the event the amounts above are insufficient to cover all costs and expenses, Borrower shall reimburse Lender for any such insufficiency upon demand.

Borrower acknowledges that Lender has retained Joseph B. Heimovics, P.A. ("Law Firm") as Lender's legal counsel in the subject Loan transaction for the exclusive and sole benefit of Lender. Notwithstanding that Law Firm's legal fees and costs are being charged to the Borrower as part of the Loan costs, Borrower acknowledges that Law Firm has only represented the Lender with respect to the Loan transaction. Borrower further acknowledges that Law Firm has made no legal representatives to Borrower with respect to the Loan or any matter connected with the Loan, and that Borrower has not relied upon Law Firm in any way whatsoever with respect to the Loan or any matter in connection with the Loan transaction.

The undersigned Borrower agrees to cooperate promptly with the Lender and its agents in the connection or completion of any of the loan documents after closing, if deemed necessary or desirable by Lender. Borrower understands that this may include the execution of additional or corrected documents consistent with the agreed upon loan terms.

Borrower has received a true copy of the above and hereby approves same and certifies that it is correct and hereby authorize Closing Agent to disburse the aforesaid costs.

BORROWER:


BY: _____
Evander Kane


Effectively Dated April 30, 2019.

Joseph B. Heimovics, P.A.
15951 SW 41st Street, Suite 800
Davie, FL 33331