United States Bankruptcy Court

Northern District of California

In re:                                                                  Case No. 21-50028-SLJ

Evander Frank Kane                                                      Chapter 7
    Debtor

# CERTIFICATE OF NOTICE

District/off: 0971-5                          User: admin                                Page 1 of 2

Date Rcvd: May 04, 2021                       Form ID: pdfnoa                            Total Noticed: 2

The following symbols are used throughout this certificate:
**Symbol**      **Definition**

\+              Addresses marked '+' were corrected by inserting the ZIP, adding the last four digits to complete the zip +4, or replacing an incorrect ZIP. USPS
         regulations require that automation-compatible mail display the correct ZIP.

**Notice by first class mail was sent to the following persons/entities by the Bankruptcy Noticing Center on May 06, 2021:**

**Recip ID**              **Recipient Name and Address**

       +  Heinz Binder, BINDER & MALTER, LLP, 2775 Park Avenue, Santa Clara, CA 95050-6004

       +  Jennifer C. Hayes, 456 Montgomery St., Fl. 20, San Francisco, CA 94104-1233

TOTAL: 2

**Notice by electronic transmission was sent to the following persons/entities by the Bankruptcy Noticing Center.**
Electronic transmission includes sending notices via email (Email/text and Email/PDF), and electronic data interchange (EDI).

NONE

# BYPASSED RECIPIENTS

**The following addresses were not sent this bankruptcy notice due to an undeliverable address, *duplicate of an address listed above, *P duplicate of a preferred address, or ## out of date forwarding orders with USPS.**

NONE

# NOTICE CERTIFICATION

**I, Joseph Speetjens, declare under the penalty of perjury that I have sent the attached document to the above listed entities in the manner shown, and prepared the Certificate of Notice and that it is true and correct to the best of my information and belief.**

**Meeting of Creditor Notices only (Official Form 309): Pursuant to Fed .R. Bank. P.2002(a)(1), a notice containing the complete Social Security Number (SSN) of the debtor(s) was furnished to all parties listed. This official court copy contains the redacted SSN as required by the bankruptcy rules and the Judiciary's privacy policies.**

Date: May 06, 2021                    Signature:        /s/Joseph Speetjens

---

# CM/ECF NOTICE OF ELECTRONIC FILING

**The following persons/entities were sent notice through the court's CM/ECF electronic mail (Email) system on May 4, 2021 at the address(es) listed below:**

**Name**                  **Email Address**

Andrew J. Ghekas
    on behalf of Creditor Centennial Bank  N.A. aghekas@anthonyandpartners.com, crodriguez@anthonyandpartners.com

Christopher O. Rivas
    on behalf of Creditor Loan Shark Holdings  LLC crivas@reedsmith.com, chris-rivas-8658@ecf.pacerpro.com

David B. Rao
    on behalf of Plaintiff South River Capital LLC David@bindermalter.com

Fred Hjelmeset
    fhtrustee@gmail.com  CA90@ecfcbis.com

Gerrick Warrington
    on behalf of Creditor Zions Bancorporation  N.A. gwarrington@frandzel.com, sking@frandzel.com

Gregg S. Kleiner
    on behalf of Trustee Fred Hjelmeset gkleiner@rinconlawllp.com  aworthing@rinconlawllp.com

John A. Anthony
    on behalf of Creditor Centennial Bank  N.A. janthony@anthonyandpartners.com, sdavis@anthonyandpartners.com

Jonathan Lewis
    on behalf of Plaintiff Hope Parker jonlewis@jlewislaw.com

Marta Villacorta
    on behalf of U.S. Trustee Office of the U.S. Trustee / SJ marta.villacorta@usdoj.gov

Michael Gerard Fletcher
    on behalf of Creditor Zions Bancorporation  N.A. mfletcher@frandzel.com, sking@frandzel.com

Office of the U.S. Trustee / SJ
    USTPRegion17.SJ.ECF@usdoj.gov

Peter C. Califano
    on behalf of Creditor Centennial Bank  N.A. pcalifano@cwclaw.com

Reed S. Waddell
    on behalf of Creditor Zions Bancorporation  N.A. rwaddell@frandzel.com, sking@frandzel.com

Richard L. Pierotti
    Rpierotti@kpmd.com

Robert B. Kaplan
    on behalf of Creditor Sure Sports  LLC rbk@jmbm.com

Ryan A. Witthans
    on behalf of Debtor Evander Frank Kane rwitthans@fhlawllp.com

Stephen D. Finestone
    on behalf of Debtor Evander Frank Kane sfinestone@fhlawllp.com

Stephen G. Opperwall
    on behalf of Creditor Professional Bank steve.opperwall@comcast.net

Thomas M. Geher
    on behalf of Creditor Sure Sports  LLC tmg@jmbm.com, tmg@ecf.inforuptcy.com

Wendy W. Smith
    on behalf of Requestor South River Capital LLC Wendy@bindermalter.com

TOTAL: 20

1 | Heinz Binder (SBN 87908)
2 | Wendy Watrous Smith (SBN 133887)
    David B. Rao (SBN 103147))
3 | BINDER & MALTER, LLP
    2775 Park Avenue
4 | Santa Clara, CA 95050
    T: (408) 295-1700
5 | F: (408) 295-1531
    Email: heinz@bindermalter.com
6 | Email: wendy@bindermalter.com
    Email: david@bindermalter.com

7 | Attorneys for Appellant South River Capital, LLC

8 |

9 |                     UNITED STATES BANKRUPTCY COURT

10 |            NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE DIVISION

11 |

12 | In re:                                    Case No.   21-50028 SLJ

13 | EVANDER F. KANE,                          Chapter 7

14 |

15 |

16 |                              Debtor.

17 |

18 |                            __NOTICE OF APPEAL__

19 |        Creditor South River Capital, LLC ("Appellant") hereby appeals under 28 U.S.C. §158(a)

20 | from the Order Denying Motion to Convert (the "Order") (ECF No. 101) in the above captioned

21 | bankruptcy case (attached hereto as Exhibit "A") entered on April 19, 2021 by the United States

22 | Bankruptcy Court.  Appellant is simultaneously filing a notice of election that the appeal be

23 | heard by the United States District Court.  The parties to the Order being appealed from and the

24 | names, addresses, and telephone numbers of the respective attorneys are as follows:

25 | ///

26 | ///

27 | ///

28 |

NOTICE OF APPEAL

**Appellant**

South River Capital, LLC, creditor
Counsel for South River Capital, LLC:

Heinz Binder
Wendy Watrous Smith
David B. Rao
2775 Park Avenue
Santa Clara, CA 95050
(408) 295-1700

**Matter on appeal**

Order Denying Motion to Convert, entered on April 19, 2021

**Other parties to the appeal**

1.  Debtor/Appellee, Evander Frank Kane
    Counsel for Debtor/Appellee:

    Stephen D. Finestone
    Jennifer C. Hayes
    Ryan A. Witthans
    Finestone Hayes LLP
    456 Montgomery Street, Floor 20
    San Francisco, CA 94104
    Email: sfinestone@fhlawllp.com
           jhayes@fhlawllp.com
           rwitthans@fhlawllp.com

2.  Creditor, Zions Bancorporation, N.A., dba California Bank & Trust
    Counsel for Creditor Zions Bancorporation:

    Michael G. Fletcher
    Frandzel, Robins, Bloom and Csato
    1000 Wilshire Blvd, 19th Floor
    Los Angeles, CA 90017
    Email: mfletcher@frandzel.com

3.  Creditor, Professional Bank
    Counsel for Professional Bank:

    Stephen G. Opperwall
    Law Offices of Stephen G. Opperwall
    4900 Hopyard Road, Suite 100
    Pleasanton, CA 94588
    Email: steve.opperwall@comcast.net

NOTICE OF APPEAL

|  |  |
|---|---|
| 1 | 4. Creditor, Loan Shark Holdings, LLC: |
|  | Counsel for Loan Shark Holdings, LLC: |
| 2 |  |
| 3 | Christopher O. Rivas |
|  | Reed Smith LLP |
| 4 | 355 South Grand Avenue, Suite 2900 |
|  | Los Angeles, CA 90071 |
| 5 | Email: crivas@reedsmith.com |
| 6 | 5. Creditor, Sure Sports, LLC |
| 7 | Counsel for Sure Sports, LLC: |
| 8 | Robert B. Kaplan |
|  | Jeffer, Mangels, Butler & Mitchell LLP |
| 9 | Two Embarcadero,Center, 5th Floor |
|  | San Francisco, CA 94111 |
| 10 | Email: rbk@jmbm.com |
| 11 | and |
| 12 |  |
| 13 | Thomas M. Geher |
|  | Jeffer Mangels Butler & Mitchell LLP |
| 14 | 1900 Avenue of the Stars, 7th Floor |
|  | Los Angeles, CA 90067 |
| 15 | Email: tmg@jmbm.com |
| 16 | Dated: May 3, 2021          BINDER & MALTER, LLP |
| 17 |  |
| 18 | By: /s/ Wendy Watrous Smith |
|  | Wendy Watrous Smith, Attorneys for |
| 19 | South River Capital LLC |
| 20 |  |
| 21 |  |
| 22 |  |
| 23 |  |
| 24 |  |
| 25 |  |
| 26 |  |
| 27 |  |
| 28 |  |

NOTICE OF APPEAL

# EXHIBIT A

**In re: Evander F. Kane**
**U.S. Bankruptcy Court, Northern District of California**
**Case No. 21-50028 SLJ**

---

**NOTICE OF APPEAL**



**Entered on Docket**
**April 19, 2021**
EDWARD J. EMMONS, CLERK
U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

The following constitutes the order of the Court.
Signed: April 19, 2021

_Stephen Johnson_

**Stephen L. Johnson**
**U.S. Bankruptcy Judge**

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF CALIFORNIA

In re **EVANDER FRANK KANE**,

                Debtor.

Case No. 21-50028 SLJ
Chapter 7

## ORDER DENYING MOTION TO CONVERT

Certain creditors[1] request I convert this Chapter 7[2] bankruptcy case to Chapter 11 and appoint a Chapter 11 trustee. Their reasoning is simple. In Chapter 7, a debtor retains post-petition income. In Chapter 11, by contrast, post-petition income belongs to the

---

[1] The original movant is Zions Bancorporation, N.A. ("Zions"), and joinders were filed by Professional Bank, Long Shark Holdings, LLC ("Lone Shark"), Sure Sports, LLC ("Sure Sports"), South River Capital, LLC ("South River"); collectively I will refer to this group as "Creditors."

[2] Unless specified otherwise, all chapter and code references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532. All "Civil Rule" references are to the Federal Rules of Civil Procedure and all "Bankruptcy Rule" references are to the Federal Rules of Bankruptcy Procedure. "Civil L.R." and "B.L.R." references refer to the applicable Civil Local Rules and Bankruptcy Local Rules.

bankruptcy estate. Because Evander Kane ("Debtor") plays professional sports and makes a substantial income, they reckon their chances of recovering on their claims would be improved substantially if he were moved to Chapter 11. They further request that a trustee be appointed because they contend Debtor cannot be trusted to run a bankruptcy case.

Debtor elected to file a voluntary Chapter 7 case, not a Chapter 11. He is willing, as the Bankruptcy Code requires, to turn over his assets to the Chapter 7 trustee for payment of creditor claims. He is willing to take his chances with any non-dischargeable claims that are brought. At the end of the case, he hopes for the fresh start every successful Chapter 7 debtor receives: the discharge of his debts while retaining exempt property.

I conclude that Creditors have not carried their burden of proof and deny the motion. Creditors may feel aggrieved that Debtor has chosen to file under Chapter 7 because his post-petition income will not flow into the bankruptcy estate. But they have not shown that he is disqualified from Chapter 7. And on the record presented, I cannot find that denying Debtor the fresh start he sought by filing Chapter 7 is in the best interests of Creditors and Debtor.

## I. BACKGROUND

### A. Debtor Evander Kane

Debtor has played professional hockey for more than 11 years, currently for the San Jose Sharks ("Sharks"). He filed this Chapter 7 petition on January 9, 2021. Debtor's summary of assets and liabilities states he owns $10,224,743.65 in property and owes $30,191,340 in liabilities. ==ECF 1, p. 8==–9; ==ECF 18==. Debtor states his debts are primarily business-related. ==ECF 1, p. 6==. Debtor is married and has a newborn child.

### B. Assets and Liabilities

Debtor's primary assets include three residential properties: (1) 2301 Richland Avenue, San Jose, California 95125, valued at $3,000,000 ("San Jose Property"); (2) 3457 West 35th Avenue, Vancouver, British Columbia, valued at $2,860,000; and (3) 8447 Isabel Place, Vancouver, British Columbia, valued at $2,400,000. ==ECF 30, p. 2==–3. Debtor also owns $40,000 in household goods and furnishings, $12,000 in electronics, $8,000 in firearms, and

$20,000 in clothing. Debtor also schedules $2,500 in cash and $48,895.65 in deposits spread among multiple bank accounts. *Id.* at 4–6. Debtor then schedules his interest in four companies: (1) Ascher Capital II and III LLC, purchased through a loan of $750,000, with his percentage of ownership unknown; (2) Lions Properties LLC, which holds no assets after Debtor transferred the San Jose Property from it to himself, wholly owned by Debtor and his wife; and (3) EK9 Marketing, LLC, wholly owned by Debtor. Debtor also expects a $1,800,000 federal tax refund from an investment related to the Ascher Capital companies – which may or may not be encumbered – and a $37,147 transfer tax refund for the transfer of the San Jose Property, which Debtor asserts is exempt. *Id.* at 7. Finally, Debtor has a life insurance policy with a refund value of $9,304, as well as claims against Leon McKenzie, Sure Sports LLC, and Rachel Kuehle. *Id.* at 7–8.

Debtor has significant debts. Debtor lists ten secured claims, totaling $23,538,494.87: (1) $600,000 to 1000568 B.C. Ltd., secured by the 3457 West 35th property; (2) $600,000 to 1000568 B.C. Ltd., secured by the 8447 Isabel Place property; (3) $8,360,000 to Centennial Bank, secured by "various collateral," including a disputed interest in future wages; (4) $750,000 to Lone Shark Holdings, LLC, secured by potential tax refunds estimated at $1,800,000; (5) $2,320,000 to Pacific Private Money, a first mortgage secured by the San Jose Property; (6) $1,354,000 to Professional Bank, secured by collateral including a disputed interest in future wages; (7) $2,330,000 to Scotia Bank, a first mortgage secured by the 3457 West 35th property; (8) $1,900,000 to Scotia Bank, secured by the 8447 Isabel Place property; (9) $1,074,494.87 to South River Capital LLC, secured by a disputed interest in collateral including future wages; and (10) $4,250,000[3] to Zions, secured by Debtor's deposit accounts and future wages. ECF 18, p. 2–7.

---

[3] Debtor states this amount reflects only the principal amount of the loan.

ORDER DENYING MOTION TO CONVERT                                                    3/27

1   Debtor schedules a total of $4,396,525 in unsecured claims. Those debts arise from

2   loans, credit card balances, or fees for services. Sure Sports LLC filed a claim for $1,282,302

3   claim by for unspecified fees.[4]

4       C.   Debtor's Income

5       Debtor's income is identified in Schedule I to his schedules. At the time he filed his

6   schedules, Debtor's NHL season had not commenced. He lists monthly income of $2,083.33

7   from work on a podcast. ECF 1, p. 40. He discloses his pay from the Sharks on an

8   attachment to Schedule I. He indicates that his salary for the 2020–2021 season is

9   $3,000,000. But he is only paid if the Sharks actually play games. And while a regular season

10  generally includes 82 non-playoff games, due to the Covid-19 crisis, the current season only

11  has 56 games scheduled. His salary will be reduced accordingly. He also states the ongoing

12  pandemic could mean the number of games played this year will be further reduced. Debtor

13  identifies a further source of potential reduction to his salary. The NHL players' collective

14  bargaining agreement requires 20% of his salary be withheld, to be released to the owners

15  under a profit-sharing agreement, in light of the likely reduction of team revenues. Debtor

16  states that an additional 10% of his salary is withheld as deferred compensation, paid in

17  equal installments without interest over three years. Finally, Debtor states his salary is

18  contingent on him opting to play this season, which he may not do in light of unstated

19  health concerns related to the birth of his first child. *Id.* at 41.

20      Debtor's main expenses per month are: $17,990.63 for home ownership expenses;

21  $4,083 for real estate taxes, property insurance, and home maintenance; $1,770 in utilities;

22  $8,000 for food and housekeeping; $12,000 in childcare and education costs; $8,910.83 for

23  two vehicle leases; $15,000 for support payments to Debtor's mother, father, grandmother,

24  and uncles; and $20,000 for mortgages. The remaining $4,760 is made up of miscellaneous

25  costs like entertainment and pet care.

26  _____

27      [4] Debtor takes issue with this claim in his opposition, alleging that after paying Sure
    Sports a fee for arranging several loans, Sure Sports may have colluded with his lenders to
28  assist them with collection efforts.

ORDER DENYING MOTION TO CONVERT                                4/27

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

D.    NHL Contract

Debtor's contract with the Sharks is worthy of mention.[5] The NHL Contract takes the form of a Standard Player's Contract. The document includes an addendum which recites a "Modified No-Trade Clause". Under this provision, the Sharks cannot trade Debtor to another NHL team during the life of the NHL Contract. However, Debtor is required to supply the team with the name of three other teams that he would agree to be traded to in advance of each season. Addendum ¶ 2.

The NHL Contract has detailed terms addressing Debtor's health and ability to work for the team. At paragraph 5, if Debtor is "disabled or unable" to perform his duties under the agreement, he must submit to medical examination (*and* treatment) by a club-designated medical doctor. Should the physician determine that Debtor is (or, is not) able to work, the Sharks must notify Debtor. If the club determines that Debtor is disabled or "not in good physical condition" at the commencement of the season or at any time thereafter, it may suspend Debtor without pay. ¶ 5(b). In that situation, Debtor will only receive a salary if his injury or disability occurred within the course of his employment. ¶ 5(d). The NHL Contract has extensive and complicated provisions that control disputes between Debtor and the club about his ability to work. Among other things, Debtor can request a "second opinion". And if there is still a dispute, an independent physician is retained.

The NHL Contract permits the Sharks to terminate Debtor's services. If terminated without cause, Debtor is entitled to a reduced salary payment extended over twice the length of the original agreement. Ex. 1. In other words, Debtor is paid some of what he would otherwise be due under the agreement, but it is paid over a longer period of time. He is then an "Unrestricted Free Agent" and no longer attached to the Sharks. On the other hand, if Debtor is terminated for cause, he loses his right to compensation. Debtor may also be suspended without pay for a variety of infractions.

---

[5] The document was attached as Exhibit 1 to Michael Toal's declaration in support of the Motion. ECF 33-1.

ORDER DENYING MOTION TO CONVERT                                                5/27

Finally, the NHL Contract provides Debtor with substantial bonuses. He is expected to receive $2 million in both 2022 and 2023.

E.    The Motion

Creditor Zions Bancorporation ("Zions") filed this motion to convert Debtor's case from Chapter 7 to Chapter 11 on February 26, 2021. ECF 33. Zions first points to aspects of Debtor's finances it finds offensive, such as: (1) Debtor admitting to owing over $18,000,000 in non-priority unsecured claims; (2) Debtor only scheduling $2,038 in monthly income from his podcast; (3) Debtor intending to pay unsecured creditors nothing; (4) Debtor having substantial assets and income, including the potential to earn up to $29,000,000 in salary and bonuses through 2025; (5) Debtor inflating his expenses; and (6) Debtor's issues with spending and gambling, including transferring Rolex watches to a creditor for a gambling debt and speculating on tax attributes with a $750,000 loan to an entity called Lone Shark Holdings, LLC. *Id.* at 11.

Zions then alleges that Debtor timed the filing of his bankruptcy case to cause maximum harm to creditors. Zions points to Debtor purchasing the San Jose Property in August of 2020, through a wholly owned entity Lions Property, LLC. But on January 8, 2021 – the day before filing this petition – Debtor transferred the San Jose Property by quitclaim deed from Lions Property to himself. Zions argues originally having Lions Property hold title was an effort to shield assets from creditors. Zion then argues the quitclaim to Debtor was: (1) a waste of $37,169.19 in transfer taxes and fees; (2) an effort to claim the newly increased California homestead exemption caused by AB 1885; and (3) a fraudulent transfer.

Finally, Zions makes unspecified allegations that there are significant irregularities in the financial statements Debtor made to Zions and other creditors. Zions states it is considering filing a non-dischargeability adversary complaint under §§ 523 and/or 727.

F.    The Joinders

Four creditors filed joinders to Zions' motion: (1) Professional Bank, ECF 41; (2) South River Capital, LLC, ECF 49; (3) Sure Sports, LLC, ECF 57; and (4) Lone Shark Holdings, LLC, ECF 63. The joinders all largely reiterate points already made in the motion.

1  Professional Bank notes Debtor owes it approximately $1,500,000, and that such debt is

2  secured by Debtor's salary. ECF 41, p. 4.

3       As for South River Capital, it states it has a November 9, 2020 judgment against

4  Debtor from the Baltimore Circuit Court for $1,074,494.87, arising from Debtor's default on

5  a May 11, 2019 loan, secured by the NHL Contract and other property. ECF 49.

6       Sure Sports simply joints the motion. ECF 57.

7       Finally, Lone Shark supports the motion, but takes issue with Zions implicitly

8  characterizing Debtor's loan to it as illegitimate; Lone Shark argues instead that its name

9  relates to Debtor's team's name, and that Debtor's loan was an investment in tax credits

10  estimated to result in a refund of $1,800,000 to Debtor. ECF 63, p. 2–3.

11      G.   Debtor's Opposition

12       Debtor filed his opposition to the motion on March 18, 2021. ECF 65. He first states

13  that the loans he entered into with movant and the joining parties were incurred through the

14  arrangement of Sure Sports, who acted as Debtor's agent or broker. He notes that, just for

15  the Zions loan, Debtor paid Sure Sports a fee of $67,000 for arranging that loan. Debtor

16  further states that, when he defaulted on these loans, Sure Sports provided those lenders

17  with recommendations on litigation strategy, including garnishing Debtor's salary.

18       After defaulting on those loans, Debtor retained attorney John Fiero of Pachulski

19  Stang Ziehl & Jones to restructure his finances. Mr. Fiero concluded that the lenders'

20  assertion of security interests in Debtor's future salary were ineffective under the Uniform

21  Commercial Code. Mr. Fiero apparently spent significant time trying to reach a resolution

22  with the lenders, but such efforts eventually failed, resulting in the lenders filing actions

23  against Debtor in Santa Clara County and Baltimore, Maryland. The Santa Clara action was

24  later dismissed, but that lender filed another action against Debtor and the Sharks in Miami

25  District Court. These multi-jurisdiction actions caused Debtor to file this case.

26       Debtor states he has fully complied with the Chapter 7 Trustee and U.S. Trustee in

27  this case, including appearing at two § 341(a) meetings; providing financial documents; and

28  settling with the Trustee regarding his claims of exemption in real property equity and bank

Case: 21-50028   Doc# 110   Filed: 04/09/21   Entered: 04/09/21 16:04:38   Page 17 of 27

Case: 21-50028   Doc# 127-1 Filed: 05/07/21 Entered: 05/07/21 11:48:39 Page 13 of 35

accounts, resulting in a settlement of $255,000 to the estate, paid across $55,000 installment payments. Debtor has also stipulated with numerous parties to extending the deadline to file non-dischargeability actions. Debtor believes these facts show he is a responsible debtor.

Debtor's income under the NHL Contract was described above. Debtor alleges in his opposition that his income is subject to reduction based on the number of games played, Shark's revenue, and other factors. Debtor states the effect of these deductions are significant, noting that of the $213,905 gross earnings in his first paycheck in January 2021, he received $38,709 in net pay. In sum, Debtor argues his future income is far less than Zion's contends.

Debtor admits he has had a gambling problem, but states he continues to receive personal therapy to deal with such issues and put them in the past. *Id.* at 9.

Debtor then objects to Zions characterizing his tax investment with Lone Shark as a gamble. He states he has disclosed the investment with the Chapter 7 Trustee and U.S. Trustee, that he was only required to pay $35,000 initially, and that he was advised his return should be approximately $1,800,000, which he intends to use to repay creditors. *Id.* at 10.

Debtor also objects to Zions attacking his truthfulness by pointing to Debtor having to amend his Statement of Financial Affairs to include two pre-petition transfer of Rolex watches. It is worth noting that no one disputes that these transactions were not uncovered by creditors. Rather, Debtor states he was reminded of the transfers during examinations under oath and promptly amended his schedules to reflect them accurately. Debtor explains that he did not have the assistance of a CPA or financial advisor in preparing his bankruptcy filings. Debtor argues this shows an ongoing effort to comply with the Code, not dishonesty.

Finally, Debtor notes the lack of specificity in the allegations by Zions and joining parties that he misrepresented his finances in entering into loans with such parties, and denies any misrepresentation on his part.

Based on these allegations, Debtor argues I should deny the motion for three reasons. First, he argues the facts do not support conversion because his pay is not as great as Zions suggests, he has acted in good faith by complying with his duties as a debtor, and it is

ORDER DENYING MOTION TO CONVERT                                      8/27

1   unlikely a plan would be confirmed in this case, given that Creditors assert they have non-

2   dischargeable claims, which means they will have little incentive to support a plan.

3         Second, Debtor argues that if I convert this case, I should not appoint a Chapter 11

4   trustee because there is no cause to do so. Debtor points to the absence of specific facts

5   showing he cannot manage his own affairs, as well as the absence of any irreconcilable

6   conflict between himself and his creditors. Debtor also argues appointing a trustee would

7   not be in the best interests of creditors or the estate, as it would only add to the expense and

8   delay in prosecuting this case. Debtor then states that evidence of him fulfilling his duties as

9   a Chapter 7 debtor shows he should at least be given the opportunity to prosecute his own

10  Chapter 11 case, should I order conversion.

11        Finally, Debtor argues converting this case to Chapter 11 and appointing a trustee

12  would violate the Thirteenth Amendment's ban on involuntary servitude. In Debtor's view,

13  conversion would violate that amendment because it would make him a peon, or one

14  compelled to work for a creditor until his debts are paid, especially because he would be

15  barred from reconverting his case to Chapter 7 under § 1112(a)(3). Debtor analogizes to

16  § 1307(a) prohibiting a debtor being involuntarily placed in a Chapter 13 case. Debtor then

17  argues appointing a Chapter 11 trustee would also violate the Thirteenth Amendment by

18  placing a trustee in charge of Debtor's future and personal decisions like accepting or

19  rejecting the NHL Contract.

20        H.    <u>Zions' Reply</u>

21        Zions filed a reply on March 25, 2021, which largely reiterates arguments it made in

22  the original motion. <mark>ECF 77</mark>.

23  **II.   LEGAL STANDARD**

24        A.    <u>§ 706(b) Conversion to Chapter 7</u>

25        Section 706(b) allows parties in interest to request a Chapter 7 case be converted to

26  Chapter 11 without the debtor's consent. "Section 706(b) does not provide guidance on

27  what (or what not) to consider when reaching a decision. Thus, courts have held that the

28  decision whether to convert under § 706(b) is left in the sound discretion of the court, based

ORDER DENYING MOTION TO CONVERT       9/27

on what will most inure to the benefit of all parties in interest. Since there are no specific grounds for conversion, a court should consider anything relevant that would further the goals of the Bankruptcy Code. Courts have considered various factors, including (1) the debtor's ability to repay debt; (2) the absence of immediate grounds for reconversion; (3) the likelihood of confirmation of a Chapter 11 plan; and (4) whether the parties in interest would benefit from conversion." *Decker v. U.S. Trustee*, 548 B.R. 813, 817 (D. Alaska 2015) (cleaned up); *see also In re Takano*, 771 Fed. Appx. 805, 806 (9th Cir. 2019); *In re LaFountaine*, 2016 WL 3344003, at *2–3 (B.A.P. 9th Cir. June 7, 2016); S. Rep. No. 95-989, at 94 (1978). "The burden is on the movant to show that the case should be converted." *In re Parvin*, 538 B.R. 96, 101 (Bankr. W.D. Wash.) (citations omitted).

A fair read of most of the decisions under § 706(b) is that the courts give great weight to the creditors' interest. Because that approach—predominant focus on creditors' interests—appears to be received wisdom, the courts analyzing the provision do not provide law or persuasive reasoning to support it. I do not conclude that the interests of creditors are paramount. Rather, I conclude that the phrase commonly used, "the benefit of all parties in interest" necessarily requires me to weigh both the interests of creditors and Debtor in making this determination and will do so below.

### B. § 1104 Appointment of Chapter 11 Trustee

Section 1104(a) provides for the appointment of a chapter 11 trustee by court order:

> At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee--
>
> (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or
>
> (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

Case: 21-50028   Doc# 103   Filed: 05/09/21   Entered: 05/09/21 18:06:38   Page 10 of 27
Case: 21-50028   Doc# 127-1   Filed: 05/07/21   Entered: 05/07/21 11:34:39   Page 16 of 35

§ 1104(a).

The Ninth Circuit has recognized two fundamental grounds for appointment in the statute: for cause, or in the best interests of creditors. *In re Lowenschuss*, 171 F.3d 673, 685 (9th Cir. 1999). In *Lowenschuss*, the court observed that debtor's transfer of pension assets out of Pennsylvania, and his later flight from Pennsylvania to Nevada to secure augmented exemptions constituted cause. And, debtor's history of manipulating estate assets showed that he was not working in his creditors' best interests. Another court found cause where a chapter 11 debtor proposed a kickback scheme for services to the estate rendered by a vendor. *In re Bibo, Inc.*, 76 F.3d 256, 258 (9th Cir. 1996). There, the principal of the debtor was acting in the service of his personal financial gain rather than creditors' best interests. *Id.* The appointment of a trustee is within the discretion of the bankruptcy court. *Lowenschuss*, 171 F.3d at 685 (reviewing on an abuse of discretion standard).

C.    Creditors Seek Interlocking Remedies under §§ 706(b) and 1104(a)

Noted above, the court must exercise its discretion in determining whether to grant either a motion to convert under § 706(b) or a motion to appoint a trustee under § 1104(a). I find one critical difference between these requests: The first requires a much broader inquiry than the second. The § 706(b) analysis is open-ended, as "the decision whether to convert under § 706(b) is left in the sound discretion of the court, based on what will most inure to the benefit of all parties in interest." *In re Schlehuber*, 489 B.R. 570, 573 (B.A.P. 8th Cir. 2013) (quoting *In re Willis*, 345 B.R. 647, 654 (B.A.P. 8th Cir. 2006)). Thus, in determining whether to convert the case, I consider the benefits—and drawbacks—to all creditors, as well as to Debtor. By contrast, the inquiry into whether a trustee ought to be appointed focuses more narrowly on whether I conclude, principally based on Debtor's pre-petition conduct, that he cannot be trusted to manage his estate. If this is true, appointment of a trustee is necessary for a successful Chapter 11 case.

# III.   DISCUSSION

## A.   Creditors' Interest in Conversion to Chapter 7

### 1.   General Concerns

Creditors' want the case converted to Chapter 11 because they contend that Debtor's post-petition earnings would inure to the bankruptcy estate in a Chapter 11. § 1115(a)(2). In Chapter 7, by contrast, Debtor's post-petition income does not belong to the estate.

Zions and the joining parties also contend they have an interest in reducing the costs of bringing non-dischargeability actions and other litigation. While it is unclear what the likely cost of a Chapter 11 case and trustee will be, at a minimum those costs will be borne by the estate, and thus all creditors, while the costs of non-dischargeability actions and other litigation will be borne solely by the parties who bring them. Spreading these costs over the creditor body generally seems to be their aim.

Finally, Zions and the joining parties have an interest in seeing a trustee appointed because the trustee would, in their view, safeguard against Debtor's estate and assets being further diminished by his gambling and poor financial decisions post-petition. So while Creditors assert they have security interests in Debtor's salary, and such interests would ride through a Chapter 7 discharge, a trustee is still necessary because after a Chapter 7 Debtor would be free to continue the financially destructive conduct that they assert led to this case.

The cases interpreting § 706(b) have identified a range of factors to consider so I will turn to those now.

### 2.   Factors Identified in Case Law

#### a.   Ability to Pay

The first factor is whether a debtor has the ability to pay creditors. It is obvious that Debtor has substantial income. Less obvious, and so far unproved, is whether Debtor will earn sufficient income in the near term to justify conversion. Debtor states that, of the $213,905 in gross earnings for his first paycheck in January 2021, the net income from that paycheck was only $38,709, or 18% of gross earnings. Debtor admits that 10% of this withholding will be repaid to him over three years, and that 20% of this withholding is held

1   in escrow pending a determination whether the league meets yearly revenue targets. So 10%

2   of his salary will be recouped in later years, and another 20% could possibly be returned to

3   him later this year.

4          But contingencies exist. The 10% withholding only becomes part of the estate if it

5   remains open for three years. The 20% withholding depends entirely on whether the NHL

6   meets its revenue targets this year; the COVID-19 pandemic is still ongoing, and the league's

7   failure to meet its target last year is at least some evidence that this year will also present

8   challenges.[6] It is uncertain just how much of Debtor's salary will be available to fund a plan.

9   And the structure of Debtor's salary means significant amounts will only be available to the

10  estate years after it was earned. For reasons discussed below, Debtor's long-term income

11  stream as a player is not assured. So, Debtor's salary – while objectively significant – may not

12  be as impactful as Zions asserts. Obviously, converting the case will mean additional funds

13  for Creditors, but it is not clear just how much.

14         The costs of Chapter 11 must be weighed as well. In a Chapter 11 case, the trustee

15  Zions requests by this motion is going to cost money. *See* 326(a). A trustee would be entitled

16  to hire professionals, which in light of the allegations Zions makes must be assumed to

17  include lawyers as well as financial professionals. These professionals are also entitled to

18  compensation. § 330(a). Zions does not address the likelihood that administrative costs

19  could consume a material portion of a Chapter 11 estate, which seriously undercuts its

20  arguments regarding Debtor's ability to pay.

21         b.   *Possibility of Immediate Reconversion to Chapter 7*

22         Zion's arguments here suggest grounds for immediate reconversion to Chapter 7.[7]

23  Zions repeatedly argues Debtor cannot be trusted to manage estate property because of his

---

24  [6] While not integral to my decision, I take judicial notice of the Vancouver Canucks'

25  ongoing difficulties in playing games due to much of the team being infected with COVID-
    19. Ian Holliday, *Canuck's Return to Ice Postponed as Another Player Added to COVID-19 List*,

26  CTV NEWS, April 11, 2021, https://bc.ctvnews.ca/canucks-return-to-ice-postponed-as-
    another-player-added-to-covid-19-list-1.5383142.

27

28  [7] Zions argues this factor is not relevant, as under § 1112(a)(3), a debtor cannot
    reconvert to Chapter 7 a case that was involuntarily converted to Chapter 11. What this

ORDER DENYING MOTION TO CONVERT                                                    13/27

1    history of gambling and spending. If I accept this argument and convert the case, those same

2    arguments would apply with equal force towards reconverting the case under § 1112(b)(4)(A)

3    and (B). That is, if Debtor's alleged mismanagement and continuing diminution of the estate

4    through his spending and gambling will continue, meaning a trustee is necessary, then such

5    mismanagement would persist after I convert the case. Those facts would then support

6    reconverting the case. True, Zions seeks to avoid this issue by having a trustee appointed,

7    but I must find conversion proper before I can consider appointing a trustee. To do

8    otherwise would put the cart before the horse.

9              *c.   Likelihood of Plan Confirmation*

10         Zion's motion suggests a Chapter 11 plan would be confirmed in this case with some

11   speed. Long experience suggests to me this may not be the slam dunk Zions believes. There

12   are both practical and legal issues that I find will make it difficult for anyone in this case to

13   confirm, let alone consummate, a plan.

14         Beginning with practicalities, creditors in this case, including Creditors, assert their

15   claims are non-dischargeable.[8] Setting aside whether such creditors ultimately prevail in their

16   non-dischargeability actions, their belief in the non-dischargeability of their claims means

17   they will have an interest in defeating confirmation if the plan does not provide for their

18   payment in full, and perhaps even if it does, as they would be submitting to payment over an

19   extended period. This is because all estate assets spent in confirming a plan, and any

20   distributions made under such plan, will diminish funds such creditors could collect on

21   outside of bankruptcy. No one can seriously dispute that a creditor has every right to pursue

22   its own best interest in the formulation and choice to oppose a plan. *In re Figter*, 118 F.3d

23   _____

24   argument ignores is that any party in interest could move to reconvert under § 1112(b). For
     instance, a creditor with a non-dischargeable claim could bring such a motion to prevent a

25   plan from being confirmed, preferring to take their chances collecting outside of bankruptcy.
     It is not relevant to this analysis whether a party in interest would; what matters is that they

26   could, so the inquiry turns to whether the record shows grounds for reconversion.

27         [8] Two creditors have already filed adversary proceedings seeking non-dischargeability
     determinations: Lone Shark, *see* Adv. Proc. Case No. 21-5010, and Hope Parker, a non-

28   movant creditor, *see* Adv. Proc. Case No. 21-5008.

ORDER DENYING MOTION TO CONVERT                                                      14/27

1 | 635, 639 (9th Cir. 1997) (concluding that a selfish motive in opposing a reorganization does

2 | not constitute bad faith) (*citing In re Pine Hill Collieries Co.*, 46 F. Supp. 669, 671 (E.D. Pa.

3 | 1942)). "[W]e do not condemn mere enlightened self interest, even if it appears selfish to

4 | those who do not benefit from it." *Figter*, 118 F.3d at 639. Zions and the joining parties

5 | make little effort to demonstrate this issue is capable of easy resolution as they contend.

6 |     Debtor's career presents another practical problem. I would venture to say that

7 | Debtor's highest income-earning years are immediately in front of him. Creditors will fight

8 | hard for better treatment in a hypothetical Chapter 11 plan for the simple reason that the

9 | likelihood of payment is higher in the near term. Moreover, no one discusses Debtor's ability

10 | to perform for years under Zion's hypothetical Chapter 11 plan. But this too, seems worthy

11 | of discussion. Debtor is a 29-year-old professional hockey player who has already clocked

12 | many years on professional teams. The NHL Contract does not necessarily provide

13 | compensation to Debtor if he is not fit to play. One is left to wonder how many more years

14 | Debtor can reasonably be expected to play in such a physically demanding environment.

15 |     Turning to legal issues, Debtor's income is not, at this stage, free of encumbrance.

16 | Creditors assert a security interest in Debtor's future income and it is this same income that

17 | is supposed to fund a plan. From a review of the claims docket in this case, secured claims

18 | total $23,538,494.87 and at least some of these assert a secured interest in Debtor's income.

19 | Whether these interests are valid or enforceable by the creditors is not clear.[9] But if these

20 | security interests are valid – a point I do not decide here – they must be paid in a manner

21 | that is consistent with § 1129(b) of the Code. Specifically, under § 1129(b)(2)(A)(i)(II) the

22 | plan would need to provide secured creditors with deferred payments "totaling at least the

23 | allowed amount of such claim, of a value, as of the effective date of the plan, of at least the

24 | value of such holder's interest in the estate's interest in such property." The existence of

25 | these secured claims itself imperils confirmation of a plan, as it appears substantially all of

26 |

27 |     [9] The Bankruptcy Appellate Panel has held they are not. *See In re Skagit Pac. Corp.*, 316 B.R. 330, 336 (B.A.P. 9th Cir. 2004) ("Revenue generated post-petition solely as a result of a

28 | debtor's labor is not subject to a creditor's pre-petition interest."); *see* § 552(b).

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

Debtor's income – the primary source of funding for a plan – will apparently be devoted to paying purportedly secured creditors. The interests of the unsecured creditors and the secured creditors obviously diverge. Creditors suggest these matters are subject to easy resolution, but cannot guarantee this is so.

The absolute priority rule is also likely to complicate confirmation of a plan. Debtor has scheduled unsecured claims valued at $4,396,525. The record indicates Debtor intends to keep and continue making payments on several parcels of real property, but he only claims an exemption in his San Jose residence. It is not clear if there is equity in the other properties.[10] Under the absolute priority rule, Debtor could only keep non-exempt property if the plan either pays unsecured creditors in full or provides new value should the unsecured creditor class object. § 1129(b)(2)(B)(i)–(ii); *see Zachary v. Cal. Bank & Tr.*, 811 F.3d 1191, 1994 ("The rule 'provides that a dissenting class of unsecured creditors must be provided for in full before any junior class can receive or retain any property under a reorganization plan.'") (quoting *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 202 (1988)). Debtor's future salary would not qualify as new value under the rule, as contributions must be "present contribution[s], taking place on the effective date of the Plan rather than a future contribution." *In re Ambanc La Mesa Ltd. P'ship*, 115 F.3d 650, 655 (9th Cir. 1997) (citing *In re Yasparro*, 100 B.R. 91, 96–97 (Bankr. M.D. Fla. 1989)). At this stage, it is enough to say I am unsure where such new value would come from, given Debtor's overextended credit. It is not clear how long it a Chapter 11 plan would need to run to accommodate those payments and Zions' motion does not illuminate that point.

Creditors' assertions of non-dischargeability also presents legal issues for confirming a plan here. As discussed above, the existence of such claims is likely to frustrate any effort to propose a plan because creditors with such claims may not support a lengthy repayment

---

[10] The Chapter 7 Trustee has valued the West 35th Avenue property at $3,300,000 in Canadian dollars, which exceeds the scheduled liens on that property. ECF 42, p. 4. This is not a finding that such valuation is correct; rather, I note only that it supports my view that Debtor may have non-exempt equity in his properties.

ORDER DENYING MOTION TO CONVERT                                    16/27

1   period if they conclude it would delay or reduce their recoveries. The problem is not

2   unknown in case law. Zions omits any discussion of the Ninth Circuit's decision in *In re*

3   *Hamilton*, 803 F. App'x. 123 (9th Cir. 2020). In that case, Debtors sought to protect

4   distributions to creditors under their Chapter 11 plan from interference by a creditor with a

5   non-dischargeable judgment by enjoining that creditor from collecting its debt during the

6   plan's term. The Bankruptcy Appellate Panel reversed the confirmation order, finding no

7   basis for such an injunction and the Ninth Circuit affirmed. Without proof that *all claims*

8   *would be paid*, such a provision was unlawful. "In fact, it is undisputed that the non-

9   dischargeable debt will significantly increase, to over $3 million, by the end of the Plan

10  period. We know of no case in which our court (or the BAP) has approved a collection

11  injunction in such circumstances." *Id.* at 125. So even if a plan is confirmed, if Creditors are

12  successful in having their claims declared non-dischargeable, nothing in the Code will

13  prevent them from continuing to collect from Debtor outside the plan. Moreover, this fact

14  will generate uncertainty for other creditors, creating further difficulties for confirmation.

15      Finally, even assuming he is in excellent health now, his career is one in which

16  physical injuries are not uncommon. The uncertainty of Debtor's ability to perform as a

17  professional athlete, and the possibility of injury taking him off the ice – temporarily or

18  otherwise – mean the kind of long-term plan implied by Zions' request has serious feasibility

19  concerns that will only grow as the years go by. Under § 1129(a)(11) a plan must be feasible,

20  or "not likely to be followed by the liquidation, or the need for further financial

21  reorganization, of the debtor[.]" "The feasibility requirement requires courts to scrutinize

22  carefully the plan to determine whether it offers a reasonable prospect of success and is

23  workable." *In re Beyond.com Corp.*, 289 B.R. 138, 145–46 (Bankr. N.D. Cal 2003) (citing *In re*

24  *Acequia, Inc.*, 787 F.2d 1352, 1364 (9th Cir. 1986)). Zions makes much of Debtor's high

25  income, but ignores the attendant uncertainty and risk his hockey career entails. Whoever

26  would manage this hypothetical Chapter 11, will not have that luxury. On the record

27  provided by Creditors, I am not convinced a plan so dependent on Debtor continuing to

28  play hockey for several years without interruption has a reasonable probability of success.

ORDER DENYING MOTION TO CONVERT                                    17/27

*d. Benefit to Creditors*

Finally, the benefit of conversion to Creditors is unproven. Conversion would certainly bring Debtor's post-petition salary into the estate. As noted above, uncertainty exists as to the amount of that income. As such, Zions will not, in the near term, receive the full amount alleged. Moreover, significant challenges await in Chapter 11, including challenges to priority and enforceability of security interests, non-dischargeable claims, and the cost and expense of the trustee and professionals. Thus, I cannot say with precision whether the administrative costs of a Chapter 11 would outweigh the costs to an individual creditor of bringing an adversary proceeding to protect their individual debt from discharge.

In sum, each factor weighs at least somewhat against converting this case. There is serious uncertainty regarding how much income to expect from Debtor, how long a plan capable of confirmation will need to last, and whether Debtor's career can be sustained over the lengthy period required to fund a plan in compliance with the Code. While Zions does present real arguments in favor of conversion, I find they fail to meet their burden.

B.    <u>Debtor's Interests under § 706(b)</u>

Next, I must consider the effect that conversion and appointment of a trustee would have on Debtor. The bargain a Chapter 7 debtor strikes is to turn over all of his non-exempt assets to a Chapter 7 trustee for administration and payment of creditors' claims. In Chapter 7, a debtor's postpetition income is not subject to creditors' claims and animates a debtor's discharge following the conclusion of the case. Were it otherwise no debtor would receive a proper fresh start after relinquishing their assets. *See Harris v. Viegelahn*, 575 U.S. 510, 513–14 (2015) ("Chapter 7 allows a debtor to make a clean break from his financial past, but at a steep price: prompt liquidation of the debtor's assets. When a debtor files a Chapter 7 petition, his assets, with specified exemptions, are immediately transferred to a bankruptcy estate . . . . Crucially, however, a Chapter 7 estate does not include the wages a debtor earns or the assets he acquires *after* the bankruptcy filing. Thus, while a Chapter 7 debtor must forfeit virtually all his prepetition property, he is able to make a 'fresh start' by shielding from creditors his postpetition earnings and acquisitions.") (internal citations omitted).

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

ORDER DENYING MOTION TO CONVERT        18/27

Debtor's primary, and most obvious interests, are to see that his post-petition income does not become entangled in his bankruptcy estate and that he obtains a timely discharge of his debts. Debtor's choice of filing Chapter 7 is not improper from a statutory standpoint. Chapter 7 is designed to allow every debtor quote a quick discharge of his debts and a fresh start." *In re Takano,* 771 Fed. App'x. 805, 806 (9th Cir. 2019). It is often said that a Chapter 7 debtor quote has no constitutional right to discharge of his debts." *In re Gordon,* 464 B.R. 683, 700) (Bankr. N.D. Ga. 2012) (*citing United States v. Kras,* 409 U.S. 434, 436 (1973). The motion does not challenge Debtor's statutory eligibility to be a debtor under Chapter 7. This being so, debtor has a statutory right to discharge and fresh start and to receive his future income free from financial encumbrances.

Conversion and appointment of a trustee would significantly impair Debtor's right to make central choices in life, such as his professional hockey career. It is obvious that his continued participation must be a matter of personal choice in view of the high level of commitment and the serious risks of playing. Two of the NHL Contract provisions bear this out. One, described above, is the Modified No-Trade Clause, requires that the Debtor make an annual choice about where he would agree to play if traded. Such a decision necessarily depends on circumstances that only Debtor could meaningfully evaluate like the quality of the team, its location, and the other players. Professional sports require a herculean commitment – Debtor must have a role in this important choice. If I appoint a trustee, it would fall to that trustee to decide those three teams. One could speculate about how this might be managed with Debtor's direction or involvement, but without clarity on that point now, this is adverse to Debtor.

The NHL Contract also has detailed provisions about Debtor's medical status and ability to play. Debtor must "be fit and in proper condition for the performance of his duties[.]" In the first instance, the NHL Contract provides that the Sharks make the call on Debtor's ability to play. It is up to Debtor to contest that call. It makes little sense to put a trustee in the position of making this critical decision, particularly if the trustee is balancing creditors' rights to payment against Debtor's health choices. It is no exaggeration to say that

ORDER DENYING MOTION TO CONVERT 19/27

1 | granting the motion would impinge very significantly on some of the most central choices in

2 | Debtor's life.[11]

3 |      Debtor's ability to participate in the negotiation of a Chapter 11 plan, and the terms

4 | of that plan, would appear to be limited if Zions' motion were granted. Chapter 11 plans are

5 | often proposed by debtors, who initially have the exclusive right to propose and confirm a

6 | plan. § 1121(a), a right that is often extended. § 1121(d).

7 |      By contrast, if Zions' motion is granted, a trustee would be appointed. That

8 | appointment would terminate Debtor's exclusive control over the case. § 1121(c)(1). The

9 | trustee or any creditor or group of creditors would then have the power to propose a plan. It

10 | is difficult to envision how Debtor, an individual, could exercise or influence the

11 | development of such a plan given the divergent interests of Debtor and his creditors, the

12 | claimed nature of his debts, and the complete lack of confidence creditors have in him.

13 |      As it now stands, Debtor is entitled to a discharge if he meets applicable statutory

14 | requirements. Conversion to Chapter 11 would imperil this possibility. If the case is

15 | converted to Chapter 11, Debtor will only receive a discharge if a plan is confirmed and then

16 | only if payments are complete. § 1141(d)(5). That process can take years in my experience. It

17 | seems plain that creditors intend to prepare and confirm a Chapter 11 plan and to do so

18 | without the input of Debtor. That process impairs Debtor's interest in a relatively quick and

19 | final resolution to his current financial troubles, the reason people file Chapter 7 cases.

---

[11] In addition to these concerns, I also note unbriefed legal issues regarding the assumability of the NHL Contract. Depending on which jurisdiction's law applies to the NHL Contract, it may not be assumable as a personal services contract. § 365(c)(1); *In re Health Plan of Redwoods*, 286 B.R. 407, 409 (Bankr. N.D. Cal. 2002). And if the contract cannot be assumed, it will be rejected, causing a breach. §§ 365(d)(1), (g). I decline to decide these issues here, given the absence of briefing. But such issues only add to the uncertainty regarding the potential benefits, and indeed even the viability, of a trustee-driven Chapter 11. They also show how converting this case would result in significant impositions on Debtor's ability to control his own life and career.

ORDER DENYING MOTION TO CONVERT               20/27

C.    *Gordon* is Distinguishable

Zions and the joining parties rely heavily on *In re Gordon*, 465 B.R. 683 (Bankr. N.D. Ga. 2012). Debtor Gordon was an operational consultant. He worked for a company called Proudfoot Consulting Group, but left to pursue a better opportunity with Highland Consulting Group. Proudfoot promptly sued Gordon for violating a non-compete agreement. It obtained a judgment for $1,659,000 in damages and $335,050.55 in attorney fees, some of which was later set aside on appeal. *Id.* at 687. Proudfoot began garnishing Gordon's wages. With the financial support of Highland, which paid his legal fees, Gordon filed a Chapter 7 case. *Id.* at 688. Gordon's schedules showed secured debts totaling $413,163, and unsecured debts of $450,000, *Id.* at 688, 693, and seemingly little likelihood of a distribution from the Chapter 7 estate. The debtor's monthly net income fluctuated from $3,400 to $10,000. *Id.* at 693.

Proudfoot brought a motion to convert under § 706(b) to Chapter 11. Gordon objected and argued that provision did not apply to individual debtors, and involuntary conversion would violate the Thirteenth Amendment and the Anti-Peonage Act. The bankruptcy court rejected both these arguments, and found cause to convert the case because: (1) the debtor "demonstrated a consistent ability to earn at a high level," and by pledging his income for five years the debtor could pay unsecured creditors 45–100% of their claims; (2) the record showed no grounds for reconversion; (3) a confirmable plan was reasonably likely, as a reasonable plan would either be accepted by the moving creditor, or confirmed over such creditor's objection; and (4) in addition to being in the best interests of creditors, conversion was in the debtor's best interest, notwithstanding his contrary assertion, as the court found he was "a pawn between two companies which have seen fit to manipulate this Debtor and ruin his credit, rather than resolve their issues." *Id.* at 692–94.

*Gordon*'s facts are distinguishable from ours. In *Gordon*, the court noted that the case was really a two-party dispute, between Proudfoot and Highland, Gordon's current and prior employers. It referred to Gordon as a "pawn between two companies which have seen fit to ruin [Gordon's] credit rather than resolve their differences." *Id.* at 694. Debtor's situation is

ORDER DENYING MOTION TO CONVERT                                    21/27

1   much more complex, involving numerous creditors with a variety of competing claims on

2   both his property and future income

3       The Gordon court found that he had significant ability to pay claims. But Debtor's

4   financial obligations dwarf Gordon's; Debtor scheduled secured debts over 56 times higher,

5   and unsecured debts over 9.5 times higher than Gordon's debts.[12] While it is true that

6   Debtor earns significantly more than Gordon did, his income is subject to significant

7   uncertainties described above, whereas Gordon's income was assured. Debtor's life as a

8   professional hockey player, with its attendant risks and challenges, is simply not comparable

9   to that of a consultant like Gordon. Even if Debtor's income is reliable, no one has shown

10  how Debtor could pay a significant portion of what he owes to creditors.

11      The second factor, the likelihood of reconversion, is also distinguishable. The

12  creditor Proudfoot did not request a trustee be appointed, so it is not surprising the record

13  did not show any basis for immediate reconversion. Here, by contrast, Zions make sweeping

14  assertions about Debtor's pre-petition mismanagement of the estate, and its attendant

15  diminution, as well as his likely prospective conduct, and urge a trustee is the sole logical

16  remedy. So unlike *Gordon*, this motion is explicitly premised on conduct that would support a

17  motion to reconvert, and will allegedly continue in Chapter 11 if I do not appoint a trustee.

18      The *Gordon* court saw a high likelihood that a Chapter 11 plan could be negotiated.

19  The court in fact so no reason to assume the moving party would object to a reasonable

20  plan, and further assumed a plan could be confirmed over that party's objection anyway.

21  Those assumptions are not obvious here for several reasons. Zions argues there are

22  irreconcilable conflicts between it and Debtor. Zions uses this to argue a trustee is required.

23  But if I converted without appointing a trustee, leaving Debtor in possession, Zions has

24  essentially admitted that "there is no likelihood of any cooperation between" it and Debtor

25  "in the near future." *In re Marvel Entm't Grp., Inc.*, 140 F.3d 463, 472–74 (3d Cir. 1998).

26

27      [12] The *Gordon* debtor apparently did not schedule the judgment creditor's judgment
against him. Adding that amount to the *Gordon* debtor's unsecured claims, I find Debtor's

28  unsecured debts are still 179% greater than in *Gordon*.

ORDER DENYING MOTION TO CONVERT         22/27

1  Furthermore, confirming a plan over Zions' objection will likely be exceedingly difficult.

2  Zions claims to be a secured creditor, so under § 1129(b)(2)(A)(i)(II) it is entitled to full

3  payment if it does not support the proposed plan. Other creditors take the same position.

4        Finally, the facts that led the *Gordon* court to find that debtor's interests best served

5  by conversion simply do not exist here. That finding appears to arise from the nature of the

6  case: a dispute between the debtor's current and former employer, which was made evident

7  by Gordon's current employer's willingness to pay debtor's legal fees, as well as the

8  potentiality of non-dischargeability litigation. In the *Gordon* court's view, converting to

9  Chapter 11 would make it easier for the debtor to obtain a final resolution and move on.

10        This case is different. Debtor's interests are not so directly served by Chapter 11 as

11  were Gordon's. Debtor filed this case of his own accord to stay multiple cases brought

12  against him by creditors. Debtor is funding his own case. He filed a Chapter 7, not a Chapter

13  11, because he wanted to obtain a discharge of as many debts as possible. He is concerned

14  that if the case is converted, he will lose access to the funds he needs to defend any non-

15  dischargeability litigation brought against him.

16        I cannot find that Chapter 11 serves Debtor's interests in the way that conversion

17  served consultant Gordon in his case. Whatever challenges Chapter 7 presents for Debtor

18  would be mitigated by not having to comply with a years-long payment plan and the lack of

19  funding for his further legal challenges. *Gordon* is an interesting case but its application to

20  the facts of Evander Kane's case are not so obvious that I could be persuaded to follow it.

21        D.    <u>I Would not Appoint a Trustee Even if I Ordered Conversion</u>

22        I also find that, if I were to grant conversion as Zions requests, I would not appoint a

23  Chapter 11 trustee. Section 1104(a) says I must appoint a trustee on a showing of cause,

24  which includes "fraud, dishonesty, incompetence, or gross mismanagement of the affairs of

25  the debtor by current management, either before or after the commencement of the case,"

26  or where "appointment is in the best interests of creditors . . . and other interests of the

27  estate." Parties seeking the appointment of a Chapter 11 trustee "have the burden of proving

28

ORDER DENYING MOTION TO CONVERT               23/27

UNITED STATES BANKRUPTCY COURT<br>NORTHERN DISTRICT OF CALIFORNIA

1   appropriate grounds exist for such appointment by the preponderance of the evidence." *In re*

2   *Corona Care Convalescent Corp.*, 527 B.R. 379, 384 (Bankr. C.D. Cal. 2015) (citations omitted).

3       Beginning with fraud or dishonesty, Zions and the joining parties first point to the

4   amendments Debtor has made to his schedules. It is possible Debtor had dishonest or

5   fraudulent motives in omitting information from his schedules. But by filing those

6   amendments Debtor shows at least some evidence of intent to comply with the Code, which

7   is bolstered by his appearance at the § 341(a) meetings and providing the Chapter 7 Trustee

8   and U.S. Trustee with documents. Debtor also provides at least some explanation for

9   omissions like transferring the Rolex watches for a gambling debt. While Zions and other

10  parties may not find such explanations convincing, this is their motion to prove up, and they

11  have given me nothing to show such explanations are false. The parties seeking a trustee also

12  vaguely assert irregularities in the financial statements he provided in obtaining loans from

13  them, but again provide no evidence for such assertions.

14      Turning to gross mismanagement of the estate, I agree that Debtor's pre-petition

15  financial decisions appear ill-considered. But I also find significant that at some point Debtor

16  appears to have realized the disarray in his financial position and hired outside experts to

17  restructure his affairs. That such efforts proved unsuccessful, resulting in this bankruptcy, is

18  less important than his showing at least some understanding of his mistakes, and the need to

19  correct them. Debtor's compliance with the Code so far shows this diligence may be more

20  than a temporary change. On balance, I find the weight of evidence shows that, even if his

21  prior conduct was gross mismanagement, his recent conduct shows marked improvement. I

22  agree with Debtor that, were this case to be converted to Chapter 11, Debtor has shown he

23  should at least have the opportunity to prosecute it himself.

24      Creditors also argues a trustee would best serve the interests of creditors and other

25  estate interests because there are acrimonious, irreconcilable conflicts between him and his

26  creditors. First, Zions cites for this argument *In re Thomas*, 596 B.R. 350, 361 (Bankr. W.D.

27  Tenn. 2019), which in turn cites cases which state the standard for finding such conflicts

28  show cause for appointing a trustee as requiring that "there is no likelihood of any

ORDER DENYING MOTION TO CONVERT                                              24/27

cooperation between the parties in the near future," *In re Marvel Entm't Grp., Inc.*, 140 F.3d 463, 472–74 (3d Cir. 1998), or that "the inherent conflicts extend beyond the healthy conflicts that always exist between debtor and creditor or . . . when the parties begin working at cross-purposes," *In re Cajun Elec. Power Coop., Inc.*, 74 F.3d 599, 600 (5th Cir. 1996). Zions and the joining parties give no evidence of such a conflict. What conflict they show appears fairly standard to a debtor-creditor relationship that is in default. Also, Debtor's decision to hire restructuring counsel prior to filing this bankruptcy shows an intent to work with his creditors, meaning Debtor recently believed cooperation was still possible. He may still, at least with regard to individual creditors, seeing as his stated reason for filing this case was that it was not possible for him to defend against the numerous creditor actions filed against him in quick succession.

I agree that Debtor has not managed his financial affairs well in the past. But more recent conduct shows he has taken this issue more seriously. His compliance with the Code so far shows that change continues. The evidence presented fails to outweigh Debtor's showing of improved management, so I find Zions fails to meet its burden.

E. <u>Conversion to Chapter 11 and Appointing a Trustee and the Role of the Thirteenth Amendment</u>

Debtor argues that converting the case to Chapter 11 and appointing a trustee would violate the Thirteenth Amendment's prohibition on involuntary servitude. Debtor argues that converting this case and appointing a trustee will necessarily lead to the trustee assuming the NHL Contract – his salary with the Sharks being the entire point of Zions' motion and the basis for a reorganization – placing Debtor in the position of a peon, "defined as a status or condition of compulsory service, based upon the indebtedness of the peon to the master." *Clyatt v. United States*, 197 U.S. 207, 215 (1905).The Thirteenth Amendment states: "Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction." The Thirteenth Amendment bars "involuntary servitude enforced by the use or threatened use of physical or legal coercion." *United States v. Kozminski*, 487 U.S.

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

1  931, 944 (1988). Under 42 U.S.C. § 1994, holding any person under peonage is "abolished

2  and forever prohibited in any Territory or State of the United States;" and all laws which

3  establish, maintain, or enforce "the voluntary or involuntary service or labor of any persons

4  as peons, in liquidation of any debt or obligation, or otherwise, are declared null and void."

5  The Supreme Court distinguished peonage from "the voluntary performance of labor or

6  rendering of services in payment of a debt" this way: "In the latter case the debtor, though

7  contracting to pay his indebtedness by labor or service, and subject, like any other

8  contractor, to an action for damages for breach of that contract, can elect at any time to

9  break it, and no law or force compels performance or a continuance of the service." *Clyatt*,

10 197 U.S. at 215–16.

11  This is an important question, but I need not address it. "A fundamental and

12  longstanding principle of judicial restraint requires that courts avoid reaching constitutional

13  questions in advance of the necessity of deciding them." *Campanelli v. Allstate Life Ins. Co.*,

14  322 F.3d 1086, 1093 (9th Cir. 2003) (quoting *Lyng v. Northwest Indian Cemetery Protective Ass'n*,

15  485 U.S. 439, 445–46 (1988)). Because I find it appropriate to deny the motion for failure to

16  satisfy the statutory standard, it is not necessary to decide this constitutional issue.

17  **IV.    CONCLUSION**

18  Because Zions and the joining parties fail to show by a preponderance of the

19  evidence that it is appropriate here to convert the case to Chapter 11 or appoint a trustee,

20  Zions' motion must be denied.

21  IT IS SO ORDERED.

22  **END OF ORDER**

23

24

25

26

27

28

ORDER DENYING MOTION TO CONVERT                                    26/27

# COURT SERVICE LIST

[ECF recipients only]

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ORDER DENYING MOTION TO CONVERT

Heinz Binder (SBN 87908)
Wendy Watrous Smith (SBN 133887)
David B. Rao (SBN 103147))
BINDER & MALTER, LLP
2775 Park Avenue
Santa Clara, CA 95050
T: (408) 295-1700
F: (408) 295-1531
Email: heinz@bindermalter.com
Email: wendy@bindermalter.com
Email: david@bindermalter.com

Attorneys for Appellant South River Capital, LLC

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE DIVISION

| | |
|---|---|
| In re: | Case No.   21-50028 SLJ |
| EVANDER F. KANE, | Chapter 7 |
| | **CERTIFICATE OF SERVICE** |
| Debtor. | |

I declare that:

I am employed in the County of Santa Clara, California.  I am over the age of eighteen years and not a party to the within entitled cause; my business address is 2775 Park Avenue, Santa Clara, California 95050.  May 3, 2021, I served the following:

Stephen D. Finestone
Jennifer C. Hayes
Ryan A. Witthans
Finestone Hayes LLP
456 Montgomery St., Fl. 20
San Francisco, CA 94104
Email: sfinestone@fhlawllp.com
     jhayes@fhlawllp.com
     rwitthans@fhlawllp.com

Michael G. Fletcher
Frandzel, Robins, Bloom and Csato
1000 Wilshire Blvd, 19th Floor
Los Angeles, CA 90017
Email: mfletcher@frandzel.com

CERTIFICATE OF SERVICE

| | |
|---|---|
| 1 | Stephen G. Opperwall |
| 2 | Law Offices of Stephen G. Opperwall |
| 3 | 4900 Hopyard Road, Suite 100 |
| 4 | Pleasanton, CA 94588 |
| | Email: steve.opperwall@comcast.net |

Stephen G. Opperwall
Law Offices of Stephen G. Opperwall
4900 Hopyard Road, Suite 100
Pleasanton, CA 94588
Email: steve.opperwall@comcast.net

Christopher O. Rivas
Reed Smith LLP
355 South Grand Avenue, Suite 2900
Los Angeles, CA 90071
Email: crivas@reedsmith.com

Robert B. Kaplan
Jeffer, Mangels, Butler & Mitchell LLP
Two Embarcadero,Center, 5th Floor
San Francisco, CA 94111
Email: rbk@jmbm.com

Thomas M. Geher
Jeffer Mangels Butler & Mitchell LLP
1900 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067
Email: tmg@jmbm.com

## NOTICE OF APPEAL

(BY ELECTRONIC SERVICE)  I caused the above true and correct copy of said document to be served via ECF.

Executed on May 3, 2021 at Santa Clara, California.  I certify under penalty of perjury that the foregoing is true and correct.

/s/Andrea Lorenz
Andrea Lorenz

CERTIFICATE OF SERVICE