ANTHONY & PARTNERS, LLC
JOHN A. ANTHONY (FL SBN 0731013)
  janthony@anthonyandpartners.com
ANDREW J. GHEKAS (FL SBN 0119169)
*Both Appearing Pro Hac Vice*
aghekas@anthonyandpartners.com
100 S. Ashley Drive, Suite 1600
Tampa, Florida 33602
Telephone: 813.273.5616
Facsimile: 813.221.4113

COOPER, WHITE & COOPER LLP
PETER C. CALIFANO (CA SBN 129043)
  pcalifano@cwclaw.com
201 California Street, 17th Floor
San Francisco, California 94111
Telephone: 415.433.1900
Facsimile: 415.433.5530

Attorneys for Creditor Centennial Bank

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| In re<br><br>EVANDER FRANK KANE,<br><br>Debtor. | CASE NO. 21-50028 SLJ<br><br>Chapter 7<br><br>**CENTENNIAL BANK'S REPLY IN SUPPORT OF MOTION TO DISMISS LIQUIDATION [DOC. 83]**<br><br>Date:     May 18, 2021<br>Time:     2:00 p.m.<br>Ctrm:     Via Zoom Video Conference<br>Judge:    Hon. Stephen L. Johnson |

Centennial Bank, an Arkansas state-chartered bank, by and through its undersigned counsel of record, hereby respectfully submits this reply in support of "Centennial Bank's Motion to Dismiss Liquidation" (the "Dismissal Motion") [Doc. 83], as joined by Professional Bank ("Professional") [Docs. 84 and 100] and Zions Bancorporation, N.A. ("Zions") [Doc. 119], and in response to

COOPER, WHITE
& COOPER LLP
ATTORNEYS AT LAW
201 CALIFORNIA STREET
SAN FRANCISCO, CA 94111-5002

Case: 21-50028    Doc# 130    Filed: 05/11/21    Entered: 05/11/21 16:18:15    Page 1 of 28

"Debtor's Opposition to Centennial Bank's Motion to Dismiss Liquidation" (the "Dismissal Opposition") [Doc. 120] filed Evander Frank Kane (the "Debtor") on May 4, 2021.[1]

## I. <u>INTRODUCTION</u>

In 2005, practitioners saw the biggest reform to the bankruptcy laws since 1978 with the passage of the Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA"). BAPCPA's primary purpose was to prevent abuses of the bankruptcy laws by making it more difficult for some consumers to file bankruptcy under chapter 7, placing more stringent restrictions on access to relief under the same. <u>See</u> <u>In re Robinson</u>, 560 B.R. 352 (Bankr. D. Colo. 2016). BAPCPA "eliminated the presumption in favor of granting relief and changed the standard for dismissal from 'substantial abuse' to 'abuse'" and provided that "any party in interest," and not just the United States Trustee, could bring a motion to dismiss an improperly filed chapter 7. <u>Id.</u>

In order to restrict the number of debtors that could take advantage of the generous benefits of declaring chapter 7 bankruptcy, BAPCPA added what is referred to as the "means test" to 11 U.S.C. §707(b)(2). <u>Id.</u> Now, those debtors whose monthly income is higher than the median income of their state, as calculated by the Bankruptcy Code, are presumptively abusive under 11 U.S.C. § 707(b)(2). <u>Id.</u> The Debtor represents such a debtor whose income, derived primarily from a multi-million-dollar Player's Contract with the San Jose Sharks, is well above the median income of his state of residence – California. He is not the honest and unfortunate debtor in need of a fresh start. But instead, is seeking to utilize the Bankruptcy Code to seek an advantage over his creditors he no longer wishes to pay. But the Debtor's ability to pay – coupled with the consumer nature of the Debtor's debt obligations – confirms that dismissal of this Liquidation is in order.

## II. <u>MEMORANDUM OF LAW</u>

### A. <u>Dismissal Is Warranted As The Debtor's Debts Are Primarily Consumer</u>

---

[1] For purposes of brevity, Centennial utilizes those terms that are more fully defined in the Dismissal Motion.

COOPER, WHITE
& COOPER LLP
ATTORNEYS AT LAW
201 CALIFORNIA STREET
SAN FRANCISCO, CA 94111-5002

Both Centennial and the Debtor agree that "consumer debt" is a "debt incurred by an individual primarily for a personal, family, or household purpose," 11 U.S.C. § 101(8), whereas non-consumer debt is "[d]ebt incurred for business ventures or other profit-seeking activities." Zolg v. Kelly (In re Kelly), 841 F.2d 908, 913 (9th Cir. 1988); see [Doc. 120 at ¶6]. However, the parties disagree as to the nature of the various secured and unsecured loans that the Debtor has incurred over a short three (3) year period with very little assets to show for it. In the Dismissal Motion, Centennial explained that the Debtor's debt obligations were primarily consumer in nature, supported by the Debtor's Schedules and own testimony at the 341 Examination and 2004 Examination. In response, the Debtor has put forth very little to rebut this evidence other than his own self-serving argument. And while the initial burden is on Centennial as the moving party to support its Dismissal Motion, the Debtor, however, "bears the burden of demonstrating a profit motive in order to establish that a debt is nonconsumer or a business debt." In re Ferreira, 549 B.R. 232, 237 (Bankr. E.D.Cal. 2016). Centennial has met its burden; the Debtor has failed to meet his.

The Debtor's Schedules reflect $28,191,340 secured and unsecured debt, of which $13,964,000 is attributed to amounts owed by the Debtor to Centennial, Professional, and Zions (collectively, the "Non-Residential Bank Debt") – or forty-nine (49%) percent of the Debtor's total claimed liabilities. In his Dismissal Opposition, the Debtor admits that he has $2,985,791 of consumer debt, representing loans incurred by the Debtor from Pacific Private Holdings, 1000568 B.C. Ltd., Wells Fargo, and Raj Bhangu (collectively, the "Other Consumer Debt"). Despite this, the Debtor ignores the $2,150,000 (collectively, the "Unsecured Consumer Debt") of additional unsecured loans that the Debtor incurred from various friends and friends in order to pay bills and other monthly expenses – clearly consumer debt as it was for personal, family, and household use at the Debtor's own admission. See Exhibit "A." The combined total of the Non-Residential Bank Debt, the Other Consumer Debt, and the Unsecured Consumer Debt equals $19,099,791 – or sixty-

COOPER, WHITE
& COOPER LLP
ATTORNEYS AT LAW
201 CALIFORNIA STREET
SAN FRANCISCO, CA 94111-5002

eight (68%) percent of the Debtor's scheduled debt.[2]

The Debtor spends the majority of its Dismissal Opposition trying to convince this Court – to no avail – that the Non-Residential Bank Debt is non-consumer. The evidence confirms that the Non-Residential Bank Debt was not utilized by the Debtor to purchase any real property, investment or otherwise, to invest in any business venture, or to operate any ongoing business enterprise. Instead, the Debtor has confirmed that the majority of Non-Residential Bank Debt went to paydown or payoff preexisting debt obligations of the Debtor (the "Preexisting Debt"). See [Doc. 99, Ex. A]. Paying off preexisting debt obligations not tied to any profit-seeking or business venture is clearly a personal use. The Debtor tacitly admits this fact, as he classified the $100,000 loan incurred from Raj Bhangu as a "[c]onsumer" debt, Doc. 120 at ¶8, despite the fact that the Debtor testified that the Bhangu loan was used to stay current on past due bills and make up late payments. See Exhibit "B."

In response to this uncontroverted evidence, the Debtor postulates that the Non-Residential Bank Debt is "clearly non-consumer in nature" because some documents may be titled "Business Loans," and the lending relationships were arranged by a third-party that was highly compensated and contained "sophisticated transactional documents." [Doc. 120 at ¶9]. However, the mere fact that a loan may be secured does not disqualify it from being a consumer debt. See Cox v. Fokkena (In re Cox), 315 B.R. 850, 855 (8th Cir. BAP 2004) (citing Kelly, 841 F.2d at 912). Instead, to determine whether a debt should be classified as a consumer debt, courts examine the debtor's purpose in incurring it. See Bushkin v. Singer (In re Bushkin), BAP No. CC-15-1285-KiKuF, 2016

---

[2] The Debtor lists the two (2) debt obligations associated with his two (2) Canadian properties as non-consumer, because the Debtor allegedly purchased the same as investment properties, despite the fact that the Debtor purchased the Isabel Property was purchased for the Debtor's family to reside in without making any financial contribution to the purchase or upkeep of the same. Regardless of whether the two (2) Canadian properties were purchased as investment properties or not, the Debtor's debt identified above is primarily consumer, as it above the fifty (50%) percent threshold. Kelly, 841 F.2d at 913.

COOPER, WHITE
& COOPER LLP
ATTORNEYS AT LAW
201 CALIFORNIA STREET
SAN FRANCISCO, CA 94111-5002

WL 4040679, at *7 (B.A.P. 9th Cir. July 22, 2016); <u>Lapke v. Mutual of Omaha Bank (In re Lapke)</u>, 428 B.R. 839, 843 (8th Cir. BAP 2010). The Debtor's stated purpose in incurring the Non-Residential Bank Debt was to payoff the Preexisting Debt – a quintessential personal interest. The Debtor has put forth no evidence that the purpose in incurring the Non-Residential Bank Debt was for any business or profit-seeking motive.[3] Instead, the evidence negates such a proposition.

The Debtor simply has not carried his burden of demonstrating that the Non-Residential Bank Debt were incurred for a profit motive. The purpose of the Non-Residential Bank Debt was personal in nature and thus is a consumer debt under 11 U.S.C. § 101(8) for purposes of 11 U.S.C. § 707(b).

**B.      Presumption Of Abuse Under §707(b)(2)**

Because the Debtor steadfastly argues – although in error - that his debt is primarily non-consumer, the Debtor does not contest the fact that the Debtor's chapter 7 filing is presumptively abusive as his annualized income greatly exceeds the applicable median family income. This fact supports dismissal of the Debtor's impermissibly filing of this Liquidation.

**C.      The Debtor's Filing Constitutes Abuse Under §707(b)(3)(B)**

The Debtor's Liquidation should be dismissed as an abuse under 11 U.S.C. § 707(b)(3)(B) based upon the totality of the circumstances surrounding the Debtor's financial situation. The evidence clearly shows that the Debtor has the ability to repay a sufficient amount of his scheduled unsecured debt – he is simply choosing not to.

The Debtor's primary argument is to take issue with Centennial's calculations of his monthly disposable income without actually attempting to set forth what the Debtor perceives to be an accurate description of his monthly disposable income to date. During his continued 341

---

[3] Nor could he as the Debtor cannot even recall what the Preexisting Debt was incurred for in the first place.

COOPER, WHITE
& COOPER LLP
ATTORNEYS AT LAW
201 CALIFORNIA STREET
SAN FRANCISCO, CA 94111-5002

Examination, the Debtor confirmed that he is paid on a bi-weekly basis. See Exhibit "C." At the time of his continued 341 Examination, the Debtor confirmed that he had received two payments pursuant to this Player's Contract – a $38,709.03 payment in January, an approximate $60,000 payment prior to February 23, 2021 as the Debtor testified to during his continued 341 Examination[4], and an approximate $70,000 payment received on February 26, 2021. See Composite Exhibit "D." Thus, through the first two (2) months of his Liquidation, the Debtor has received net payments amounting to approximately $170,000 – far greater than the $91,605 median family income for a family of three (3) living in California.[5] One can easily surmise that the Debtor has continued to receive significant income payments in light of the fact that he has played in every game that the San Jose Sharks have competed in this season despite what the Debtor's Schedules reflect.[6] This again does not take into consideration the Debtor's expectation of receiving an additional $1,200,000 federal tax refund. [Doc. 29 at ¶2].

The Debtor's ability to repay unsecured debts, standing alone, is sufficient to find an abuse under Bankruptcy Code §707(b)(3)(B) necessitating dismissal of this Liquidation. See e.g. In re Reed, 422 B.R. 214 (C.D. Cal. 2009) (holding that the debtor's ability to repay is, by itself, sufficient to find abuse under the totality of the circumstances test under §707(b)(3)); Kelly, 841 F.2d at 914 ("The rule adopted by the overwhelming majority of the courts considering the issue appears to be that a debtor's ability to pay his debts will, standing alone, justify a section 707(b) dismissal"); Calhoun v. United States Trustee, 650 F.3d 338 (4th Cir. 2011) (dismissing the debtor's case under

---

[4] Documentation pertaining to this payment was not provided to Centennial in advance of the Debtor's 2004 Examination.

[5] www.justice.gov/ust/eo/bapcpa/20201101/bci_data/median_income_table.htm

[6] The Debtor's $170,000 received salary payments known to Centennial accounts for only fifteen (15) games played by Kane. Since receiving his last known check on February 26, 2021 – for the pay period ending on February 18, 2021 – the Debtor has competed in forty (40) additional games. See https://www.nhl.com/sharks/stats

COOPER, WHITE
& COOPER LLP
ATTORNEYS AT LAW
201 CALIFORNIA STREET
SAN FRANCISCO, CA 94111-5002

§707(b)(3) because they were able to pay their creditors based on the totality of the circumstances of their financial situation); <u>In re Krohn</u>, 886 F.2d 123 (6th Cir. 1989) (stating that "ability to pay" "alone may be sufficient to warrant dismissal" for substantial abuse). The Debtor's lavish lifestyle does not excuse his unwillingness to pay his creditors, instead, the Debtor should "be required to engage in some good, old-fashioned belt tightening," <u>In re Scarberry</u>, 428 B.R. 403, 427 (Bankr. N.D. Ohio 2009), something the Debtor's Schedules indicate he is unwilling to do. <u>See</u> Doc. 30 ¶11 Part 24.

**D.      The Debtor's Filing Constitutes Bad Faith Pursuant to §707(b)(3)(A)**

The Debtor's filing of this Liquidation constitutes bad faith pursuant to 11 U.S.C. § 707(b)(3)(A) requiring dismissal. In the Dismissal Motion, Centennial, following the nine (9) factors as outlined in <u>In re Mitchell</u>, 357 B.R. 142 (Bankr. C.D. Cal. 2006) and <u>In re Leavitt</u>, 171 F.3d 1219 (9th Cir. 1999), identified that the Debtor's filing of this Liquidation meets eight (8) out of the nine (9) factors for "bad faith." In his Dismissal Opposition, the Debtor has done very little to refute the evidence submitted by Centennial in the Dismissal Motion. Centennial need not repeat here what it has already proven in the context of the Dismissal Motion. Accordingly, and for all of the foregoing reasons stated therein, this Court should conclude that the instant Liquidation constitutes an abuse of the bankruptcy process and has been initiated in bad faith in violation of 11 U.S.C. §§707(b)(2), (b)(3)(A), and (b)(3)(B), and accordingly dismiss this Liquidation.

Based on the foregoing analysis, this Court should reject the Dismissal Opposition and enter an order granting the Dismissal Motion and dismissing this Liquidation.

/ / /

/ / /

/ / /

/ / /

/ / /

COOPER, WHITE
& COOPER LLP
ATTORNEYS AT LAW
201 CALIFORNIA STREET
SAN FRANCISCO, CA 94111-5002

1    DATED:  May 11, 2021                    ANTHONY & PARTNERS, LLC

2

3                                            By:      /s/ John A. Anthony
4                                                  John A. Anthony
                                                  Attorneys for Creditor Centennial Bank
5

6

7

8    DATED:  May 11, 2021                    COOPER, WHITE & COOPER LLP

9

10                                           By:      /s/ Peter C. Califano
11                                                 Peter C. Califano
                                                 Attorneys for Creditor Centennial Bank
12

13   1503797.1

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COOPER, WHITE
& COOPER LLP
ATTORNEYS AT LAW
201 CALIFORNIA STREET
SAN FRANCISCO, CA 94111-5002

# EXHIBIT "A"

1                 UNITED STATES BANKRUPTCY COURT
                  NORTHERN DISTRICT OF CALIFORNIA
2                      SAN JOSE DIVISION
                  CASE NO.: 21-50028-SLJ
3                        Chapter 7

4    In re

5    EVANDER FRANK KANE,

6        Debtor.
    _____/
7

8

9

RULE 2004
10   EXAMINATION AND
    DUCES TECUM
11   DEPOSITION OF:       **EVANDER FRANK KANE**

12   TAKEN:              Pursuant to Notice by
                         Counsel for Centennial Bank
13

DATE:               March 24, 2021
14

TIME:               2:01 p.m. to 5:14 p.m. (EST)
15

LOCATION:          Zoom videoconference
16

REPORTED BY:       Melanie Keefe, FPR
17                         Notary Public
                         State of Florida at Large
18

19

20

21

22

23

24

25

```
 1    APPEARANCES:      ANDREW J. GHEKAS, ESQUIRE
                        Anthony & Partners, LLC
 2                      100 South Ashley Drive
                        Suite 1600
 3                      Tampa, Florida  33602

 4                            Attorney for Centennial Bank

 5                      STEPHEN D. FINESTONE, ESQUIRE
                        Finestone Hayes LLP
 6                      456 Montgomery Street
                        20th Floor
 7                      San Francisco, California  94104

 8                            Attorney for the Debtor

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

—————— REGENCY REPORTING SERVICE, INC. (813)224-0224 ——————

1      Professional Bank?

2          A.   Correct.

3          Q.   And so, again, to confirm, you didn't use any of

4      the Zions Bancorporation or California Bank & Trust loan to

5      buy any property?

6          A.   Correct.

7          Q.   You didn't use it to invest in any ongoing

8      business?

9          A.   Correct.

10         Q.   You didn't start a new business with it?

11         A.   Correct.

12         Q.   If we can skip to page 12 of this document and

13     there's a series of unsecured loans that you have listed

14     there.  I just want to briefly go through each one.  Davis

15     Sanchez you identify as a $150,000 loan.  Do you know what

16     that loan was for?

17         A.   Yeah.  It was money I borrowed from him.

18         Q.   And what was the purpose of borrowing the money?

19         A.   To basically just be able to pay my bills.

20         Q.   And do you know when you took out -- or sorry,

21     not took out.  Do you know when you borrowed this money?

22         A.   It wasn't all at the same time.  It was over the

23     course of a number of years.

24         Q.   Are there any payment terms to this loan?

25         A.   On paper or...

—— REGENCY REPORTING SERVICE, INC. (813)224-0224 ——

1        Q.    Yes, on paper.

2        A.    No.

3        Q.    And who is Davis Sanchez to you?

4        A.    Just a friend of mine.

5        Q.    And going to page 13, the first one, Hebron

6  Shyng?

7        A.    Yep.

8        Q.    430,000, what was that loan for?

9        A.    Again, to help pay off some debt that I had and

10  also to stay current on my bills.

11        Q.    And do you know what debt you're referring to?

12        A.    There's probably some credit card debt, some

13  bills that I was behind on, so I can be able to pay my

14  mortgages, rent at the time, food.

15        Q.    And -- and who is Mr. Shyng?

16        A.    He's a friend of my parents.

17        Q.    And then the page 14, Mike Lispti?

18        A.    Um-hmm.

19        Q.    750,000, what was that loan for?

20        A.    That was some money that I had borrowed.

21        Q.    And what was the purpose of borrowing that money?

22        A.    Just to help pay off some -- some other people

23  that I borrowed money from.

24        Q.    And do you know when this loan was incurred?

25        A.    Not exactly, no.

1      Q.   Is there any documentation to it?

2      A.   No.

3      Q.   And continuing to page 15 -- I'm sorry.  Skip 15.

4      Page 16, Pete Gianakas?

5      A.   Um-hmm.

6      Q.   400,000, what was this loan for?

7      A.   Again, just to pay off some other people that I

8      had borrowed money from in the past.

9      Q.   Did you know who those people were?

10     A.   I don't recall at this time.

11     Q.   Do you know the date in which you took out -- or

12     took this loan?

13     A.   No, I do not.

14     Q.   Is there any documentation?

15     A.   No.

16     Q.   And then same page, Raj Bhangu?

17     A.   Bhangu, yeah.

18     Q.   Bhangu.  Sorry.  A hundred thousand, same

19     question, do you know why -- why this loan was taken out?

20     A.   Yeah.  He loaned me the money because I was

21     behind on some bills and needed -- needed the cash to -- to

22     stay current and make up some late payments.

23     Q.   And do you know when this loan was taken out?

24     A.   I don't recall, no.

25     Q.   And is it documented?

```
 1          A.    It is not.
 2          Q.    And then the last one I have on this, page 17 of
 3    19, Tony Veltri?
 4          A.    Yes.
 5          Q.    320,000, again, do you know what this loan was
 6    taken out for?
 7          A.    Yes.  It was money used to pay off other people
 8    that I had borrowed money from in the past.
 9          Q.    And do you recall who those other people were?
10          A.    I do not.
11          Q.    And do you know the date in which you took out
12    this loan?
13          A.    No.  It was money pieced together over time.
14          Q.    And there's no written documentation regarding
15    it?
16          A.    No.
17          Q.    Okay.  So now I'm going to want to have you open
18    up a document entitled Wells Fargo 2020 Statements
19    Combined.
20          A.    Yep.
21          Q.    All right.  If you could, what -- what is -- what
22    is your Wells Fargo account primarily used for?
23          A.    There's nothing specific about what the account
24    is used for.
25          Q.    Okay.  And you just have seven accounts.  I
```

1                    CERTIFICATE OF REPORTER

2      STATE OF FLORIDA            )

3      COUNTY OF HILLSBOROUGH      )

4

5              I, Melanie Keefe, Court Reporter, certify that I
       was authorized to and did stenographically report remotely
6      the deposition of EVANDER FRANK KANE; that a review of the
       transcript was requested; and that the transcript, pages 5
7      through 102, inclusive, is a true and complete record of my
       stenographic notes.

8

9              I further certify that I am not a relative,
       employee, attorney, or counsel of any of the parties, nor am
10     I a relative or employee of any of the parties' attorney or
       counsel connected with the action, nor am I financially
11     interested in the action.

              *s/ Melanie Keefe*
12            Melanie Keefe, FPR
              Court Reporter
13     _____

14                     CERTIFICATE OF OATH

15     STATE OF FLORIDA            )

16     COUNTY OF HILLSBOROUGH      )

17             I, the undersigned authority, certify that
       EVANDER FRANK KANE personally appeared before me remotely
18     and was duly sworn.

19             WITNESS my hand and official seal this 8th day of
       April, 2021.

20

21            *s/ Melanie Keefe*
              Melanie Keefe, FPR
22            Notary Public
              State of Florida
23            My Commission No.:  HH055410
              Expires:  December 9, 2024

24

25

            —REGENCY REPORTING SERVICE, INC. (813)224-0224—

# EXHIBIT "B"

1         Q.   Is there any documentation to it?

2         A.   No.

3         Q.   And continuing to page 15 -- I'm sorry.  Skip 15.

4 Page 16, Pete Gianakas?

5         A.   Um-hmm.

6         Q.   400,000, what was this loan for?

7         A.   Again, just to pay off some other people that I

8 had borrowed money from in the past.

9         Q.   Did you know who those people were?

10         A.   I don't recall at this time.

11         Q.   Do you know the date in which you took out -- or

12 took this loan?

13         A.   No, I do not.

14         Q.   Is there any documentation?

15         A.   No.

16         Q.   And then same page, Raj Bhangu?

17         A.   Bhangu, yeah.

18         Q.   Bhangu.  Sorry.  A hundred thousand, same

19 question, do you know why -- why this loan was taken out?

20         A.   Yeah.  He loaned me the money because I was

21 behind on some bills and needed -- needed the cash to -- to

22 stay current and make up some late payments.

23         Q.   And do you know when this loan was taken out?

24         A.   I don't recall, no.

25         Q.   And is it documented?

# EXHIBIT "C"

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

_____
                                            )
In re:                                      )
                                            )
EVANDER FRANK KANE           CH: 7          )    21-50028
                                            )
          Debtor.                           )
_____ )

                              U.S. Trustee
                              P.O. Box 4188
                              Mountain View, CA 94040

                              February 23, 2021


            BEFORE FRODE S. HJELMESET Chapter 7 Trustee

APPEARANCES:

For the Debtor:               Stephen Finestone
                              Finestone Hayes LLP
                              456 Montgomery St. 20th Fl.
                              San Francisco, CA 94104

For the United States         Marta E. Villacorta
Trustee:

Proceedings recorded by electronic sound recording;
transcript produced by The Record Xchange.

1          MS. VILLACORTA:  When is your next game?  When do

2    you play next?

3          MR. FINESTONE:  What's the relevance of that

4    question, Ms. Villacorta, I don't understand why you're asking

5    when his next is?

6          MS. VILLACORTA:  I'm asking about his, I mean, he's

7    earning income, right?  You know, I'm still really confused as

8    to why no income was reported on Schedule I.

9          MR. KANE:  So --

10         MR. FINESTONE:  Well, asking him about what his next

11   game is, isn't going to change that confusion.  You and I just

12   have a difference of opinion about how Schedule I should be

13   filled out.

14         His schedule is online, if you want to see what the

15   Sharks' schedule is.

16         MS. VILLACORTA:  Oh, thank you, Mr. Finestone.  So,

17   when do you expect your next paycheck, Mr. -- Mr. Kane?

18         MR. KANE:  I'm not sure.  I'd have to look at the

19   pay, pay schedule.

20         MS. VILLACORTA:  Okay.  Do you get paid bi-weekly?

21   Because I know you got paid once in January, and then it

22   sounds like you just got paid.

23         MR. KANE:  Yeah, we do.  We get paid bi-weekly.

24         MS. VILLACORTA:  Okay.  All right.  So, thank you

25   for that.  So, I have some questions regarding some transfers

C E R T I F I C A T E

I hereby certify that the foregoing is a true and correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_John Buckley_
John Buckley, CET-623
Digital Court Proofreader

TheRecordXchange

# COMPOSITE
# EXHIBIT "D"

1              MR. KANE:  Correct.

2              MS. VILLACORTA:  Is an additional payment from the

3   Sharks, okay.

4              MR. KANE:  Not an additional payment.  Not an

5   additional --

6              MR. FINESTONE:  The confusion, Ms. Villacorta, was

7   your -- he's answering a different question than you're

8   asking.  You're asking, did he receive an additional payment

9   beyond the July payment.

10             MS. VILLACORTA:  Right.

11             MR. FINESTONE:  And what Mr. Kane, I believe, is

12  saying is no, that's just part of that same money.

13             MR. KANE:  Correct.

14             MS. VILLACORTA:  Okay, is that what you're saying,

15  Mr. Kane?

16             MR. KANE:  That is correct.

17             MS. VILLACORTA:  Okay.  I think we've requested this

18  last time, but can you provide, for example, the payments that

19  you received from your employer since July 2020?

20             MR. FINESTONE:  Yes, you've requested it and he has,

21  he does not have a copy of it, but he's asked for one, and we

22  will forward that to you.

23             MS. VILLACORTA:  Okay.  Thank you.  And then,

24  Mr. Kane, just for the record, how many paychecks have you

25  received this year, 2021?

1        MR. KANE:  Two.

2        MS. VILLACORTA:  Okay.  And how much were you paid?

3        MR. KANE:  I believe, we sent you a copy of the

4  first pay stub.  And this last check, I believe it was around

5  60,000.

6        MS. VILLACORTA:  Okay.  And, you know, I'm still a

7  little confused, because I went back to Schedule I, and it

8  looks like Schedule I, where you listed, disclosed your

9  income, it looks like it wasn't amended to include or report

10 any of the earnings that you received from the San Jose

11 Sharks.

12       So, even though you received income in July, August,

13 and October, nothing was reported on Schedule I.  Can you

14 please explain that?

15       MR. FINESTONE:  Yeah, that's a legal question.  And

16 I've answered it in the correspondence we've had,

17 Ms. Villacorta.  I believe Mr. Kane has provided a lengthy

18 explanation of his income, far more than you would normally

19 receive in any bankruptcy filing to explain the potential

20 future income.

21       And so, from our perspective, Schedule I is

22 appropriate.  You may disagree, but that's our position.

23       MS. VILLACORTA:  Okay.  And Mr. -- Kane, thank you,

24 Mr. Finestone, but when is your next game?

25       MR. KANE:  Pardon me?

1    Q.   And so that was actually my -- my first question

2    is why there are three separate checks, it looks like?

3    A.   I do not know why there are three separate

4    checks.

5    Q.   Okay.

6    A.   I -- I know that they total my pay for that pay

7    period.  But with regards to why there were three separate

8    individual checks, I do not know.

9    Q.   Okay.  And -- and so did you, in fact, receive

10   the total of 73,000 or --

11   A.   Yes.

12   Q.   Yes?  Okay.

13   A.   Yeah, approximately, whatever those three totals

14   add up to.

15   Q.   Okay.  And so here it says this pay period was

16   for February 5th through February 18.  And the -- and the

17   January check that we just looked at, that pay period ended

18   -- I believe it was January 21.  So was -- was there not a

19   pay period in between these two checks?

20   A.   Yeah, I -- again, I don't make these documents or

21   these checks, but no, there is no pay period in between

22   that.  No.

23   Q.   Okay.  And so previously when we covered your

24   expense number -- your monthly expense number, you weren't

25   able to testify whether or not you -- what your checks were

REGENCY REPORTING SERVICE, INC. (813)224-0224

## PROOF OF SERVICE

### In re EVANDER FRANK KANE
### Case No. 21-50028-SLJ

**STATE OF CALIFORNIA, COUNTY OF SAN FRANCISCO**

At the time of service, I was over 18 years of age and not a party to this action.  I am employed in the County of San Francisco, State of California.  My business address is 201 California Street, Seventeenth Floor, San Francisco, CA 94111-5002.

On May 11, 2021, I served true copies of the following document(s) described as **CENTENNIAL BANK'S REPLY IN SUPPORT OF MOTION TO DISMISS LIQUIDATION [DOC. 83]** on the interested parties in this action as follows:

### SEE ATTACHED SERVICE LIST

**BY MAIL:**  I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed in the Service List and placed the envelope for collection and mailing, following our ordinary business practices.  I am readily familiar with the practice of Cooper, White & Cooper LLP for collecting and processing correspondence for mailing.  On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.  I am a resident or employed in the county where the mailing occurred.  The envelope was placed in the mail at San Francisco, California.

**BY CM/ECF NOTICE OF ELECTRONIC FILING:**  I electronically filed the document(s) with the Clerk of the Court by using the CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.  Participants in the case who are not registered CM/ECF users will be served by mail or by other means permitted by the court rules.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on May 11, 2021, at San Francisco, California.

Mercedes Stuefen

COOPER, WHITE
& COOPER LLP
ATTORNEYS AT LAW
201 CALIFORNIA STREET
SAN FRANCISCO, CA 94111-5002

**SERVICE LIST**

**In Re: EVANDER FRANK KANE**
**Case No. 21-50028**

Stephen D. Finestone                                  Attorney for Debtor
Finestone Hayes LLP
456 Montgomery St. 20th Fl.
San Francisco, CA 94104

Marta E. Villacorta                                  U.S. Trustee
Office of the U.S. Trustee / SJ
U.S. Federal Bldg.
280 S 1st St. #268
San Jose, CA 95113-3004

Gregg S. Kleiner                                  Attorney for Chapter 7 Trustee
Rincon Law LLP
268 Bush St. #3335
San Francisco, CA 94104

Fred Hjelmeset                                  Chapter 7 Trustee
P.O. Box 4188
Mountain View, CA 94040

COOPER, WHITE
& COOPER LLP
ATTORNEYS AT LAW
201 CALIFORNIA STREET
SAN FRANCISCO, CA 94111-5002