1   ANTHONY & PARTNERS, LLC
    JOHN A. ANTHONY (SBN0731013)
2     janthony@anthonyandpartners.com
    ANDREW J. GHEKAS (SBN 0119169)
3     aghekas@anthonyandpartners.com
    *Both admitted Pro Hac Vice*
4   100 S. Ashley Drive, Suite 1600
    Tampa, Florida 33602
5   Telephone: 813.273.5616
    Facsimile: 813.221.4113
6
    COOPER, WHITE & COOPER LLP
7   PETER C. CALIFANO (SBN 129043)
      pcalifano@cwclaw.com
8   201 California Street, 17th Floor
    San Francisco, California 94111
9   Telephone: 415.433.1900
    Facsimile: 415.433.5530
10
11  Attorneys for Creditor CENTENNIAL BANK
12
                    **UNITED STATES BANKRUPTCY COURT**
13
            **NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION**
14
15  In re                                  CASE NO. 21-50028 SLJ
16  EVANDER FRANK KANE,                    Chapter 7
17         Debtor.                         **NOTICE OF APPEAL AND STATEMENT
18                                         OF ELECTION TO HAVE APPEAL
                                           HEARD BY DISTRICT COURT**
19
20          PLEASE TAKE NOTICE that Creditor, Centennial Bank ("Centennial") hereby appeals

21  from the "Order Denying Motion to Dismiss" (the "Original Dismissal Order") [Dkt 151] entered

22  in this bankruptcy case on May 28, 2021, and the "Amended Order Denying Motion to Dismiss"

23  (the "Amended Dismissal Order") [Dkt 152] entered in this bankruptcy case on June 1, 2021, both

24  of which are collectively referred to herein as the "Dismissal Order." Copies of the Original

25  Dismissal Order and Amended Dismissal Order are attached hereto as Exhibit "A" and "B,"

26  respectively.

27          **NOTICE IS FURTHER GIVEN** that the names of all parties to the Dismissal Order and

28  the names, addresses, and telephone numbers of the respective attorneys are as follows:

COOPER, WHITE
& COOPER LLP
ATTORNEYS AT LAW
201 CALIFORNIA STREET
SAN FRANCISCO, CA 94111-5002

| Party | Attorney |
|---|---|
| Centennial Bank (Appellant) | John A. Anthony<br>Anthony & Partners, LLC<br>100 S. Ashley Drive, Suite 1600<br>Tampa, Florida 33602<br>Telephone: 813-273-5616<br><br>Peter C. Califano<br>Cooper, White & Cooper LLP<br>201 California Street, 17th Floor<br>San Francisco, California 94111-5002<br>Telephone: (415) 433-1900<br><br>Attorneys for Creditor, Centennial Bank |
| Evander Frank Kane (Respondent) | Stephen D. Finestone<br>Ryan A. Witthans<br>Finestone Hayes LLP<br>456 Montgomery St. 20th Fl.<br>San Francisco, CA 94104<br>(415) 421-2624<br><br>Attorneys for Evander Frank Kane |

   NOTICE IS FURTHER GIVEN that Centennial hereby elects to have the appeal heard by the United States District Court, rather than by the Bankruptcy Appellate Panel, pursuant to Rule 8005(a) of the Federal Rules of Bankruptcy Procedure and 28 U.S.C. § 158 (c).

DATED:  June 8, 2021    ANTHONY & PARTNERS, LLC

         By:    */s/John A. Anthony*
             John A. Anthony
             Attorneys for Creditor
             CENTENNIAL BANK

DATED:  June 8, 2021    COOPER, WHITE & COOPER LLP

         By:    */s/Peter C. Califano*
             Peter C. Califano
             Attorneys for Creditor
             CENTENNIAL BANK

COOPER, WHITE
& COOPER LLP
ATTORNEYS AT LAW
201 CALIFORNIA STREET
SAN FRANCISCO, CA 94111-5002

1505161.1

Case: 21-50028 Doc# 161 Filed: 06/08/21 Entered: 06/08/21 15:54:48 Page 2 of 2

# EXHIBIT "A"

**Entered on Docket**
**May 28, 2021**
EDWARD J. EMMONS, CLERK
U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA



The following constitutes the order of the Court.
Signed: May 28, 2021

_Stephen Johnson_

_____
**Stephen L. Johnson**
**U.S. Bankruptcy Judge**

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF CALIFORNIA

In re **EVANDER FRANK KANE**,

           Debtor.

Case No. 21-50028 SLJ
Chapter 7

## ORDER DENYING MOTION TO DISMISS

      Movant Centennial Bank ("Centennial") asserts Debtor Evander Kane's bankruptcy case is an abuse of the provisions of chapter 7,[1] and so requests the case be dismissed under § 707(b).[2] Debtor objects, responding that his debts are not primarily consumer debts, as required under that section, and in any event this case is not an abuse of chapter 7.

      I will deny the motion. I conclude Centennial fails to provide evidence sufficient to meet its burden of showing that Debtor's debts are primarily consumer debts. As this is a threshold requirement for granting a motion to dismiss brought under § 707(b), Centennial's

---

[1] Unless specified otherwise, all chapter and code references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532. All "Civil Rule" references are to the Federal Rules of Civil Procedure and all "Bankruptcy Rule" references are to the Federal Rules of Bankruptcy Procedure. "Civil L.R." and "B.L.R." references refer to the applicable Civil Local Rules and Bankruptcy Local Rules.

[2] Creditors Professional Bank and Zions Bancorporation filed joinders to the motion. *See* ECF 84, 100, 119.

ORDER DENYING MOTION TO DISMISS              1/15

motion fails. In any event, I conclude on the record presented that Debtor's debts are primarily consumer debts, which also means the motion must be denied.

## I.   BACKGROUND

### A.   Debtor Evander Kane

Debtor has played professional hockey for more than 11 years, currently for the San Jose Sharks ("Sharks"). He filed this Chapter 7 petition on January 9, 2021. Debtor's summary of assets and liabilities states he owns $10,224,743.65 in property and owes $28,191,340 in liabilities.[3] ECF 1, p. 8–9; ECF 18. Debtor states his debts are primarily business-related. ECF 1, p. 6. Debtor is married and has a newborn child.

### B.   Debtor's Debts

Debtor has significant debts. Relevant debts for this motion include:

1. $4,230,000 to Scotia Bank across two first-position mortgages on two properties Debtor owns in Canada ("Scotia Bank Debts")[4];

2. $2,320,000 to Pacific Private Holdings, secured by Debtor's home at 2301 Richland Avenue, San Jose, California 95125;

3. $486,000 to 1000568 B.C. Ltd., secured by a second mortgage on the Canadian Properties.

4. $8,340,000 to Centennial ("Centennial Debt"); and

5. $3,740,305 to Zions Bancorporation, $1,354,541.79 to Professional Bank, and $1,101,429.87 to South River Capital, totaling $6,196,276.66 ("'Business' Loans")[5];

6. $715,000 to Lone Shark Holdings;

---

[3] In my order denying Zions Bancorporation's motion to convert this case, I estimated Debtor's liabilities at $30,191,340 in liabilities. ECF 101, p. 2. The motion does not provide an estimate, and Debtor's opposition says his total debts, as shown by the amended schedules and claims register, are $19,489,186.81. My independent review of the schedules and claims register leads me to conclude the correct amount is $28,191,340.

[4] Those properties are located at 3457 West 35th Avenue, Vancouver, British Columbia and 8447 Isabel Place, Vancouver, British Columbia. ECF 30, p. 2–3 ("Canadian Properties").

[5] Both the 'Business' Loans and the Centennial Debt were primarily used to pay off prior high interest loans Debtor incurred. ECF 83, p. 9.

ORDER DENYING MOTION TO DISMISS                                          2/15

1    Debtor admits the second and third debts listed above are consumer debts. Debtor

2    argues the rest are non-consumer debts, and collectively they represent $18,599,685.81 in

3    debt, much more than half of Debtor's total debt. They are described more fully below.

4        C. Centennial's Motion

5    Centennial filed this motion on March 29, 2021. ECF 83. Centennial noticed the

6    motion on April 16, 2021, with a hearing set for May 18, 2021. ECF 98. The motion first

7    argues that, while Debtor stated in his schedules that his debts are primarily non-consumer

8    debts, they are in fact primarily consumer debts. Centennial notes first that Debtor has not

9    been engaged in any business other than being a professional hockey player. The motion

10   only discusses the 'Business' Loans and Centennial Debt. Centennial says that Debtor was

11   unable to recall the amount and purpose of the loans the 'Business' Loans and Centennial

12   Debt were used to repay. But Debtor did confirm that they were not used to buy property or

13   a business, fund an existing business, or purchase any sort of investment. Accordingly, in

14   Centennial's view, they are consumer debt as a matter of law.

15       D. Debtor's Opposition

16   Debtor filed his opposition on May 4, 2021. ECF 120. Debtor primarily argues that

17   Centennial's motion fails because it fails to show his debts are consumer debts. Debtor first

18   points to the Scotia Bank Debts, and says these are non-consumer because he purchased the

19   Canadian Properties as investments, and has never lived in them. Debtor then argues the

20   'Business' Loans and Centennial Debt are also not consumer debt because their cross-

21   collateralization, complexity, inclusion of a security interest in Debtor's future wages, and

22   absence of standard consumer disclosures mean they cannot be consumer debt.

23       E. Centennial's Reply

24   Centennial filed its reply on May 11, 2021. ECF 130. The reply largely reiterates

25   arguments already made in the motion.

26   **II.   LEGAL STANDARD**

27   Section 707(b)(1) allows me to dismiss a chapter 7 "case filed by an individual debtor

28   under this chapter whose debts are primarily consumer debts" if I find granting the debtor

ORDER DENYING MOTION TO DISMISS                                         3/15

relief would be an abuse of the provisions of chapter 7. "There are two prerequisites which must be satisfied in order for a chapter 7 case to be dismissed under § 707(b). First, the individual who seeks relief under chapter 7 must have debts that are 'primarily consumer debts.' Second, the granting of relief must represent a 'substantial abuse' of that chapter." *In re Gomes*, 220 B.R. 84, 86 (B.A.P. 9th Cir. 1998). The party seeking dismissal bears the burden of establishing those prerequisites. *In re Cherrett*, 523 B.R. 660, 668 (B.A.P. 9th Cir. 2014), *aff'd*, 873 F.3d 1060 (9th Cir. 2017); *In re Harris*, 279 B.R. 254, 259 (B.A.P. 9th Cir. 2002).

Section 101(8) defines "consumer debt" as "debt incurred by an individual primarily for a personal, family, or household purpose." The purpose the debtor incurred the debt for "affects whether it falls within the statutory definition of 'consumer debt'[;] debt incurred for business ventures or other profit-seeking activities does not qualify." *In re Hill*, 268 B.R. 548, 552–53 (B.A.P. 9th Cir. 2001) (citing *In re Kelly*, 841 F.2d 908, 913 (9th Cir. 1988)). "Courts determine the debtor's purpose as of the time the debt was incurred." *In re Cherrett*, 873 F.3d 1060, 1067 (9th Cir. 2017) (citation omitted).

## III. DISCUSSION

Below, I first discuss the ambiguity in § 101(8)'s definition of consumer debt. Then, applying that definition, I conclude Centennial fails to meet its burden of production. I also consider the totality of the circumstances and find that, even if I overlook Centennial's lack of evidence, the record shows that the relevant debts are not consumer debts, meaning the motion also fails on the merits.

### A. The Definition of Consumer Debt

Centennial essentially argues Debtor's debts are primarily consumer debts because, except for the Loan Shark Debt, none of them were incurred "to (i) purchase any real property, (ii) purchase any operating business, (iii) fund any operating business, or (iv) invest in any other business enterprise or investment opportunity." ECF 83, p. 9. This argument turns the consumer debt inquiry on its head. Section 101(8) defines consumer debt as "debt incurred for a personal, family, or household purpose." Centennial is correct that whether a debt was incurred to purchase or fund a business or real estate investment is relevant to the

ORDER DENYING MOTION TO DISMISS                                                4/15

consumer debt inquiry, as such debts certainly fall outside the Code's definition. But nothing in the Code or case law prevents other debts from not being consumer debts.

The Code does not provide much help for interpreting the definition of consumer debt, so I will look to other sources to assist in my textual interpretation. A "consumer" is one "who buys goods or services for personal, family, or household use, *with no intention of resale*; a natural person who uses products for personal rather than business purposes." Consumer, Black's Law Dictionary (11th ed. 2019) (emphasis added). I also find that "use" in the context of a consumer is informed by "consumption": "The act of destroying a thing by using it; the use of a thing in a way that exhausts it." Consumption, Black's Law Dictionary (11th ed. 2019). Next, "profit" is an "excess of revenues over expenditures in a business transaction." Profit, Black's Law Dictionary (11th ed. 2019). That definition of profit cites to the definition of "gain": "An increase in amount, degree, or value." Gain, Black's Law Dictionary (11th ed. 2019). So implicit in the concept of "consumer debt" is the notion that the debt is incurred to buy a good or service that the debtor both intends for personal use – that is, destroying or exhausting the good or service to satisfy personal, family, or household needs – and has no intention of reselling. And when courts discuss debt incurred in profit-seeking activities, they mean the debt was incurred to effect a transaction that results in more revenue than expense, or an increase in economic value.[6]

This interpretation of consumer debt accords with Judge Thuma's analysis in *In re Garcia*, 606 B.R. 98 (Bankr. D.N.M. 2019). The court began the inquiry by noting debts that are clearly consumer – debts to buy a home and divorce judgments – and clearly non-consumer – investment debts and credit cards used solely for businesses. *Id.* at 105 (citations omitted). But the court then noted a "gray area," where debts could not easily be classified as either consumer or non-consumer. Surveying relevant case law, the court found several

---

[6] True, the dictionary definition of profit refers to business transactions specifically. But the case law makes clear that a debt need not be incurred in a business transaction to fall outside the definition of consumer debt. *Hill*, 268 B.R. at 552–53. So while this definition is useful for describing what a "profit-seeking activity" is, I decline to adopt the portion of the definition that conflicts with persuasive BAP authority.

ORDER DENYING MOTION TO DISMISS                                                5/15

relevant principles helpful in analyzing debts in the "gray area." First, there is a "significant and commonsensical" link between consumer debts and consumption, such that "consumer debts are those incurred for the consumption of the necessities or luxuries of daily existence." *Id.* (citing *In re Manning*, 126 B.R. 984, 989 (M.D. Tenn. 1991), *vacated on mootness grounds by* 1991 WL 628883 (6th Cir. Sept. 30, 1991). Second, "while debts incurred with a profit motive clearly are not consumer debts, the reverse is not true: a debt that is not incurred with a profit motive may, or may not be, a consumer debt." *Garcia*, 606 B.R. at 106 (citations omitted). Examples of debts in that gray area which are not consumer debts include "[i]nvoluntary debts like taxes," debts incurred to obtain a "financial advantage like a tax write off," and individual guarantees of corporate debt. *Id.* (citations omitted). Third, the main factor in this inquiry is the debtor's purpose in incurring a debt, *id.* (citing *Cherrett*, 523 B.R. at 670), which must be determined by "examin[ing] the totality of the circumstances as they existed at the time that the obligation was incurred," *Garcia*, 606 B.R. at 106 (citing *In re Millard*, 585 B.R. 182, 187 (Bankr. D. Utah 2018)). Fourth and finally, the court noted at least one bankruptcy court concluded the consumer debt definition should be strictly construed. *See In re Constantino*, 72 B.R. 189, 192 (Bankr. D.S.C. 1986).[7]

Interpreting "consumer debt" to include a gray area also accords with the Sixth Circuit's decision in *In re Westberry*, 215 F.3d 589 (6th Cir. 2000). The *Westberry* court was asked to decide whether § 101(8)'s definition of consumer debt includes "federal income and self-employment taxes[.]" *Id.* at 589. The court held such taxes were not consumer debts. The court so reasoned on several grounds: (1) tax debts are not incurred like consumer debts, as tax debts are involuntary; (2) consumer debt is incurred for personal or household purposes, while taxes are incurred for public purposes; and (3) tax debts arise from earning money, while consumer debt arises from consumption. *Id.* at 591. The court also affirmed the use of a profit motive analysis "to determine whether a debt falls outside the category of consumer debt. [But] [t]here is nothing inherent in this test, or direction from the

---

[7] The *Constantino* court provided no explanation for this rule. I conclude such a rule is unnecessary to my decision, and so decline to adopt it.

ORDER DENYING MOTION TO DISMISS

6/15

Bankruptcy Code to suggest, that the test defines the *only* category of non-consumer debt. Therefore, while the profit motive analysis may assist in the determination of which debts are not consumer debt, it does not prohibit other debts from falling outside of the category of consumer debt." *Id.* at 593 (citation omitted). In so holding, the Sixth Circuit rejected the Fourth Circuit's approach, which uses only the profit motive inquiry to determine whether a given debt is not consumer debt. *See In re Kestell*, 99 F.3d 146, 149 (4th Cir. 1996).

I find the reasoning of *Garcia* and *Westberry* persuasive and so adopt it. To summarize: there are clearly consumer debts like mortgages to purchase a primary residence and divorce judgments. There are also clearly non-consumer debts: business debts and profit-seeking investments. But there is a middle ground between these poles, and determining where debts in this "gray area" fall requires examining the totality of the circumstances to determine whether the debtor's purpose in incurring the debt was for consumption, or some other purpose. The possibility of reselling whatever the debt was used to purchase is relevant in deciding whether the debtor had a consumptive purpose. Also relevant is whether the transaction resulted in an economic benefit to the debtor. Since § 101(8) asks what the debtor's primary purpose in incurring a given debt was, where the evidence shows a debtor had more than purpose in incurring a debt, a court must weigh those purposes against each other in light of the evidence presented and decide which took precedence. I apply this interpretation below and find Debtor's debts are primarily not consumer debts.

B. <u>Centennial Fails to Meet its Burden of Production</u>

As discussed above, the party seeking dismissal bears the burden of establishing the prerequisites of § 707(b), including showing that a debtor's debts are primarily consumer debts. *Cherrett*, 523 B.R. at 668; *Harris*, 279 B.R. at 259. At least one bankruptcy court in this circuit has said the debtor bears the burden of showing her debts are not consumer debts, even where the debtor is not the movant. *In re Ferreira*, 549 B.R. 232, 237 (Bankr. E.D. Cal. 2016). But the case the *Ferreira* court relied upon for that proposition, *In re Palmer*, 542 B.R. 289, 297 (Bankr. D. Colo. 2015), was reversed by the district court, *Palmer v. Laying*, 559 B.R. 746 (D. Colo. 2016). In its order reversing the bankruptcy court, the district court concluded

Case: 21-50028   Doc# 161   Filed: 06/28/21   Entered: 06/28/21 13:54:41   Page 10 of 34

United States Bankruptcy Court
Northern District of California

1  that, "at most, the debtor's burden in this regard is one of persuasion. It still remains the

2  UST's burden to show that the debtor's chapter 7 case should be dismissed, which, means

3  that it remains the UST's burden to show that the debtor's debts are primarily consumer

4  debts." *Id.* at 756. It is unclear to me how a debtor can have the burden of persuasion on an

5  issue where the moving party still bears the burden of proof. In any event, I decline to

6  depart from BAP authority placing the burden on the moving party.

7  Debtor stated under penalty of perjury in his petition that his debts are primarily

8  consumer debts. So at a minimum, even under *Ferreira*'s approach Centennial has a burden

9  to produce evidence sufficient to create a genuine dispute of material fact whether Debtor's

10  debts are primarily consumer debts. *See* Civil Rule 56(a). The only evidence on the consumer

11  debt question Centennial provides in its motion is Debtor's deposition testimony, where he

12  confirms the Centennial Debt and 'Business' Loans were not incurred to buy a business or

13  investment property. The only supplement Centennial provides in its reply is Debtor's

14  statement that the Centennial Debt and 'Business' Loans were incurred to pay off old debts.

15  As discussed below, I have my doubts that incurring debt to pay off old debts

16  automatically makes the new debt consumer debt, as Centennial suggests. But even if I agree,

17  Centennial's evidence only shows that the relevant debts do not fall within the clearly

18  non-consumer category of business or profit-seeking debt. This evidence does nothing to

19  affirmatively place the Centennial Debt or 'Business' Loans in the consumer debt category.

20  More importantly, Centennial's evidence and supporting argument fails to show why those

21  debts are either not in the gray area described in *Garcia*, or what indicia should lead me to

22  conclude Debtor's purpose was more consumer than non-consumer.

23  The BAP says Centennial bears the burden of showing Debtor's debts are primarily

24  consumer debts. At a minimum, even under *Ferreira* Centennial must present evidence that

25  such debts are consumer debts sufficient to shift the burden to Debtor. Centennial fails

26  under either standard because, at best, its evidence shows the debts were not business or

27  investment debt. But as *Garcia* makes clear, there are consumer debts, and then a universe of

28  debts that are not consumer debts, and business or investment debts are not the whole of

ORDER DENYING MOTION TO DISMISS                                                    8/15

1   that universe. Centennial could have satisfied its burden with evidence that either

2   affirmatively showed the debts were consumer debts, or that showed such debts did not fall

3   within the universe of non-consumer debt described in *Garcia*. Centennial did neither, so it

4   did not meet the burden of production placed on it by § 707(b).

5           C.   The Centennial Debt is not Consumer Debt

6           Setting aside Centennial's burden of production, the parties agree Debtor incurred

7   the Centennial Debt to pay off prior high interest loans. ECF 83, p. 9; ECF 121 ¶ 12. In fact,

8   Debtor did not personally receive any funds from Centennial, as the proceeds from the

9   Centennial Debt were disbursed directly to the holders of those prior high interest loans.

10  ECF 121, ¶ 12. This places the Centennial Debt in the "gray area" contemplated by *Garcia*,

11  as there are no indicia that would allow me to say it is clearly consumer or non-consumer.

12          I note again that the parties appear to agree that Debtor used the Centennial Debt to

13  pay off high interest loans. Though the parties present little evidence on this point, the

14  constant reference to the prior loans being high interest allows for the inference that Debtor

15  refinanced for better terms. Another way of saying Debtor refinanced for better terms is that

16  he effected a transaction that increased his economic value, which further shows that this

17  debt was not incurred for a consumer purpose.

18          Another relevant point is that no consumption occurred when Debtor incurred the

19  Centennial Debt. On the record provided, the service Debtor received was purely financial:

20  Debtor "received" funds in exchange for a promise to repay such funds back over time.

21  Nothing was consumed in this transaction. Money changed hands, but it was not used up in

22  the process. The absence of evidence of consumption in this transaction by Debtor is

23  another point against the Centennial Debt being consumer debt.

24          The lack of evidence presented makes it difficult to precisely determine Debtor's

25  purpose in incurring the Centennial Debt. Centennial could argue, but did not, that the lack

26  of evidence is due to Debtor's inability to recall why he took out the high interest loans the

27  Centennial Debt was used to partially pay off. Setting aside that this is not the inquiry – what

28  matters is Debtor's intent when he executed *this* loan – Centennial ignores that it paid the

ORDER DENYING MOTION TO DISMISS                                                    9/15

loan proceeds directly to creditors of Debtor. ECF 121, p. 3. I can infer from this fact that Centennial had an opportunity to obtain that information at the time, and likely could still do so now. It is unclear why a lender exercising reasonable due diligence would not have obtained any information about the prior loans or the entities who extended them, especially when part of Centennial's loan involved paying such lenders directly. So to the extent that Centennial requests I hold the absence of evidence of purpose against Debtor, I decline to do so. At minimum, both parties bear similar culpability for the absence of such evidence. This issue is also dealt with by the burden of proof, which is squarely on Centennial.

I conclude the evidence shows the Centennial Debt was incurred with a purpose not related to consumption and with an eye towards economic gain, and that Debtor could resell this debt again in the future, all of which show a non-consumer purpose. Centennial does nothing to counter this conclusion, as its evidence only deals with whether the Centennial Debt was business or investment debt, which is only part of the question. Even if I were unwilling to infer from these limited facts that Debtor incurred the Centennial Debt with a non-consumer purpose, I would still find that Centennial fails to meet its burden of proof as to this debt. Indeed, it presents essentially no evidence that would allow me to even infer Debtor's purpose. Accordingly, I conclude that, for purposes of this motion, the $8,600,000 Centennial Debt is not consumer debt.

D. The 'Business' Loans are not Consumer Debts

Turning to the 'Business' Loans, I consider them together because, as discussed more below, they include materially similar terms. I note first that the Zions and South River loans are characterized in their documents as business loans. ECF 121-1, p. 2, 26. And the South River loan states that Debtor certified then that the proceeds from the loan would be used for "Business related expenses." *Id.* at 26. Each of these loans also purports to create a security interest in Debtor's future income with the San Jose Sharks, and required that Debtor maintain "Death & Disgrace Insurance," *id.* at 3, 17, 39, 49, 52. And as Debtor notes, the loan documents contain few, if any, of the customary disclosures expected in

ORDER DENYING MOTION TO DISMISS                                    10/15

more standard consumer loan agreements; the sole exception is the schedule of repayment provided in the Professional Bank loan. *Id.* at 22.

As for relevant provisions peculiar to each loan, the Professional Bank loan required payment directly from the Sharks to the lender. *Id.* at 14. And the Zions loan required Debtor covenant that he "[m]aintain executive and management personnel with substantially the same qualifications as the present executive and management personnel . . . ." *Id.* at 4. The Zions loan also stated that Debtor either "received prior commercial loans from [Zions] or applied to [Zions] for a commercial loan . . . ." *Id.* at 2.

As with the Centennial Debt, Centennial fails to present any evidence of Debtor's purpose in incurring these debts, so I am left to infer Debtor's intent from the documents themselves. The Zions and South River loans characterize themselves as business loans; the South River loan even states explicitly that the loan proceeds are for business expenses. "[I]t is well established that a party who signs a document is presumed to have read it and to understand its contents." *Baker v. Italian Maple Holdings, LLC*, 13 Cal. App. 5th 1152, 1162 n.6 (2017). So I must presume that Debtor understood he was signing documents to apply for a business loan with Zions and South River. To find Debtor incurred these debts with a consumer purpose, I would have to find he signed these documents with fraudulent intent. At a minimum, I would have to find Debtor lied when he signed the South River loan documents, as those documents explicitly state the proceeds were solely for business related expenses. Centennial and other creditors have gestured to such arguments in this motion and the motion to convert this case to chapter 11. But so far they have not presented any evidence that would allow me to make that finding.

The 'Business' Loans requiring death and disgrace insurance, and attempting to create a security interest in Debtor's future income as an NHL player, also complicates Centennial's claim that these are consumer debts. A useful analogy is *In re Cherrett*, 873 F.3d 1060 (9th Cir. 2017). In *Cherrett*, the Ninth Circuit concluded that a bankruptcy court did not clearly err in finding that a debtor's housing loan was not a consumer debt when it was offered as part of an employment package to entice the debtor to leave his current job for employment with

ORDER DENYING MOTION TO DISMISS                                              11/15

the offeror. The Court noted, among other things, that the loan was at a below-market-rate that the debtor could likely only have obtained through his employer, was originated by an affiliate of the offeror, and was later transferred to the offeror itself. *Id.* at 1068.

I have no evidence that the 'Business' Loans were somehow part of Debtor's employment package. And again, I have no evidence what the purpose was of these loans, or the loans they were used to pay off. But like *Cherrett*, each of the 'Business' Loans make clear that Debtor's employment as an NHL player was the only reason he was considered for the loans, and his continued employment was the basic assumption underpinning them. The requirement Debtor maintain death and disgrace insurance supports this inference; death would certainly cause Debtor to lose his employment, and presumably a sufficiently grave disgrace would do so as well. Either event would cut off the lenders' expected source of repayment. What all this shows is the 'Business' Loans are inextricably tied to Debtor's "business" of being a professional hockey player. ECF 83, p. 8. I find this makes it reasonable to infer that Debtor's purpose in incurring the 'Business' Loans was also related to his employment, rather than being purely personal. Centennial presents no evidence to foreclose such an inference, and gives no explanation why it is erroneous.

Finally, I note that, like the Centennial Debt, the 'Business' Loans were taken out to refinance already-existing loans. So the analysis that led me to find the Centennial Debt not a consumer debt – that it was incurred to improve Debtor's financial position, not to purchase for consumption a good or service – applies equally to the 'Business' Debts.

As with the Centennial Debt, Centennial fails to provide evidence showing Debtor had a consumer purpose in mind when he incurred the 'Business' Debts. And the evidence that is in the record either supports finding them non-consumer debts, or are at best ambivalent on the question. The weight of the evidence, such as it is, goes against finding the $6,196,276.66 'Business' Debts consumer debts, so I conclude they are not.

E. The Lone Shark Debt is not Consumer Debt

The Lone Shark Debt is also not consumer debt. In the papers filed in connection with the motion to convert this case to chapter 11, both creditors and Debtor confirmed

that this debt was incurred to purchase an interest in the tax attributes of Ascher Capital II and III LLC. ECF 101, p. 3. Debtor argues this makes it a non-consumer investment debt, and Centennial appears to concede this is so. ECF 83, p. 9 ("Instead, it would see that the only potential non-consumer debt incurred by the Debtor is the Loan Shark Debt the Debtor took out less than a month after initiating this Liquidation."). I conclude the $750,000 Lone Shark Debt, being an investment, is not consumer debt.

F. The Scotia Bank Debts are not Consumer Debts

Finally, the Scotia Bank Debts are also not consumer debts. "Evidence that a debtor incurred a debt 'purely or primarily as a business investment, albeit an investment in herself or himself, much like a loan incurred for a new business,' can serve as an important factor in determining the debtor's purpose." Debtor states he purchased the Canadian Properties that secure the Scotia Bank Debts as an investment and has never lived in them. ECF 121 ¶ 5–6. He also states he has rented the 3457 West 35th Avenue property "from time to time since it was acquired." *Id.* ¶ 6. Centennial's motion fails to discuss the Scotia Bank Debts, so I have no evidence in opposition to Debtor's statement. I accordingly find that, because the Scotia Bank Debts were incurred to purchase investment properties that Debtor has never lived in, the $4,230,000 Scotia Bank Debts are not consumer debts.

G. Debtor's Debts are Primarily Non-consumer Debts

Above I found that Debtor's total debts are $28,191,340. Given the analysis above, Debtor's non-consumer debts total $19,776,276.66. Debtor's non-consumer debts therefore are much more than half of Debtor's total debts, meaning he holds primarily non-consumer debt. As Debtor having primarily consumer debt is a threshold requirement for a § 707(b) motion to succeed, Centennial's motion must fail.

IV. **CONCLUSION**

Because Centennial fails to meet its burden of production to show Debtor's debts are primarily consumer debts, and because the evidence I do have points to such debts being incurred with a non-consumer purpose, Debtor's debts are primarily non-consumer debts, and Centennial's motion is denied.

Case: 21-50028    Doc# 161    Filed: 06/08/21    Entered: 06/08/21 15:55:48    Page 16 of 34

IT IS SO ORDERED.

**END OF ORDER**

**COURT SERVICE LIST**

[ECF recipients only]

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

ORDER DENYING MOTION TO DISMISS

# EXHIBIT "B"



The following constitutes the order of the Court.
Signed: June 1, 2021

*Stephen Johnson*

_____
**Stephen L. Johnson**
**U.S. Bankruptcy Judge**

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF CALIFORNIA

In re **EVANDER FRANK KANE**,

                Debtor.

Case No. 21-50028 SLJ
Chapter 7

## AMENDED ORDER DENYING MOTION TO DISMISS

Movant Centennial Bank ("Centennial") asserts Debtor Evander Kane's bankruptcy case is an abuse of the provisions of chapter 7,[1] and so requests the case be dismissed under § 707(b).[2] Debtor objects, responding that his debts are not primarily consumer debts, as required under that section, and in any event this case is not an abuse of chapter 7.

I will deny the motion. I conclude Centennial fails to provide evidence sufficient to meet its burden of showing that Debtor's debts are primarily consumer debts. As this is a threshold requirement for granting a motion to dismiss brought under § 707(b), Centennial's

---

[1] Unless specified otherwise, all chapter and code references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532. All "Civil Rule" references are to the Federal Rules of Civil Procedure and all "Bankruptcy Rule" references are to the Federal Rules of Bankruptcy Procedure. "Civil L.R." and "B.L.R." references refer to the applicable Civil Local Rules and Bankruptcy Local Rules.

[2] Creditors Professional Bank and Zions Bancorporation filed joinders to the motion. *See* ECF 84, 100, 119.

AMENDED ORDER DENYING MOTION TO DISMISS

motion fails. In any event, I conclude on the record presented that Debtor's debts are not primarily consumer debts, which also means the motion must be denied.

## I. BACKGROUND

### A. Debtor Evander Kane

Debtor has played professional hockey for more than 11 years, currently for the San Jose Sharks ("Sharks"). He filed this Chapter 7 petition on January 9, 2021. Debtor's summary of assets and liabilities states he owns $10,224,743.65 in property and owes $28,191,340 in liabilities.[3] ECF 1, p. 8–9; ECF 18. Debtor states his debts are primarily business-related. ECF 1, p. 6. Debtor is married and has a newborn child.

### B. Debtor's Debts

Debtor has significant debts. Relevant debts for this motion include:

1. $4,230,000 to Scotia Bank across two first-position mortgages on two properties Debtor owns in Canada ("Scotia Bank Debts")[4];

2. $2,320,000 to Pacific Private Holdings, secured by Debtor's home at 2301 Richland Avenue, San Jose, California 95125;

3. $486,000 to 1000568 B.C. Ltd., secured by a second mortgage on the Canadian Properties.

4. $8,340,000 to Centennial ("Centennial Debt"); and

5. $3,740,305 to Zions Bancorporation, $1,354,541.79 to Professional Bank, and $1,101,429.87 to South River Capital, totaling $6,196,276.66 ("'Business' Loans")[5];

---

[3] In my order denying Zions Bancorporation's motion to convert this case, I estimated Debtor's liabilities at $30,191,340 in liabilities. ECF 101, p. 2. The motion does not provide an estimate, and Debtor's opposition says his total debts, as shown by the amended schedules and claims register, are $19,489,186.81. My independent review of the schedules and claims register leads me to conclude the correct amount is $28,191,340.

[4] Those properties are located at 3457 West 35th Avenue, Vancouver, British Columbia and 8447 Isabel Place, Vancouver, British Columbia. ECF 30, p. 2–3 ("Canadian Properties").

[5] Both the 'Business' Loans and the Centennial Debt were primarily used to pay off prior high interest loans Debtor incurred. ECF 83, p. 9.

AMENDED ORDER DENYING MOTION TO DISMISS

1    6. $715,000 to Lone Shark Holdings;

2    Debtor admits the second and third debts listed above are consumer debts. Debtor

3    argues the rest are non-consumer debts, and collectively they represent $18,599,685.81 in

4    debt, much more than half of Debtor's total debt. They are described more fully below.

5    C. Centennial's Motion

6    Centennial filed this motion on March 29, 2021. ECF 83. Centennial noticed the

7    motion on April 16, 2021, with a hearing set for May 18, 2021. ECF 98. The motion first

8    argues that, while Debtor stated in his schedules that his debts are primarily non-consumer

9    debts, they are in fact primarily consumer debts. Centennial notes first that Debtor has not

10   been engaged in any business other than being a professional hockey player. The motion

11   only discusses the 'Business' Loans and Centennial Debt. Centennial says that Debtor was

12   unable to recall the amount and purpose of the loans the 'Business' Loans and Centennial

13   Debt were used to repay. But Debtor did confirm that they were not used to buy property or

14   a business, fund an existing business, or purchase any sort of investment. Accordingly, in

15   Centennial's view, they are consumer debt as a matter of law.

16   D. Debtor's Opposition

17   Debtor filed his opposition on May 4, 2021. ECF 120. Debtor primarily argues that

18   Centennial's motion fails because it fails to show his debts are consumer debts. Debtor first

19   points to the Scotia Bank Debts, and says these are non-consumer because he purchased the

20   Canadian Properties as investments, and has never lived in them. Debtor then argues the

21   'Business' Loans and Centennial Debt are also not consumer debt because their cross-

22   collateralization, complexity, inclusion of a security interest in Debtor's future wages, and

23   absence of standard consumer disclosures mean they cannot be consumer debt.

24   E. Centennial's Reply

25   Centennial filed its reply on May 11, 2021. ECF 130. The reply largely reiterates

26   arguments already made in the motion.

27

28   AMENDED ORDER DENYING MOTION TO DISMISS
     3/15

## II. LEGAL STANDARD

Section 707(b)(1) allows me to dismiss a chapter 7 "case filed by an individual debtor under this chapter whose debts are primarily consumer debts" if I find granting the debtor relief would be an abuse of the provisions of chapter 7. "There are two prerequisites which must be satisfied in order for a chapter 7 case to be dismissed under § 707(b). First, the individual who seeks relief under chapter 7 must have debts that are 'primarily consumer debts.' Second, the granting of relief must represent a 'substantial abuse' of that chapter." *In re Gomes*, 220 B.R. 84, 86 (B.A.P. 9th Cir. 1998). The party seeking dismissal bears the burden of establishing those prerequisites. *In re Cherrett*, 523 B.R. 660, 668 (B.A.P. 9th Cir. 2014), *aff'd*, 873 F.3d 1060 (9th Cir. 2017); *In re Harris*, 279 B.R. 254, 259 (B.A.P. 9th Cir. 2002).

Section 101(8) defines "consumer debt" as "debt incurred by an individual primarily for a personal, family, or household purpose." The purpose the debtor incurred the debt for "affects whether it falls within the statutory definition of 'consumer debt'[;] debt incurred for business ventures or other profit-seeking activities does not qualify." *In re Hill*, 268 B.R. 548, 552–53 (B.A.P. 9th Cir. 2001) (citing *In re Kelly*, 841 F.2d 908, 913 (9th Cir. 1988)). "Courts determine the debtor's purpose as of the time the debt was incurred." *In re Cherrett*, 873 F.3d 1060, 1067 (9th Cir. 2017) (citation omitted).

## III. DISCUSSION

Below, I first discuss the ambiguity in § 101(8)'s definition of consumer debt. Then, applying that definition, I conclude Centennial fails to meet its burden of production. I also consider the totality of the circumstances and find that, even if I overlook Centennial's lack of evidence, the record shows that the relevant debts are not consumer debts, meaning the motion also fails on the merits.

### A. The Definition of Consumer Debt

Centennial essentially argues Debtor's debts are primarily consumer debts because, except for the Loan Shark Debt, none of them were incurred "to (i) purchase any real property, (ii) purchase any operating business, (iii) fund any operating business, or (iv) invest

AMENDED ORDER DENYING MOTION TO DISMISS
4/15

in any other business enterprise or investment opportunity." ECF 83, p. 9. This argument turns the consumer debt inquiry on its head. Section 101(8) defines consumer debt as "debt incurred for a personal, family, or household purpose." Centennial is correct that whether a debt was incurred to purchase or fund a business or real estate investment is relevant to the consumer debt inquiry, as such debts certainly fall outside the Code's definition. But nothing in the Code or case law prevents other debts from not being consumer debts.

The Code does not provide much help for interpreting the definition of consumer debt, so I will look to other sources to assist in my textual interpretation. A "consumer" is one "who buys goods or services for personal, family, or household use, *with no intention of resale*; a natural person who uses products for personal rather than business purposes." Consumer, Black's Law Dictionary (11th ed. 2019) (emphasis added). I also find that "use" in the context of a consumer is informed by "consumption": "The act of destroying a thing by using it; the use of a thing in a way that exhausts it." Consumption, Black's Law Dictionary (11th ed. 2019). Next, "profit" is an "excess of revenues over expenditures in a business transaction." Profit, Black's Law Dictionary (11th ed. 2019). That definition of profit cites to the definition of "gain": "An increase in amount, degree, or value." Gain, Black's Law Dictionary (11th ed. 2019). So implicit in the concept of "consumer debt" is the notion that the debt is incurred to buy a good or service that the debtor both intends for personal use – that is, destroying or exhausting the good or service to satisfy personal, family, or household needs – and has no intention of reselling. And when courts discuss debt incurred in profit-seeking activities, they mean the debt was incurred to effect a transaction that results in more revenue than expense, or an increase in economic value.[6]

---

[6] True, the dictionary definition of profit refers to business transactions specifically. But the case law makes clear that a debt need not be incurred in a business transaction to fall outside the definition of consumer debt. *Hill*, 268 B.R. at 552–53. So while this definition is useful for describing what a "profit-seeking activity" is, I decline to adopt the portion of the definition that conflicts with persuasive BAP authority.

AMENDED ORDER DENYING MOTION TO DISMISS

5/15

This interpretation of consumer debt accords with Judge Thuma's analysis in *In re Garcia*, 606 B.R. 98 (Bankr. D.N.M. 2019). The court began the inquiry by noting debts that are clearly consumer – debts to buy a home and divorce judgments – and clearly non-consumer – investment debts and credit cards used solely for businesses. *Id.* at 105 (citations omitted). But the court then noted a "gray area," where debts could not easily be classified as either consumer or non-consumer. Surveying relevant case law, the court found several relevant principles helpful in analyzing debts in the "gray area." First, there is a "significant and commonsensical" link between consumer debts and consumption, such that "consumer debts are those incurred for the consumption of the necessities or luxuries of daily existence." *Id.* (citing *In re Manning*, 126 B.R. 984, 989 (M.D. Tenn. 1991), *vacated on mootness grounds by* 1991 WL 628883 (6th Cir. Sept. 30, 1991). Second, "while debts incurred with a profit motive clearly are not consumer debts, the reverse is not true: a debt that is not incurred with a profit motive may, or may not be, a consumer debt." *Garcia*, 606 B.R. at 106 (citations omitted). Examples of debts in that gray area which are not consumer debts include "[i]nvoluntary debts like taxes," debts incurred to obtain a "financial advantage like a tax write off," and individual guarantees of corporate debt. *Id.* (citations omitted). Third, the main factor in this inquiry is the debtor's purpose in incurring a debt, *id.* (citing *Cherrett*, 523 B.R. at 670), which must be determined by "examin[ing] the totality of the circumstances as they existed at the time that the obligation was incurred," *Garcia*, 606 B.R. at 106 (citing *In re Millard*, 585 B.R. 182, 187 (Bankr. D. Utah 2018)). Fourth and finally, the court noted at least one bankruptcy court concluded the consumer debt definition should be strictly construed. *See In re Constantino*, 72 B.R. 189, 192 (Bankr. D.S.C. 1986).[7]

Interpreting "consumer debt" to include a gray area also accords with the Sixth Circuit's decision in *In re Westberry*, 215 F.3d 589 (6th Cir. 2000). The *Westberry* court was asked to decide whether § 101(8)'s definition of consumer debt includes "federal income and

---

[7] The *Constantino* court provided no explanation for this rule. I conclude such a rule is unnecessary to my decision, and so decline to adopt it.

AMENDED ORDER DENYING MOTION TO DISMISS

self-employment taxes[.]" *Id.* at 589. The court held such taxes were not consumer debts. The court so reasoned on several grounds: (1) tax debts are not incurred like consumer debts, as tax debts are involuntary; (2) consumer debt is incurred for personal or household purposes, while taxes are incurred for public purposes; and (3) tax debts arise from earning money, while consumer debt arises from consumption. *Id.* at 591. The court also affirmed the use of a profit motive analysis "to determine whether a debt falls outside the category of consumer debt. [But] [t]here is nothing inherent in this test, or direction from the Bankruptcy Code to suggest, that the test defines the *only* category of non-consumer debt. Therefore, while the profit motive analysis may assist in the determination of which debts are not consumer debt, it does not prohibit other debts from falling outside of the category of consumer debt." *Id.* at 593 (citation omitted). In so holding, the Sixth Circuit rejected the Fourth Circuit's approach, which uses only the profit motive inquiry to determine whether a given debt is not consumer debt. *See In re Kestell*, 99 F.3d 146, 149 (4th Cir. 1996).

I find the reasoning of *Garcia* and *Westberry* persuasive and so adopt it. To summarize: there are clearly consumer debts like mortgages to purchase a primary residence and divorce judgments. There are also clearly non-consumer debts: business debts and profit-seeking investments. But there is a middle ground between these poles, and determining where debts in this "gray area" fall requires examining the totality of the circumstances to determine whether the debtor's purpose in incurring the debt was for consumption, or some other purpose. The possibility of reselling whatever the debt was used to purchase is relevant in deciding whether the debtor had a consumptive purpose. Also relevant is whether the transaction resulted in an economic benefit to the debtor. Since § 101(8) asks what the debtor's primary purpose in incurring a given debt was, where the evidence shows a debtor had more than purpose in incurring a debt, a court must weigh those purposes against each other in light of the evidence presented and decide which took precedence. I apply this interpretation below and find Debtor's debts are primarily not consumer debts.

AMENDED ORDER DENYING MOTION TO DISMISS
7/15

### B. Centennial Fails to Meet its Burden of Production

As discussed above, the party seeking dismissal bears the burden of establishing the prerequisites of § 707(b), including showing that a debtor's debts are primarily consumer debts. *Cherrett*, 523 B.R. at 668; *Harris*, 279 B.R. at 259. At least one bankruptcy court in this circuit has said the debtor bears the burden of showing her debts are not consumer debts, even where the debtor is not the movant. *In re Ferreira*, 549 B.R. 232, 237 (Bankr. E.D. Cal. 2016). But the case the *Ferreira* court relied upon for that proposition, *In re Palmer*, 542 B.R. 289, 297 (Bankr. D. Colo. 2015), was reversed by the district court, *Palmer v. Laying*, 559 B.R. 746 (D. Colo. 2016). In its order reversing the bankruptcy court, the district court concluded that, "at most, the debtor's burden in this regard is one of persuasion. It still remains the UST's burden to show that the debtor's chapter 7 case should be dismissed, which, means that it remains the UST's burden to show that the debtor's debts are primarily consumer debts." *Id.* at 756. It is unclear to me how a debtor can have the burden of persuasion on an issue where the moving party still bears the burden of proof. In any event, I decline to depart from BAP authority placing the burden on the moving party.

Debtor stated under penalty of perjury in his petition that his debts are primarily not consumer debts. So at a minimum, even under *Ferreira*'s approach Centennial has a burden to produce evidence sufficient to create a genuine dispute of material fact whether Debtor's debts are primarily consumer debts. *See* Civil Rule 56(a). The only evidence on the consumer debt question Centennial provides in its motion is Debtor's deposition testimony, where he confirms the Centennial Debt and 'Business' Loans were not incurred to buy a business or investment property. The only supplement Centennial provides in its reply is Debtor's statement that the Centennial Debt and 'Business' Loans were incurred to pay off old debts.

As discussed below, I have my doubts that incurring debt to pay off old debts automatically makes the new debt consumer debt, as Centennial suggests. But even if I agree, Centennial's evidence only shows that the relevant debts do not fall within the clearly non-consumer category of business or profit-seeking debt. This evidence does nothing to

AMENDED ORDER DENYING MOTION TO DISMISS

1 affirmatively place the Centennial Debt or 'Business' Loans in the consumer debt category.

2 More importantly, Centennial's evidence and supporting argument fails to show why those

3 debts are either not in the gray area described in *Garcia*, or what indicia should lead me to

4 conclude Debtor's purpose was more consumer than non-consumer.

5     The BAP says Centennial bears the burden of showing Debtor's debts are primarily

6 consumer debts. At a minimum, even under *Ferreira* Centennial must present evidence that

7 such debts are consumer debts sufficient to shift the burden to Debtor. Centennial fails

8 under either standard because, at best, its evidence shows the debts were not business or

9 investment debt. But as *Garcia* makes clear, there are consumer debts, and then a universe of

10 debts that are not consumer debts, and business or investment debts are not the whole of

11 that universe. Centennial could have satisfied its burden with evidence that either

12 affirmatively showed the debts were consumer debts, or that showed such debts did not fall

13 within the universe of non-consumer debt described in *Garcia*. Centennial did neither, so it

14 did not meet the burden of production placed on it by § 707(b).

15     C.   <u>The Centennial Debt is not Consumer Debt</u>

16     Setting aside Centennial's burden of production, the parties agree Debtor incurred

17 the Centennial Debt to pay off prior high interest loans. ECF 83, p. 9; ECF 121 ¶ 12. In fact,

18 Debtor did not personally receive any funds from Centennial, as the proceeds from the

19 Centennial Debt were disbursed directly to the holders of those prior high interest loans.

20 ECF 121, ¶ 12. This places the Centennial Debt in the "gray area" contemplated by *Garcia*,

21 as there are no indicia that would allow me to say it is clearly consumer or non-consumer.

22     I note again that the parties appear to agree that Debtor used the Centennial Debt to

23 pay off high interest loans. Though the parties present little evidence on this point, the

24 constant reference to the prior loans being high interest allows for the inference that Debtor

25 refinanced for better terms. Another way of saying Debtor refinanced for better terms is that

26 he effected a transaction that increased his economic value, which further shows that this

27 debt was not incurred for a consumer purpose.

28 AMENDED ORDER DENYING MOTION TO DISMISS

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Another relevant point is that no consumption occurred when Debtor incurred the Centennial Debt. On the record provided, the service Debtor received was purely financial: Debtor "received" funds in exchange for a promise to repay such funds back over time. Nothing was consumed in this transaction. Money changed hands, but it was not used up in the process. The absence of evidence of consumption in this transaction by Debtor is another point against the Centennial Debt being consumer debt.

The lack of evidence presented makes it difficult to precisely determine Debtor's purpose in incurring the Centennial Debt. Centennial could argue, but did not, that the lack of evidence is due to Debtor's inability to recall why he took out the high interest loans the Centennial Debt was used to partially pay off. Setting aside that this is not the inquiry – what matters is Debtor's intent when he executed *this* loan – Centennial ignores that it paid the loan proceeds directly to creditors of Debtor. ECF 121, p. 3. I can infer from this fact that Centennial had an opportunity to obtain that information at the time, and likely could still do so now. It is unclear why a lender exercising reasonable due diligence would not have obtained any information about the prior loans or the entities who extended them, especially when part of Centennial's loan involved paying such lenders directly. So to the extent that Centennial requests I hold the absence of evidence of purpose against Debtor, I decline to do so. At minimum, both parties bear similar culpability for the absence of such evidence. This issue is also dealt with by the burden of proof, which is squarely on Centennial.

I conclude the evidence shows the Centennial Debt was incurred with a purpose not related to consumption and with an eye towards economic gain, and that Debtor could resell this debt again in the future, all of which show a non-consumer purpose. Centennial does nothing to counter this conclusion, as its evidence only deals with whether the Centennial Debt was business or investment debt, which is only part of the question. Even if I were unwilling to infer from these limited facts that Debtor incurred the Centennial Debt with a non-consumer purpose, I would still find that Centennial fails to meet its burden of proof as to this debt. Indeed, it presents essentially no evidence that would allow me to even infer

AMENDED ORDER DENYING MOTION TO DISMISS

10/15

1 Debtor's purpose. Accordingly, I conclude that, for purposes of this motion, the $8,600,000

2 Centennial Debt is not consumer debt.

3       D. <u>The 'Business' Loans are not Consumer Debts</u>

4       Turning to the 'Business' Loans, I consider them together because, as discussed more

5 below, they include materially similar terms. I note first that the Zions and South River loans

6 are characterized in their documents as business loans. ECF 121-1, p. 2, 26. And the South

7 River loan states that Debtor certified then that the proceeds from the loan would be used

8 for "Business related expenses." *Id.* at 26. Each of these loans also purports to create a

9 security interest in Debtor's future income with the San Jose Sharks, and required that

10 Debtor maintain "Death & Disgrace Insurance," *id.* at 3, 17, 39, 49, 52. And as Debtor

11 notes, the loan documents contain few, if any, of the customary disclosures expected in

12 more standard consumer loan agreements; the sole exception is the schedule of repayment

13 provided in the Professional Bank loan. *Id.* at 22.

14       As for relevant provisions peculiar to each loan, the Professional Bank loan required

15 payment directly from the Sharks to the lender. *Id.* at 14. And the Zions loan required

16 Debtor covenant that he "[m]aintain executive and management personnel with substantially

17 the same qualifications as the present executive and management personnel . . . ." *Id.* at 4.

18 The Zions loan also stated that Debtor either "received prior commercial loans from [Zions]

19 or applied to [Zions] for a commercial loan . . . ." *Id.* at 2.

20       As with the Centennial Debt, Centennial fails to present any evidence of Debtor's

21 purpose in incurring these debts, so I am left to infer Debtor's intent from the documents

22 themselves. The Zions and South River loans characterize themselves as business loans; the

23 South River loan even states explicitly that the loan proceeds are for business expenses. "[I]t

24 is well established that a party who signs a document is presumed to have read it and to

25 understand its contents." *Baker v. Italian Maple Holdings, LLC*, 13 Cal. App. 5th 1152, 1162

26 n.6 (2017). So I must presume that Debtor understood he was signing documents to apply

27 for a business loan with Zions and South River. To find Debtor incurred these debts with a

28 AMENDED ORDER DENYING MOTION TO DISMISS
                  11/15

consumer purpose, I would have to find he signed these documents with fraudulent intent. At a minimum, I would have to find Debtor lied when he signed the South River loan documents, as those documents explicitly state the proceeds were solely for business related expenses. Centennial and other creditors have gestured to such arguments in this motion and the motion to convert this case to chapter 11. But so far they have not presented any evidence that would allow me to make that finding.

The 'Business' Loans requiring death and disgrace insurance, and attempting to create a security interest in Debtor's future income as an NHL player, also complicates Centennial's claim that these are consumer debts. A useful analogy is *In re Cherrett*, 873 F.3d 1060 (9th Cir. 2017). In *Cherrett*, the Ninth Circuit concluded that a bankruptcy court did not clearly err in finding that a debtor's housing loan was not a consumer debt when it was offered as part of an employment package to entice the debtor to leave his current job for employment with the offeror. The Court noted, among other things, that the loan was at a below-market-rate that the debtor could likely only have obtained through his employer, was originated by an affiliate of the offeror, and was later transferred to the offeror itself. *Id.* at 1068.

I have no evidence that the 'Business' Loans were somehow part of Debtor's employment package. And again, I have no evidence what the purpose was of these loans, or the loans they were used to pay off. But like *Cherrett*, each of the 'Business' Loans make clear that Debtor's employment as an NHL player was the only reason he was considered for the loans, and his continued employment was the basic assumption underpinning them. The requirement Debtor maintain death and disgrace insurance supports this inference; death would certainly cause Debtor to lose his employment, and presumably a sufficiently grave disgrace would do so as well. Either event would cut off the lenders' expected source of repayment. What all this shows is the 'Business' Loans are inextricably tied to Debtor's "business" of being a professional hockey player. ECF 83, p. 8. I find this makes it reasonable to infer that Debtor's purpose in incurring the 'Business' Loans was also related

to his employment, rather than being purely personal. Centennial presents no evidence to foreclose such an inference, and gives no explanation why it is erroneous.

Finally, I note that, like the Centennial Debt, the 'Business' Loans were taken out to refinance already-existing loans. So the analysis that led me to find the Centennial Debt not a consumer debt – that it was incurred to improve Debtor's financial position, not to purchase for consumption a good or service – applies equally to the 'Business' Debts.

As with the Centennial Debt, Centennial fails to provide evidence showing Debtor had a consumer purpose in mind when he incurred the 'Business' Debts. And the evidence that is in the record either supports finding them non-consumer debts, or are at best ambivalent on the question. The weight of the evidence, such as it is, goes against finding the $6,196,276.66 'Business' Debts consumer debts, so I conclude they are not.

E. The Lone Shark Debt is not Consumer Debt

The Lone Shark Debt is also not consumer debt. In the papers filed in connection with the motion to convert this case to chapter 11, both creditors and Debtor confirmed that this debt was incurred to purchase an interest in the tax attributes of Ascher Capital II and III LLC. ECF 101, p. 3. Debtor argues this makes it a non-consumer investment debt, and Centennial appears to concede this is so. ECF 83, p. 9 ("Instead, it would see that the only potential non-consumer debt incurred by the Debtor is the Loan Shark Debt the Debtor took out less than a month after initiating this Liquidation."). I conclude the $750,000 Lone Shark Debt, being an investment, is not consumer debt.

F. The Scotia Bank Debts are not Consumer Debts

Finally, the Scotia Bank Debts are also not consumer debts. "Evidence that a debtor incurred a debt 'purely or primarily as a business investment, albeit an investment in herself or himself, much like a loan incurred for a new business,' can serve as an important factor in determining the debtor's purpose." Debtor states he purchased the Canadian Properties that secure the Scotia Bank Debts as an investment and has never lived in them. ECF 121 ¶ 5–6. He also states he has rented the 3457 West 35th Avenue property "from time to time since it

AMENDED ORDER DENYING MOTION TO DISMISS
13/15

was acquired." *Id.* ¶ 6. Centennial's motion fails to discuss the Scotia Bank Debts, so I have no evidence in opposition to Debtor's statement. I accordingly find that, because the Scotia Bank Debts were incurred to purchase investment properties that Debtor has never lived in, the $4,230,000 Scotia Bank Debts are not consumer debts.

G. Debtor's Debts are Primarily Non-consumer Debts

Above I found that Debtor's total debts are $28,191,340. Given the analysis above, Debtor's non-consumer debts total $19,776,276.66. Debtor's non-consumer debts therefore are much more than half of Debtor's total debts, meaning he holds primarily non-consumer debt. As Debtor having primarily consumer debt is a threshold requirement for a § 707(b) motion to succeed, Centennial's motion must fail.

IV. **CONCLUSION**

Because Centennial fails to meet its burden of production to show Debtor's debts are primarily consumer debts, and because the evidence I do have points to such debts being incurred with a non-consumer purpose, Debtor's debts are primarily non-consumer debts, and Centennial's motion is denied.

IT IS SO ORDERED.

**END OF ORDER**

COURT SERVICE LIST

[ECF recipients only]

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

AMENDED ORDER DENYING MOTION TO DISMISS

15/15