ANTHONY & PARTNERS, LLC
JOHN A. ANTHONY (SBN0731013)
  janthony@anthonyandpartners.com
ANDREW J. GHEKAS (SBN 0119169)
  aghekas@anthonyandpartners.com
*Both admitted Pro Hac Vice*
100 S. Ashley Drive, Suite 1600
Tampa, Florida 33602
Telephone: 813.273.5616
Facsimile: 813.221.4113

COOPER, WHITE & COOPER LLP
PETER C. CALIFANO (SBN 129043)
  pcalifano@cwclaw.com
201 California Street, 17th Floor
San Francisco, California 94111
Telephone: 415.433.1900
Facsimile: 415.433.5530

Attorneys for Creditor, CENTENNIAL BANK

# UNITED STATES BANKRUPTCY COURT

# NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| In re<br><br>EVANDER FRANK KANE,<br><br>Debtor. | Case No. 21-50028-SLJ<br>Chapter 7<br><br>**CENTENNIAL BANK'S MOTION TO DISMISS CASE AS A BAD FAITH FILING PURSUANT TO SECTION 707(a)**<br><br>**Date:** **August 17, 2021**<br>**Time:** **2:00 PM**<br>**Place:** **Via Zoom Video Conference**<br>**Judge:** **Hon. Stephen L. Johnson** |

COOPER, WHITE
& COOPER LLP
ATTORNEYS AT LAW
201 CALIFORNIA STREET
SAN FRANCISCO, CA 94111-5002

# **TABLE OF CONTENTS**

Page

I.      INTRODUCTION………………………………………………............1

II.     STATEMENT OF FACTS………………………………………….......2

  A.   The Debtor's Lending Relationship with Centennial…………………………….2

  B.   The Debtor's Bad Faith Initiation of this Bankruptcy Case……………………….4

III.    JURISDICTION AND STANDING…………………………………............6

IV.     MEMORANDUM OF LAW………………………………………….6

  A.   Statutory Framework…………………………………………………….6

  B.   Factors That Constitute Bad Faith……………………………………………….9

i.      The Debtor made no life-style adjustments and has continued living a lavish lifestyle…11

ii.     The Debtor has sufficient resources to repay his debts………………………………13

iii.    The Debtor lack of candor, and Schedules reflect bad faith…………………………...13

iv.     The Debtor's conduct objectively reflects intent to avoid a single group of creditors…...15

v.      The Debtor has made no effort to repay the Centennial Obligation……………………...15

vi.     The Debtor is intending to use Chapter 7 relief unfairly  ……………………………...16

vii.    The Debtor is paying debts of insiders…………………………………………17

viii.   The Debtor failed to make candid and full disclosure…………………………………17

ix.     The Debtor transferred assets………………………………………………17

V.      CONCLUSION………………………………………………………1

COOPER, WHITE
& COOPER LLP
ATTORNEYS AT LAW
201 CALIFORNIA STREET
SAN FRANCISCO, CA 94111-5002

# TABLE OF AUTHORITIES

## Cases

In re Baird,
  456 B.R 112, 116-17 (Bankr. M.D.Fla. 2010)…………………………………………..11
In re Bryant,
  474 B.R. 770 (Bankr. N.D. Fla. 2012)…………………………………………………..16
In re Champion,
  600 B.R. 459, 464 (Bankr. S.D.Ga. 2019)………………………………………………6
In re Collins,
  250 B.R. 645, 654 (Bankr. N.D. Ill. 2000)……………………………………….…12, 13
In re Griffieth,
  209 B.R. 823, 826-27 (Bankr. N.D. N.Y. 1996)………………………………….9, 11, 12
In re Hammonds,
  139 B.R. 535, 542 (Bankr. D. Co. 1002)……………………………………………....11
In re Jones, 8
  114 B.R. 917 (Bankr. N.D. Ohio 1990)…………………………………………………8
In re Krueger,
  812 F.3d 363, 370 (5th Cir. 2016)………………………………………………….7, 8
In re Mitchell,
  357 B.R. 142, 154 n. 11 (C.D. Cal. 2006)………………………………………………9
In re Padilla,
  222 F.3d 1184, 1191 (9th Cir. 2000)………………………………………….7, 8, 9
In re Piazza,
  719 F.3d 1253, 1260-61 (11th Cir. 2013)…………………………7, 9, 10, 11, 12
In re Rosson,
  545 F.3d 764, 773 n. 12 (9th Cir. 2008)…………………………………………………8
In re Schwartz,
  799 F.3d 760, 764 (7th Cir. 2015)………………………………………………….7, 16
In re Smith,
  229 B.R. 895 (Bankr. S.D. Ga. 1997)………………………………..……….9, 13
In re Spagnolia,
  199 B.R. 362, 365 (Bankr. W.D. Ky. 1995)……………………………………….9, 11
In re Tamecki,
  229 F.3d 205, 207, (3rd Cir. 2000)…………………………………………………7
In re U.S. Voting Machines, Inc.,
  2007 WL 4287526, at *3 n.5 (N.D. Cal. Dec. 6, 2007)………………………………....9
In re Watson,
  2010 4497477, at *4 (Bankr. N.D.W.Va. Nov. 1, 2010)………………………………9
Industrial Insurance Services, Inc. v. Zick (In re Zick),
  931 F.2d 1124, 1127 (6th Cir. 1991)…………………………………………………..8
Janvey v. Romero,
  883 F.3d 406, 412 (4th Cir. 2018)…………………………………………………7, 9, 10
Local Loan v. Hunt,
  292 U.S. 234 (1923)………………………………………………………………...8
Marrama v. Citizens Bank of Massachusetts,
  549 U.S. 365, 373-76 (2007)………………………………………………………8

COOPER, WHITE
& COOPER LLP
ATTORNEYS AT LAW
201 CALIFORNIA STREET
SAN FRANCISCO, CA 94111-5002

McDow V. Smith,
    295 B.R. 69, 79 n.22 (E.D. Va. 2003)…………………………………………………...9, 11

**Statutes**

11 U.S.C. § 102…………………………………………………………………....7

11 U.S.C. § 707…………………………………………………………………...passim

28 U.S.C. § 1334………………………………………………………………....6

28 U.S.C. § 151………………………………………………………………...…6

28 U.S.C. § 157………………………………………………………………...…6

Bankruptcy Code § 707……………………………………………………...passim

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

COOPER, WHITE
& COOPER LLP
ATTORNEYS AT LAW
201 CALIFORNIA STREET
SAN FRANCISCO, CA 94111-5002

Pursuant to 11 U.S.C. § 707(a), Federal Rule of Bankruptcy Procedure 1017, and other applicable law, Centennial Bank ("Centennial"), an Arkansas state-chartered bank, by and through its undersigned counsel of record, hereby moves on the following grounds for an order of this Court dismissing the above-captioned chapter 7 bankruptcy case (this "Bankruptcy Case") initiated by Evander Frank Kane (the "Debtor"), on January 9, 2021 (the "Petition Date").

## I.  INTRODUCTION

1.    The Debtor's resort to bankruptcy is this Bankruptcy Case makes a mockery of the fresh start afforded to the honest but unfortunate debtor under the Bankruptcy Code.  Through his initiation of this Bankruptcy Case, the Debtor seeks a discharge of his debts, yet maintains a lavish lifestyle that includes, among other things, maintaining three (3) multimillion dollar homes in both California and Canada, paying $12,000 per month - $144,000 per year – in childcare expenses for a sixth month year old, driving two (2) posh Mercedes G-Wagons, consuming $8,000 per month - $96,000 per year – worth of food and housekeeping supplies, and still having enough discretionary income to gamble away over $1,000,000 within a single year.[1]  Indeed, documents produced by the Debtor to date reveal that on the Petition Date, the Debtor charged on his credit card over $300 at a premier gun shooting range in the State of Arizona, that was preceded by a nearly $500 meal at Mastro's Ocean Club just a few days before.[2]  The Debtor now seeks to discharge these debts as well.

2.    This is the lifestyle that has enabled the Debtor to now claim that his monthly expenditures are in excess of $93,000 while his scheduled monthly net income is purportedly only $2,000, thus purportedly entitling the Debtor to the protection of the bankruptcy laws.[3]  The Debtor's claim that he is entitled to the protection of the bankruptcy laws, was made possible primarily as a result of the self-serving timing of the Petition Date, and withers under the light of careful scrutiny.

---

[1] Dkt. 30, Debtor's amended Schedules A/B and J.

[2] See relevant excerpts from bank statements produced by the Debtor attached hereto as Exhibit "A."

[3] See Dkt. 30, Debtor's amended Schedule J.

COOPER, WHITE
& COOPER LLP
ATTORNEYS AT LAW
201 CALIFORNIA STREET
SAN FRANCISCO, CA 94111-5002

3.      The indisputable fact is that the Debtor will earn income in excess of $20,000,000 over the next four (4) years.[4]  Moreover, on the Petition Date, the Debtor was aware that his 2021 monthly income would be a multiple of the $2,000 scheduled.  To be sure, the Debtor intentionally downplays the source of his massive income, previously utilizing concerns stemming from the novel COVID-19 pandemic to postulate that he may simply walk away from his lucrative professional ice hockey contract.  These "concerns," however, are belied by the undisputed fact that the Debtor participated in every professional ice hockey game his team competed in this season.[5]

4.      The practical result the Debtor seeks from this Bankruptcy Case is to wipe out his debt so that he can continue enjoying his wealth undisturbed.  Thus, and as will be amply demonstrated below, this Bankruptcy Case is tainted by "bad faith," and should therefore be dismissed for "cause."

## II.      STATEMENT OF FACTS

### A.      The Debtor's Lending Relationship with Centennial

5.      On September 5, 2018, the Debtor entered into a loan agreement with Centennial where the Debtor initially borrowed $3,900,000 from Centennial and executed and delivered a "Promissory Note" (the "Original Note") to Centennial in the original principal amount of $3,900,000 (the "Loan") in connection therewith.

6.      In addition to the Original Note, the Loan was secured by that certain "Secured Financial Transaction and Security Agreement" (the "Original Security Agreement").[6]  Pursuant to the terms of the Security Agreement, the Debtor granted Centennial a perfected security interest in any and all salary payments, bonus, or other form of compensation (the "Pledged Payments") due and payable to the Debtor under the Player's Contract, dated as of May 25, 2018, as between the Debtor and the Team.

---

[4] A copy of the Debtor's contract (the "Player's Contract") with the San Jose Sharks (the "Team") is attached hereto as Exhibit "B."

[5] https://www.nhl.com/player/evander-kane-8475169

[6] A copy of the Original Security Agreement is attached hereto as Exhibit "C."

COOPER, WHITE
& COOPER LLP
ATTORNEYS AT LAW
201 CALIFORNIA STREET
SAN FRANCISCO, CA 94111-5002

7. In connection therewith, the Debtor agreed to have all Pledged Payments electronically deposited by the Team into a controlled deposit account opened with Centennial (the "Designated Account"). Centennial was then further authorized to automatically remit funds deposited into the Designated Account in payment of the amounts due under the Loan. In this manner, Centennial ensured that it would be paid as required by the Note, i.e., by routing the Debtor's Pledged Payments under the Player's Contract directly to Centennial without the need for the Debtor to take any further action.

8. Consistent with the terms of the Original Note and Original Security Agreement, the Debtor executed in favor of Centennial a "Florida Agreement and Waive Garnishment Protection" (the "Garnishment Waiver").[7] In executing the Garnishment Waiver, the Debtor agreed to waive protection from garnishment otherwise potentially afforded under Florida law, thereby confirming the Debtor's promises made to Centennial pursuant to the terms of the Original Security Agreement.

9. At the request of the Debtor, the Loan and Original Note were amended three (3) times, on October 17, 2018, February 28, 2019, and April 30, 2019, each time renewing, increasing, and amending the Loan up to an amount of $8,000,000. At each stage in which the Debtor executed one of the foregoing amendments to the Loan, the Debtor additionally executed a corresponding amendment document to the Original Security Agreement expressly referencing the new loan amount as well as the Debtor's continued intention to have the Pledged Payments and Player's Contract serve as a form of repayment on the Loan.

10. Shortly after executing the last amendment to the Original Note, the Debtor failed to direct deposit any of the Pledged Payments into the Designated Account as required under both the terms of the Original Note as amended and Original Security Agreement as amended. Instead, the Debtor began requesting "live" checks from the Team for compensation purportedly owed to him by the Team under the Player's Contract.

11. As of the Petition Date, the Debtor's outstanding obligation owed to Centennial (the

---

[7] A copy of the Garnishment Waiver is attached hereto as Exhibit "D."

COOPER, WHITE
& COOPER LLP
ATTORNEYS AT LAW
201 CALIFORNIA STREET
SAN FRANCISCO, CA 94111-5002

"Centennial Obligation") was in the amount of $8,435,362.65.[8]

## B.    The Debtor's Bad Faith Initiation of this Bankruptcy Case

12.    The Debtor filed for relief under chapter 7 of the Bankruptcy Code on the Petition Date.[9]

13.    Just two (2) days prior to the Debtor's initiation of this Bankruptcy Case, Centennial initiated loan enforcement litigation as against the Debtor in the United States District Court in and for the Southern District of Florida, Fort Lauderdale Division, Case No. 21-cv-60045 (the "Centennial Federal Litigation"), pursuant to which Centennial sought, inter alia, to bind the Team to a judicial determination that the Debtor was obligated under the Original Security Agreement, as amended, to direct monthly payments due under the Player's Contract to Centennial.   Thus, Centennial sought to preclude the Debtor from further interfering with Centennial's rights under the Original Security Agreement.

14.    The Debtor has disclosed that he is a professionally ice hockey player who has played in the National Hockey League for the last eleven (11) years.  Under the Debtor's current Player's Contract with the Team, the Debtor has received approximately $20,000,000 in compensation over the immediate three (3) years preceding the Debtor's initiation of this Bankruptcy Case[10]. Moreover, pursuant to the terms of the Player's Contract, the Debtor is due to receive approximately $29,000,000 over the course of the next four (4) seasons.[11]   Despite this fact, the Debtor has listed his monthly income as being solely derived from a podcast show that the Debtor admits has never aired an episode and is no longer viable.[12]

15.    Having grossly undervalued his current monthly income, the Debtor proceeds to

---

[8] POC-5

[9] Dkt. 1.

[10] See Exhibit B.

[11] Id.

[12] This income further ignores the Debtor's $1,250,000 federal tax return that he anticipates receiving.

4

COOPER, WHITE
& COOPER LLP
ATTORNEYS AT LAW
201 CALIFORNIA STREET
SAN FRANCISCO, CA 94111-5002

disclose the extravagant lifestyle he enjoys as a professional athlete, encompassing (i) the leasing of two (2) Mercedes G-wagons, (ii) ownership of three (3) multimillion dollar residences for himself and his immediate family members, (iii) multimillion gambling losses, (iv) $8,000 in monthly food and housekeeping supplies, (v) $12,000 in childcare expenses, and (vi) $15,000 in monthly transfers to his mother, father, grandmother, and uncles. In total, the Debtor estimates his monthly expenses to $93,214.46 – or $91,131.13 greater than the fictitious $2,083.33 the Debtor never planned to receive from his failed podcast arrangement.

16. Although the Debtor has amended his Schedules multiple times in a short period of time – including the Debtor's amendment to remove his mother, father, grandmother, and two (2) uncles as dependents – the Debtor has never amended his Schedule I regarding his income, despite having played in every game that the Team competed in this season.[13]

17. Although the Debtor's Schedules indicate that the Debtor has substantial liabilities – liabilities that the Debtor can only explain at the most basic level – what the Schedules do not show is the Debtor's substantial income. When compared to each other, it is quite clear that the Debtor is able to substantially pay his debts in their entirety. However, the Debtor wishes to utilize the bankruptcy process not to receive a "fresh start," but to gain a "head start" over his poor financial decisions, seeking to only selectively assume those liabilities that actually benefit him – i.e. the several mortgages on the three (3) residential properties and the two (2) leases on his luxury vehicles – and asking this Court to discharge the rest of the liabilities that he willingly entered into and simply chooses not to be accountable for.[14] But choosing to waste $1,500,000 in gambling debts, maintain three (3) residences, and drive two (2) luxury vehicles in lieu of servicing his debts, is not the type of behavior the bankruptcy process was intended to protect.

18. Accordingly, and as more fully described herein, the Debtor's demonstrated abuse of the bankruptcy process and bad faith filing requires that this Court should dismiss the Debtor's case under 11 U.S.C. § 707(a).

---

[13] See Dkt. 1, Schedule I.

[14] Dkt. 1, Official Form 108 Statement of Intention for Individuals Filing Chapter 7

COOPER, WHITE
& COOPER LLP
ATTORNEYS AT LAW
201 CALIFORNIA STREET
SAN FRANCISCO, CA 94111-5002

# III. JURISDICTION AND STANDING

This Court has jurisdiction of this matter under 28 U.S.C. § 1334(a) and (b), 28 U.S.C. § 157(a) and (b)(1) and 28 U.S.C. § 151. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (B). This motion is filed pursuant to 11 U.S.C. § 707(a).

# IV. MEMORANDUM OF LAW[15]

## A. Statutory Framework

19. This Bankruptcy Case should be dismissed with cause pursuant to Bankruptcy Code § 707(a) because the petition was not filed in good faith. The "good faith requirement" is a technical legal term as utilized herein, and is not used in a vernacular sense or directed at counsel. It simply is the case that the Debtor should not be permitted to conclude this Bankruptcy Case and obtain a discharge in light of the current factual context.

20. Dismissal of an action by a creditor or party in interest in a chapter 7 case is governed by Bankruptcy Code § 707(a). Bankruptcy Code § 707(a) provides that "[t]he court may dismiss a case under this chapter only after notice and a hearing and only for cause, including" unreasonable delay by the debtor that is prejudicial to its creditors, nonpayment of filing fees, and failure to file required statements or schedules. Bankruptcy Code § 707(a). The Ninth Circuit has found that the three enumerated examples in Bankruptcy Code § 707(a) are "illustrative not exhaustive." In re Padilla, 222 F.3d 1184, 1191 (9th Cir. 2000) (citing 11 U.S.C. § 102(3) (defining "including," for purposes of Title 11, to be "not limiting")).

21. The term "cause" is not expressly defined in Code § 707(a). However, the majority of the circuits have held that the prepetition bad faith acts of a debtor "unquestionably constitutes adequate or sufficient reason to dismiss a Chapter 7 petition" and are sufficient to establish cause for dismissal under Bankruptcy Code § 707(a). See In re Piazza, 719 F.3d 1253, 1260-61 (11th Cir. 2013) ("We conclude that, based on the ordinary meaning of the statutory language and relevant principals of statutory construction, the power to dismiss 'for cause' in § 707(a) includes the power

---

[15] Unlike a motion to dismiss brought pursuant to 11 U.S.C. §§ 707(b) or 707(c), the Bankruptcy Code and Rules provide no express, universal deadline for commencing a motion under 11 U.S.C. § 707(a). See In re Champion, 600 B.R. 459, 464 (Bankr. S.D.Ga. 2019).

COOPER, WHITE
& COOPER LLP
ATTORNEYS AT LAW
201 CALIFORNIA STREET
SAN FRANCISCO, CA 94111-5002

to involuntarily dismiss a Chapter 7 case for prepetition bad faith"); <u>see also</u> <u>Janvey v. Romero</u>, 883 F.3d 406, 412 (4th Cir. 2018) (finding the "majority view is the sounder one, because it is the most helpful in preventing serious abuses of the bankruptcy process" in finding that bad faith may constitute cause for dismissal); <u>In re Krueger</u>, 812 F.3d 363, 370 (5th Cir. 2016) (stating that broadly reading "cause" to encompass bad faith "is no more than acknowledgment in the chapter 7 context of what has long been recognized: 'Every bankruptcy statute since 1898 has incorporated literally, or by judicial interpretation, a standard of good faith for the commencement, prosecution, and confirmation of bankruptcy proceedings.'" (internal citation and quotation marks omitted)); <u>In re Schwartz</u>, 799 F.3d 760, 764 (7th Cir. 2015) (applying § 707(a) to find that "unjustified refusal to pay one's debts is a valid ground" for dismissal); <u>Tamecki v. Frank (In re Tamecki)</u>, 229 F.3d 205, 207, (3rd Cir. 2000) (holding that a bankruptcy case may be dismissed for cause for the lack of good faith); <u>Industrial Insurance Services, Inc. v. Zick (In re Zick)</u>, 931 F.2d 1124, 1127 (6th Cir. 1991) ("[L]ack of good faith is a valid basis of decision in a 'for cause' dismissal by a bankruptcy court").

22.     The undersigned understands that the Ninth Circuit has previously found that "bad faith as a general proposition does not provide 'cause' to dismiss a Chapter 7 petition under § 707(a)," <u>In re Padilla</u>, 222 F.3d at 1191.  However, it would now appear that <u>Padilla</u> is no longer good law, and that the majority view articulated in the preceding paragraph is to be followed.

23.     To be sure, since the Ninth Circuit's opinion in <u>Padilla</u>, the Supreme Court has clarified that bad faith is pertinent to all chapters of the Bankruptcy Code regardless of whether a provision contains an explicit good-faith filing requirement. <u>See</u> <u>Marrama v. Citizens Bank of Massachusetts</u>, 549 U.S. 365, 373-76 (2007); <u>see also</u> <u>In re Krueger</u>, 812 F.3d at 373 (citing <u>Marrama</u>, "[T]he Supreme Court has held bad faith can be the basis of a decision under the Code even if the text does not require its consideration").  Thus, as the Fifth Circuit has held, "[i]t is incorrect to infer that Congress's silence on good faith in chapter 7 is a license for bad faith debtors to misuse that chapter to their ends." <u>Krueger</u>, 812 F.3d at 373.  That is to say simply that "although the jurisdictional requirement of good faith is not explicitly stated in the statute, it is inherent in the purpose of bankruptcy relief." <u>In re Jones</u>, 114 B.R. 917 (Bankr. N.D. Ohio 1990) (citing <u>Local Loan v. Hunt</u>, 292 U.S. 234 (1923), among many other cases).

COOPER, WHITE
& COOPER LLP
ATTORNEYS AT LAW
201 CALIFORNIA STREET
SAN FRANCISCO, CA 94111-5002

The Bankruptcy Code is intended to serve those persons who, despite their best efforts, find themselves hopelessly adrift in a sea of debt. Bankruptcy protection was not intended to assist those who, despite their own conduct, are attempting to preserve a comfortable standard of living at the expense of the creditors. Good faith and candor are necessary prerequisites to obtaining a fresh start. The bankruptcy laws are grounded on the fresh start concept. There is no right, however, to a head start.

Id. at 926; see also In re Rosson, 545 F.3d 764, 773 n. 12 (9th Cir. 2008) (citing Marrama for the proposition that "even otherwise unqualified rights in the debtor are subject to limitation by the bankruptcy court's power under § 105(a) to police bad faith and abuse of process").

24.  Moreover, since the enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA") in 2005, several courts across the State of California seem to be retreating from Padilla's steadfast rejection of a "bad faith" dismissal. See In re U.S. Voting Machines, Inc., 2007 WL 4287526, at *3 n.5 (N.D. Cal. Dec. 6, 2007) ("Padilla was superseded by statute enacted April 20, 2005. Pursuant to [BACPA] which specifically lists as bad-faith petition example of abuse as warranting dismissal of Chapter 7 case, the bankruptcy court may now dismiss a case under the statute governing dismissal or conversion of Chapter 7 cases even if the Bankruptcy Code provides another remedy for debtor's 'bad faith' acts."); In re Mitchell, 357 B.R. 142, 154 n. 11 (C.D. Cal. 2006) ("Before the enactment of BAPCPA in Neary v. Padilla (In re Padilla), the Ninth Circuit concluded that 'bad faith as a general proposition does not provide 'cause' to dismiss a Chapter 7 petition under § 707(a)' because chapter 7 did not specifically include a requirement of 'good faith' as do Chapters 11 and 13. However in light of the addition of § 707(b)(3) to the Bankruptcy Code, a debtor's bad faith now clearly constitutes grounds for dismissal of a chapter 7 case.").[16]

25.  In light of the foregoing, this Court should follow the Supreme Court's directive in Marrama and analyze this Bankruptcy Case and the Debtor's initiation of the same as one having been filed in bad faith and thus requiring dismissal of the same.

---

[16] Courts have reasoned that "it would make little sense to treat differently those Chapter 7 cases where the debts are primarily business debts." In re Watson, 2010 4497477, at *4 (Bankr. N.D.W.Va. Nov. 1, 2010).

COOPER, WHITE
& COOPER LLP
ATTORNEYS AT LAW
201 CALIFORNIA STREET
SAN FRANCISCO, CA 94111-5002

**B. Factors That Constitute Bad Faith**

26. When considering whether a case should be dismissed for lack of good faith under Bankruptcy Code § 707(a), courts must consider the "totality of the circumstances underlying each case." Romero, 883 F.3d at 412; In re Piazza, 719 F.3d at 1271. "To aid in this effort, bankruptcy courts have developed a number of multifactor tests." Id.; see, e.g., McDow V. Smith, 295 B.R. 69, 79 n.22 (E.D. Va. 2003) (assembling eleven factors); In re Griffieth, 209 B.R. 823, 826-27 (Bankr. N.D. N.Y. 1996) (proposing six factors); In re Spagnolia, 199 B.R. 362, 365 (Bankr. W.D. Ky. 1995) (proposing fourteen factors). While these factors are instructive, they are meant to be guides only, and a "bankruptcy court need not mechanically tick off each factor and tally up its tick marks at the end. It may be the case that many factors are relevant, or it may be the case that relatively few of them are. It all depends." Romero, 883 F.3d at 412-13; In re Zick, 931 F.2d at 1127 (explaining that "[t]he facts required to mandate dismissal based on a lack of good faith are as varied as the number of cases"). According to the Eleventh Circuit, a totality-of-the-circumstances inquiry "looks for 'atypical conduct' that falls short of the 'honest and forthright invocation of the [Bankruptcy] Code's protections." In re Piazza, 719 F.3d at 1271.

27. In applying a totality of the circumstances approach, courts have considered, among others, the following non-dispositive factors:

    a. the debtor's concealment or misrepresentation of assets and/or sources of income, such as the improper or unexplained transfers of assets prior to filing;

    b. the debtor's lack of candor and completeness in his statements and schedules, such as the inflation of his expenses to disguise his financial well-being;

    c. the debtor has sufficient resources to repay his debts, and leads a lavish lifestyle, continuing to have excessive and continued expenditures;

    d. the debtor's motivation in filing is to avoid a large single debt incurred through conduct akin to fraud, misconduct, or gross negligence, such as a judgment in pending litigation, or a collection action;

    e. the debtor's petition is part of a "deliberate and persistent pattern" of evading a single creditor;

COOPER, WHITE
& COOPER LLP
ATTORNEYS AT LAW
201 CALIFORNIA STREET
SAN FRANCISCO, CA 94111-5002

f.  the debtor is "overutilizing the protection of the Code" to the detriment of his creditors;

g.  the debtor reduced his creditors to a single creditor prior to filing the petition;

h.  the debtor's lack of attempt to repay creditors;

i.  the debtor's payment of debts to insider creditors;

j.  the debtor's "procedural gymnastics" that have the effect of frustrating creditors;

k.  the unfairness of the debtor's use of the bankruptcy process.

McDow, 295 B.R. at 79, n.22 (assembling the foregoing eleven factors from those found in In re Zick, 931 F.2d at 1129; In re Griffieth, 209 B.R. at 826; In re Spagnolia, 199 B.R. 362, 365 (Bankr. W.D.Ky. 1995); and In re Hammonds, 139 B.R. 535, 542 (Bankr. D. Co. 1002)); see also In re Piazza, 719 F.3d at 1259 (citing In re Baird, 456 B.R 112, 116-17 (Bankr. M.D.Fla. 2010)).

28.  As discussed more thoroughly below, this Bankruptcy Case presents an instance where a number of the foregoing factors are present. Consequently, the totality of the circumstances demonstrates that the Debtor lacked good faith in filing the petition, and, therefore, this Bankruptcy Case must be dismissed for cause pursuant to Bankruptcy Code § 707(a).

### i. The Debtor made no life-style adjustments and has continued living a lavish lifestyle.

29.  The Schedules reflect expenses well above the standards applied by the US Trustee including: (a) car payments of over $8,000 per month on two (2) Mercedes G-Wagons, which does not include the $600 per month on "gas, maintenance, bus or train fare" or the $600 per month on vehicle insurance; (b) mortgage payments on three (3) multimillion dollar homes of approximately $38,000 per month; (c) $12,000 per month in childcare expenses for a single six-month year old at the date of filing; (d) $8,000 per month for the consumption of food and housekeeping supplies; and (e) $15,000 per month in gratuitous payments to the Debtor's mother, father, grandmother, and uncles.[17] As is discernable from the Schedules, no meaningful lifestyle adjustments have been made by Debtor. In fact, the Debtor admitted as much as the Schedules indicate that the Debtor does not

---

[17] Dkt. 30, amended Schedule J.

COOPER, WHITE
& COOPER LLP
ATTORNEYS AT LAW
201 CALIFORNIA STREET
SAN FRANCISCO, CA 94111-5002

"expect an increase or decrease in [his] expenses within the year after you file this form."[18] Moreover, the Debtor's intentions as set forth in the Schedules to assume his two (2) luxury vehicle leases and three (3) mortgages associated with his three (3) multimillion dollar homes – representing approximately $47,000 per month - is indicative of a debtor who is unwilling to undertake the appropriate belt tightening one would expect from a chapter 7 debtor. Even more indicative of bad faith, is the undisputed fact that not only did the Debtor enter into the two (2) luxury vehicle leases in late November 2020 – a month before initiating this Bankruptcy Case[19] – bust also purchased his $3,000,000 California residence – just five (5) months before seeking chapter 7 bankruptcy protection – at a time when he was unable to service his debts as they became due.[20]

30.     These expenses illustrate that there is no lawful purpose to be served by this Bankruptcy Case and instead it has been filed in order to provide the Debtor with a head start to the detriment of Centennial and other creditors and the bankruptcy process itself. Therefore, this Court should dismiss this Bankruptcy Case. See In re Collins, 250 B.R. 645, 654 (Bankr. N.D. Ill. 2000) (citing the debtor's "unwillingness to make lifestyle changes, such as a cutback in vacations and gifts to his family," in dismissing his case as a bad faith filing under § 707(a), finding that "a significant factor in a totality of the circumstances analysis is whether the debtor is willing to make lifestyle changes to pay his debts" as "[c]reditors should not have to bear the burden of a debtor's open-handedness, especially to non-dependent members of his family."); In re Bryant, 474 B.R. 770 (Bankr. N.D. Fla. 2012) (citing the same factors as the bankruptcy court in Piazza, including that the debtor failed to make lifestyle adjustments and continued living a lavish lifestyle; the debtor made no effort to repay his debts; and the unfairness of the debtor's use of chapter 7; finding that

---

[18] During the Debtor's 2004 examination on March 24, 2021, the Debtor was "not sure" if he had done anything different in his lifestyle that would cause his monthly expenses to go down at all. See Exhibit "E," 40:18-41:6.

[19] Relevant excerpts from the Debtor's 341 initial meeting of creditors on February 3, 2021, at 68:14-25, together with copies of the Debtor's lease agreements, are attached hereto as Composite Exhibit "F."

[20] Relevant excerpts from the Debtor's 2004 examination on March 24, 2021, at 47:3-48:18, are attached hereto as Exhibit "G."

COOPER, WHITE
& COOPER LLP
ATTORNEYS AT LAW
201 CALIFORNIA STREET
SAN FRANCISCO, CA 94111-5002

"the Debtor's lavish lifestyle supports a finding of bad faith."); In re Griffieth, 209 B.R. at 827 (dismissing for cause under section 707(a), citing several factors as evidence of the debtor's bad faith, including that the debtor made no good faith effort to repay creditors, that they were "enjoying a relatively comfortable lifestyle, and [were] apparently unwilling to undertake any 'belt-tightening.'"); In re Smith, 229 B.R. 895 (Bankr. S.D. Ga. 1997) (failure of Chapter 7 debtors to make substantial reductions in monthly expenses as evidenced by attempt to maintain home in excess of $200,000 and by executing lease of luxury automobile at $571 per month immediately prior to filing bankruptcy constitutes bad faith warranting dismissal of petition under 11 U.S.C. § 707(a)).

**ii.   The Debtor has sufficient resources to repay his debts.**

31.    Pursuant to his Player's Contract, the Debtor is scheduled to receive upwards of $26,000,000 over the next four (4) years. Even though the Debtor has the ability to pay his debts to Centennial and others, he has chosen instead to indulge in a lavish lifestyle. Indeed, as identified above, according to the Schedules, the Debtor's expenses are approximately $93,000 per month, or over $1,000,000 per year. The Debtor can sustain such a lavish and lush lifestyle because of the fact he is a highly compensated professional ice hockey player. Here again, this factor supports a finding that the Debtor has initiated this Bankruptcy Case in bad faith. See In re Collins, 250 B.R. at 654 ("Courts should consider the debtor's future income as it relates to his debts and living expenses in determining whether the debtor is abusing the bankruptcy process.").

**iii.   The Debtor lack of candor, and Schedules reflect bad faith.**

32.    In the Schedules, the Debtor indicated that his monthly income was just over $2,000, resulting not from his employment as a professional ice hockey player in the National Hockey League, but from a podcast. It was later confirmed at the Debtor's 341 meeting that he actually never intended on receiving any payment in connection with the podcast, as the opportunity fell through.[21]

/ / /

---

[21] See Exhibit "H", reflecting relevant excerpts of the 341 meeting transcript, at 63:8-64:11.

COOPER, WHITE
& COOPER LLP
ATTORNEYS AT LAW
201 CALIFORNIA STREET
SAN FRANCISCO, CA 94111-5002

33.     The Debtor also indicated that he "may terminate his contract and he may opt out of the season, as allowed under current rules, because of health concerns given the recent birth of his first child."[22]  The Debtor made this statement despite the fact that the deadline to opt out for the 2020-2021 season due to COVID-19 had already expired.  During his 2004 examination, when asked whether or not the Debtor indeed planned on terminating his contract as stated in the Schedules, the Debtor responded that he was "taking it day by day."[23]  The Debtor in fact never terminated his Player's Contract, did not opt out of the season, played all 56 games of the 2020-2021 season, and was voted "2020-2021 Sharks Player of the Year."  And for that, it is estimated that the Debtor has received approximately $635,000 in net income[24], with the 2021-2022 hockey season scheduled to start later this year.  Despite all of the foregoing, the Debtor never amended the Schedules to reflect the accurate accounting of his monthly income, despite the fact that the Debtor has amended the Schedules a total of five times.  This was clearly an undertaking by the Debtor to conceal his considerable wealth.

34.     As a last point, a number of recurring purchases for a website called "OnlyFans" appear on the Debtor's Wells Fargo account statement from September 2020 through the end of January 2021 – postdating the Debtor's initiation of this Bankruptcy Case.[25]  When questioned about these recurring purchases during his 2004 examination, the Debtor testified under oath that he was not a subscriber, testified that there should be nobody else with access to his Wells Fargo debit card, and postulated that this may have been associated with activity that resulted in him having to obtain a new credit card because of entries he did not recognize.[26]  However, such testimony is not only

---

[22] Dkt. 1, Schedule I.

[23] See Exhibit "I," relevant excerpt from the Debtor's 2004 examination, at 37:17-21.

[24] Computed based upon the Debtor having received $170,000 for participating in only 15 games based upon documentation produced by the Debtor – copies of which are attached hereto as Exhibit "J."  The Debtor ultimately participated in all 56 games during the season.

[25] See Exhibit "K," relevant monthly statements from the Debtor's Wells Fargo account.

[26] See Exhibit "L," relevant excerpts from the Debtor's 2004 examination, at 81:16-83:5

COOPER, WHITE
& COOPER LLP
ATTORNEYS AT LAW
201 CALIFORNIA STREET
SAN FRANCISCO, CA 94111-5002

belied by the fact that these are recurring charges spanning a five-month period and continuing after the Debtor's initiation of this Bankruptcy Case but is further discredited by the fact that similar charges appear on the Debtor's RBC credit card for the time period of November 26, 2020 through December 29, 2020.[27] The Debtor's lack of candor is evident.

### iv. The Debtor's conduct objectively reflects intent to avoid a single group of creditors.

35. It is clear that the Debtor's intent is to avoid only a few creditors – those being the Non-Real Estate Bank Creditors[28], which includes Centennial.

36. Additionally, there is no evidence that the Debtor has experienced any sudden loss of income or incurred any unexpected, significant expense in the immediate months leading up to the filing of the petition. In fact, Debtor's yearly income appears to be growing. Instead, the Debtor's motivation in filing the petition was to avoid his obligations to Centennial and other similar situated creditors, while at the same time assuming those obligations that most benefit the Debtor. This motivation is evidence of the Debtor's lack of good faith in filing the petition.

### v. The Debtor has made no effort to repay the Centennial Obligation.

37. The last payment made on the Centennial Obligation by the Debtor was in 2019. It is undisputed that the Debtor was required to have any compensation, bonus, proceeds, or payments owed to him under his Player's Contract deposited into the Designated Account, that would then be used to pay down the Centennial Obligation. Instead of abiding by the terms of the Original Note as amended and Original Security Agreement as amended, that Centennial relied upon, the Debtor began requesting "live" checks from the Team and otherwise caused the payments under the Player's Contract to be diverted to accounts other than the Designated Account. Moreover, in lieu of making any effort to repay the Centennial Obligation, the Debtor made a conscious decision to (i) gamble away over a million dollars in the year preceding the filing of the Bankruptcy Case, (ii) put a substantial down payment on his $3,000,000 California residence, (iii) consume $8,000 per

---

[27] See Exhibit "M," relevant monthly statements from the Debtor's RBC credit card.

[28] The "Non-Real Estate Bank Creditors" include Centennial Bank, Zions Bancorporation, N.A., and Professional Bank.

COOPER, WHITE
& COOPER LLP
ATTORNEYS AT LAW
201 CALIFORNIA STREET
SAN FRANCISCO, CA 94111-5002

1   month in food, (iv) fund the lifestyles of his immediate family members in Canada, and (v) maintain

2   the ability to drive not one but two Mercedes G-Wagons – which required the Debtor to make an

3   approximate $15,000 down payment at signing and estimated monthly payments close to $300,000

4   over the life of the two leases he now wishes to assume.

5   **vi.   The Debtor is intending to use Chapter 7 relief unfairly.**

6   38.     The "purpose of chapter 7 to give a fresh start, not a head start," and the Debtor has

7   sufficient resources to pay a significant portion of his debts.  Utilizing the equitable concepts of

8   Chapter 7 of the Bankruptcy Code, the Debtor seeks to pay nothing to his creditors despite having

9   significant income and keeping all of his assets.  This is not fair.  There is no evidence that the

10  Debtor suffered any sudden hardship or unfortunate circumstance or event to explain why the Debtor

11  resorted to bankruptcy, and there is no valid policy aim to be served by this bankruptcy case.

12  39.     It would appear that the Debtor strategically waited to initiate this Bankruptcy Case

13  – despite the pendency of the various state court litigation – at a time in which he knew his

14  compensation under the Player's Contract would be at its absolute lowest point.  To be sure, under

15  the Player's Contract, for the 2020-2021 season the Debtor was to receive $3,000,000 – which is

16  $3,000,000 million less than what the Debtor received in the previous season and $4,000,000 less

17  than what the Debtor is set to receive for the 2021-2022 season – which begins in October 2021.

18  Moreover, 2021 was not a year slated for the Debtor to receive part of his $12,000,000 signing bonus

19  – having just received $2,000,000 in 2019, $3,000,000 in 2020, and set to receive $2,000,000 in

20  2022.  The Debtor's bad faith is evident.[29] See In re Schwartz, 799 F.3d at 763 (agreeing that "an

21  unjustified refusal to pay one's debts is a valid ground under 11 U.S.C. § 707(a) to deny a discharge

22  of a bankrupt's debts.").

23  **vii.   The Debtor is paying debts of insiders**

24  40.     The Debtor supports not only his wife and nine-month year old daughter, but also

25  indicates that he funds the lifestyles of his mother, father, grandmother, and two uncles.  The

26

27  _____

28  [29] See Exhibit "B."

COOPER, WHITE
& COOPER LLP
ATTORNEYS AT LAW
201 CALIFORNIA STREET
SAN FRANCISCO, CA 94111-5002

Schedules confirm that the Debtor sends $15,000 monthly to these family members,[30] has testified that his mother and father live in one of his multimillion-dollar Canadian homes rent free, and has testified that he not only pays off his immediate family's credit card debt but additionally pays for his father's vehicle loan.[31]  In bankruptcy, although supporting family members may be laudable, it is not permissible at the expense of the Debtor's legitimate creditors such as Centennial. See, e.g., In re Goins, 372 B.R. 824, 827 (Bankr. D.S.C. 2007); In re Walker, 383 B.R. 830, 838 (Bankr. N.D. Ga. 2008).

**viii.  The Debtor failed to make candid and full disclosure.**

41.  As set for hereinabove, the Debtor has intentionally understated the source of his income.

**ix.  The Debtor transferred assets.**

42.  As set forth more fully in the "Objection by Creditor Zions Bancorporation, N.A. to Debtor Evander Frank Kane's Homestead Exemption" (the "Zions Exemption Objection") [Dkt. 74] and the "Objection by Professional Bank to Debtor's Claimed Homestead Exemption" (the "Professional Exemption Objection") [Dkt. 79], to which Centennial joined [Dkt. 82], in the twenty-four hours leading up to the filing of this Bankruptcy Case, the Debtor transferred ownership interest in the $3,000,000 California residence from Lions Properties LLC – an entity controlled by the Debtor – to the Debtor and his spouse in their individual capacity, in order manufacture a $600,000 homestead exemption.  Moreover, the Debtor has continuously transferred and disposed of funds on behalf of insiders so as to allow them to live comfortable lives in Canada, paying their monthly bills, vehicle loans, and credit card debt.

## V.  CONCLUSION

43.  As set forth above, the totality of the circumstances evidences that the Debtor lacked good faith in filing the petition and, therefore, this Bankruptcy Case must be dismissed for cause

---

[30] Dkt. 30, amended Schedule J.

[31] Exhibit "N," relevant excerpts from the Debtor's 2004 examination, at 51:8-25, 94:24-95:5, and 95:6-16.

& COOPER LLP
ATTORNEYS AT LAW
201 CALIFORNIA STREET
SAN FRANCISCO, CA 94111-5002

Case: 21-50028    Doc# 172    Filed: 06/25/21    Entered: 06/25/21 17:29:42    Page 20 of 21

16

pursuant to Bankruptcy Code § 707(a).

WHEREFORE, Centennial moves for the order of this Court providing for the dismissal of Debtor's Chapter 7 case and for such other or additional relief as this Court may determine to be just and appropriate.

DATED:  June 25, 2021                    ANTHONY & PARTNERS, LLC


By:  _____/s/ John A. Anthony_____
     John A. Anthony
     Attorneys for Creditor CENTENNIAL BANK


DATED:  June 25, 2021                    COOPER, WHITE & COOPER LLP


By:  _____/s/ Peter C. Califano_____
     Peter C. Califano
     Attorneys for Creditor CENTENNIAL BANK

1505980.1

COOPER, WHITE
& COOPER LLP
ATTORNEYS AT LAW
201 CALIFORNIA STREET
SAN FRANCISCO, CA 94111-5002